United States Attorney
Northern District of Alabama

Chief, Fraud Section
Criminal Division
United States Department of Justice


by:

_____
GEORGE A. MARTIN
Assistant United States Attorney
Northern District of Alabama

_____
RICHARD C. SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice


_____
MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama

14

**FOR IMMEDIATE RELEASE**
March 19, 2003

## HEALTHSOUTH OFFICER PLEADS GUILTY

Alice H. Martin, United States Attorney for the Northern District of Alabama; Carmen S. Adams, Special Agent in Charge, Federal Bureau of Investigation (FBI); and Richard P. Wessel, District Administrator, Securities and Exchange Commission (SEC), Atlanta Division, announce that WESTON SMITH, age 42, of Hoover, Alabama, has pled guilty today to an Information on charges of conspiracy to commit wire fraud and securities fraud and to filing false certification of financial information with the SEC.

According to Martin, the four-count Information charges that, beginning in or about 1997 and continuing to the present, SMITH and other senior officers of HealthSouth conspired and agreed to commit wire fraud and securities fraud by making false statements in financial filings required to be made to the SEC and to falsify books and records and accounts of HealthSouth. The purpose of the conspiracy was for SMITH and others to fraudulently enrich themselves by inflating artificially HealthSouth's publicly reported earnings and financial condition.

"Today's Information confirms that swift action by law enforcement will be taken against those who exploit financial information for personal profit at the expense of corporate investors," said Martin. "Count Three of the Information is believed to be the first criminal charge in the country brought under the certification requirements contained in Sarbanes/Oxley, an important tool in fighting corporate fraud."

SMITH was released on $500 bond; he could receive a maximum of years in prison and a fine of up to $ . Sentencing is scheduled for , at , before United States District Judge Robert B. Propst.

This case was investigated by Special Agents of the Federal Bureau of Investigation-Birmingham Field Office with assistance from the SEC, Atlanta District-Enforcement Division. The prosecution is being handled by attorneys with the United States Attorney's Office and the Department of Justice Fraud Section.

The investigation is active and ongoing and additional charges are expected to be filed.

- END -

Back to Northern District of Alabama Main Page

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| MICHAEL MARTIN | ) |

RULE 11(f) FACTUAL BASIS FOR GUILTY PLEA

COMES NOW the United States of America through its undersigned counsel, for the purpose of satisfying the requirements of Federal Rule of Criminal Procedure 11(f), and submits the following Factual Basis in support of the guilty plea of **MICHAEL MARTIN**:

*HealthSouth*

1.    *HealthSouth Corporation* ("*HealthSouth*") was formed in 1984. *HealthSouth* is the nations largest provider of outpatient surgery, diagnostic imaging and rehabilitative health care services with approximately 1800 locations in all 50 state and abroad. Since around 1998, and continuing until March 2003, *HealthSouth*'s common stock has been listed on the New York Stock Exchange. Many of its executives, including its then Chief Executive Officer ("CEO"), either owned shares in *HealthSouth*, or owned options to such shares. The CEO, and others, were also compensated in part by bonuses. The bonuses depended on how well *HealthSouth* performed financially.

2.    *HealthSouth*, like other companies whose shares were publically traded, generated and publicized earnings expectations. Stock market analysts did the same. Whether a company met, exceeded, or failed to meet such expectations, was often a factor the influenced the price of its shares.

3.    Since in or about 1986, when it made its Initial Public Offering (IPO), *HealthSouth* has been an issuer of a class of securities registered under Section 12 of the Securities Exchange Act of 1934, required to file quarterly and annual statements (Forms 10-Q and Forms 10K) under said Act with the Securities Exchange Commission ("SEC"). These

statements reported *HealthSouth's* earnings, as well as the value of its assets and liabilities. These reports were available to the public, which used them to determine whether *HealthSouth* met the aforesaid expectations.

4.      Under provisions of the federal securities laws and the regulations promulgated thereunder, HealthSouth was also required to make and keep books, records, and accounts that accurately and fairly reflected the transactions and dispositions of the company's assets; and to devise and maintain a system of internal accounting controls sufficient to provide – (i) reasonable assurances that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles ("GAAP") and other criteria applicable to such statements and to maintain the accountability of assets; and (ii) reasonable assurances that the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

<u>The Conspiracy.</u>

5.      Beginning before 1994, the then CEO and Senior Officers at *HealthSouth* conspired to inflate the financial statements filed with the SEC, at least some of which were electronically transmitted from the Northern District of Alabama to Washington, D.C., to defraud investors and *HealthSouth*, and to make false entries in *HealthSouth's* books, records, and accounts.

6.      *HealthSouth's* then CEO and other Senior Officers reviewed monthly and quarterly preliminary reports showing *HealthSouth's* true and actual financial results, which usually showed that *HealthSouth* had not met earnings per share expectations.   These Senior Officers would then direct that *HealthSouth's* accounting staff to manipulate HealthSouth's books, accounts and records to ensure that *HealthSouth's* earnings per share number met or exceeded those expectations.

7.      Methods to increase earnings included making entries to reduced offsets against revenues or to reduce expenses.  Corresponding fraudulent entries were made to increase assets and decrease liabilities on *HealthSouth's* Balance Sheet.  Such entries were made in, among other accounts, *HealthSouth's* (1) Property, Plant and Equipment ("PP&E") accounts; (2) cash

accounts; (3) inventory accounts; and (4) intangible asset (goodwill) accounts.

8.     These entries caused the quarterly and annual financial statements filed with the SEC for the years from before 1994 through 2002, that is, Forms 10-Q and Forms 10K, to be materially false. The cumulative inflations summed to billions of dollars. Some of these statements were transmitted electronically from Birmingham, Alabama to Washington, D.C., to be filed with the SEC.

9.     The then CEO and other conspirators benefitted from the conspiracy by receiving salaries, bonuses, and an increased value in their stock and stock options. The investing public suffered to the extent they paid for shares whose value was inflated by the aforesaid conspiracy.

<u>The Defendant</u>

10.     Defendant Martin began working for *HealthSouth* as Vice President and Treasurer in 1989 after having worked in the banking industry as a commercial lender for several years. In or about October 1997, Martin became *HealthSouth's* CFO, a position he held until he left *HealthSouth* in March 2000.

11.     Martin became aware that the company was not meeting earnings projections in at least 1994. After Martin became CFO in 1997, he began reviewing quarterly preliminary income statements showing *HealthSouth's* true and accurate financial results, which showed that *HealthSouth* was not meeting earnings per share projections. When earnings did not meet the then CEO's projections, the then CEO would instruct Martin and another Senior Officer to fix the books and records of *HealthSouth* so that they would reflect the then CEO's earnings per share projections. Martin had repeated discussions with the then CEO regarding the fact that the income statements being provided to the SEC and investing public did not accurately reflect the true revenue of *HealthSouth*.

12.     Martin periodically attended meetings with members of the accounting department where discussions were held regarding how the financial statements could be altered to meet the then CEO's earnings per share projections.

13.     As the CFO of *HealthSouth*, Martin signed *HealthSouth's* Forms 10-Q and 10-K beginning with the 10-K for 1997 and continuing through the 10-Q for the third quarter of 1999 knowing that the financial statements attached to the forms did not fairly present, in all material

3

respects, the financial condition and results of operations at *HealthSouth*. These documents were also signed by the then CEO.

14.     On or about November 15, 1999, *HealthSouth's* 10-Q for the third quarter of 1999 was transmitted by wire in interstate commerce from Birmingham, Alabama, to Washington, D.C., for filing with the SEC.

15.     This document does not set forth the complete and full extent of defendant **MARTIN'S** knowledge about criminal activity at *HealthSouth*, but is intended only to provide a factual basis for his guilty plea to an Information filed against him by the United States.


ALICE H. MARTIN
United States Attorney
Northern District of Alabama


JOSHUA R. HOCHBERG
Chief, Fraud Section
Criminal Division
United States Department of Justice


by:

GEORGE A. MARTIN
Assistant United States Attorney
Northern District of Alabama

RICHARD SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice


MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama

RICHARD N. WEIDIS
Senior Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice


4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

UNITED STATES OF AMERICA )
 )
v. )
 )
MICHAEL MARTIN, )
Defendant )

## PLEA AGREEMENT AND CONDITIONS

The United States of America ("United States"), MICHAEL MARTIN ("Defendant") and

Defendant's attorney each hereby acknowledge the following to be the plea agreement between

the Defendant and the United States and the conditions and understandings that apply to the

agreement:

I. PLEA AGREEMENT: The United States and the Defendant hereby AGREE to the

following:

(a) Plea: Defendant will waive indictment and plead guilty in the Northern District of
Alabama to an information charging him with one count each of conspiracy to
commit wire fraud and securities fraud (18 U.S.C. § 371), willfully and knowingly
falsifying books, records and accounts (15 U.S.C. §§78m(b) (2) (A), 78m(b) (5) &
78ff, 17, C.F.R. § 240.13b2-1) and criminal forfeiture (18 U.S.C. § 981(a)(1)(C)
and 28 U.S.C. § 2461(c)).

(b) Recommendation: Pursuant to Rule 11(e)(1)(B) of the *Federal Rules of Criminal
Procedure*, and upon the Court's acceptance of the aforesaid plea and entry of
judgment on the same, the United States will recommend that the Defendant be
given a three-level reduction for acceptance of responsibility and be sentenced at
the low end of the sentencing guideline range as determined by the court.

(c) Motion for Downward Departure: If the United States determines that the
Defendant has cooperated fully, provided substantial assistance in the
investigation or prosecution of another person who has committed an offense, and
otherwise complied with the terms of this agreement, the United States will file a

motion pursuant to *United States Sentencing Guidelines* § 5K1.1 and 18 U.S.C. § 3553(e) with the sentencing Court setting forth the nature and extent of his cooperation. Such a motion will permit the Court, in its discretion, to impose a sentence below the applicable Sentencing Guidelines range and also below any applicable mandatory minimum sentence. In this connection, it is understood that a good faith determination by the United States as to whether Defendant has cooperated fully and provided substantial assistance and has otherwise complied with the terms of this agreement, and the United States' good faith assessment of the value, truthfulness, completeness and accuracy of the cooperation, shall be binding upon him. Defendant agrees that, in making this determination, the United States may consider facts known to it at this time. The United States may or may not, in its discretion, recommend to the Court a specific sentence to be imposed. The United States cannot and does not make a promise or representation as to what sentence will be imposed by the Court. The determination of whether to file a motion for downward departure is in the sole discretion of the United States Attorney for the Northern District of Alabama or her designated Assistant United States Attorney.

II. CONDITIONS AND UNDERSTANDINGS: The following conditions and understandings apply to the above stated plea agreement:

AGREEMENT TO MAKE RESTITUTION

The Court can order the Defendant to pay restitution for the full loss caused by Defendant's criminal conduct. The Defendant agrees the Court's consideration of the amount of restitution shall **NOT** be limited to the amounts alleged in the counts to which the Defendant is pleading guilty, and may include all amounts attributable to the Defendant's conduct, whether charged or uncharged, pursuant to 18 U.S.C. §3663, provided, however, that the value of any property forfeited shall be credited against any order of restitution. The Defendant further agrees that any amount ordered by the Court to be paid as restitution may not be discharged, in whole or in part, in any bankruptcy proceeding.

The Defendant acknowledges that, because the offense of conviction occurred after April 24, 1996, restitution is mandatory without regard to the Defendant's ability to pay.

2

## ASSET FORFEITURE

As stated in Paragraph I(a), above, the Defendant hereby agrees to surrender to the United States of America any and all property constituting, or derived from proceeds traceable to violations of Title 18, United States Code, Section 371 on or before the date of sentencing in this action, and further consents to the entry of an order of criminal forfeiture herein of said property at that time under Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as property constituting or derived from proceeds traceable to violations of Title 18, United States Code, Section 371, without further notice to him. Defendant further agrees to waive any and all claims, defenses or challenges, and to not contest or challenge in any manner (including direct appeal or any other means) any related administrative or civil judicial forfeiture on any grounds, including that the forfeiture constitutes double jeopardy, or an excessive fine or punishment. The defendant will cooperate fully with investigations of his financial assets, including cooperation in the tracing all of the defendant's assets.

## POSSIBLE SENTENCES AND THE GUIDELINES

(a) Maximum Possible Sentences:     The Defendant acknowledges that the maximum statutory sentence for conspiracy under Title 18, United States Code, Section 371 is not more than 5 years imprisonment and/or a fine not to exceed $250,000, or twice the pecuniary gain/loss caused by the Defendant's act. Additionally, the Defendant is aware, if imprisonment is imposed, that the Court may include as part of the sentence a requirement that the Defendant be placed on supervised release after imprisonment for a term not to exceed three (3) years.

The Defendant further acknowledges that the maximum statutory sentence for willful and knowing falsification of books, records and accounts in violation of Title 15, United States Code, Sections 78m(b) (2) (A), 78m(b) (5) and 78ff and Title 17, Code of Federal Regulations, Section

240.13b2-1 is not more than 10 years imprisonment and/or a fine not to exceed $1,000,000, or twice the pecuniary gain/loss caused by the Defendant's act. Additionally, the Defendant is aware, if imprisonment is imposed, that the Court may include as part of the sentence a requirement that the Defendant be placed on supervised release after imprisonment for a term not to exceed three (3) years.

If the term of supervised release for the count of conviction is revoked, the Defendant may be imprisoned for an additional term not to exceed the term of imprisonment authorized in Title 18, United States Code, Section 3583(e)(3) for the offense of conviction, with no credit being given for any time served while on supervised release. Further, if the crime of conviction occurred after September 13, 1994, the Court may impose another term of supervised release following any term of imprisonment imposed for a violation of supervised release conditions, and this term of supervised release may not exceed the term of supervised release originally authorized by statute for the offense of conviction less any term of imprisonment that was imposed upon revocation of supervised release. (18 U.S.C. §3583(e) and (h)). If a second or subsequent term of supervised release is revoked, the Court may impose another term of imprisonment not to exceed the difference between any imprisonment imposed for a prior revocation of supervised release for the offense of conviction and the term of imprisonment authorized pursuant to Title 18, United States Code, Section 3583(e)(3). Accordingly, the original term of imprisonment when combined with any term of imprisonment arising from revocations of supervised release, may result in a total amount of imprisonment greater than the statutory maximum term for the offense of conviction.

4

(b) Special Assessment Fees: The Defendant hereby agrees to pay the total amount required for the Special Monetary Assessment ($100 per felony count) to the Clerk, United States District Court, at the time of sentencing.

(c) Sentencing Guidelines: The Defendant is aware that the sentence to be imposed shall be in conformity with the Sentencing Guidelines promulgated pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §3551 through §3742, and 28 U.S.C. §991 through §998, and that a sentence imposed under the Guidelines is without parole. The Defendant is further aware that the sentence has not yet been determined by the Court, that any estimate of the likely sentence received from any source is a prediction, not a promise, and that the Court has the final discretion to impose any sentence up to the statutory maximum. The Defendant further understands that all recommendations or requests by the United States pursuant to this agreement are not binding upon the Court (Sentencing Guidelines §6B1.4(d)). The Court will impose a sentence within the appropriate guideline range, unless the Court finds there is a basis for departure because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. The Court may also depart from the guidelines if there is a motion from the United States stating that the Defendant has provided substantial assistance in the investigation or prosecution of another person who has committed a criminal offense.

If the sentencing court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, but will remain bound to fulfill all of the obligations under the agreement.

Nothing in the plea agreement, save and except any stipulations contained herein, limits the right of the United States to present to the Court or Probation Office, either orally or in

writing, any and all facts and arguments relevant to the Defendant's sentence and the Defendant's criminal history category, that are available to the United States at the time of sentencing. The United States reserves its full right of allocution pursuant to Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedure.

The Defendant further understands that the sentence to be imposed upon the Defendant will be determined solely by the sentencing judge. The United States cannot and does not make any promise or representation as to what sentence the Defendant will receive.

(d) Non-binding: It is the Court's duty to impose sentence. The Court is not a party to the above plea agreement. Any sentence recommendation by the United States does not bind the Court, and the Court may impose a more severe or less severe sentence than that recommended.

## WITHDRAWAL OF GUILTY PLEA NOT ALLOWED

If the Court decides not to give the recommended sentence, or decides that the recommended sentence is not within the guidelines range, the Defendant may not withdraw the plea of guilty.

## FAMILIARITY WITH CHARGES

The Defendant is aware of the charges, and has discussed the charges and possible defenses with counsel. The Defendant is fully aware of the elements of each count.

## ACKNOWLEDGMENT OF GUILT

The Defendant is pleading guilty to the charges described above because the Defendant is in fact guilty and for no other reason.

6

## COOPERATION - IN GENERAL

The Defendant will cooperate fully with the United States and with any federal, state or local law enforcement or regulatory agency designated by the United States Attorney, including, but not limited to, the Securities and Exchange Commission. This cooperation will include, but is not limited to, the following:

(a)    Defendant agrees to be fully debriefed and to attend all meetings at which his presence is requested by the United States, concerning his participation in and knowledge of all criminal activities.

(b)    Defendant waives all claims of attorney-client privilege and agrees to furnish to the United States all documents and other material that may be relevant to the investigation and that are in Defendant's possession or control, except privileged communications relating to the investigation by the United States, and waives his right to move to suppress evidence or raise any other Fourth or Fifth Amendment claims, and waives his right to any further discovery from the government.

(c)    Defendant agrees not to reveal his cooperation, or any information derived therefrom to any third party without prior consent of the United States, and to instruct his attorneys to do the same.

(d)    Defendant agrees to testify at any proceeding in the Northern District of Alabama or elsewhere as requested by the United States.

(e)    Defendant consents to adjournments of his sentence as requested by the United States and agrees that his obligations under this agreement continue until the United States determines that his cooperation is concluded.

## WAIVER OF CERTAIN CONSTITUTIONAL RIGHTS

The Defendant understands that by pleading guilty, the following constitutional rights will be relinquished: the right to be indicted by a grand jury, if proceeding by information; the right to plead not guilty; the right to be tried by a jury or, if the Defendant wishes and with the consent of the United States, to be tried by a judge. At that trial, the Defendant would have the right to an attorney and, if the Defendant could not afford an attorney, the Court would appoint

7

one to represent the Defendant. The Defendant would have the right to assist in the selection of the jury. During the trial, the Defendant would be presumed innocent and a jury would be instructed that the burden of proof is on the United States to prove the Defendant guilty beyond a reasonable doubt and by a unanimous verdict. The Defendant would have the right to confront and cross-examine witnesses against the Defendant. If desired, the Defendant could testify on his own behalf and present witnesses in his own defense. On the other hand, if the Defendant did not wish to testify, that fact could not be used against him and the jury would be so instructed. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal that verdict to determine if any errors had been committed during trial that would require either a new trial or a dismissal of the charges.

By pleading guilty, the Defendant will be giving up all of these rights. By pleading guilty, the Defendant may be required to answer questions posed to him by the Court both about the rights that the Defendant will be giving up and the factual basis for the Defendant's plea. Any statements made by the Defendant during such a hearing are not, in any civil or criminal proceeding, admissible against Defendant except as provided Rule 11(e)(6) of the *Federal Rules of Criminal Procedure*.

Rule 11(e)(6) of the *Federal Rules of Criminal Procedure*

The Defendant knowingly and expressly waives all of the rights afforded Defendant pursuant to the provisions of Rule 11(e)(6) of the *Federal Rules of Criminal Procedure* and Section 1B1.8(a) of the United States Sentencing Guidelines in the event, and only in the event, that, after he enters a plea of guilty pursuant to this agreement, the Defendant then moves to withdraw his plea of guilty and the court grants his motion. In that event, the following shall be admissible against the Defendant:

8

(a)    Plea of guilty which is later withdrawn or which the Defendant seeks to withdraw;

(b)    Any statement made in the course of any proceeding under Rule 11 regarding said plea of guilty;

(c)    Any statement made in the course of plea discussions with an attorney or agent for the United States which result in a plea of guilty later withdrawn. The parties expressly agree that, if the court rejects this plea agreement, the above waiver will not apply and the Defendant will have all the rights and protections afforded him by Rule 11(e)(6).

## WAIVER OF RIGHTS TO APPEAL AND COLLATERAL ATTACK

Defendant is aware that his sentence will be imposed in accordance with the United States Sentencing Commission's *Guidelines Manual*. Defendant nonetheless acknowledges and agrees that the Court has jurisdiction and authority to impose any sentence within the statutory maximum set for the offense(s) to which Defendant pleads guilty. Defendant is aware that Title 18, United States Code, Section 3742, affords a defendant the right to appeal the sentence imposed. Knowing that, Defendant waives the right to appeal his sentence or the manner in which it was determined on the grounds set forth in Title 18, United States Code, Section 3742, or any other grounds, except that Defendant may appeal a sentence imposed above the statutory maximum or an upward departure from the Sentencing Guidelines, other than a departure requested by the United States. This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).

In agreeing to this waiver, Defendant is aware that a sentence has not yet been determined by the Court. Defendant is also aware that any estimate of the probable sentencing range under the sentencing guidelines that he may have received from his counsel, the United States or the

9

Probation Office, is a prediction, not a promise, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence Defendant will receive. Realizing the uncertainty in estimating what sentence Defendant will ultimately receive, Defendant knowingly waives the right to appeal the sentence in exchange for the concessions made by the United States in this plea agreement.

Defendant's right to file a motion attacking his sentence pursuant to 28 U.S.C. § 2255 has also been explained to him and he understands that right. As a part of this plea agreement, Defendant waives his right to challenge his conviction and sentence pursuant to 28 U.S.C. § 2255.

## Acknowledgment

I hereby knowingly, intelligently, and voluntarily waive the rights to appeal or collaterally attack the sentence as set forth above.

_____
Defendant's Signature

## BANKRUPTCY WAIVER

Defendant agrees not to attempt to avoid paying any fine or restitution imposed by the Court through any proceeding pursuant to the United States Bankruptcy Code. Defendant waives all rights, if any, to obtain discharge or to delay payment of any fine or restitution obligation or alter the time for payment by filing a petition pursuant to the Bankruptcy Code. Defendant stipulates that enforcement of any fine or restitution obligation by the United States is not barred or affected by the automatic stay provisions of the United States Bankruptcy Code (Title 11, United States Code, Section 362), and that enforcement of any fine or restitution obligation by the United States is a valid exercise of its police or regulatory power within the meaning of Title

11, United States Code, Section 362(b). Defendant stipulates and agrees not to institute or participate in any proceeding to interfere with, alter, or bar enforcement of any fine or restitution obligation pursuant to the automatic stay or other provision of the Bankruptcy Code in any case filed by Defendant or his creditors. Upon request of the United States, Defendant will execute an order or stipulation granting the United States relief from the automatic stay or other Bankruptcy Code provisions in order to enforce any fine or restitution obligation. Defendant stipulates that any fine or restitution obligation imposed by the Court is not dischargeable pursuant to Title 11, United States Code, Section 523 in any case commenced by Defendant or his creditors pursuant to the Bankruptcy Code. Defendant's waivers and stipulations or agreements set forth above are made in exchange for the United States' concessions set forth in this agreement.

## COUNSEL

The Defendant has discussed this case at length with Defendant's counsel. The Defendant is satisfied with counsel's investigation of the case, exploration of possible defenses, advice and other representation.

## OTHER DISTRICTS AND JURISDICTIONS

This document **DOES NOT BIND** any other United States Attorney in any other district, and it in no way limits, binds, or otherwise affects the rights, powers, duties or obligations of any state or local law enforcement agency, administrative or regulatory authorities, civil or administrative enforcement, collection, bankruptcy, adversary proceedings or suits which have been or may be filed by any governmental entity.

## TAX PROCEEDINGS

11

Unless otherwise specified herein, this document in no way applies to or limits any pending or prospective proceedings, related to the Defendant's tax liabilities, if any.

## BREACH OF AGREEMENT

In the event either party believes the other has failed to fulfill any obligations under this agreement, then the complaining party shall, in its discretion, have the option of petitioning the Court to be relieved of its obligations herein.  Whether or not a party has completely fulfilled all of its obligations under this agreement shall be determined by the Court in an appropriate proceeding at which any disclosures and documents provided by either party shall be admissible and at which the complaining party shall be required to establish any breach by a preponderance of the evidence.  The Defendant hereby **WAIVES** all rights pursuant to Rule 32(e), *Federal Rules of Criminal Procedure*, to withdraw from Defendant's guilty plea and this agreement, save and except for the limited reasons outlined above in this paragraph.

In the event that the Defendant, after entry of a plea of guilty, unsuccessfully attempts to withdraw his plea of guilty, the United States may continue to enforce the agreement but will no longer be bound by any provision in this agreement regarding acceptance of responsibility.  This provision will not have any continued vitality if it is determined by the Court that the United States acted in bad faith to bring about the attempted withdrawal of plea.

## COMPETENCE

The Defendant has not had any drugs, medication or alcohol within the past 48 hours except as stated hereafter, and is competent to enter the plea agreement stated above.

## COMPLETE AGREEMENT

Other than what is contained in this document, NO PROMISES, OR REPRESENTATIONS HAVE BEEN MADE TO THE DEFENDANT BY THE PROSECUTOR, OR BY ANYONE ELSE, NOR HAVE ANY THREATS BEEN MADE OR FORCE USED, TO INDUCE THE DEFENDANT TO PLEAD GUILTY. This document represents the sole agreement and understanding between the Defendant and the United States, and no other agreement will be entered into unless memorialized in writing and signed by all parties. To become effective, this agreement must be signed by all signatories listed below.

## ACKNOWLEDGMENTS

1. I have READ this document, DISCUSSED it with my attorney, and UNDERSTAND and AGREE with all its provisions both individually and totally.


_____                    _____
        DATE                                MICHAEL MARTIN
                                            Defendant


2. I have discussed this case with the Defendant in detail and have advised the Defendant of the Defendant's rights and all possible defenses. The Defendant has conveyed to me that the Defendant understands this document and consents to all its terms. I believe the plea and disposition set forth herein are appropriate under the facts of this case. I concur in the entry of the plea as indicated above and on the terms and conditions set forth herein.


_____                    _____
        DATE                                MARK J. HULKOWER
                                            Counsel for Defendant


13

3.    I have reviewed this document and agree to its provisions.


ALICE H. MARTIN
United States Attorney
Northern District of Alabama

JOSHUA R. HOCHBERG
Chief, Fraud Section
Criminal Division
United States Department of Justice


GEORGE A. MARTIN
Assistant United States Attorney
Northern District of Alabama

by:

RICHARD C. SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice


MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama

RICHARD N. WIEDIS
Senior Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

UNITED STATES OF AMERICA        )
                                   )
        v.                          )
                                   )
AARON BEAM                    )

## RULE 11(f) FACTUAL BASIS FOR GUILTY PLEA

COMES NOW the United States of America through its undersigned counsel, for the purpose of satisfying the requirements of Federal Rule of Criminal Procedure 11(f), and submits the following Factual Basis in support of the guilty plea of **AARON BEAM**:

### *HealthSouth*

1.    *HealthSouth Corporation* ("*HealthSouth*") was formed in 1984. *HealthSouth* claims to be the nation's largest provider of outpatient surgery, diagnostic imaging and rehabilitative health care services with approximately 1800 locations in all 50 state and abroad. Until March 2003, *HealthSouth*'s common stock was traded on the New York Stock Exchange. Many of its executives, including its then Chief Executive Officer ("CEO"), either owned shares in *HealthSouth*, or owned options to purchase shares. The CEO, and others, were also compensated in part by bonuses. The bonuses depended on how well *HealthSouth* performed financially.

2.    *HealthSouth*, like other companies whose shares were publically traded, generated and publicized earnings expectations. Stock market analysts did the same. Whether a company met, exceeded, or failed to meet such expectations, was often a factor that influenced the price of its shares.

3.    *HealthSouth* reported the financial results of its operations in financial statements that include both an Income Statement and a Balance Sheet. A company's Income Statement reports, among other things, revenue recognized, expenses incurred, and income earned during a

stated period of time – usually for a fiscal quarter or fiscal year. Within an Income Statement, expenses are generally subtracted from revenues to calculate net income. A company's Balance Sheet reports, among other things, the assets and liabilities of a company at a point in time, usually at the end of a fiscal quarter or the end of a fiscal year.

### The Scheme

4.     Beginning at least in or about 1996, a group of *HealthSouth's* senior officers, which included the defendant BEAM and the then Chief Executive Officer (the "CEO") (collectively, the "Senior Officers"), and others, recognized that *HealthSouth's* financial results were failing to produce sufficient earnings per share to meet or exceed Wall Street "earning expectations" or "analyst expectations." The Senior Officers and others recognized that the earnings shortfall created a substantial risk that, unless *HealthSouth's* earnings per share were artificially inflated, *HealthSouth's* earnings would fail to meet analyst expectations and the market price of *HealthSouth's* securities would therefore decline.

5.     Beginning at least in or about 1996, the Senior Officers, including defendant BEAM and others, engaged in an illegal scheme to inflate artificially *HealthSouth's* publicly reported earnings and earnings per share and falsify reports of *HealthSouth's* financial condition. The Senior Officers, including defendant BEAM and others, caused *HealthSouth* to file publicly with the Securities and Exchange Commission annual reports and quarterly reports that materially misstated, among other things, *HealthSouth's* net income, revenue, earnings per share, assets, and liabilities during the period of defendant BEAM'S involvement in the scheme. In addition, when HealthSouth applied for extensions of credit, the Senior Officers, including defendant BEAM and others, caused false reports of *HealthSouth's* financial condition to be presented to banks and other lenders.

6.     On or about April 18, 1996, *HealthSouth* entered into a Third Amended and Restated Credit Agreement ("Agreement") with a syndicate of 32 lenders from around the world, including AmSouth Bank of Birmingham, Alabama, which was insured by the Federal Deposit Insurance Corporation. This credit facility obligated the lenders to extend a line of credit totaling $1.25 billion to *HealthSouth*. Of this total amount, AmSouth Bank agreed to loan $55,000,000

2

to *HealthSouth*. The Agreement required *HealthSouth* to provide each lender with quarterly and annual financial statements which had been certified as true and accurate. In order to receive, and continue to receive, the line of credit, the Senior Officers, including the then CEO and defendant BEAM, knowingly caused false financial statements of *HealthSouth* to be provided to the lenders, including AmSouth Bank,

### The Defendant

7.      Defendant BEAM was one of the original founders of *HealthSouth*. From the company's inception in or about 1984, until he resigned in October 1997, defendant BEAM was *HealthSouth's* CFO. He also served on *HealthSouth's* Board of Directors from 1984 until October 1997.

8.      Defendant BEAM became aware that the company was not meeting earnings projections in at least 1996. Defendant BEAM reviewed quarterly preliminary income statements showing *HealthSouth's* true and accurate financial results, which showed that *HealthSouth* was not meeting earnings per share projections. When earnings did not meet the then CEO's projections, the then CEO would instruct defendant BEAM and other Senior Officers to fix the books and records of *HealthSouth* so that they would reflect the then CEO's earnings per share projections.

9.      As the CFO of *HealthSouth*, defendant BEAM signed numerous Forms 10-Q and 10-K. Beginning at least in or about 1996, he signed the Forms 10-Q and 10-K knowing that the financial statements attached to the forms did not fairly present, in all material respects, the financial condition and results of operations at *HealthSouth*. These documents were also signed by the then CEO.

10.      On or about August 14, 1996, and periodically thereafter, until defendant BEAM resigned in October 1997, the Senior Officers, including the then CEO and defendant BEAM, caused *HealthSouth*, in connection with the Third Amended and Restated Credit Agreement, to make financial statements available to AmSouth Bank knowing that the financial statements did not fairly present, in all material respects, the financial condition and results of *HealthSouth*.

3

11.    This document does not set forth the complete and full extent of defendant BEAM'S knowledge about criminal activity at *HealthSouth*, but is intended only to provide a factual basis for his guilty plea to an Information filed against him by the United States.


ALICE H. MARTIN
United States Attorney
Northern District of Alabama

JOSHUA R. HOCHBERG
Chief, Fraud Section
Criminal Division
United States Department of Justice


by:

GEORGE A. MARTIN
Assistant United States Attorney
Northern District of Alabama

RICHARD SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice


MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama

4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| AARON BEAM, | ) |
| Defendant | ) |

PLEA AGREEMENT AND CONDITIONS

The United States of America ("United States"), AARON BEAM ("Defendant") and

Defendant's attorney each hereby acknowledge the following to be the plea agreement between

the Defendant and the United States and the conditions and understandings that apply to the

agreement:

I.  PLEA AGREEMENT:  The United States and the Defendant hereby AGREE to the

following:

   (a)  Plea: Defendant will waive indictment and plead guilty in the Northern District of
        Alabama to an information charging him with one count each of bank fraud (18
        U.S.C. § 1344 and § 2) and criminal forfeiture (18 U.S.C. § 981(a)(1)(C) and 28
        U.S.C. § 2461(c)).

   (b)  Recommendation: Pursuant to Rule 11(e)(1)(B) of the *Federal Rules of Criminal
        Procedure*, and upon the Court's acceptance of the aforesaid plea and entry of
        judgment on the same, the United States will recommend that the Defendant be
        given a three-level reduction for acceptance of responsibility and be sentenced at
        the low end of the sentencing guideline range as determined by the court.

   (c)  Motion for Downward Departure:  If the United States determines that the
        Defendant has cooperated fully, provided substantial assistance in the
        investigation or prosecution of another person who has committed an offense, and
        otherwise complied with the terms of this agreement, the United States will file a
        motion pursuant to *United States Sentencing Guidelines* § 5K1.1 and 18 U.S.C.
        § 3553(e) with the sentencing Court setting forth the nature and extent of his
        cooperation.  Such a motion will permit the Court, in its discretion, to impose a
        sentence below the applicable Sentencing Guidelines range and also below any
        applicable mandatory minimum sentence.  In this connection, it is understood that

a good faith determination by the United States as to whether Defendant has cooperated fully and provided substantial assistance and has otherwise complied with the terms of this agreement, and the United States' good faith assessment of the value, truthfulness, completeness and accuracy of the cooperation, shall be binding upon him. Defendant agrees that, in making this determination, the United States may consider facts known to it at this time. The United States may or may not, in its discretion, recommend to the Court a specific sentence to be imposed. The United States cannot and does not make a promise or representation as to what sentence will be imposed by the Court. The determination of whether to file a motion for downward departure is in the sole discretion of the United States Attorney for the Northern District of Alabama or her designated Assistant United States Attorney.

## II. CONDITIONS AND UNDERSTANDINGS: The following conditions and understandings apply to the above stated plea agreement:

## AGREEMENT TO MAKE RESTITUTION

The Court can order the Defendant to pay restitution for the full loss caused by Defendant's criminal conduct. The Defendant agrees the Court's consideration of the amount of restitution shall **NOT** be limited to the amounts alleged in the counts to which the Defendant is pleading guilty, and may include all amounts attributable to the Defendant's conduct, whether charged or uncharged, pursuant to 18 U.S.C. §3663, provided, however, that the value of any property forfeited shall be credited against any order of restitution. The Defendant further agrees that any amount ordered by the Court to be paid as restitution may not be discharged, in whole or in part, in any bankruptcy proceeding.

The Defendant acknowledges that, because the offense of conviction occurred after April 24, 1996, restitution is mandatory without regard to the Defendant's ability to pay.

## ASSET FORFEITURE

As stated in Paragraph I(a), above, the Defendant hereby agrees to surrender to the United States of America any and all property constituting, or derived from proceeds traceable to

2

violations of Title 18, United States Code, Section 1344 on or before the date of sentencing in this action, and further consents to the entry of an order of criminal forfeiture herein of said property at that time under Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as property constituting or derived from proceeds traceable to violations of Title 18, United States Code, Section 1344, without further notice to him. Defendant further agrees to waive any and all claims, defenses or challenges, and to not contest or challenge in any manner (including direct appeal or any other means) any related administrative or civil judicial forfeiture on any grounds, including that the forfeiture constitutes double jeopardy, or an excessive fine or punishment. The defendant expressly reserves the right to contest the issue of what property constitutes, or was derived from, proceeds of the fraud. The defendant will cooperate fully with investigations of his financial assets, including cooperation in the tracing all of the defendant's assets.

## POSSIBLE SENTENCES AND THE GUIDELINES

(a) Maximum Possible Sentences:   The Defendant acknowledges that the maximum statutory sentence for conspiracy under Title 18, United States Code, Section 1344 is not more than 30 years imprisonment and/or a fine not to exceed $1,000,000. Additionally, the Defendant is aware, if imprisonment is imposed, that the Court may include as part of the sentence a requirement that the Defendant be placed on supervised release after imprisonment for a term not to exceed five (5) years.

If the term of supervised release for the count of conviction is revoked, the Defendant may be imprisoned for an additional term not to exceed the term of imprisonment authorized in Title 18, United States Code, Section 3583(e)(3) for the offense of conviction, with no credit being given for any time served while on supervised release. Further, if the crime of conviction

3

occurred after September 13, 1994, the Court may impose another term of supervised release following any term of imprisonment imposed for a violation of supervised release conditions, and this term of supervised release may not exceed the term of supervised release originally authorized by statute for the offense of conviction less any term of imprisonment that was imposed upon revocation of supervised release. (18 U.S.C. §3583(e) and (h)). If a second or subsequent term of supervised release is revoked, the Court may impose another term of imprisonment not to exceed the difference between any imprisonment imposed for a prior revocation of supervised release for the offense of conviction and the term of imprisonment authorized pursuant to Title 18, United States Code, Section 3583(e)(3). Accordingly, the original term of imprisonment when combined with any term of imprisonment arising from revocations of supervised release, may result in a total amount of imprisonment greater than the statutory maximum term for the offense of conviction.

(b) Special Assessment Fees: The Defendant hereby agrees to pay the total amount required for the Special Monetary Assessment ($100 per felony count) to the Clerk, United States District Court, at the time of sentencing.

(c) Sentencing Guidelines: The Defendant is aware that the sentence to be imposed shall be in conformity with the Sentencing Guidelines promulgated pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §3551 through §3742, and 28 U.S.C. §991 through §998, and that a sentence imposed under the Guidelines is without parole. The Defendant and the United States agree that the version of the Guidelines Manual in effect on the date of the offense is applicable. The Defendant is further aware that the sentence has not yet been determined by the Court, that any estimate of the likely sentence received from any source is a prediction, not a promise, and that the Court has the final discretion to impose any sentence up to the statutory maximum. The

4

Defendant further understands that all recommendations or requests by the United States pursuant to this agreement are not binding upon the Court (Sentencing Guidelines §6B1.4(d)). The Court will impose a sentence within the appropriate guideline range, unless the Court finds there is a basis for departure because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. The Court may also depart from the guidelines if there is a motion from the United States stating that the Defendant has provided substantial assistance in the investigation or prosecution of another person who has committed a criminal offense.

If the sentencing court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, but will remain bound to fulfill all of the obligations under the agreement.

Nothing in the plea agreement, save and except any stipulations contained herein, limits the right of the United States to present to the Court or Probation Office, either orally or in writing, any and all facts and arguments relevant to the Defendant's sentence and the Defendant's criminal history category, that are available to the United States at the time of sentencing. The United States reserves its full right of allocution pursuant to Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedure.

The Defendant further understands that the sentence to be imposed upon the Defendant will be determined solely by the sentencing judge.  The United States cannot and does not make any promise or representation as to what sentence the Defendant will receive.

(d)  Non-binding:  It is the Court's duty to impose sentence.  The Court is not a party to the above plea agreement.  Any sentence recommendation by the United States does not bind the Court, and the Court may impose a more severe or less severe sentence than that recommended.

## WITHDRAWAL OF GUILTY PLEA NOT ALLOWED

If the Court decides not to give the recommended sentence, or decides that the recommended sentence is not within the guidelines range, the Defendant may not withdraw the plea of guilty.

## FAMILIARITY WITH CHARGES

The Defendant is aware of the charges, and has discussed the charges and possible defenses with counsel. The Defendant is fully aware of the elements of each count.

## ACKNOWLEDGMENT OF GUILT

The Defendant is pleading guilty to the charges described above because the Defendant is in fact guilty and for no other reason.

## COOPERATION - IN GENERAL

The Defendant will cooperate fully with the United States and with any federal, state or local law enforcement or regulatory agency designated by the United States Attorney, including, but not limited to, the Securities and Exchange Commission. This cooperation will include, but is not limited to, the following:

(a)    Defendant agrees to be fully debriefed and to attend all meetings at which his presence is requested by the United States, concerning his participation in and knowledge of all criminal activities.

(b)    Defendant waives all claims of attorney-client privilege, except privileged communications with his present counsel, and agrees to furnish to the United States all documents and other material that may be relevant to the investigation and that are in Defendant's possession or control, and waives his right to move to suppress evidence or raise any other Fourth or Fifth Amendment claims, and waives his right to any further discovery from the government.

(c)   Defendant agrees not to reveal his cooperation, or any information derived therefrom to any third party without prior consent of the United States, and to instruct his attorneys to do the same.

(d)   Defendant agrees to testify at any proceeding in the Northern District of Alabama or elsewhere as requested by the United States.

(e)   Defendant consents to adjournments of his sentence as requested by the United States and agrees that his obligations under this agreement continue until the United States determines that his cooperation is concluded.

## WAIVER OF CERTAIN CONSTITUTIONAL RIGHTS

The Defendant understands that by pleading guilty, the following constitutional rights will be relinquished: the right to be indicted by a grand jury, if proceeding by information; the right to plead not guilty; the right to be tried by a jury or, if the Defendant wishes and with the consent of the United States, to be tried by a judge. At that trial, the Defendant would have the right to an attorney and, if the Defendant could not afford an attorney, the Court would appoint one to represent the Defendant. The Defendant would have the right to assist in the selection of the jury. During the trial, the Defendant would be presumed innocent and a jury would be instructed that the burden of proof is on the United States to prove the Defendant guilty beyond a reasonable doubt and by a unanimous verdict. The Defendant would have the right to confront and cross-examine witnesses against the Defendant. If desired, the Defendant could testify on his own behalf and present witnesses in his own defense. On the other hand, if the Defendant did not wish to testify, that fact could not be used against him and the jury would be so instructed. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal that verdict to determine if any errors had been committed during trial that would require either a new trial or a dismissal of the charges.

By pleading guilty, the Defendant will be giving up all of these rights. By pleading guilty, the Defendant may be required to answer questions posed to him by the Court both about the rights that the Defendant will be giving up and the factual basis for the Defendant's plea. Any statements made by the Defendant during such a hearing are not, in any civil or criminal proceeding, admissible against Defendant except as provided Rule 11(e)(6) of the *Federal Rules of Criminal Procedure.*

Rule 11(e)(6) of the *Federal Rules of Criminal Procedure*

The Defendant knowingly and expressly waives all of the rights afforded Defendant pursuant to the provisions of Rule 11(e)(6) of the *Federal Rules of Criminal Procedure* and Section 1B1.8(a) of the United States Sentencing Guidelines in the event, and only in the event, that, after he enters a plea of guilty pursuant to this agreement, the Defendant then moves to withdraw his plea of guilty and the court grants his motion. In that event, the following shall be admissible against the Defendant:

(a)    Plea of guilty which is later withdrawn or which the Defendant seeks to withdraw;

(b)    Any statement made in the course of any proceeding under Rule 11 regarding said plea of guilty;

(c)    Any statement made in the course of plea discussions with an attorney or agent for the United States which result in a plea of guilty later withdrawn.

The parties expressly agree that, if the court rejects this plea agreement, the above waiver will not apply and the Defendant will have all the rights and protections afforded him by Rule 11(e)(6).

8

## WAIVER OF RIGHTS TO APPEAL AND COLLATERAL ATTACK

Defendant is aware that his sentence will be imposed in accordance with the United States Sentencing Commission's *Guidelines Manual.* Defendant nonetheless acknowledges and agrees that the Court has jurisdiction and authority to impose any sentence within the statutory maximum set for the offense(s) to which Defendant pleads guilty. Defendant is aware that Title 18, United States Code, Section 3742, affords a defendant the right to appeal the sentence imposed. Knowing that, Defendant waives the right to appeal his sentence or the manner in which it was determined on the grounds set forth in Title 18, United States Code, Section 3742, or any other grounds, except that Defendant may appeal a sentence imposed above the statutory maximum or an upward departure from the Sentencing Guidelines, other than a departure requested by the United States. This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).

In agreeing to this waiver, Defendant is aware that a sentence has not yet been determined by the Court. Defendant is also aware that any estimate of the probable sentencing range under the sentencing guidelines that he may have received from his counsel, the United States or the Probation Office, is a prediction, not a promise, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence Defendant will receive. Realizing the uncertainty in estimating what sentence Defendant will ultimately receive, Defendant knowingly waives the right to appeal the sentence in exchange for the concessions made by the United States in this plea agreement.

Defendant's right to file a motion attacking his sentence pursuant to 28 U.S.C. § 2255 has also been explained to him and he understands that right. As a part of this plea agreement,

9

Defendant waives his right to challenge his conviction and sentence pursuant to 28 U.S.C. §

2255.

### Acknowledgment

I hereby knowingly, intelligently, and voluntarily waive the rights to appeal or collaterally attack the sentence as set forth above.

_____
Defendant's Signature

## BANKRUPTCY WAIVER

Defendant agrees not to attempt to avoid paying any fine or restitution imposed by the Court through any proceeding pursuant to the United States Bankruptcy Code. Defendant waives all rights, if any, to obtain discharge or to delay payment of any fine or restitution obligation or alter the time for payment by filing a petition pursuant to the Bankruptcy Code. Defendant stipulates that enforcement of any fine or restitution obligation by the United States is not barred or affected by the automatic stay provisions of the United States Bankruptcy Code (Title 11, United States Code, Section 362), and that enforcement of any fine or restitution obligation by the United States is a valid exercise of its police or regulatory power within the meaning of Title 11, United States Code, Section 362(b). Defendant stipulates and agrees not to institute or participate in any proceeding to interfere with, alter, or bar enforcement of any fine or restitution obligation pursuant to the automatic stay or other provision of the Bankruptcy Code in any case filed by Defendant or his creditors. Upon request of the United States, Defendant will execute an order or stipulation granting the United States relief from the automatic stay or other Bankruptcy Code provisions in order to enforce any fine or restitution obligation. Defendant stipulates that any fine or restitution obligation imposed by the Court is not dischargeable

pursuant to Title 11, United States Code, Section 523 in any case commenced by Defendant or his creditors pursuant to the Bankruptcy Code. Defendant's waivers and stipulations or agreements set forth above are made in exchange for the United States' concessions set forth in this agreement.

## COUNSEL

The Defendant has discussed this case at length with Defendant's counsel. The Defendant is satisfied with counsel's investigation of the case, exploration of possible defenses, advice and other representation.

## OTHER DISTRICTS AND JURISDICTIONS

This document **DOES NOT BIND** any other United States Attorney in any other district, and it in no way limits, binds, or otherwise affects the rights, powers, duties or obligations of any state or local law enforcement agency, administrative or regulatory authorities, civil or administrative enforcement, collection, bankruptcy, adversary proceedings or suits which have been or may be filed by any governmental entity.

## TAX PROCEEDINGS

Unless otherwise specified herein, this document in no way applies to or limits any pending or prospective proceedings, related to the Defendant's **tax liabilities**, if any.

11

## BREACH OF AGREEMENT

In the event either party believes the other has failed to fulfill any obligations under this agreement, then the complaining party shall, in its discretion, have the option of petitioning the Court to be relieved of its obligations herein. Whether or not a party has completely fulfilled all of its obligations under this agreement shall be determined by the Court in an appropriate proceeding at which any disclosures and documents provided by either party shall be admissible and at which the complaining party shall be required to establish any breach by a preponderance of the evidence. The Defendant hereby WAIVES all rights pursuant to Rule 32(e), *Federal Rules of Criminal Procedure,* to withdraw from Defendant's guilty plea and this agreement, save and except for the limited reasons outlined above in this paragraph.

In the event that the Defendant, after entry of a plea of guilty, unsuccessfully attempts to withdraw his plea of guilty, the United States may continue to enforce the agreement but will no longer be bound by any provision in this agreement regarding acceptance of responsibility. This provision will not have any continued vitality if it is determined by the Court that the United States acted in bad faith to bring about the attempted withdrawal of plea.

## COMPETENCE

The Defendant has not had any drugs, medication or alcohol within the past 48 hours except as stated hereafter, and is competent to enter the plea agreement stated above.

## COMPLETE AGREEMENT

Other than what is contained in this document, NO PROMISES, OR REPRESENTATIONS HAVE BEEN MADE TO THE DEFENDANT BY THE

12

PROSECUTOR, OR BY ANYONE ELSE, NOR HAVE ANY THREATS BEEN MADE OR FORCE USED, TO INDUCE THE DEFENDANT TO PLEAD GUILTY. This document represents the sole agreement and understanding between the Defendant and the United States, and no other agreement will be entered into unless memorialized in writing and signed by all parties. To become effective, this agreement must be signed by all signatories listed below.

## ACKNOWLEDGMENTS

1.    I have READ this document, DISCUSSED it with my attorney, and UNDERSTAND and AGREE with all its provisions both individually and totally.


_____                    _____
        DATE                                   AARON BEAM
                                                Defendant


2.    I have discussed this case with the Defendant in detail and have advised the Defendant of the Defendant's rights and all possible defenses. The Defendant has conveyed to me that the Defendant understands this document and consents to all its terms. I believe the plea and disposition set forth herein are appropriate under the facts of this case. I concur in the entry of the plea as indicated above and on the terms and conditions set forth herein.


_____                    _____
        DATE                                  DONALD BRISKMAN
                                              Counsel for Defendant


13

3.    I have reviewed this document and agree to its provisions.


_____
ALICE H. MARTIN
United States Attorney
Northern District of Alabama


JOSHUA R. HOCHBERG
Chief, Fraud Section
Criminal Division
United States Department of Justice


_____
GEORGE A. MARTIN
Assistant United States Attorney
Northern District of Alabama

by:    _____
RICHARD C. SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice


_____
MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

```
UNITED STATES OF AMERICA          )
                                  )
v.                                )
                                  )
RICHARD E. BOTTS,                 )
Defendant                         )
```

## RULE 11(f) FACTUAL BASIS FOR GUILTY PLEA

COMES NOW the United States of America through its undersigned counsel, for the purpose of satisfying the requirements of Federal Rule of Criminal Procedure 11(f), submits the following Factual Basis in support of the guilty plea of **RICHARD E. BOTTS**:

### HealthSouth

1.     HealthSouth Corporation ("HealthSouth") was formed in 1984. HealthSouth is the nation's largest provider of outpatient surgery, diagnostic imaging, and rehabilitative health care services with approximately 1800 locations in all fifty states, the District of Columbia and abroad. Since approximately 1988 until March 2003, HealthSouth's common stock was listed on the New York Stock Exchange. Many of its executives, including its then Chief Executive Officer (the "CEO), either owned shares in HealthSouth, or owned options to such shares. The CEO, and others, were also compensated in **part** by bonuses. The bonuses depended on how well HealthSouth performed financially.

2.       HealthSouth, like other companies whose shares were publically traded, generated and publicized earnings expectations. Stock market analysts did the same. Whether a company met, exceeded, or failed to meet such expectations, was often a factor that influenced the price of its shares.

3.       Since in or about 1986, when it made its Initial Public Offering (IPO),. HealthSouth has been an issuer of a class of securities registered under Section 12 of the Securities Exchange Act of 1934, required to file quarterly and annual statements (Forms 10-Q and Forms 10-K) under said Act with the Securities Exchange Commission ("SEC"). These statements reported HealthSouth's earnings, as well as the value of its assets and liabilities. These reports were available to the public, which used them to determine whether HealthSouth met the aforesaid expectations.

4.       Under provisions of the federal securities laws and the regulations promulgated thereunder, HealthSouth was also required to make and keep books, records, and accounts that accurately and fairly reflected the transactions and dispositions of the company's assets; and to devise and maintain a system of internal accounting controls sufficient to provide − (i) reasonable assurances that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles ("GAAP") and other criteria applicable to such statements and to maintain the accountability of assets; and (ii) reasonable assurances that the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

The Conspiracy.

5.      Beginning at least in 1996, the CEO, other Senior Officers and members of
HealthSouth's accounting staff including, from time to time, Michael Martin, William Owens,
Aaron Beam, Malcolm McVay, Weston Smith, Emery Harris, Ken Livesay, Cathy Edwards,
Virginia Valentine, Kay Morgan, Angela Ayres, Jason Brown and others, engaged in a
conspiracy and scheme and artifice to, among other objectives, defraud investors by artificially
inflating HealthSouth's earnings and earnings per share, make false entries in HealthSouth's
books and records, file false statements with the SEC, and commit mail and wire fraud.

6.      HealthSouth's CEO and other Senior Officers reviewed monthly and quarterly
preliminary reports showing HealthSouth's true and actual financial results, which usually
showed that HealthSouth had not met earnings per share expectations.   At the direction of the
CEO, these Senior Officers would then direct HealthSouth's accounting staff to manipulate
HealthSouth's books, accounts and records to ensure that HealthSouth's earnings per share
number met or exceeded those expectations.

7.      Methods to increase earnings included making entries to reduced offsets against
revenues or to reduce expenses.  Corresponding fraudulent entries were made to increase assets
and decrease liabilities on HealthSouth's Balance Sheet.  Such entries were made to, among
other accounts, HealthSouth's **(1)** Property, Plant and Equipment ("PP&E") accounts; **(2)** cash
accounts; **(3)** inventory accounts; **(4)** intangible asset (goodwill) accounts; and **(5)** investment
portfolio.

8.      These entries caused the quarterly and annual financial statements filed with the
SEC for the years from before **1996** through **2002**, that is, Forms 10-Q and Forms 10-K, to be

3

materially false.  The cumulative overstatement of assets summed more than a billion dollars.
Some of these financial statements were transmitted electronically from Birmingham, Alabama
to Washington, D.C., to be filed with the SEC.

9.      The CEO and other conspirators benefitted from the conspiracy by receiving
salaries, bonuses, and an increased value in their stock and stock options.  The investing public
suffered to the extent they paid for shares whose value was inflated by the aforesaid conspiracy.

<u>The Defendant</u>

10.      Defendant **RICHARD E. BOTTS** was employed at HealthSouth since
approximately 1988 in the tax department.  In May 1998, defendant **BOTTS** was promoted to
the position of Senior Vice President for Tax.   In this position, defendant **BOTTS** headed
HealthSouth's tax department which included as many as sixteen employees.  As Senior Vice
President for Tax, defendant **BOTTS'** responsibilities included reviewing, signing and
.maintaining HealthSouth's federal tax returns, tax returns for all fifty states, the District of
Columbia and Puerto Rico, and providing information to taxing authorities who sought to ensure
HealthSouth's compliance with federal and state laws and regulations.

11.      In the course of his employment at HealthSouth, defendant **BOTTS** would and
did become aware of the HealthSouth's earnings shortfalls and the potential adverse effect on
HealthSouth's stock price if these shortfalls were disclosed to the public.

12.      In or about the fall of 2000, defendant **BOTTS** learned of, and knowingly and
voluntarily joined in, the above-described conspiracy and scheme and artifice.  This occurred in
the course of a county tangible personal property tax audit when defendant **BOTTS** learned that
bogus and fictitious assets, for which there **was** no legitimate back-up documentation, had been

4

created and placed on the books and records of HealthSouth. Once learning of the scheme, defendant BOTTS knew that the fictitious assets which had been placed on HealthSouth's general ledger would affect the amount of the depreciation which would need to be reported to the tax authorities. Members of HealthSouth's accounting staff provided defendant BOTTS with false depreciation schedules which were tied to and included the fictitious assets on the general ledger. Defendant BOTTS then provided the false depreciation schedules to tax officials, knowing that his action would prevent discovery of the bogus assets and the scheme to inflate HealthSouth's earnings.

13.    Defendant BOTTS thereafter prepared, signed and submitted, and caused to be prepared, signed and submitted, to other local and state tax authorities tax returns for HealthSouth which contained false information including, but not limited to, false information about HealthSouth's taxable income, depreciation deductions and assets.

14.    In addition, in 2001 and 2002 defendant BOTTS knowingly and wilfully prepared, signed and submitted, and caused to be prepared, signed and submitted, to the U.S. Internal Revenue Service (IRS) consolidated U.S. Corporation Income Tax Returns for HealthSouth which he knew to contain materially false information and representations including, but not limited to, false information about HealthSouth's taxable income, depreciation deductions and assets. These false documents included HealthSouth's consolidated U.S. Corporation Income Tax Returns for fiscal year 2000 dated September 15, 2001 and HealthSouth's consolidated U.S. Corporation Income Tax Returns for fiscal year 2001 dated September 16, 2002.

5

15.     Defendant **BOTTS** sent and delivered and caused to be sent and delivered to the IRS the HealthSouth U.S. Corporation Income Tax Returns via the U.S. Postal Service knowing his actions would help prevent discovery of, and thereby further, the scheme to inflate HealthSouth's publically reported earnings.

16.     Defendant **BOTTS** and others also maintained in the files, books and records of HealthSouth the above-described state and federal tax returns which they knew to contain false information.


ALICE H. MARTIN
United States Attorney
Northern District of Alabama


MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama


GEORGE A. MARTIN
Assistant United States Attorney
Northern District of Alabama


J. PATTON MEADOWS
Assistant United States Attorney
Northern District of Alabama


JOSHUA R. HOCHBERG
Chief, Fraud Section
Criminal Division
United States Department of Justice

by:

RICHARD C. SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice


RICHARD N. WIEDIS
Senior Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

FILED

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA 03 JUL 31 AM 9:42

U.S. DISTRICT COURT
SOUTHERN DIVISION  N.D. OF ALABAMA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| RICHARD E. BOTTS, | ) |
| Defendant | ) |

### PLEA AGREEMENT AND CONDITIONS

The United States of America ("United States"), RICHARD E. BOTTS ("Defendant")

and Defendant's attorney each hereby acknowledge the following to be the plea agreement

between the Defendant and the United States and the conditions and understandings that apply to

the agreement:

I. PLEA AGREEMENT  The United States and the Defendant hereby AGREE to the

following:

(a) Plea: Defendant will waive indictment and plead guilty in the Northern District of Alabama to an information charging him with one count each of Conspiracy (18 U.S.C. § 371), Mail Fraud (18 U.S.C. §1341); and criminal forfeiture (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)).

(b) Recommendation: Pursuant to Rule 11(e)(1)(B) of the *Federal Rules of Criminal Procedure,* and upon the Court's acceptance of the aforesaid plea and entry of judgment on the same, the United States will recommend that the Defendant be given a three-level reduction for acceptance of responsibility and be sentenced at the low end of the sentencing guideline range as determined by the Court.

(c) Motion for Downward Departure:  If the United States determines that the Defendant has cooperated fully, provided substantial assistance in the investigation or prosecution of another person who has committed an offense, and otherwise complied with the terms of this agreement, the United States will file a motion pursuant to *United States Sentencing Guidelines* § 5K1.1 and 18 U.S.C. § 3553(e) with the sentencing Court setting forth the nature and extent of his

cooperation. Such a motion will permit the Court, in its discretion, to impose a sentence below the applicable Sentencing Guidelines range and also below any applicable mandatory minimum sentence. In this connection, it is understood that a good faith determination by the United States as to whether Defendant has cooperated fully and provided substantial assistance and has otherwise complied with the terms of this agreement, and the United States' good faith assessment of the value, truthfulness, completeness and accuracy of the cooperation, shall be binding upon him. Defendant agrees that, in making this determination, the United States may consider facts known to it at this time. The United States may or may not, in its discretion, recommend to the Court a specific sentence to be imposed. The United States cannot and does not make a promise or representation as to what sentence will be imposed by the Court. The determination of whether to file a motion for downward departure is in the sole discretion of the United States Attorney for the Northern District of Alabama or her designated Assistant United States Attorney.

II. **CONDITIONS AND UNDERSTANDINGS**: The following conditions and understandings apply to the above stated plea agreement:

## AGREEMENT TO MAKE RESTITUTION

The Court can order the Defendant to pay restitution for the full loss caused by Defendant's criminal conduct. The Defendant agrees the Court's consideration of the amount of restitution shall **NOT** be limited to the amounts alleged in the counts to which the Defendant is pleading guilty, and may include all amounts attributable to the Defendant's conduct, whether charged or uncharged, pursuant to 18 U.S.C. §3663, provided, however, that the value of any property forfeited shall be credited against any order of restitution. The Defendant further agrees that any amount ordered by the Court to be paid as restitution may not be discharged, in whole or in part, in any bankruptcy proceeding.

The Defendant acknowledges that, because the offense of conviction occurred after April 24, **1996**, restitution is mandatory without regard to the Defendant's ability to pay.

2

## ASSET FORFEITURE

As stated in Paragraph I(a), above, the Defendant hereby agrees to surrender to the United States of America any and all property constituting, or derived from proceeds traceable to violations of Title 18, United States Code, Section 371 on or before the date of sentencing in this action, and further consents to the entry of an order of criminal forfeiture herein of said property at that time under Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as property constituting or derived from proceeds traceable to violations of Title 18, United States Code, Section 371, without further notice to him. Defendant further agrees to waive any and all claims, defenses or challenges, and to not contest or challenge in any manner (including direct appeal or any other means) any related administrative or civil judicial forfeiture on any grounds, including that the forfeiture constitutes double jeopardy, or an excessive fine or punishment. The Defendant will cooperate fully with investigations of his financial assets, including cooperation in the tracing all of the Defendant's assets.

## POSSIBLE SENTENCES AND THE GUIDELINES

(a)  Maximum Possible Sentences:

The Defendant acknowledges that the maximum statutory sentence for Conspiracy in violation of Title 18, United States Code, Section 371 is not more than 5 years imprisonment and/or a fine not to exceed $250,000, or twice the pecuniary gain/loss caused by the Defendant's act. Additionally, the Defendant is aware, if imprisonment is imposed, that the Court may include as part of the sentence a requirement that the Defendant be placed on supervised release after imprisonment for a term not to exceed three (3) years.

The Defendant acknowledges that the maximum statutory sentence for Mail Fraud in violation of Title 18, United States Code, Section 1341 is not more than 5 years imprisonment

3

and/or a fine not to exceed $250,000, or twice the pecuniary gain/loss caused by the Defendant's act. Additionally, the Defendant is aware, if imprisonment is imposed, that the Court may include as part of the sentence a requirement that the Defendant be placed on supervised release after imprisonment for a term not to exceed three (3) years.

If the term of supervised release for the count of conviction is revoked, the Defendant may be imprisoned for an additional term not to exceed the term of imprisonment authorized in Title 18, United States Code, Section 3583(e)(3) for the offense of conviction, with no credit being given for any time served while on supervised release. Further, if the crime of conviction occurred after September 13, 1994, the Court may impose another term of supervised release following any term of imprisonment imposed for a violation of supervised release conditions, and this term of supervised release may not exceed the term of supervised release originally authorized by statute for the offense of conviction less any term of imprisonment that was imposed upon revocation of supervised release. (18 U.S.C. §3583(e) and (h)). If a second or subsequent term of supervised release is revoked, the Court may impose another term of imprisonment not to exceed the difference between any imprisonment imposed for a prior revocation of supervised release for the offense of conviction and the term of imprisonment authorized pursuant to Title 18, United States Code, Section 3583(e)(3). Accordingly, the original term of imprisonment when combined with any term of imprisonment arising from revocations of supervised release, may result in a total amount of imprisonment greater than the statutory maximum term for the offense of conviction.

(b) <u>Special Assessment Fees</u>: The Defendant hereby agrees to pay the total amount required for the Special Monetary Assessment ($100 per felony count) to the Clerk, United States District Court, **at the time of sentencing.**

4

(c) <u>Sentencing Guidelines</u>: The Defendant is aware that the sentence to be imposed shall be in conformity with the Sentencing Guidelines promulgated pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §3551 through §3742, and 28 U.S.C. §991 through §998, and that a sentence imposed under the Guidelines is without parole. The Defendant is further aware that the sentence has not yet been determined by the Court, that any estimate of the likely sentence received from any source is a prediction, not a promise, and that the Court has the final discretion to impose any sentence up to the statutory maximum. The Defendant further understands that all recommendations or requests by the United States pursuant to this agreement are not binding upon the Court (Sentencing Guidelines §6B1.4(d)). The Court will impose a sentence within the appropriate guideline range, unless the Court finds there is a basis for departure because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. The Court may also depart from the guidelines if there is a motion from the United States stating that the Defendant has provided substantial assistance in the investigation or prosecution of another person who has committed a criminal offense.

If the sentencing Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, but will remain bound to fulfill all of the obligations under the agreement.

Nothing in the plea agreement, save and except any stipulations contained herein, limits the right of the United States to present to the Court or Probation Office, either orally or in Writing, any and all facts and arguments relevant to the Defendant's sentence and the Defendant's criminal history category, that are available to the United States at the time of sentencing. The

United States reserves its fill right of allocution pursuant to Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedure.

The Defendant further understands that the sentence to be imposed upon the Defendant will be determined solely by the sentencing judge. The United States cannot and does not make any promise or representation as to what sentence the Defendant will receive.

(d) <u>Non-binding</u>: It is the Court's duty to impose sentence. The Court is not a party to the above plea agreement. Any sentence recommendation by the United States does not bind the Court, and the Court may impose a more severe or less severe sentence than that recommended.

## <u>WITHDRAWAL OF GUILTY PLEA NOT ALLOWED</u>

If the Court decides not to give the recommended sentence, or decides that the recommended sentence is not within the guidelines range, the Defendant may not withdraw the plea of guilty.

## <u>FAMILIARITY WITH CHARGES</u>

The Defendant is aware of the charges, and has discussed the charges and possible defenses with counsel. The Defendant is fully aware of the elements of each count.

## <u>ACKNOWLEDGMENT OF GUILT</u>

The Defendant is pleading guilty to the charges described above because the Defendant is in fact guilty and for no other reason.

## <u>COOPERATION - IN GENERAL</u>

The Defendant will cooperate fully with the United States and with any federal, state or local law enforcement or regulatory agency designated by the United States Attorney, including, but not limited to, the Securities and Exchange Commission. This cooperation will include, but is not limited to, the following:

(a)    Defendant agrees to be fully debriefed and to attend all meetings at which his presence is requested by the United States, concerning his participation in and knowledge of all criminal activities.

(b)    Defendant waives all claims of attorney-client privilege and agrees to furnish to the United States all documents and other material that may be relevant to the investigation and that are in Defendant's possession or control, except privileged communications relating to the investigation by the United States, and waives his right to move to suppress evidence or raise any other Fourth or Fifth Amendment claims, and waives his right to any further discovery from the government.

(c)    Defendant agrees not to reveal his cooperation, or any information derived therefrom to any third party without prior consent of the United States, and to instruct his attorneys to do the same.

(d)    Defendant agrees to testify at any proceeding in the Northern District of Alabama or elsewhere as requested by the United States.

(e)    Defendant consents to adjournments of his sentence as requested by the United States and agrees that his obligations under this agreement continue until the United States determines that his cooperation is concluded.

## WAIVER OF CERTAIN CONSTITUTIONAL RIGHTS

The Defendant understands that by pleading guilty, the following constitutional rights will be relinquished: the right to be indicted by a grand jury, if proceeding by information; the right to plead not guilty; the right to be tried by a jury or, if the Defendant wishes and with the consent of the United States, to be tried by a judge. At that trial, the Defendant would have the right to an attorney and, if the Defendant could not afford an attorney, the Court would appoint one to represent the Defendant. The Defendant would have the right to assist in the selection of the jury. During the trial, the Defendant would be presumed innocent and a jury would be instructed that the burden of proof is on the United States to prove the Defendant guilty beyond a reasonable doubt and by a unanimous verdict. The Defendant would have the right to confront and cross-examine witnesses against the Defendant. If desired, the Defendant could testify on his

7

own behalf and present witnesses in his own defense. On the other hand, if the Defendant did not wish to testify, that fact could not be used against him and the jury would be so instructed. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal that verdict to determine if any errors had been committed during trial that would require either a new trial or a dismissal of the charges.

By pleading guilty, the Defendant will be giving up all of these rights. By pleading guilty, the Defendant may be required to answer questions posed to him by the Court both about the rights that the Defendant will be giving up and the factual basis for the Defendant's plea. Any statements made by the Defendant during such a hearing are not, in any civil or criminal proceeding, admissible against Defendant except as provided Rule 11(e)(6) of the *Federal Rules of Criminal Procedure*.

## RULE 11(e)(6) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

The Defendant knowingly and expressly waives all of the rights afforded Defendant pursuant to the provisions of Rule 11(e)(6) of the *Federal Rules of Criminal Procedure* and Section 1B1.8(a) of the United States Sentencing Guidelines in the event, and only in the event, that, after he enters a plea of guilty pursuant to this agreement, the Defendant then moves to withdraw his plea of guilty and the grants his motion. In that event, the following shall be admissible against the Defendant:

(a)    Plea of guilty which is later withdrawn or which the Defendant seeks to withdraw;

(b)    Any statement made in the course of any proceeding under Rule 11 regarding said plea of guilty;

(c)    Any statement made in the course of plea discussions with an attorney or

agent for the United States which result in a plea of guilty later withdrawn.

The parties expressly agree that, if the Court rejects this plea agreement, the above waiver will

not apply and the Defendant will have all the rights and protections afforded him by Rule

11(e)(6).

## WAIVER OF RIGHTS TO APPEAL AND COLLATERAL ATTACK

Defendant is aware that his sentence will be imposed in accordance with the United

States Sentencing Commission's *Guidelines Manual*. Defendant nonetheless acknowledges and

agrees that the Court has jurisdiction and authority to impose any sentence within the statutory

maximum set for the offense(s) to which Defendant pleads guilty. Defendant is aware that Title

18, United States Code, Section 3742, affords a defendant the right to appeal the sentence

imposed. Knowing that, Defendant waives the right to appeal his sentence or the manner in

which it was determined on the grounds set forth in Title 18, United States Code, Section 3742,

or any other grounds, except that Defendant may appeal a sentence imposed above the statutory

maximum, in violation of, or an upward departure from the Sentencing Guidelines. This

agreement does not affect the rights or obligations of the United States as set forth in Title 18,

United States Code, Section 3742(b).

In agreeing to this waiver, Defendant is aware that a sentence has not yet been determined

by the Court. Defendant is also aware that any estimate of the probable sentencing range under

the sentencing guidelines that he may have received from his counsel, the United States or the

Probation Office, is a prediction, not a promise, and is not binding on the United States, the

Probation Office or the Court. The United States does not make any promise or representation

concerning what sentence Defendant will receive. Realizing the uncertainty in estimating what

sentence Defendant will ultimately receive, Defendant knowingly waives the right to appeal the sentence, except as stated above, in exchange for the concessions made by the United States in this plea agreement.

Defendant's right to file a motion attacking his sentence pursuant to 28 U.S.C. § 2255 has also been explained to him and he understands that right. As a part of this plea agreement, Defendant waives his right to challenge his conviction and sentence pursuant to 28 U.S.C. § 2255.

## Acknowledgment

I hereby knowingly, intelligently, and voluntarily waive the rights to appeal or collaterally attack the sentence as set forth above.

RICHARD E. BOTTS
Defendant

## BANKRUPTCY WAIVER

Defendant agrees not to attempt to avoid paying any fine or restitution imposed by the Court through any proceeding pursuant to the United States Bankruptcy Code. Defendant waives all rights, if any, to obtain discharge or to delay payment of any fine or restitution obligation or alter the time for payment by filing a petition pursuant to the Bankruptcy Code. Defendant stipulates that enforcement of any fine or restitution obligation by the United States is not barred or affected by the automatic stay provisions of the United States Bankruptcy Code (Title 11, United States Code, Section 362), and that enforcement of any fine or restitution obligation by the United States is a valid exercise of its police or regulatory power within the meaning of Title 11, United States Code, Section 362(b). Defendant stipulates and agrees not to institute or participate in any proceeding to interfere with, alter, or bar enforcement of any fine or restitution

10

obligation pursuant to the automatic stay or other provision of the Bankruptcy Code in any case filed by Defendant or his creditors. Upon request of the United States, Defendant will execute an order or stipulation granting the United States relief from the automatic stay or other Bankruptcy Code provisions in order to enforce any fine or restitution obligation. Defendant stipulates that any fine or restitution obligation imposed by the Court is not dischargeable pursuant to Title 11, United States Code, Section 523 in any case commenced by Defendant or his creditors pursuant to the Bankruptcy Code. Defendant's waivers and stipulations or agreements set forth above are made in exchange for the United States' concessions set forth in this agreement.

## COUNSEL

The Defendant has discussed this case at length with Defendant's counsel. The Defendant is satisfied with counsel's investigation of the case, exploration of possible defenses, advice and other representation.

## OTHER DISTRICTS AND JURISDICTIONS

This document **DOES NOT BIND** any other United States Attorney in any other district, and it in no way limits, binds, or otherwise affects the rights, powers, duties or obligations of any state or local law enforcement agency, administrative or regulatory authorities, civil or administrative enforcement, collection, bankruptcy, adversary proceedings or suits which have been or may be filed by any government & entity.

## TAX PROCEEDINGS

Unless otherwise specified herein, this document in no way applies to or limits any pending or prospective proceedings, related to the Defendant's **tax liabilities**, if any.

## BREACH OF AGREEMENT

In the event either party believes the other has failed to fulfill any obligations under this agreement, then the complaining party shall, in its discretion, have the option of petitioning the Court to be relieved of its obligations herein. Whether or not a party has completely fulfilled all of its obligations under this agreement shall be determined by the Court in an appropriate proceeding at which any disclosures and documents provided by either party shall be admissible and at which the complaining party shall be required to establish any breach by a preponderance of the evidence. The Defendant hereby **WAIVES** all rights pursuant to Rule 32(e), *Federal Rules of Criminal Procedure,* to withdraw from Defendant's guilty plea and this agreement, save and except for the limited reasons outlined above in this paragraph.

In the event that the Defendant, after entry of a plea of guilty, unsuccessfully attempts to withdraw his plea of guilty, the United States may continue to enforce the agreement but will no longer be bound by any provision in this agreement regarding acceptance of responsibility. This provision will not have any continued vitality if it is determined by 'the Court that the United States acted in bad faith to bring about the attempted withdrawal of plea.

## COMPETENCE

The Defendant has not had any drugs, medication or alcohol within the past 48 hours except as stated hereafter, and is competent to enter the plea agreement stated above.

## COMPLETE AGREEMENT

Other than what is contained in this document, NO PROMISES, OR REPRESENTATIONS HAVE BEEN MADE TO THE DEFENDANT BY THE PROSECUTOR, OR BY ANYONE ELSE, NOR HAVE ANY THREATS BEEN MADE OR FORCE USED; TO INDUCE THE DEFENDANT TO PLEAD GUILTY. This document

12

represents the sole agreement and understanding between the Defendant and the United States, and no other agreement will be entered into unless memorialized in writing and signed by all parties. To become effective, this agreement must be signed by all signatories listed below.

## ACKNOWLEDGMENTS

1.  I have **READ** this document, DISCUSSED it with my attorney, and UNDERSTAND and AGREE with all its provisions both individually and totally.

7/25/03
_____
DATE

_____
Defendant

2.  I have discussed this case with the Defendant in detail and have advised the Defendant of the Defendant's rights and all possible defenses. The Defendant has conveyed to me that the Defendant understands this document and consents to all its terms. I believe the plea and disposition set forth herein are appropriate under the facts of this case. I concur in the entry of the plea as indicated above and on the terms and conditions set forth herein.

9/28/03
_____
DATE

_____
DAVID MEISTER
Counsel for Defendant

13

3.      I have reviewed this document and agree to its provisions.


ALICE H. MARTIN
United States Attorney
Northern District of Alabama


MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama


GEORGE A. MARTIN
Assistant United States Attorney
Northern District of Alabama


J. PATTON MEADOWS
Assistant United States Attorney
Northern District of Alabama


JOSHUA R. HOCHBERG
Chief, Fraud Section
Criminal Division
United States Department of Justice

by:

RICHARD C. SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice


RICHARD N. WIEDIS
Senior Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice


14

03 JUL 31 AM 9: 42

U.S. DISTRICT COURT
N.R. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| WILL HICKS, | ) |
| Defendant | ) |

## RULE 11(f) FACTUAL BASIS FOR GUILTY PLEA

COMES NOW the United States of America through its undersigned counsel, for the purpose of satisfying the requirements of Federal Rule of Criminal Procedure 11(f), submits the following Factual Basis in support of the guilty plea of **WILL HICKS**:

### HealthSouth

1.      HealthSouth Corporation ("HealthSouth") was formed in 1984. HealthSouth is the nation's largest provider of outpatient surgery, diagnostic imaging, and rehabilitative health care services with approximately 1800 locations in all 50 states and abroad. Since approximately 1988 until March 2003, HealthSouth's common stock was listed on the New York Stock Exchange. Many of its executives, including its then Chief Executive Officer (the "CEO"), either owned shares in HealthSouth, or owned options to such shares. The CEO, and others, were also compensated in part by bonuses. The bonuses depended on how well HealthSouth performed financially.

2.  .    HealthSouth, like other companies whose shares were publically traded, generated and publicized earnings expectations. Stock market analysts did the same. Whether a company met, exceeded, or failed to meet such expectations, was often a factor that influenced the price of its shares.

3.    Since in or about 1986, when it made its Initial Public Offering (IPO), HealthSouth has been an issuer of a class of securities registered under Section 12 of the Securities Exchange Act of 1934 required to file quarterly and annual statements (Forms 10-Q and Forms 1OK) under said Act with the Securities Exchange Commission ("SEC"). These statements reported HealthSouth's earnings, as well as the value of its assets and liabilities. These reports were available to the public which used them to determine whether HealthSouth met the aforesaid expectations.

4.    Under provisions of the federal securities laws and the regulations promulgated thereunder, HealthSouth was also required to make and keep books, records and accounts that accurately and fairly reflected the transactions and dispositions of the company's assets and to devise and maintain a system of internal accounting controls sufficient to provide − (i) reasonable assurances that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles ("GAAP") and other criteria applicable to such statements and to maintain the accountability of assets; and (ii) reasonable assurances that the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

2

<u>The Conspiracy</u>.

5.     Beginning at least in 1996, the CEO, other Senior Officers and members of HealthSouth's accounting staff including, from time to time, Michael Martin, William Owens, Aaron Beam, Malcolm McVay, Weston Smith, Emery Harris, Ken Livesay, Cathy Edwards, Virginia Valentine, Kay Morgan, Angela Ayres, Jason Brown and others, engaged in a conspiracy and scheme and artifice to, among other objectives, defraud investors by artificially inflating HealthSouth's earnings and earnings per share, make false entries in HealthSouth's books and records, file false statements with the SEC and commit mail and wire fraud.

6.     The CEO and other Senior Officers reviewed monthly and quarterly preliminary reports showing HealthSouth's true and actual financial results, which usually showed that HealthSouth had not met earnings per share expectations.   At the direction of the CEO, these Senior Officers would then direct HealthSouth's accounting staff to manipulate HealthSouth's books, accounts and records to ensure that HealthSouth's earnings per share number met or exceeded those expectations.

7.     Methods to increase earnings included making entries to reduce offsets against revenues or to reduce expenses.  Corresponding fraudulent entries were made to increase assets and decrease liabilities on HealthSouth's Balance Sheet. Such entries were made in, among other accounts, HealthSouth's (1) Property, Plant and Equipment ("PP&E") accounts; (2) cash accounts; (3) inventory accounts;  (4) intangible asset (goodwill) accounts; and (5) investment portfolio.

8. These entries caused the quarterly and annual financial statements filed with the SEC for the years from before 1996 through 2002, that is, Forms 10-Q and Forms 10-K, to be materially false. The cumulative overstatement of assets summed more than a billion dollars. Some of these financial statements were transmitted electronically from Birmingham, Alabama to Washington, D.C., to be filed with the SEC.

9. The CEO and other conspirators benefitted from the conspiracy by receiving salaries, bonuses, and an increased value in their stock and stock options. The investing public suffered to the extent they paid for shares whose value was inflated by the aforesaid conspiracy.

### The Defendant

10. From 1991 until 1996, defendant WILL HICKS was a securities analyst at Cowen and Company in Boston, Massachusetts, where he specialized in coverage of the health care industry. During this period he issued reports on healthcare companies including HealthSouth. From 1996 until March 1999, defendant HICKS was a principal in 21st Century Health Ventures, a company he owned with the CEO and Michael Martin, the then Chief Financial Officer of HealthSouth. In March 1999, defendant HICKS was hired by the CEO for the position of Vice President of Investments at HealthSouth. Defendant HICKS' responsibilities included managing HealthSouth's investment portfolio and advising HealthSouth on the viability of current and potential investments. Defendant HICKS also caused the preparation of summaries of HealthSouth's investment portfolio and met with HealthSouth's auditors to review and discuss the value of the investment portfolio.

## Inflated Valuation of HealthSouth's Investment Portfolio

11.    In or about the late fall or early winter of 2000, defendant HICKS learned that the value of HealthSouth's investment in a privately held company ("the privately held company") which operated senior residential assisted living facilities ("the assisted living facility investment") would be substantially impaired unless HealthSouth participated in an additional round of financing being offered by the privately held company.

12.    In or about the end of 2000, defendant HICKS informed the CEO and one of the other Senior Officers that the value of HealthSouth's assisted living facility investment, which HealthSouth carried on its balance sheet at $13 million, should be written off or its value would be substantially impaired unless HealthSouth participated in an additional round of financing being offered by the privately held company.

13.    In or about the winter of 2000 or spring of 2001, one of the Senior Officers instructed defendant HICKS not to inform HealthSouth's auditors orally or in writing that the value of the assisted living facility investment would be substantially impaired unless HealthSouth purchased additional shares of the privately held company.

14.    In or about the winter of 2000 or spring 2001, defendant HICKS knowingly and intentionally joined in the above described conspiracy.

15.    In or about the spring of 2001, defendant HICKS caused the preparation of a summary of the assets in HealthSouth's investment portfolio to be provided to HealthSouth's accountants in connection with their audit of HealthSouth's financial statements for the year ended December 31, 2000, which contained false information and omitted material facts concerning HealthSouth's assisted living facility investment.

16.    In or about the spring of 2001, during the audit of HealthSouth's financial statements for the year ended December 31,2000, defendant HICKS provided HealthSouth's accountants with the investment portfolio summary described above which contained false information and omitted material facts about the value of the assisted living facility investment.

17.    In or about the spring of 2001, defendant HICKS met with HealthSouth's accountants during their audit of HealthSouth's financial statements for the year ended December 31,2000, discussed HealthSouth's investment portfolio and omitted material facts concerning the value of the assisted living facility investment.

18.    In or about 2001, defendant HICKS learned that HealthSouth would not participate in the additional round of financing offered by the privately held company and that as a result HealthSouth's assisted living facility investment was substantially worthless. Defendant HICKS advised one of the Senior Officers that HealthSouth was required to write down the value of the assisted living facility investment.

19.    In or about 2001, one of the Senior Officers told defendant HICKS that HealthSouth would not write down the value of its assisted living facility investment and that HealthSouth would continue to represent on its books and to its auditors that the investment was valued at $13 million.

20.    In or about the spring of 2002, one of the Senior Officers instructed defendant HICKS not to inform HealthSouth's accountants of material facts which would adversely affect the $13 million valuation which HealthSouth placed on its assisted living facility investment.

21.    In or about the spring of 2002, defendant HICKS caused the preparation of a summary of the assets in HealthSouth's investment portfolio to be provided to HealthSouth's

accountants in connection with their audit of HealthSouth's financial statements for the year ended December 31, 2001 which contained false information and omitted material facts concerning the value of the assisted living facility investment.

22.    In or about the spring of 2002, during the audit of HealthSouth's financial statements for the year ended December 31, 2001, defendant HICKS provided HealthSouth's accountants with an investment portfolio summary which contained false information and omitted material facts about the value of the assisted living facility investment.

23.    In or about the spring of 2002, defendant HICKS met with HealthSouth's, accountants during their audit of HealthSouth's financial statements for the year ended December 31, 2001, discussed HealthSouth's investment portfolio and omitted material facts concerning the value of the assisted living facility investment.

24.    Defendant HICKS and others also maintained in the files, books and records of HealthSouth the above-described documents and records which they knew to contain false information.

ALICE H. MARTIN
United States Attorney
Northern District of Alabama

JOSHUA R. HOCHBERG
Chief, Fraud Section
Criminal Division
United States Department of Justice

7

MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama

by:     RICHARD C. SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice

GEORGE A/M
Assistant United States Attorney
Northern District of Alabama

RICHARD N. WIEDIS
Senior Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

J. PATTON MEADOWS
Assistant United States Attorney
Northern District of Alabama

8

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

UNITED STATES OF AMERICA )
                         )
     v.                  )
                         )
WILL HICKS,              )
Defendant

PLEA AGREEMENT AND CONDITIONS

The United States of America ("United States"), WILL HICKS ("Defendant") and

Defendant's attorney each hereby acknowledge the following to be the plea agreement between

the Defendant and the United States and the conditions and understandings that apply to the

agreement:

I.  PLEA AGREEMENT:  The United States and the Defendant hereby AGREE to the

following:

(a)  Plea: Defendant will waive indictment and plead guilty in the Northern District of
     Alabama to an information charging him with one count of Conspiracy (18 U.S.C.
     § 371) and one count of criminal forfeiture (18 U.S.C. § 981(a)(1)(C) and 28
     U.S.C. § 2461(c)).

(b)  Recommendation: Pursuant to Rule 11(e)(1)(B) of the *Federal Rules of Criminal
     Procedure,* and upon the Court's acceptance of the aforesaid plea and entry of
     judgment on the same, the United States will recommend that the Defendant be
     given a three-level reduction for acceptance of responsibility.

(c)  Motion for Downward Departure:   If the United States determines that the
     Defendant has cooperated fully, provided substantial assistance in the
     investigation or prosecution of another person who has committed an offense, and
     otherwise complied with the terms of this agreement, the United States will file a
     motion pursuant to *United States Sentencing Guidelines* § 5K1.1 and 18 U.S.C.
     § 3553(e) with the sentencing Court setting forth the nature and extent of his

cooperation. Such a motion will permit the Court, in its discretion, to impose a sentence below the applicable Sentencing Guidelines range and also below any applicable mandatory minimum sentence. In this connection, it is understood that a good faith determination by the United States as to whether Defendant has cooperated fully and provided substantial assistance and has otherwise complied with the terms of this agreement, and the United States' good faith assessment of the value, truthfulness, completeness and accuracy of the cooperation, shall be binding upon him. Defendant agrees' that, in making this determination, the United States may consider facts known to it at this time. The United States may or may not, in its discretion, recommend to the Court a specific sentence to be imposed. The United States cannot and does not make a promise or representation as to what sentence will be imposed by the Court. The determination of whether to file a motion for downward departure is in the sole discretion of the United States Attorney for the Northern District of Alabama or her designated Assistant United States Attorney.

11. CONDITIONS AND UNDERSTANDINGS: The following conditions and understandings apply to the above stated plea agreement:

### AGREEMENT TO MAKE RESTITUTION

The Court can order the Defendant to pay restitution for the full loss caused by Defendant's criminal conduct. The Defendant agrees the Court's consideration of the amount of restitution shall **NOT** be limited to the amounts alleged in the counts to which the Defendant is pleading guilty, and may include all amounts attributable to the Defendant's conduct, whether charged or uncharged, pursuant to 18 U.S.C. §3663, provided, however, that the value of any property forfeited shall be credited against any order of restitution. The Defendant further agrees that any amount ordered by the Court to be paid as restitution may not be discharged, in whole or in part, in any bankruptcy proceeding.

The Defendant acknowledges that, because the offense of conviction occurred after April 24, 1996, restitution is mandatory without regard to the Defendant's ability to pay.

## ASSET FORFEITURE

As stated in Paragraph I(a), above, the Defendant hereby agrees to surrender to the United States of America any and all property constituting, or derived from proceeds traceable to violations of Title 18, United States Code, Section 371 on or before the date of sentencing in this action, and further consents to the entry of an order of criminal forfeiture herein of said property at that time under Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as property constituting or derived from proceeds traceable to violations of Title 18, United States Code, Section 371, without further notice to him. Defendant has been informed that the government interprets property constituting or derived from proceeds traceable to the above-referenced violation to be bonuses he received or the profits from sales of HealthSouth stock in the time period after he joined the above-referenced conspiracy. Defendant further agrees to waive any and all claims, defenses or challenges, and to not contest or challenge in any manner (including direct appeal or any other means) any related administrative or civil judicial forfeiture on any grounds, including that the forfeiture constitutes double jeopardy, or an excessive fine or punishment. The Defendant will cooperate fully with investigations of his financial assets, including cooperation in the tracing all of the Defendant's assets.

## POSSIBLE SENTENCES AND THE GUIDELINES

(a) Maximum Possible Sentences:

The Defendant acknowledges that the maximum statutory sentence for Conspiracy in violation of Title 18, United States Code, Section 371 is not more than 5 years imprisonment and/or a fine not to exceed $250,000, or twice the pecuniary gain/loss caused by the Defendant's acts. Additionally, the Defendant is aware, if imprisonment is imposed, that the Court may

include as part of the sentence a requirement that the Defendant be placed on supervised release after imprisonment for a term not to exceed three (3) years.

If the term of supervised release for the count of conviction is revoked, the Defendant may be imprisoned for an additional term not to exceed the term of imprisonment authorized in Title 18, United States Code, Section 3583(e)(3) for the offense of conviction, with no credit being given for any time served while on supervised release. Further, if the crime of conviction occurred after September 13, 1994, the Court may impose another term of supervised release following any term of imprisonment imposed for a violation of supervised release conditions, and this term of supervised release may not exceed the term of supervised release originally authorized by statute for the offense of conviction less any term of imprisonment that was imposed upon revocation of supervised release. (18 U.S.C. §3583(e) and (h)). If a second or subsequent term of supervised release is revoked, the Court may impose another term of imprisonment not to exceed the difference between any imprisonment imposed for a prior revocation of supervised release for the offense of conviction and the term of imprisonment authorized pursuant to Title 18, United States Code, Section 3583(e)(3). Accordingly, the original term of imprisonment when combined with any term of imprisonment arising from revocations of supervised release, may result in a total amount of imprisonment greater than the statutory maximum term for the offense of conviction.

(b)  <u>Special Assessment Fees</u>:  The Defendant hereby agrees to pay the total amount required for the Special Monetary Assessment ($100 per felony count) to the Clerk, United States District Court, **at the time of sentencing.**

(c)  <u>Sentencing Guidelines</u>:  The Defendant is aware that the sentence to be imposed shall be in conformity with the Sentencing Guidelines promulgated pursuant to the Sentencing Reform

Act of 1984 at 18 U.S.C. §3551 through §3742, and 28 U.S.C. §991 through §998, and that a sentence imposed under the Guidelines is without parole. The Defendant is further aware that the sentence has not yet been determined by the Court, that any estimate of the likely sentence received from any source is a prediction, not a promise, and that the Court has the final discretion to impose any sentence up to the statutory maximum. The Defendant further understands that all recommendations or requests by the United States pursuant to this agreement are not binding upon the Court (Sentencing Guidelines §6B1.4(d)). The Court will impose a sentence within the appropriate guideline range, unless the Court finds there is a basis for departure because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. The Court may also depart from the guidelines if there is a motion from the United States stating that the Defendant has provided substantial assistance in the investigation or prosecution of another person who has committed a criminal offense.

If the sentencing Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, but will remain bound to fulfill all of the obligations under the agreement.

Nothing in the plea agreement, save and except any stipulations contained herein, limits the right of the United States to present to the Court or Probation Office, either orally or in writing, any and all facts and arguments relevant to the Defendant's sentence and the Defendant's criminal history category, that are available to the United States at the time of sentencing. The United States reserves its full right of allocution pursuant to Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedure.

The Defendant further understands that the sentence to be imposed upon the Defendant will be determined solely by the sentencing judge, The United States cannot and does not make any promise or representation as to what sentence the Defendant will receive.

(d) Non-binding: It is the Court's duty to impose sentence. The Court is not a party to the above plea agreement. Any sentence recommendation by the United States does not bind the Court, and the Court may impose a more severe or less severe sentence than that recommended.

## WITHDRAWAL OF GUILTY PLEA NOT ALLOWED

If the Court decides not to give the recommended sentence, or decides that the recommended sentence is not within the guidelines range, the Defendant may not withdraw the plea of guilty.

## FAMILIARITY WITH CHARGES

The Defendant is aware of the charges, and has discussed the charges and possible defenses with counsel. The Defendant is fully aware of the elements of each count.

## ACKNOWLEDGMENT OF GUILT

The Defendant is pleading guilty to the charges described above because the Defendant is in fact guilty and for no other reason.

## COOPERATION - IN GENERAL

The Defendant will cooperate fully with the United States and with any federal, state or local law enforcement or regulatory agency designated by the United States Attorney, including, but not limited to, the Securities and Exchange Commission. This cooperation will include, but is not limited to, the following:

(a) Defendant agrees to be fully debriefed and to attend all meetings at which his presence is requested by the United States, concerning his participation in and knowledge of all criminal activities.

(b) Defendant waives all claims of attorney-client privilege which he might assert over communications made during the course of or in furtherance of the conspiracy. Defendant agrees to furnish to the United States all

6

documents and other material that may be relevant to the investigation and that are in Defendant's possession or control, waives his right to move to suppress evidence or raise any other Fourth or Fifth Amendment claims, and waives his right to any further discovery from the government.

(c)    Defendant agrees not to reveal his cooperation, or any information derived therefrom to any third party without prior consent of the United States, and to instruct his attorneys to do the same.

(d)    Defendant agrees to testify at any proceeding in the Northern District of Alabama or elsewhere as requested by the United States.

(e)    Defendant consents to adjournments of his sentence as requested by the United States and agrees that his obligations under this agreement continue until the United States determines that his cooperation is concluded.

## WAIVER OF CERTAIN CONSTITUTIONAL RIGHTS

The Defendant understands that by pleading guilty, the following constitutional rights will be relinquished: the right to be indicted by a grand jury, if proceeding by information; the right to plead not guilty; the right to be tried by a jury or, if the Defendant wishes and with the consent of the United States, to be tried by a judge. At that trial, the Defendant would have the right to an attorney and, if the Defendant could not afford an attorney, the Court would appoint one to represent the Defendant. The Defendant would have the right to assist in the selection of the jury. During the trial, the Defendant would be presumed innocent and a jury would be instructed that the burden of proof is on the United States to prove the Defendant guilty beyond a reasonable doubt and by a unanimous verdict. The Defendant would have the right to confront and cross-examine witnesses against the Defendant, If desired, the Defendant could testify on his own behalf and present witnesses in his own defense. On the other hand, if the Defendant did not wish to testify, that fact could not be used against him and the jury would be so instructed. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal that

verdict to determine if any errors had been committed during trial that would require either a new trial or a dismissal of the charges.

By pleading guilty, the Defendant will be giving up all of these rights. By pleading guilty, the Defendant may be required to answer questions posed to him by the Court both about the rights that the Defendant will be giving up and the factual basis for the Defendant's plea. Any statements made by the Defendant during such a hearing are not, in any civil or criminal proceeding, admissible against Defendant except as provided Rule 11(e)(6) of the *Federal Rules of Criminal Procedure.*

## RULE 11(e)(6) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

The Defendant knowingly and expressly waives all of the rights afforded Defendant pursuant to the provisions of Rule 11(e)(6) of the *Federal Rules of Criminal Procedure* and Section 1B1.8(a) of the United States Sentencing Guidelines in the event, and only in the event, that, after he enters a plea of guilty pursuant to this agreement, the Defendant then moves to withdraw his plea of guilty and the Court grants his motion. In that event, the following shall be admissible against the Defendant:

    (a)    Plea of guilty which is later withdrawn or which the Defendant seeks to withdraw;

    (b)    Any statement made in the course of any proceeding under Rule 11 regarding said plea of guilty;

    (c)    Any statement made in the course of plea discussions with an attorney or agent for the United States which result in a plea of guilty later withdrawn.

The parties expressly agree that, if the Court rejects this plea agreement, the above waiver will not apply and the Defendant will have all the rights and protections afforded him by Rule 11(e)(6).

## WAIVER OF RIGHTS TO APPEAL AND COLLATERAL ATTACK

Defendant is aware that his sentence will be imposed in accordance with the United States Sentencing Commission's *Guidelines Manual*. Defendant nonetheless acknowledges and agrees that the Court has jurisdiction and authority to impose any sentence within the statutory maximum set for the offense(s) to which Defendant pleads guilty. Defendant is aware that Title 18, United States Code, Section 3742, affords a defendant the right to appeal the sentence imposed. Knowing that, Defendant waives the right to appeal his sentence or the manner in which it was determined on the grounds set forth in Title 18, United States Code, Section 3742, or any other grounds, except that Defendant may appeal a sentence imposed above the statutory maximum or an upward departure from the Sentencing Guidelines. This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).

In agreeing to this waiver, Defendant is aware that a sentence has not yet been determined by the Court. Defendant is also aware that any estimate of the probable sentencing range under the sentencing guidelines that he may have received from his counsel, the United States or the Probation Office, is a prediction, not a promise, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence Defendant will receive. Realizing the uncertainty in estimating what sentence Defendant will ultimately receive, Defendant knowingly waives the

9

right to appeal the sentence, except as stated above, in exchange for the concessions made by the

United States in this plea agreement.

Defendant's right to file a motion attacking his sentence pursuant to 28 U.S.C. § 2255 has

also been explained to him and he understands that right. As a part of this plea agreement,

Defendant waives his right to challenge his conviction and sentence pursuant to 28 U.S.C.

§ 2255.

Acknowledgment

I hereby knowingly, intelligently, and voluntarily waive the rights to appeal or collaterally attack
the sentence as set forth above.

_____
WILL HICKS
Defendant

## BANKRUPTCY WAIVER

Defendant agrees not to attempt to avoid paying any fine or restitution imposed by the

Court through any proceeding pursuant to the United States Bankruptcy Code. Defendant

waives all rights, if any, to obtain discharge or to delay payment of any fine or restitution

obligation or alter the time for payment by filing a petition pursuant to the Bankruptcy Code.

Defendant stipulates that enforcement of any fine or restitution obligation by the United States is

not barred or affected by the automatic stay provisions of the United States Bankruptcy Code

(Title 11, United States Code, Section 362), and that enforcement of any fine or restitution

obligation by the United States is a valid exercise of its police or regulatory power within the

meaning of Title 11, United States Code, Section 362(b). Defendant stipulates and agrees not to

institute or participate in any proceeding to interfere with, alter, or bar enforcement of any fine or

restitution obligation pursuant to the automatic stay or other provision of the Bankruptcy Code in

10

any case filed by Defendant or his creditors. Upon request of the United States, Defendant will execute an order or stipulation granting the United States relief from the automatic stay or other Bankruptcy Code provisions in order to enforce any fine or restitution obligation. Defendant stipulates that any fine or restitution obligation imposed by the Court is not dischargeable pursuant to Title 11, United States Code, Section 523 in any case commenced by Defendant or his creditors pursuant to the Bankruptcy Code, Defendant's waivers and stipulations or agreements set forth above are made in exchange for the United States' concessions set forth in this agreement.

## COUNSEL

The Defendant has discussed this case at length with Defendant's counsel. The Defendant is satisfied with counsel's investigation of the case, exploration of possible defenses, advice and other representation.

## OTHER DISTRICTS AND JURISDICTIONS

This document **DOES NOT BIND** any other United States Attorney in any other district, and it in no way limits, binds, or otherwise affects the rights, powers, duties or obligations of any state or local law enforcement agency, administrative or regulatory authorities, civil or administrative enforcement, collection, bankruptcy, adversary proceedings or suits which have been or may be filed by any governmental entity.

## TAX PROCEEDINGS

Unless otherwise specified herein, this document in no way applies to or limits any pending or prospective proceedings, related to the Defendant's **tax liabilities,** if any.

11

## BREACH OF AGREEMENT

In the event either party believes the other has failed to fulfill any obligations under this agreement, then the complaining party shall, in its discretion, have the option of petitioning the Court to be relieved of its obligations herein. Whether or not a party has completely fulfilled all of its obligations under this agreement shall be determined by the Court in an appropriate proceeding at which any disclosures and documents provided by either party shall be admissible and at which the complaining party shall be required to establish any breach by a preponderance of the evidence. The Defendant hereby WAIVES all rights pursuant to Rule 32(e), *Federal Rules of Criminal Procedure*, to withdraw from Defendant's guilty plea and this agreement, save and except for the limited reasons outlined above in this paragraph.

In the event that the Defendant, after entry of a plea of guilty, unsuccessfully attempts to withdraw his plea of guilty, the United States may continue to enforce the agreement but will no longer be bound by any provision in this agreement regarding acceptance of responsibility. This provision will not have any continued vitality if it is determined by the Court that the United States acted in bad faith to bring about the attempted withdrawal of plea.

## COMPETENCE

The Defendant has not had any drugs, medication or alcohol within the past 48 hours except as stated hereafter, and is competent to enter the plea agreement stated above.

## COMPLETE AGREEMENT

Other than what is contained in this document, NO PROMISES, OR REPRESENTATIONS HAVE BEEN MADE TO THE DEFENDANT BY THE

12

PROSECUTOR, OR BY ANYONE ELSE, NOR HAVE ANY THREA-- BEEN MADE OR FORCE USED, TO INDUCE THE DEFENDANT TO PLEAD GUILTY. This document represents the sole agreement and understanding between the Defendant and the United States, and no other agreement will be entered into unless memorialized in writing and signed by all parties. To become effective, this agreement must be signed by all signatories listed below.

## ACKNOWLEDGMENTS

1.  I have READ this document, DISCUSSED it with my attorney, and UNDERSTAND and AGREE with all its provisions both individually and totally.

7-30-03
DATE

WILL HICKS
Defendant

2.  I have discussed this case with the Defendant in detail and have advised the Defendant of the Defendant's rights and all possible defenses. The Defendant has conveyed to me that the Defendant understands this document and consents to all its terms. I believe the plea and disposition set forth herein are appropriate under the facts of this case. I concur in the entry of the plea as indicated above and on the terms and conditions set forth herein.

7-29-03
DATE

IRA SORKIN
Counsel for Defendant

13

3.     I have reviewed this document and agree to its provisions.


_Alice H. Martin_
ALICE H. MARTIN
United States Attorney
Northern District of Alabama


JOSHUA R. HOCHBERG
Chief, Fraud Section
Criminal Division
United States Department of Justice


_Mike Rasmussen by GAM_
MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama

by:  _Richard C. Smith_
RICHARD C. SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice


_George A. Martin_
GEORGE A. MARTIN
Assistant United States Attorney
Northern District of Alabama

_Richard N. Wiedis_
RICHARD N. WIEDIS
Senior Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice


_J. Patton Meadows by GAM_
J. PATTON MEADOWS
Assistant United States Attorney
Northern District of Alabama


14

FILED

03 JUL -8 PM 3: 15

IN THE UNITED STATES DISTRICT COURT

U.S. DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA ALABAMA

SOUTHERN DIVISION

UNITED STATES OF AMERICA    )
                            )
v.                          )
                            )
JASON BROWN                 )

RULE 11(f) FACTUAL BASIS FOR GUILTY PLEA

COMES NOW the United States of America through its undersigned counsel, for the purpose of satisfying the requirements of Federal Rule of Criminal Procedure 11(f), submits the following Factual Basis in support of the guilty plea of JASON BROWN:

HealthSouth

1.    HealthSouth Corporation ("HealthSouth") was formed in 1984. HealthSouth is the nation's largest provider of outpatient surgery, diagnostic imaging, and rehabilitative health care services with approximately 1800 locations in all 50 states and abroad. Since approximately 1988 until March 2003, HealthSouth's common stock was listed on the New York Stock Exchange. Many of its executives, including its then Chief Executive Officer ("CEO"), either owned shares in HealthSouth, or owned options to such shares. The CEO, and others, were also compensated in part by bonuses. The bonuses depended on how well HealthSouth performed financially.

2.     HealthSouth, like other companies whose shares were publically traded, generated and publicized earnings expectations. Stock market analysts did the same. Whether a company met, exceeded, or failed to meet such expectations, was often a factor that influenced the price of its shares.

3.     Since in or about 1986, when it made its Initial Public Offering (IPO), HealthSouth has been an issuer of a class of securities registered under Section 12 of the Securities Exchange Act of 1934 required to file quarterly and annual statements (Forms 10-Q and Forms 10K) under said Act with the Securities Exchange Commission ("SEC"). These statements reported HealthSouth's earnings, as well as the value of its assets and liabilities. These reports were available to the public which used them to determine whether HealthSouth met the aforesaid expectations.

4.     Under provisions of the federal securities laws and the regulations promulgated thereunder, HealthSouth was also required to make and keep books, records and accounts that accurately and fairly reflected the transactions and dispositions of the company's assets and to devise and maintain a system of internal accounting controls sufficient to provide – (i) reasonable assurances that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles ("GAAP") and other criteria applicable to such statements and to maintain the accountability of assets; and (ii) reasonable assurances that the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

2

### The Conspiracy.

5.      Beginning at least in 1996, the CEO, other Senior Officers and members of HealthSouth's accounting staff including, from time to time, Michael Martin, William Owens, Aaron Beam, Malcolm McVay, Weston Smith, Emery Harris, Ken Livesay, Cathy Edwards, Virginia Valentine, Kay Morgan, Angela Ayres and others, engaged in a conspiracy and scheme and artifice to, among other objectives, defraud investors by artificially inflating HealthSouth's earnings and earnings per share; make false entries in HealthSouth's books and records, file false statements with the SEC and commit mail and wire fraud.

6.      HealthSouth's CEO and other Senior Officers reviewed monthly and quarterly preliminary reports showing HealthSouth's true and actual financial results, which usually showed that HealthSouth had not met earnings per share expectations.   These Senior Officers would then direct HealthSouth's accounting staff to manipulate HealthSouth's books, accounts and records to ensure that HealthSouth's earnings per share number met or exceeded those expectations.

7.      Methods to increase earnings included making entries to reduce offsets against revenues or to reduce expenses.  Corresponding fraudulent entries were made to increase assets and decrease liabilities on HealthSouth's Balance Sheet. Such entries were made in, among other accounts, HealthSouth's (1) Property, Plant and Equipment ("PP&E") accounts; (2) cash accounts; (3) inventory accounts; (4) intangible asset (goodwill) accounts; and (5) investment portfolio.

8.      These entries caused the quarterly and annual financial statements filed with the SEC for the years from before 1994 through 2002, that is, Forms 10-Q and Forms 10K,  to be

materially false. The cumulative overstatement of assets summed more than a billion dollars. Some of these financial statements were transmitted electronically from Birmingham, Alabama to Washington, D.C., to be filed with the SEC.

9.    The CEO and other conspirators benefitted from the conspiracy by receiving salaries, bonuses, and an increased value in their stock and stock options. The investing public suffered to the extent they paid for shares whose value was inflated by the aforesaid conspiracy.

## The Defendant

10.    Defendant JASON BROWN was employed at HealthSouth Corporation ("HealthSouth") since 1994. Defendant BROWN worked in the accounting division from the beginning of his employment until mid-1996. From mid-1996 until the end of 1997, BROWN worked in the Corporate Development Department. He then moved to the Treasury Department. In May of 2000, defendant BROWN was promoted to the position of Vice President -- Finance.

11.    In the course of his employment at HealthSouth, defendant BROWN would and did become aware of the HealthSouth's earnings shortfalls and the potential adverse effect on HealthSouth's stock price if these shortfalls were disclosed to the public.

## Bogus Stock Sale Documents

12.    In or about the summer of 2002, defendant BROWN learned of, and knowingly and voluntarily joined in, the above-described conspiracy and scheme and artifice. Defendant BROWN was instructed by other Senior Officers of HealthSouth to create a bogus document showing the sale of stock of another publicly traded company owned by HealthSouth in 2002, when, as the conspirators well knew, the stock had been sold for more than $27 million in 2001.

4

13.    In the meetings with other Senior Officers defendant BROWN discussed steps that would have to be taken to make the bogus stock sale document appear legitimate. Defendant BROWN was instructed to have the phony document show that the stock was sold in small blocks over a period of several weeks. This would be done to ensure that the number of shares shown on the bogus document as sold on a particular day in 2002, did not exceed the actual volume of stock in the company that traded on that day. Further, in creating the bogus stock sale document, defendant BROWN would confirm the stock's actual trading price on the dates in 2002 when the bogus sales would purportedly take place. Finally, defendant BROWN and others would cause actual wire transfers from HealthSouth's investment account in amounts that were consistent with the purported proceeds of the bogus stock sales. Employing all of the above-listed devices, defendant BROWN created the bogus document which the conspirators would provide to HealthSouth's auditors to give the appearance that the stock sale occurred in 2002.

14.    Defendant BROWN provided the false and fraudulent stock sale document to others in HealthSouth's Treasury Department and accounting staff who provided the bogus document to HealthSouth's auditors.

**False Same-Store Volume Information**

15.    Same-store volume figures compared operating results from a defined set of facilities for the current quarter with the operating results for the same set of facilities for the same period during the prior year. Same-store volume is one of the statistics that is relied upon by Wall Street analysts in evaluating for their clients and the public the financial condition and operating results of HealthSouth.

5

16.    In a meeting which took place near the end of 2002, defendant **BROWN** met with other Senior Officers of HealthSouth and discussed the fact that HealthSouth's outpatient "same-store volume" had declined significantly in the third quarter of 2002 compared to the same quarter for 2001.  At the direction of the other Senior Officers, defendant **BROWN** altered the actual same-store volume numbers in HealthSouth's books and records, making it appear that same-store volume for the third quarter of 2002 had not declined as much as the actual operating results showed.  Defendant **BROWN** and others then caused the falsified outpatient same-store volume numbers to be included in a press release which was sent via interstate wire to HealthSouth's analysts and to the public.

17.    Defendant **BROWN** and others also maintained in the files, books and records of HealthSouth the above-described documents and records which they knew to contain false information.

ALICE H. MARTIN
United States Attorney
Northern District of Alabama

_____ by:
MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama


GEORGE A. MARTIN
Assistant United States Attorney
Northern District of Alabama

JOSHUA R. HOCHBERG
Chief, Fraud Section
Criminal Division
United States Department of Justice

RICHARD C. SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice


RICHARD N. WIEDIS
Senior Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

6

J. PATTON MEADOWS
Assistant United States Attorney
Northern District of Alabama

7

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

UNITED STATES OF AMERICA )
                             )
       v.                  )
                             )
JASON BROWN )
Defendant )

## PLEA AGREEMENT AND CONDITIONS

      The United States of America ("United States"), JASON BROWN ("Defendant") and

Defendant's attorney each hereby acknowledge the following to be the plea agreement between

the Defendant and the United States and the conditions and understandings that apply to the

agreement:

      I.  PLEA AGREEMENT:  The United States and the Defendant hereby AGREE to the

following:

    (a)    Plea: Defendant will waive indictment and plead guilty in the Northern District of
             Alabama to an information charging him with one count of Conspiracy (18 U.S.C.
             § 371) and one count of criminal forfeiture (18 U.S.C. § 981(a)(1)(C) and 28
             U.S.C. § 2461(c)).

    (b)    Recommendation:  Pursuant to Rule 11(e)(1)(B) of the *Federal Rules of Criminal*
             *Procedure,* and upon the Court's acceptance of the aforesaid plea and entry of
             judgment on the same, the United States will recommend that the Defendant be
             given a three-level reduction for acceptance of responsibility.

    (c)    Motion for Downward Departure:  If the United States determines that the
             Defendant has cooperated fully, provided substantial assistance in the
             investigation or prosecution of another person who has committed an offense, and
             otherwise complied with the terms of this agreement, the United States will file a
             motion pursuant to *United States Sentencing Guidelines* § 5K1.1 and 18 U.S.C.
             § 3553(e) with the sentencing Court setting forth the nature and extent of his

cooperation. Such a motion will permit the Court, in its discretion, to impose a sentence below the applicable Sentencing Guidelines range and also below any applicable mandatory minimum sentence. In this connection, it is understood that a good faith determination by the United States as to whether Defendant has cooperated fully and provided substantial assistance and has otherwise complied with the terms of this agreement, and the United States' good faith assessment of the value, truthfulness, completeness and accuracy of the cooperation, shall be binding upon him. Defendant agrees that, in making this determination, the United States may consider facts known to it at this time. The United States may or may not, in its discretion, recommend to the Court a specific sentence to be imposed. The United States cannot and does not make a promise or representation as to what sentence will be imposed by the Court. The determination of whether to file a motion for downward departure is in the sole discretion of the United States Attorney for the Northern District of Alabama or her designated Assistant United States Attorney.

II. <u>CONDITIONS AND UNDERSTANDINGS</u>: The following conditions and understandings apply to the above stated plea agreement:

<u>AGREEMENT TO MAKE RESTITUTION</u>

The Court can order the Defendant to pay restitution for the full loss caused by Defendant's criminal conduct. The Defendant agrees the Court's consideration of the amount of restitution shall **NOT** be limited to the amounts alleged in the counts to which the Defendant is pleading guilty, and may include all amounts attributable to the Defendant's conduct, whether charged or uncharged, pursuant to 18 U.S.C. §3663, provided, however, that the value of any property forfeited shall be credited against any order of restitution. The Defendant further agrees that any amount ordered by the Court to be paid as restitution may not be discharged, in whole or in part, in any bankruptcy proceeding.

The Defendant acknowledges that, because the offense of conviction occurred after April 24, 1996, restitution is mandatory without regard to the Defendant's ability to pay.

## ASSET FORFEITURE

As stated in Paragraph I(a), above, the Defendant hereby agrees to surrender to the United States of America any and all property constituting, or derived from proceeds traceable to violations of Title 18, United States Code, Section 371 on or before the date of sentencing in this action, and further consents to the entry of an order of criminal forfeiture herein of said property at that time under Title18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as property constituting or derived from proceeds traceable to violations of Title 18, United States Code, Section 371, without further notice to him. Defendant further agrees to waive any and all claims, defenses or challenges, and to not contest or challenge in any manner (including direct appeal or any other means) any related administrative or civil judicial forfeiture on any grounds, including that the forfeiture constitutes double jeopardy, or an excessive fine or punishment. The defendant will cooperate fully with investigations of his financial assets, including cooperation in the tracing all of the Defendant's assets.

## POSSIBLE SENTENCES AND THE GUIDELINES

(a) Maximum Possible Sentences:

The Defendant acknowledges that the maximum statutory sentence for Conspiracy in violation of Title 18, United States Code, Section 371 is not more than 5 years imprisonment and/or a fine not to exceed $250,000, or twice the pecuniary gain/loss caused by the Defendant's act. Additionally, the Defendant is aware, if imprisonment is imposed, that the Court may include as part of the sentence a requirement that the Defendant be placed on supervised release after imprisonment for a term not to exceed three (3) years.

3

If the term of supervised release for the count of conviction is revoked, Defendant may be imprisoned for an additional term not to exceed the term of imprisonment authorized in Title 18, United States Code, Section 3583(e)(3) for the offense of conviction, with no credit being given for any time served while on supervised release. Further, if the crime of conviction occurred after September 13, 1994, the Court may impose another term of supervised release following any term of imprisonment imposed for a violation of supervised release conditions, and this term of supervised release may not exceed the term of supervised release originally authorized by statute for the offense of conviction less any term of imprisonment that was imposed upon revocation of supervised release. (18 U.S.C. §3583(e) and (h)). If a second or subsequent term of supervised release is revoked, the Court may impose another term of imprisonment not to exceed the difference between any imprisonment imposed for a prior revocation of supervised release for the offense of conviction and the term of imprisonment authorized pursuant to Title 18, United States Code, Section 3583(e)(3). Accordingly, the original term of imprisonment when combined with any term of imprisonment arising from revocations of supervised release, may result in a total amount of imprisonment greater than the statutory maximum term for the offense of conviction.

(b) <u>Special Assessment Fees</u>: The Defendant hereby agrees to pay the total amount required for the Special Monetary Assessment ($100 per felony count) to the Clerk, United States District Court, at the time of sentencing.

(c) <u>Sentencing Guidelines</u>: The Defendant is aware that the sentence to be imposed shall be in conformity with the Sentencing Guidelines promulgated pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §3551 through §3742, and 28 U.S.C. §991 through §998, and that a sentence imposed under the Guidelines is without parole. The Defendant is further aware that

the sentence has not yet been determined by the Court, that any estimate of the likely sentence received from any source is a prediction, not a promise, and that the Court has the final discretion to impose any sentence up to the statutory maximum. The Defendant further understands that all recommendations or requests by the United States pursuant to this agreement are not binding upon the Court (Sentencing Guidelines §6B1.4(d)). The Court will impose a sentence within the appropriate guideline range, unless the Court finds there is a basis for departure because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. The Court may also depart from the guidelines if there is a motion from the United States stating that the Defendant has provided substantial assistance in the investigation or prosecution of another person who has committed a criminal offense.

If the sentencing court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, but will remain bound to fulfill all of the obligations under the agreement.

Nothing in the plea agreement, save and except any stipulations contained herein, limits the right of the United States to present to the Court or Probation Office, either orally or in writing, any and all facts and arguments relevant to the Defendant's sentence and the Defendant's criminal history category, that are available to the United States at the time of sentencing. The United States reserves its full right of allocution pursuant to Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedure.

The Defendant further understands that the sentence to be imposed upon the Defendant will be determined solely by the sentencing judge. The United States cannot and does not make any promise or representation as to what sentence the Defendant will receive.

(d) Non-binding: It is the Court's duty to impose sentence. The Court is not a party to the above plea agreement. Any sentence recommendation by the United States does not bind the Court, and the Court may impose a more severe or less severe sentence than that recommended.

## WITHDRAWAL OF GUILTY PLEA NOT ALLOWED

If the Court decides not to give the recommended sentence, or decides that the recommended sentence is not within the guidelines range, the Defendant may not withdraw the plea of guilty.

## FAMILIARITY WITH CHARGES

The Defendant is aware of the charges, and has discussed the charges and possible defenses with counsel. The Defendant is fully aware of the elements of each count.

## ACKNOWLEDGMENT OF GUILT

The Defendant is pleading guilty to the charges described above because the Defendant is in fact guilty and for no other reason.

## COOPERATION - IN GENERAL

The Defendant will cooperate fully with the United States and with any federal, state or local law enforcement or regulatory agency designated by the United States Attorney, including, but not limited to, the Securities and Exchange Commission. This cooperation will include, but is not limited to, the following:

(a) Defendant agrees to be fully debriefed and to attend all meetings at which his presence is requested by the United States, concerning his participation in and knowledge of all criminal activities.

(b) Defendant waives all claims of attorney-client privilege and agrees to furnish to the United States all documents and other material that may be relevant to the investigation and that are in Defendant's possession or control, except privileged communications relating to the investigation by the United States, and waives his right to move to suppress evidence or

6

raise any other Fourth or Fifth Amendment claims, and waives his right to any further discovery from the government.

(c)    Defendant agrees not to reveal his cooperation, or any information derived therefrom to any third party without prior consent of the United States, and to instruct his attorneys to do the same.

(d)    Defendant agrees to testify at any proceeding in the Northern District of Alabama or elsewhere as requested by the United States.

(e)    Defendant consents to adjournments of his sentence as requested by the United States and agrees that his obligations under this agreement continue until the United States determines that his cooperation is concluded.

## WAIVER OF CERTAIN CONSTITUTIONAL RIGHTS

The Defendant understands that by pleading guilty, the following constitutional rights will be relinquished: the right to be indicted by a grand jury, if proceeding by information; the right to plead not guilty; the right to be tried by a jury or, if the Defendant wishes and with the consent of the United States, to be tried by a judge. At that trial, the Defendant would have the right to an attorney and, if the Defendant could not afford an attorney, the Court would appoint one to represent the Defendant. The Defendant would have the right to assist in the selection of the jury. During the trial, the Defendant would be presumed innocent and a jury would be instructed that the burden of proof is on the United States to prove the Defendant guilty beyond a reasonable doubt and by a unanimous verdict. The Defendant would have the right to confront and cross-examine witnesses against the Defendant. If desired, the Defendant could testify on his own behalf and present witnesses in his own defense. On the other hand, if the Defendant did not wish to testify, that fact could not be used against him and the jury would be so instructed. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal that verdict to determine if any errors had been committed during trial that would require either a new trial or a dismissal of the charges.

7

By pleading guilty, the Defendant will be giving up all of these rights. By pleading guilty, the Defendant may be required to answer questions posed to him by the Court both about the rights that the Defendant will be giving up and the factual basis for the Defendant's plea. Any statements made by the Defendant during such a hearing are not, in any civil or criminal proceeding, admissible against Defendant except as provided Rule 11(e)(6) of the *Federal Rules of Criminal Procedure.*

RULE 11(e)(6) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

The Defendant knowingly and expressly waives all of the rights afforded Defendant pursuant to the provisions of Rule 11(e)(6) of the *Federal Rules of Criminal Procedure* and Section 1B1.8(a) of the United States Sentencing Guidelines in the event, and only in the event, that, after he enters a plea of guilty pursuant to this agreement, the Defendant then moves to withdraw his plea of guilty and the court grants his motion. In that event, the following shall be admissible against the Defendant:

(a)    Plea of guilty which is later withdrawn or which the Defendant seeks to withdraw;

(b)    Any statement made in the course of any proceeding under Rule 11 regarding said plea of guilty;

(c)    Any statement made in the course of plea discussions with an attorney or agent for the United States which result in a plea of guilty later withdrawn.

The parties expressly agree that, if the court rejects this plea agreement, the above waiver will not apply and the Defendant will have all the rights and protections afforded him by Rule 11(e)(6).

## WAIVER OF RIGHTS TO APPEAL AND COLLATERAL ATTACK

Defendant is aware that his sentence will be imposed in accordance with the United States Sentencing Commission's *Guidelines Manual*. Defendant nonetheless acknowledges and agrees that the Court has jurisdiction and authority to impose any sentence within the statutory maximum set for the offense(s) to which Defendant pleads guilty. Defendant is aware that Title 18, United States Code, Section 3742, affords a defendant the right to appeal the sentence imposed. Knowing that, Defendant waives the right to appeal his sentence or the manner in which it was determined on the grounds set forth in Title 18, United States Code, Section 3742, or any other grounds, except that Defendant may appeal a sentence imposed above the statutory maximum or an upward departure from the Sentencing Guidelines. This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).

In agreeing to this waiver, Defendant is aware that a sentence has not yet been determined by the Court. Defendant is also aware that any estimate of the probable sentencing range under the sentencing guidelines that he may have received from his counsel, the United States or the Probation Office, is a prediction, not a promise, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence Defendant will receive. Realizing the uncertainty in estimating what sentence Defendant will ultimately receive, Defendant knowingly waives the right to appeal the sentence, except as stated above, in exchange for the concessions made by the United States in this plea agreement.

9

Defendant's right to file a motion attacking his sentence pursuant to 28 U.S.C. § 2255 has also been explained to him and he understands that right. As a part of this plea agreement, Defendant waives his right to challenge his conviction and sentence pursuant to 28 U.S.C. § 2255.

### Acknowledgment

I hereby knowingly, intelligently, and voluntarily waive the rights to appeal or collaterally attack the sentence as set forth above.

JASON BROWN
Defendant

## BANKRUPTCY WAIVER

Defendant agrees not to attempt to avoid paying any fine or restitution imposed by the Court through any proceeding pursuant to the United States Bankruptcy Code. Defendant waives all rights, if any, to obtain discharge or to delay payment of any fine or restitution obligation or alter the time for payment by filing a petition pursuant to the Bankruptcy Code. Defendant stipulates that enforcement of any fine or restitution obligation by the United States is not barred or affected by the automatic stay provisions of the United States Bankruptcy Code (Title 11, United States Code, Section 362), and that enforcement of any fine or restitution obligation by the United States is a valid exercise of its police or regulatory power within the meaning of Title 11, United States Code, Section 362(b). Defendant stipulates and agrees not to institute or participate in any proceeding to interfere with, alter, or bar enforcement of any fine or restitution obligation pursuant to the automatic stay or other provision of the Bankruptcy Code in any case filed by Defendant or his creditors. Upon request of the United States, Defendant will execute an order or stipulation granting the United States relief from the automatic stay or other

Bankruptcy Code provisions in order to enforce any fine or restitution obligation. Defendant stipulates that any fine or restitution obligation imposed by the Court is not dischargeable pursuant to Title 11, United States Code, Section 523 in any case commenced by Defendant or his creditors pursuant to the Bankruptcy Code. Defendant's waivers and stipulations or agreements set forth above are made in exchange for the United States' concessions set forth in this agreement.

## COUNSEL

The Defendant has discussed this case at length with Defendant's counsel. The Defendant is satisfied with counsel's investigation of the case, exploration of possible defenses, advice and other representation.

## OTHER DISTRICTS AND JURISDICTIONS

This document **DOES NOT BIND** any other United States Attorney in any other district, and it in no way limits, binds, or otherwise affects the rights, powers, duties or obligations of any state or local law enforcement agency, administrative or regulatory authorities, civil or administrative enforcement, collection, bankruptcy, adversary proceedings or suits which have been or may be filed by any governmental entity.

## TAX PROCEEDINGS

Unless otherwise specified herein, this document in no way applies to or limits any pending or prospective proceedings, related to the Defendant's tax liabilities, if any.

11

## BREACH OF AGREEMENT

In the event either party believes the other has failed to fulfill any obligations under this agreement, then the complaining party shall, in its discretion, have the option of petitioning the Court to be relieved of its obligations herein. Whether or not a party has completely fulfilled all of its obligations under this agreement shall be determined by the Court in an appropriate proceeding at which any disclosures and documents provided by either party shall be admissible and at which the complaining party shall be required to establish any breach by a preponderance of the evidence. The Defendant hereby WAIVES all rights pursuant to Rule 32(e), *Federal Rules of Criminal Procedure*, to withdraw from Defendant's guilty plea and this agreement, save and except for the limited reasons outlined above in this paragraph.

In the event that the Defendant, after entry of a plea of guilty, unsuccessfully attempts to withdraw his plea of guilty, the United States may continue to enforce the agreement but will no longer be bound by any provision in this agreement regarding acceptance of responsibility. This provision will not have any continued vitality if it is determined by the Court that the United States acted in bad faith to bring about the attempted withdrawal of plea.

## COMPETENCE

The Defendant has not had any drugs, medication or alcohol within the past 48 hours except as stated hereafter, and is competent to enter the plea agreement stated above.

## COMPLETE AGREEMENT

Other than what is contained in this document, NO PROMISES, OR REPRESENTATIONS HAVE BEEN MADE TO THE DEFENDANT BY THE PROSECUTOR, OR BY ANYONE ELSE, NOR HAVE ANY THREATS BEEN MADE OR FORCE USED, TO INDUCE THE DEFENDANT TO PLEAD GUILTY. This document

12

represents the sole agreement and understanding between the Defendant and the United States,

and no other agreement will be entered into unless memorialized in writing and signed by all

parties. To become effective, this agreement must be signed by all signatories listed below.

## ACKNOWLEDGMENTS

1.    I have READ this document, DISCUSSED it with my attorney, and UNDERSTAND and
      AGREE with all its provisions both individually and totally.


_July 8, 2003_
DATE

JASON BROWN
Defendant


2.    I have discussed this case with the Defendant in detail and have advised the Defendant of
      the Defendant's rights and all possible defenses. The Defendant has conveyed to me that
      the Defendant understands this document and consents to all its terms. I believe the plea
      and disposition set forth herein are appropriate under the facts of this case. I concur in
      the entry of the plea as indicated above and on the terms and conditions set forth herein.


_July 8, 2003_
DATE

JOE ESPY
Counsel for Defendant


13

3.    I have reviewed this document and agree to its provisions.


ALICE H. MARTIN
United States Attorney
Northern District of Alabama


MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama


GEORGE A. MARTIN
Assistant United States Attorney
Northern District of Alabama


J. PATTON MEADOWS
Assistant United States Attorney
Northern District of Alabama


JOSHUA R. HOCHBERG
Chief, Fraud Section
Criminal Division
United States Department of Justice

by:

RICHARD C. SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice


RICHARD N. WIEDIS
Senior Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice


14

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

<u>SOUTHERN DIVISION</u>

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| ANGELA AYERS | ) |

<u>RULE 11(f) FACTUAL BASIS FOR GUILTY PLEA</u>

**COMES NOW** the United States of America through its undersigned counsel, for the purpose of satisfying the requirements of Federal Rule of Criminal Procedure 11(f), submits the following Factual Basis in support of the guilty plea of **ANGELA AYERS**:

*HealthSouth*

1.      *HealthSouth Corporation* ("*HealthSouth*") was formed in 1984. *HealthSouth* is the nations largest provider of outpatient surgery, diagnostic imaging and rehabilitative health care services with over a thousand locations in all 50 state and abroad. Since around 1998, *HealthSouth*'s common stock has been listed on the New York Stock Exchange. Many of its executives, including its Chief Executive Officer ("CEO"), either owned shares in *HealthSouth*, or owned options to such shares. The CEO, and others, were also compensated in part by bonuses. The bonuses depended on how well *HealthSouth* performed financially.

3.      *HealthSouth*, like other companies whose shares were publically traded, generated and publicized earnings expectations. Stock market analysts did the same. Whether a company met, exceeded, or failed to meet such expectations, was often a factor the influenced the price of its shares.

4.      Since in or about 1986, when it made its Initial Public Offering (IPO), *HealthSouth* has been an issuer of a class of securities registered under Section 12 of the Securities Exchange Act of 1934, required to file quarterly and annual statements (Forms 10-Q and Forms 10K) under said Act with the Securities Exchange Commission ("SEC"). These statements reported *HealthSouth's* earnings, as well as the value of its assets and liabilities.

These reports were available to the public, which used them to determine whether *HealthSouth* met the aforesaid expectations.

5.      Under provisions of the federal securities laws and the regulations promulgated thereunder, *HealthSouth* was also required to make and keep books, records, and accounts that accurately and fairly reflected the transactions and dispositions of the company's assets; and to devise and maintain a system of internal accounting controls sufficient to provide – (i) reasonable assurances that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles ("GAAP") and other criteria applicable to such statements and to maintain the accountability of assets; and (ii) reasonable assurances that the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

<u>The Conspiracy.</u>

6.      Beginning before 1994, the CEO and senior management at *HealthSouth*, including William Owns, Weston Smith, and Emery Harris, conspired to inflate the financial statements filed with the SEC, at least some of which were electronically transmitted from the Northern District of Alabama to Washington, D.C., to defraud investors and *HealthSouth*, and to make false entries in *HealthSouth's* books, records, and accounts.

7.      Owens, Smith, Harris, *HealthSouth's* CEO and others reviewed monthly and quarterly preliminary reports showing *HealthSouth's* true and actual financial results, which usually showed that *HealthSouth* had not met earnings per share expectations.   These persons would then direct that *HealthSouth's* accounting staff manipulate HealthSouth's books, accounts and records to ensure that *HealthSouth's* earnings per share number met or exceeded those expectations.

8.      Methods to increase earnings included making entries to reduced offsets against revenues or to reduce expenses.  Corresponding fraudulent entries were made to increase assets and decrease liabilities on *HealthSouth's* Balance Sheet.  Such entries were made in, among other accounts, *HealthSouth's* (1) Property, Plant and Equipment ("PP&E") accounts; (2) cash accounts; (3) inventory accounts; and (4) intangible asset (goodwill) accounts.

9.     These entries caused the quarterly and annual financial statements filed with the SEC for the years from before 1994 through 2002, that is, Forms 10-Q and Forms 10K, to be materially false. The cumulative inflations summed to over one billion dollars. Some of these statements were transmitted electronically from Alabama to Washington, D.C., to be filed with the SEC.

10.     The CEO and other conspirators benefitted from the conspiracy by receiving salaries, bonuses, and an increased value in their stock and stock options. The investing public suffered to the extent they paid for shares whose value was inflated by the aforesaid conspiracy.

### The Defendant

11.     Defendant Ayers received a degree in computer science and a certificate of accountancy. She was first employed by *HealthSouth* as a staff accountant in 1994. Over the years, she received promotions to Senior Accountant, Accounting Manager, Director of Accounting, and Assistant Vice-President. She was promoted to Vice-President in the Accounting Department in 2002. She has always reported to senior managers who were involved in the aforesaid scheme.

12.     Beginning in 1998, and continuing until June 2002, Emery Harris and others instructed her to make entries to the books and records of *HealthSouth*. These adjustments included reductions to the contractual adjustment account. Defendant Ayers was given specific amounts by Emery Harris and others by which to reduce this account and was told to allocate that amount among various *HealthSouth* facilities. Defendant Ayers understood that these entries would result in an increase to *HealthSouth*'s revenues. Defendant Ayers was also instructed by Emery Harris and others to and did make adjustments to other accounts, including revenue accounts and fixed asset accounts. This became a regular practice at the end of each quarter when *HealthSouth's* financial statements were being compiled. She was never supplied with the usual back up documentation for the adjustments. The amounts being adjusted were large, in the millions of dollars, and became larger over time. She came to understand that the adjustments were bogus and designed to inflate the financial statements of *HealthSouth*. She, nevertheless, continued to make the entries as instructed up to around June of 2002. Even then, the previous inflations of the accounts, for the most part, were not backed out of the accounts. She also came

3

to understand that the inaccurate information in her accounts would be and were reflected in financial statements submitted by *HealthSouth* to the SEC.

13.    The Forms 10-Q and Forms 10K were often transmitted by wire to a service in Washington, D.C., which filed them with the SEC.  On or about November 13, 2001, *HealthSouth's* Form 10-Q for the third quarter of 2001 was transmitted by wire in interstate commerce from Birmingham, Alabama to Washington, D.C., for filing with the SEC.

| | |
|---|---|
| _____ | JOSHUA R. HOCHBERG |
| ALICE H. MARTIN | Chief, Fraud Section |
| United States Attorney | Criminal Division |
| Northern District of Alabama | United States Department of Justice |

by:

| | |
|---|---|
| _____ | _____ |
| GEORGE A. MARTIN | RICHARD SMITH |
| Assistant United States Attorney | Deputy Chief, Fraud Section |
| Northern District of Alabama | Criminal Division |
| | United States Department of Justice |

| | |
|---|---|
| _____ | _____ |
| MIKE RASMUSSEN | RICHARD N. WEIDIS |
| Assistant United States Attorney | Senior Trial Attorney, Fraud Section |
| Northern District of Alabama | Criminal Division |
| | United States Department of Justice |

4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| ANGELA C. AYERS | ) |

PLEA AGREEMENT AND CONDITIONS

The United States of America ("United States"), ANGELA C. AYERS ("Defendant") and

Defendant's attorney each hereby acknowledge the following to be the plea agreement between

the Defendant and the United States and the conditions and understandings that apply to the

agreement:

I.   PLEA AGREEMENT:  The United States and the Defendant hereby AGREE to the

following:

(a)   Plea: Defendant will waive indictment and plead guilty in the Northern District of
Alabama to an information charging her with one count of conspiracy to commit
wire fraud and securities fraud (18 U.S.C. § 371) and one count of criminal
forfeiture (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)).

(b)   Recommendation:  Pursuant to Rule 11(e)(1)(B) of the *Federal Rules of Criminal
Procedure*, and upon the Court's acceptance of the aforesaid plea and entry of
judgment on the same, the United States will recommend that the Defendant be
given a three-level reduction for acceptance of responsibility and be sentenced at
the low end of the sentencing guideline range as determined by the court.

(c)   Motion for Downward Departure:  If the United States determines that the
Defendant has cooperated fully, provided substantial assistance in the
investigation or prosecution of another person who has committed an offense, and
otherwise complied with the terms of this agreement, the United States will file a
motion pursuant to *United States Sentencing Guidelines* § 5K1.1 and 18 U.S.C. §
3553(e) with the sentencing Court setting forth the nature and extent of his
cooperation.  Such a motion will permit the Court, in its discretion, to impose a
sentence below the applicable Sentencing Guidelines range and also below any
applicable mandatory minimum sentence.  In this connection, it is understood that

a good faith determination by the United States as to whether Defendant has cooperated fully and provided substantial assistance and has otherwise complied with the terms of this agreement, and the United States' good faith assessment of the value, truthfulness, completeness and accuracy of the cooperation, shall be binding upon her. Defendant agrees that, in making this determination, the United States may consider facts known to it at this time. The United States may or may not, in its discretion, recommend to the Court a specific sentence to be imposed. The United States cannot and does not make a promise or representation as to what sentence will be imposed by the Court. The determination of whether to file a motion for downward departure is in the sole discretion of the United States Attorney for the Northern District of Alabama or her designated Assistant United States Attorney.

II. <u>CONDITIONS AND UNDERSTANDINGS:</u> The following conditions and understandings apply to the above stated plea agreement:

<u>AGREEMENT TO MAKE RESTITUTION</u>

The Court can order the Defendant to pay restitution for the full loss caused by Defendant's criminal conduct. The Defendant agrees the Court's consideration of the amount of restitution shall NOT be limited to the amounts alleged in the counts to which the Defendant is pleading guilty, and may include all amounts attributable to the Defendant's conduct, whether charged or uncharged, pursuant to 18 U.S.C. §3663, provided, however, that the value of any property forfeited shall be credited against any order of restitution. The Defendant further agrees that any amount ordered by the Court to be paid as restitution may not be discharged, in whole or in part, in any bankruptcy proceeding.

The Defendant acknowledges that, because the offense of conviction occurred after April 24, 1996, restitution is mandatory without regard to the Defendant's ability to pay.

## ASSET FORFEITURE

As stated in Paragraph I(a), above, the Defendant hereby agrees to surrender to the United States of America any and all property constituting, or derived from proceeds traceable to violations of Title 18, United States Code, Section 371 on or before the date of sentencing in this action, and further consents to the entry of an order of criminal forfeiture herein of said property at that time under Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as property constituting or derived from proceeds traceable to violations of Title 18, United States Code, Section 371, without further notice to him. Defendant further agrees to waive any and all claims, defenses or challenges, and to not contest or challenge in any manner (including direct appeal or any other means) any related administrative or civil judicial forfeiture on any grounds, including that the forfeiture constitutes double jeopardy, or an excessive fine or punishment. The defendant will cooperate fully with investigations of his financial assets, including cooperation in the tracing all of the defendant's assets.

## POSSIBLE SENTENCES AND THE GUIDELINES

(a) Maximum Possible Sentences:   The Defendant acknowledges that the maximum statutory sentence for conspiracy under Title 18, United States Code, Section 371 is not more than 5 years imprisonment and/or a fine not to exceed $250,000, or twice the pecuniary gain/loss caused by the Defendant's act. Additionally, the Defendant is aware, if imprisonment is imposed, that the Court may include as part of the sentence a requirement that the Defendant be placed on supervised release after imprisonment for a term not to exceed three (3) years.

If the term of supervised release for the count of conviction is revoked, the Defendant may be imprisoned for an additional term not to exceed the term of imprisonment authorized in Title 18, United States Code, Section 3583(e)(3) for the offense of conviction, with no credit

3

being given for any time served while on supervised release. Further, if the crime of conviction occurred after September 13, 1994, the Court may impose another term of supervised release following any term of imprisonment imposed for a violation of supervised release conditions, and this term of supervised release may not exceed the term of supervised release originally authorized by statute for the offense of conviction less any term of imprisonment that was imposed upon revocation of supervised release. (18 U.S.C. §3583(e) and (h)). If a second or subsequent term of supervised release is revoked, the Court may impose another term of imprisonment not to exceed the difference between any imprisonment imposed for a prior revocation of supervised release for the offense of conviction and the term of imprisonment authorized pursuant to Title 18, United States Code, Section 3583(e)(3). Accordingly, the original term of imprisonment when combined with any term of imprisonment arising from revocations of supervised release, may result in a total amount of imprisonment greater than the statutory maximum term for the offense of conviction.

(b) <u>Special Assessment Fees</u>: The Defendant hereby agrees to pay the total amount required for the Special Monetary Assessment ($100 per felony count) to the Clerk, United States District Court, **at the time of sentencing.**

(c) <u>Sentencing Guidelines</u>: The Defendant is aware that the sentence to be imposed shall be in conformity with the Sentencing Guidelines promulgated pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §3551 through §3742, and 28 U.S.C. §991 through §998, and that a sentence imposed under the Guidelines is without parole. The Defendant is further aware that the sentence has not yet been determined by the Court, that any estimate of the likely sentence received from any source is a prediction, not a promise, and that the Court has the final discretion to impose any sentence up to the statutory maximum. The Defendant further understands that all

4

recommendations or requests by the United States pursuant to this agreement are not binding upon the Court (Sentencing Guidelines §6B1.4(d)). The Court will impose a sentence within the appropriate guideline range, unless the Court finds there is a basis for departure because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. The Court may also depart from the guidelines if there is a motion from the United States stating that the Defendant has provided substantial assistance in the investigation or prosecution of another person who has committed a criminal offense.

If the sentencing court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, but will remain bound to fulfill all of the obligations under the agreement.

Nothing in the plea agreement, save and except any stipulations contained herein, limits the right of the United States to present to the Court or Probation Office, either orally or in writing, any and all facts and arguments relevant to the Defendant's sentence and the Defendant's criminal history category, that are available to the United States at the time of sentencing. The United States reserves its full right of allocution pursuant to Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedure.

The Defendant further understands that the sentence to be imposed upon the Defendant will be determined solely by the sentencing judge. The United States cannot and does not make any promise or representation as to what sentence the Defendant will receive.

(d) <u>Non-binding</u>: It is the Court's duty to impose sentence. The Court is not a party to the above plea agreement. Any sentence recommendation by the United States does not bind the Court, and the Court may impose a more severe or less severe sentence than that recommended.

5

## WITHDRAWAL OF GUILTY PLEA NOT ALLOWED

If the Court decides not to give the recommended sentence, or decides that the recommended sentence is not within the guidelines range, the Defendant may not withdraw the plea of guilty.

## FAMILIARITY WITH CHARGES

The Defendant is aware of the charges, and has discussed the charges and possible defenses with counsel. The Defendant is fully aware of the elements of each count.

## ACKNOWLEDGMENT OF GUILT

The Defendant is pleading guilty to the charges described above because the Defendant is in fact guilty and for no other reason.

## COOPERATION - IN GENERAL

The Defendant will cooperate fully with the United States and with any federal, state or local law enforcement or regulatory agency designated by the United States Attorney, including, but not limited to, the Securities and Exchange Commission. This cooperation will include, but is not limited to, the following:

(a)    Defendant agrees to be fully debriefed and to attend all meetings at which her presence is requested by the United States, concerning her participation in and knowledge of all criminal activities.

(b)    Defendant waives all claims of attorney-client privilege and agrees to furnish to the United States all documents and other material that may be relevant to the investigation and that are in Defendant's possession or control, except privileged communications relating to the investigation by the United States, and waives her right to move to suppress evidence or raise any other Fourth or Fifth Amendment claims, and waives her right to any further discovery from the government.

6

(c)    Defendant agrees not to reveal her cooperation, or any information derived therefrom to any third party without prior consent of the United States, and to instruct her attorneys to do the same.

(d)    Defendant agrees to testify at any proceeding in the Northern District of Alabama or elsewhere as requested by the United States.

(e)    Defendant consents to adjournments of her sentence as requested by the United States and agrees that her obligations under this agreement continue until the United States determines that her cooperation is concluded.

## WAIVER OF CERTAIN CONSTITUTIONAL RIGHTS

The Defendant understands that by pleading guilty, the following constitutional rights will be relinquished: the right to be indicted by a grand jury, if proceeding by information; the right to plead not guilty; the right to be tried by a jury or, if the Defendant wishes and with the consent of the United States, to be tried by a judge. At that trial, the Defendant would have the right to an attorney and, if the Defendant could not afford an attorney, the Court would appoint one to represent the Defendant. The Defendant would have the right to assist in the selection of the jury. During the trial, the Defendant would be presumed innocent and a jury would be instructed that the burden of proof is on the United States to prove the Defendant guilty beyond a reasonable doubt and by a unanimous verdict. The Defendant would have the right to confront and cross-examine witnesses against the Defendant. If desired, the Defendant could testify on his own behalf and present witnesses in his own defense. On the other hand, if the Defendant did not wish to testify, that fact could not be used against him and the jury would be so instructed. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal that verdict to determine if any errors had been committed during trial that would require either a new trial or a dismissal of the charges.

7

By pleading guilty, the Defendant will be giving up all of these rights. By pleading guilty, the Defendant may be required to answer questions posed to him by the Court both about the rights that the Defendant will be giving up and the factual basis for the Defendant's plea. Any statements made by the Defendant during such a hearing are not, in any civil or criminal proceeding, admissible against Defendant except as provided Rule 11(e)(6) of the *Federal Rules of Criminal Procedure.*

Rule 11(e)(6) of the *Federal Rules of Criminal Procedure*

The Defendant knowingly and expressly waives all of the rights afforded Defendant pursuant to the provisions of Rule 11(e)(6) of the *Federal Rules of Criminal Procedure* and Section 1B1.8(a) of the United States Sentencing Guidelines in the event, and only in the event, that, after he enters a plea of guilty pursuant to this agreement, the Defendant then moves to withdraw his plea of guilty and the court grants his motion. In that event, the following shall be admissible against the Defendant:

(a)    Plea of guilty which is later withdrawn or which the Defendant seeks to withdraw;

(b)    Any statement made in the course of any proceeding under Rule 11 regarding said plea of guilty;

(c)    Any statement made in the course of plea discussions with an attorney or agent for the United States which result in a plea of guilty later withdrawn.

The parties expressly agree that, if the court rejects this plea agreement, the above waiver will not apply and the Defendant will have all the rights and protections afforded him by Rule 11(e)(6).

## WAIVER OF RIGHTS TO APPEAL AND COLLATERAL ATTACK

Defendant is aware that his sentence will be imposed in accordance with the United States Sentencing Commission's *Guidelines Manual*. Defendant nonetheless acknowledges and agrees that the Court has jurisdiction and authority to impose any sentence within the statutory maximum set for the offense(s) to which Defendant pleads guilty. Defendant is aware that Title 18, United States Code, Section 3742, affords a defendant the right to appeal the sentence imposed. Knowing that, Defendant waives the right to appeal his sentence or the manner in which it was determined on the grounds set forth in Title 18, United States Code, Section 3742, or any other grounds, except that Defendant may appeal a sentence imposed above the statutory maximum or an upward departure from the Sentencing Guidelines, other than a departure requested by the United States. This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).

In agreeing to this waiver, Defendant is aware that a sentence has not yet been determined by the Court. Defendant is also aware that any estimate of the probable sentencing range under the sentencing guidelines that he may have received from his counsel, the United States or the Probation Office, is a prediction, not a promise, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence Defendant will receive. Realizing the uncertainty in estimating what sentence Defendant will ultimately receive, Defendant knowingly waives the right to appeal the sentence in exchange for the concessions made by the United States in this plea agreement.

Defendant's right to file a motion attacking her sentence pursuant to 28 U.S.C. § 2255 has also been explained to her and she understands that right. As a part of this plea agreement,

9

Defendant waives her right to challenge her conviction and sentence pursuant to 28 U.S.C. §

2255.

Acknowledgment

I hereby knowingly, intelligently, and voluntarily waive the rights to appeal or collaterally attack the sentence as set forth above.

_____
Defendant's Signature

BANKRUPTCY WAIVER

Defendant agrees not to attempt to avoid paying any fine or restitution imposed by the Court through any proceeding pursuant to the United States Bankruptcy Code. Defendant waives all rights, if any, to obtain discharge or to delay payment of any fine or restitution obligation or alter the time for payment by filing a petition pursuant to the Bankruptcy Code. Defendant stipulates that enforcement of any fine or restitution obligation by the United States is not barred or affected by the automatic stay provisions of the United States Bankruptcy Code (Title 11, United States Code, Section 362), and that enforcement of any fine or restitution obligation by the United States is a valid exercise of its police or regulatory power within the meaning of Title 11, United States Code, Section 362(b). Defendant stipulates and agrees not to institute or participate in any proceeding to interfere with, alter, or bar enforcement of any fine or restitution obligation pursuant to the automatic stay or other provision of the Bankruptcy Code in any case filed by Defendant or his creditors. Upon request of the United States, Defendant will execute an order or stipulation granting the United States relief from the automatic stay or other Bankruptcy Code provisions in order to enforce any fine or restitution obligation. Defendant stipulates that any fine or restitution obligation imposed by the Court is not dischargeable

10

pursuant to Title 11, United States Code, Section 523 in any case commenced by Defendant or his creditors pursuant to the Bankruptcy Code. Defendant's waivers and stipulations or agreements set forth above are made in exchange for the United States' concessions set forth in this agreement.

### COUNSEL

The Defendant has discussed this case at length with Defendant's counsel. The Defendant is satisfied with counsel's investigation of the case, exploration of possible defenses, advice and other representation.

### OTHER DISTRICTS AND JURISDICTIONS

This document **DOES NOT BIND** any other United States Attorney in any other district, and it in no way limits, binds, or otherwise affects the rights, powers, duties or obligations of any state or local law enforcement agency, administrative or regulatory authorities, civil or administrative enforcement, collection, bankruptcy, adversary proceedings or suits which have been or may be filed by any governmental entity.

### TAX PROCEEDINGS

Unless otherwise specified herein, this document in no way applies to or limits any pending or prospective proceedings, related to the Defendant's tax liabilities, if any.

### BREACH OF AGREEMENT

In the event either party believes the other has failed to fulfill any obligations under this agreement, then the complaining party shall, in its discretion, have the option of petitioning the Court to be relieved of its obligations herein. Whether or not a party has completely fulfilled all of its obligations under this agreement shall be determined by the Court in an appropriate

11

proceeding at which any disclosures and documents provided by either party shall be admissible and at which the complaining party shall be required to establish any breach by a preponderance of the evidence. The Defendant hereby WAIVES all rights pursuant to Rule 32(e), *Federal Rules of Criminal Procedure*, to withdraw from Defendant's guilty plea and this agreement, save and except for the limited reasons outlined above in this paragraph.

In the event that the Defendant, after entry of a plea of guilty, unsuccessfully attempts to withdraw his plea of guilty, the United States may continue to enforce the agreement but will no longer be bound by any provision in this agreement regarding acceptance of responsibility. This provision will not have any continued vitality if it is determined by the Court that the United States acted in bad faith to bring about the attempted withdrawal of plea.

## COMPETENCE

The Defendant has not had any drugs, medication or alcohol within the past 48 hours except as stated hereafter, and is competent to enter the plea agreement stated above.

## COMPLETE AGREEMENT

Other than what is contained in this document, NO PROMISES, OR REPRESENTATIONS HAVE BEEN MADE TO THE DEFENDANT BY THE PROSECUTOR, OR BY ANYONE ELSE, NOR HAVE ANY THREATS BEEN MADE OR FORCE USED, TO INDUCE THE DEFENDANT TO PLEAD GUILTY. This document represents the sole agreement and understanding between the Defendant and the United States, and no other agreement will be entered into unless memorialized in writing and signed by all parties. To become effective, this agreement must be signed by all signatories listed below.

12

## ACKNOWLEDGMENTS

1.  i have READ this document, DISCUSSED it with my attorney, and UNDERSTAND and AGREE with all its provisions both individually and totally.

_____                    _____
      DATE                              ANGELA C. AYERS
                                           Defendant

2.  I have discussed this case with the Defendant in detail and have advised the Defendant of the Defendant's rights and all possible defenses. The Defendant has conveyed to me that the Defendant understands this document and consents to all its terms. I believe the plea and disposition set forth herein are appropriate under the facts of this case. I concur in the entry of the plea as indicated above and on the terms and conditions set forth herein.

_____                    _____
      DATE                              HENRY I. FROHSIN
                                        Counsel for Defendant

13

3.    I have reviewed this document and agree to its provisions.


_____

ALICE H. MARTIN
United States Attorney
Northern District of Alabama



JOSHUA R. HOCHBERG
Chief, Fraud Section
Criminal Division
United States Department of Justice


_____

GEORGE A. MARTIN
Assistant United States Attorney
Northern District of Alabama


by:

_____

RICHARD C. SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice


_____

MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama


_____

RICHARD N. WIEDIS
Senior Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

<u>SOUTHERN DIVISION</u>

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| VIRGINIA B. VALENTINE | ) |

## <u>RULE 11(f) FACTUAL BASIS FOR GUILTY PLEA</u>

COMES NOW the United States of America through its undersigned counsel, for the purpose of satisfying the requirements of Federal Rule of Criminal Procedure 11(f), submits the following Factual Basis in support of the guilty plea of **VIRGINIA B. VALENTINE**:

*HealthSouth*

1.      *HealthSouth Corporation* ("*HealthSouth*") was formed in 1984. *HealthSouth* is the nations largest provider of outpatient surgery, diagnostic imaging and rehabilitative health care services with over a thousand locations in all 50 state and abroad. Since around 1998, *HealthSouth*'s common stock has been listed on the New York Stock Exchange. Many of its executives, including its Chief Executive Officer ("CEO"), either owned shares in *HealthSouth*, or owned options to such shares. The CEO, and others, were also compensated in part by bonuses. The bonuses depended on how well *HealthSouth* performed financially.

3.      *HealthSouth*, like other companies whose shares were publically traded, generated and publicized earnings expectations. Stock market analysts did the same. Whether a company met, exceeded, or failed to meet such expectations, was often a factor the influenced the price of its shares.

4.      Since in or about 1986, when it made its Initial Public Offering (IPO), *HealthSouth* has been an issuer of a class of securities registered under Section 12 of the Securities Exchange Act of 1934, required to file quarterly and annual statements (Forms 10-Q and Forms 10K) under said Act with the Securities Exchange Commission ("SEC"). These statements reported *HealthSouth's* earnings, as well as the value of its assets and liabilities.

These reports were available to the public, which used them to determine whether *HealthSouth* met the aforesaid expectations.

5.    Under provisions of the federal securities laws and the regulations promulgated thereunder, HealthSouth was also required to make and keep books, records, and accounts that accurately and fairly reflected the transactions and dispositions of the company's assets; and to devise and maintain a system of internal accounting controls sufficient to provide – (i) reasonable assurances that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles ("GAAP") and other criteria applicable to such statements and to maintain the accountability of assets; and (ii) reasonable assurances that the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

The Conspiracy.

6.    Beginning before 1994, the CEO and senior management at *HealthSouth*, including William Owns, Weston Smith, and Emery Harris, conspired to inflate the financial statements filed with the SEC, at least some of which were electronically transmitted from the Northern District of Alabama to Washington, D.C., to defraud investors and *HealthSouth*, and to make false entries in *HealthSouth's* books, records, and accounts.

7.    Owens, Smith, Harris, *HealthSouth's* CEO and others reviewed monthly and quarterly preliminary reports showing *HealthSouth's* true and actual financial results, which usually showed that *HealthSouth* had not met earnings per share expectations.   These persons would then direct that *HealthSouth's* accounting staff manipulate HealthSouth's books, accounts and records to ensure that *HealthSouth's* earnings per share number met or exceeded those expectations.

8.    Methods to increase earnings included making entries to reduced offsets against revenues or to reduce expenses. Corresponding fraudulent entries were made to increase assets and decrease liabilities on *HealthSouth's* Balance Sheet. Such entries were made in, among other accounts, *HealthSouth's* (1) Property, Plant and Equipment ("PP&E") accounts; (2) cash accounts; (3) inventory accounts; and (4) intangible asset (goodwill) accounts.

2

9.    These entries caused the quarterly and annual financial statements filed with the SEC for the years from before 1994 through 2002, that is, Forms 10-Q and Forms 10K, to be materially false. The cumulative inflations summed to over one billion dollars. Some of these statements were transmitted electronically from Alabama to Washington, D.C., to be filed with the SEC.

10.    The CEO and other conspirators benefitted from the conspiracy by receiving salaries, bonuses, and an increased value in their stock and stock options. The investing public suffered to the extent they paid for shares whose value was inflated by the aforesaid conspiracy.

### The Defendant

11.    Defendant Valentine received a degree in accounting and was first employed by *HealthSouth* as a staff accountant in 1995. Over the years, she received promotions to Senior Accountant, Accounting Manager. She was promoted to Assistant Vice-President in the Accounting Department in 2000. She has always reported to senior managers who were involved in the aforesaid scheme.

12.    Beginning in 1997, Emery Harris and others instructed her to make entries to the books and records of *HealthSouth* that would reduce the contractual adjustment account. Defendant Valentine was given specific amounts by Emery Harris and others by which to reduce this account and was told to allocate that amount among various *HealthSouth* facilities. Defendant Valentine understood that these entries would result in an increase to *HealthSouth's* revenues. This became a regular practice at the end of each quarter when *HealthSouth's* financial statements were being compiled. She was never supplied with the usual back up documentation for the adjustments. The amounts being adjusted were large, in the millions of dollars, and became larger over time. She came to understand that the adjustments were bogus and designed to inflate the financial statements of *HealthSouth*. She, nevertheless, continued to make the entries as instructed up to around June of 2002. Even then, the previous inflations of the accounts, for the most part, were not backed out of the accounts. She also came to understand that the inaccurate information in her accounts would be and were reflected in financial statements submitted by *HealthSouth* to the SEC.

13.    The Forms 10-Q and Forms 10K were often transmitted by wire to a service in

Washington, D.C., which filed them with the SEC.  On or about November 13, 2001, *HealthSouth's* Form 10-Q for the third quarter of 2001 was transmitted by wire in interstate commerce from Birmingham, Alabama to Washington, D.C., for filing with the SEC.


ALICE H. MARTIN
United States Attorney
Northern District of Alabama

JOSHUA R. HOCHBERG
Chief, Fraud Section
Criminal Division
United States Department of Justice


by:

GEORGE A. MARTIN
Assistant United States Attorney
Northern District of Alabama

RICHARD SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice


MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama

RICHARD N. WEIDIS
Senior Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

UNITED STATES OF AMERICA    )
                            )
        v.                  )
                            )
VIRGINIA BROOKS VALENTINE   )

## PLEA AGREEMENT AND CONDITIONS

The United States of America ("United States"), VIRGINIA BROOKS VALENTINE

("Defendant") and Defendant's attorney each hereby acknowledge the following to be the plea

agreement between the Defendant and the United States and the conditions and understandings

that apply to the agreement:

I.   PLEA AGREEMENT:  The United States and the Defendant hereby AGREE to the

following:

   (a)   Plea: Defendant will waive indictment and plead guilty in the Northern District of
         Alabama to an information charging her with one count of conspiracy to commit
         wire fraud and securities fraud (18 U.S.C. § 371) and one count of criminal
         forfeiture (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)).

   (b)   Recommendation:  Pursuant to Rule 11(e)(1)(B) of the *Federal Rules of Criminal
         Procedure*, and upon the Court's acceptance of the aforesaid plea and entry of
         judgment on the same, the United States will recommend that the Defendant be
         given a three-level reduction for acceptance of responsibility and be sentenced at
         the low end of the sentencing guideline range as determined by the court.

   (c)   Motion for Downward Departure:  If the United States determines that the
         Defendant has cooperated fully, provided substantial assistance in the
         investigation or prosecution of another person who has committed an offense, and
         otherwise complied with the terms of this agreement, the United States will file a
         motion pursuant to *United States Sentencing Guidelines* § 5K1.1 and 18 U.S.C. §
         3553(e) with the sentencing Court setting forth the nature and extent of his
         cooperation.  Such a motion will permit the Court, in its discretion, to impose a
         sentence below the applicable Sentencing Guidelines range and also below any
         applicable mandatory minimum sentence.  In this connection, it is understood that

a good faith determination by the United States as to whether Defendant has cooperated fully and provided substantial assistance and has otherwise complied with the terms of this agreement, and the United States' good faith assessment of the value, truthfulness, completeness and accuracy of the cooperation, shall be binding upon her. Defendant agrees that, in making this determination, the United States may consider facts known to it at this time. The United States may or may not, in its discretion, recommend to the Court a specific sentence to be imposed. The United States cannot and does not make a promise or representation as to what sentence will be imposed by the Court. The determination of whether to file a motion for downward departure is in the sole discretion of the United States Attorney for the Northern District of Alabama or her designated Assistant United States Attorney.

II. <u>CONDITIONS AND UNDERSTANDINGS:</u> The following conditions and understandings apply to the above stated plea agreement:

## AGREEMENT TO MAKE RESTITUTION

The Court can order the Defendant to pay restitution for the full loss caused by Defendant's criminal conduct. The Defendant agrees the Court's consideration of the amount of restitution shall **NOT** be limited to the amounts alleged in the counts to which the Defendant is pleading guilty, and may include all amounts attributable to the Defendant's conduct, whether charged or uncharged, pursuant to 18 U.S.C. §3663, provided, however, that the value of any property forfeited shall be credited against any order of restitution. The Defendant further agrees that any amount ordered by the Court to be paid as restitution may not be discharged, in whole or in part, in any bankruptcy proceeding.

The Defendant acknowledges that, because the offense of conviction occurred after April 24, 1996, restitution is mandatory without regard to the Defendant's ability to pay.

## ASSET FORFEITURE

As stated in Paragraph I(a), above, the Defendant hereby agrees to surrender to the United States of America any and all property constituting, or derived from proceeds traceable to violations of Title 18, United States Code, Section 371 on or before the date of sentencing in this action, and further consents to the entry of an order of criminal forfeiture herein of said property at that time under Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as property constituting or derived from proceeds traceable to violations of Title 18, United States Code, Section 371, without further notice to her. Defendant further agrees to waive any and all claims, defenses or challenges, and to not contest or challenge in any manner (including direct appeal or any other means) any related administrative or civil judicial forfeiture on any grounds, including that the forfeiture constitutes double jeopardy, or an excessive fine or punishment. The defendant will cooperate fully with investigations of her financial assets, including cooperation in the tracing all of the defendant's assets.

## POSSIBLE SENTENCES AND THE GUIDELINES

(a) Maximum Possible Sentences:    The Defendant acknowledges that the maximum statutory sentence for conspiracy under Title 18, United States Code, Section 371 is not more than 5 years imprisonment and/or a fine not to exceed $250,000, or twice the pecuniary gain/loss caused by the Defendant's act. Additionally, the Defendant is aware, if imprisonment is imposed, that the Court may include as part of the sentence a requirement that the Defendant be placed on supervised release after imprisonment for a term not to exceed three (3) years.

If the term of supervised release for the count of conviction is revoked, the Defendant may be imprisoned for an additional term not to exceed the term of imprisonment authorized in Title 18, United States Code, Section 3583(e)(3) for the offense of conviction, with no credit

being given for any time served while on supervised release. Further, if the crime of conviction occurred after September 13, 1994, the Court may impose another term of supervised release following any term of imprisonment imposed for a violation of supervised release conditions, and this term of supervised release may not exceed the term of supervised release originally authorized by statute for the offense of conviction less any term of imprisonment that was imposed upon revocation of supervised release. (18 U.S.C. §3583(e) and (h)). If a second or subsequent term of supervised release is revoked, the Court may impose another term of imprisonment not to exceed the difference between any imprisonment imposed for a prior revocation of supervised release for the offense of conviction and the term of imprisonment authorized pursuant to Title 18, United States Code, Section 3583(e)(3). Accordingly, the original term of imprisonment when combined with any term of imprisonment arising from revocations of supervised release, may result in a total amount of imprisonment greater than the statutory maximum term for the offense of conviction.

(b) <u>Special Assessment Fees</u>: The Defendant hereby agrees to pay the total amount required for the Special Monetary Assessment ($100 per felony count) to the Clerk, United States District Court, at the time of sentencing.

(c) <u>Sentencing Guidelines</u>: The Defendant is aware that the sentence to be imposed shall be in conformity with the Sentencing Guidelines promulgated pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §3551 through §3742, and 28 U.S.C. §991 through §998, and that a sentence imposed under the Guidelines is without parole. The Defendant is further aware that the sentence has not yet been determined by the Court, that any estimate of the likely sentence received from any source is a prediction, not a promise, and that the Court has the final discretion to impose any sentence up to the statutory maximum. The Defendant further understands that all

recommendations or requests by the United States pursuant to this agreement are not binding upon the Court (Sentencing Guidelines §6B1.4(d)). The Court will impose a sentence within the appropriate guideline range, unless the Court finds there is a basis for departure because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. The Court may also depart from the guidelines if there is a motion from the United States stating that the Defendant has provided substantial assistance in the investigation or prosecution of another person who has committed a criminal offense.

If the sentencing court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, but will remain bound to fulfill all of the obligations under the agreement.

Nothing in the plea agreement, save and except any stipulations contained herein, limits the right of the United States to present to the Court or Probation Office, either orally or in writing, any and all facts and arguments relevant to the Defendant's sentence and the Defendant's criminal history category, that are available to the United States at the time of sentencing. The United States reserves its full right of allocution pursuant to Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedure.

The Defendant further understands that the sentence to be imposed upon the Defendant will be determined solely by the sentencing judge. The United States cannot and does not make any promise or representation as to what sentence the Defendant will receive.

(d) <u>Non-binding</u>: It is the Court's duty to impose sentence. The Court is not a party to the above plea agreement. Any sentence recommendation by the United States does not bind the Court, and the Court may impose a more severe or less severe sentence than that recommended.

## WITHDRAWAL OF GUILTY PLEA NOT ALLOWED

If the Court decides not to give the recommended sentence, or decides that the recommended sentence is not within the guidelines range, the Defendant may not withdraw the plea of guilty.

## FAMILIARITY WITH CHARGES

The Defendant is aware of the charges, and has discussed the charges and possible defenses with counsel. The Defendant is fully aware of the elements of each count.

## ACKNOWLEDGMENT OF GUILT

The Defendant is pleading guilty to the charges described above because the Defendant is in fact guilty and for no other reason.

## COOPERATION - IN GENERAL

The Defendant will cooperate fully with the United States and with any federal, state or local law enforcement or regulatory agency designated by the United States Attorney, including, but not limited to, the Securities and Exchange Commission. This cooperation will include, but is not limited to, the following:

(a)    Defendant agrees to be fully debriefed and to attend all meetings at which her presence is requested by the United States, concerning her participation in and knowledge of all criminal activities.

(b)    Defendant waives all claims of attorney-client privilege and agrees to furnish to the United States all documents and other material that may be relevant to the investigation and that are in Defendant's possession or control, except privileged communications relating to the investigation by the United States, and waives her right to move to suppress evidence or raise any other Fourth or Fifth Amendment claims, and waives her right to any further discovery from the government.

6

(c)     Defendant agrees not to reveal her cooperation, or any information derived therefrom to any third party without prior consent of the United States, and to instruct her attorneys to do the same.

(d)     Defendant agrees to testify at any proceeding in the Northern District of Alabama or elsewhere as requested by the United States.

(e)     Defendant consents to adjournments of his sentence as requested by the United States and agrees that her obligations under this agreement continue until the United States determines that her cooperation is concluded.

## WAIVER OF CERTAIN CONSTITUTIONAL RIGHTS

The Defendant understands that by pleading guilty, the following constitutional rights will be relinquished: the right to be indicted by a grand jury, if proceeding by information; the right to plead not guilty; the right to be tried by a jury or, if the Defendant wishes and with the consent of the United States, to be tried by a judge. At that trial, the Defendant would have the right to an attorney and, if the Defendant could not afford an attorney, the Court would appoint one to represent the Defendant. The Defendant would have the right to assist in the selection of the jury. During the trial, the Defendant would be presumed innocent and a jury would be instructed that the burden of proof is on the United States to prove the Defendant guilty beyond a reasonable doubt and by a unanimous verdict. The Defendant would have the right to confront and cross-examine witnesses against the Defendant. If desired, the Defendant could testify on her own behalf and present witnesses in his own defense. On the other hand, if the Defendant did not wish to testify, that fact could not be used against her and the jury would be so instructed. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal that verdict to determine if any errors had been committed during trial that would require either a new trial or a dismissal of the charges.

7

By pleading guilty, the Defendant will be giving up all of these rights. By pleading guilty, the Defendant may be required to answer questions posed to her by the Court both about the rights that the Defendant will be giving up and the factual basis for the Defendant's plea. Any statements made by the Defendant during such a hearing are not, in any civil or criminal proceeding, admissible against Defendant except as provided Rule 11(e)(6) of the *Federal Rules of Criminal Procedure.*

Rule 11(e)(6) of the *Federal Rules of Criminal Procedure*

The Defendant knowingly and expressly waives all of the rights afforded Defendant pursuant to the provisions of Rule 11(e)(6) of the *Federal Rules of Criminal Procedure* and Section 1B1.8(a) of the United States Sentencing Guidelines in the event, and only in the event, that, after she enters a plea of guilty pursuant to this agreement, the Defendant then moves to withdraw her plea of guilty and the court grants his motion. In that event, the following shall be admissible against the Defendant:

(a)    Plea of guilty which is later withdrawn or which the Defendant seeks to withdraw;

(b)    Any statement made in the course of any proceeding under Rule 11 regarding said plea of guilty;

(c)    Any statement made in the course of plea discussions with an attorney or agent for the United States which result in a plea of guilty later withdrawn.

The parties expressly agree that, if the court rejects this plea agreement, the above waiver will not apply and the Defendant will have all the rights and protections afforded him by Rule 11(e)(6).

## WAIVER OF RIGHTS TO APPEAL AND COLLATERAL ATTACK

Defendant is aware that his sentence will be imposed in accordance with the United States Sentencing Commission's *Guidelines Manual*. Defendant nonetheless acknowledges and agrees that the Court has jurisdiction and authority to impose any sentence within the statutory maximum set for the offense(s) to which Defendant pleads guilty. Defendant is aware that Title 18, United States Code, Section 3742, affords a defendant the right to appeal the sentence imposed. Knowing that, Defendant waives the right to appeal his sentence or the manner in which it was determined on the grounds set forth in Title 18, United States Code, Section 3742, or any other grounds, except that Defendant may appeal a sentence imposed above the statutory maximum or an upward departure from the Sentencing Guidelines, other than a departure requested by the United States. This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).

In agreeing to this waiver, Defendant is aware that a sentence has not yet been determined by the Court. Defendant is also aware that any estimate of the probable sentencing range under the sentencing guidelines that he may have received from his counsel, the United States or the Probation Office, is a prediction, not a promise, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence Defendant will receive. Realizing the uncertainty in estimating what sentence Defendant will ultimately receive, Defendant knowingly waives the right to appeal the sentence in exchange for the concessions made by the United States in this plea agreement.

Defendant's right to file a motion attacking his sentence pursuant to 28 U.S.C. § 2255 has also been explained to her and she understands that right. As a part of this plea agreement,

Defendant waives her right to challenge his conviction and sentence pursuant to 28 U.S.C. § 2255.

Acknowledgment

I hereby knowingly, intelligently, and voluntarily waive the rights to appeal or collaterally attack the sentence as set forth above.

_____          _____
                                            Defendant's Signature

BANKRUPTCY WAIVER

Defendant agrees not to attempt to avoid paying any fine or restitution imposed by the Court through any proceeding pursuant to the United States Bankruptcy Code. Defendant waives all rights, if any, to obtain discharge or to delay payment of any fine or restitution obligation or alter the time for payment by filing a petition pursuant to the Bankruptcy Code. Defendant stipulates that enforcement of any fine or restitution obligation by the United States is not barred or affected by the automatic stay provisions of the United States Bankruptcy Code (Title 11, United States Code, Section 362), and that enforcement of any fine or restitution obligation by the United States is a valid exercise of its police or regulatory power within the meaning of Title 11, United States Code, Section 362(b). Defendant stipulates and agrees not to institute or participate in any proceeding to interfere with, alter, or bar enforcement of any fine or restitution obligation pursuant to the automatic stay or other provision of the Bankruptcy Code in any case filed by Defendant or his creditors. Upon request of the United States, Defendant will execute an order or stipulation granting the United States relief from the automatic stay or other Bankruptcy Code provisions in order to enforce any fine or restitution obligation. Defendant stipulates that any fine or restitution obligation imposed by the Court is not dischargeable

10

pursuant to Title 11, United States Code, Section 523 in any case commenced by Defendant or his creditors pursuant to the Bankruptcy Code. Defendant's waivers and stipulations or agreements set forth above are made in exchange for the United States' concessions set forth in this agreement.

COUNSEL

The Defendant has discussed this case at length with Defendant's counsel. The Defendant is satisfied with counsel's investigation of the case, exploration of possible defenses, advice and other representation.

OTHER DISTRICTS AND JURISDICTIONS

This document **DOES NOT BIND** any other United States Attorney in any other district, and it in no way limits, binds, or otherwise affects the rights, powers, duties or obligations of any state or local law enforcement agency, administrative or regulatory authorities, civil or administrative enforcement, collection, bankruptcy, adversary proceedings or suits which have been or may be filed by any governmental entity.

TAX PROCEEDINGS

Unless otherwise specified herein, this document in no way applies to or limits any pending or prospective proceedings, related to the Defendant's tax liabilities, if any.

BREACH OF AGREEMENT

In the event either party believes the other has failed to fulfill any obligations under this agreement, then the complaining party shall, in its discretion, have the option of petitioning the Court to be relieved of its obligations herein. Whether or not a party has completely fulfilled all of its obligations under this agreement shall be determined by the Court in an appropriate

11

proceeding at which any disclosures and documents provided by either party shall be admissible and at which the complaining party shall be required to establish any breach by a preponderance of the evidence. The Defendant hereby WAIVES all rights pursuant to Rule 32(e), *Federal Rules of Criminal Procedure*, to withdraw from Defendant's guilty plea and this agreement, save and except for the limited reasons outlined above in this paragraph.

In the event that the Defendant, after entry of a plea of guilty, unsuccessfully attempts to withdraw his plea of guilty, the United States may continue to enforce the agreement but will no longer be bound by any provision in this agreement regarding acceptance of responsibility. This provision will not have any continued vitality if it is determined by the Court that the United States acted in bad faith to bring about the attempted withdrawal of plea.

## COMPETENCE

The Defendant has not had any drugs, medication or alcohol within the past 48 hours except as stated hereafter, and is competent to enter the plea agreement stated above.

## COMPLETE AGREEMENT

Other than what is contained in this document, NO PROMISES, OR REPRESENTATIONS HAVE BEEN MADE TO THE DEFENDANT BY THE PROSECUTOR, OR BY ANYONE ELSE, NOR HAVE ANY THREATS BEEN MADE OR FORCE USED, TO INDUCE THE DEFENDANT TO PLEAD GUILTY. This document represents the sole agreement and understanding between the Defendant and the United States, and no other agreement will be entered into unless memorialized in writing and signed by all parties. To become effective, this agreement must be signed by all signatories listed below.

12

## ACKNOWLEDGMENTS

1.  I have READ this document, DISCUSSED it with my attorney, and UNDERSTAND and
    AGREE with all its provisions both individually and totally.


_____                    _____
        DATE                                 VIRGINIA BROOKS VALENTINE
                                                     Defendant


2.  I have discussed this case with the Defendant in detail and have advised the Defendant of
    the Defendant's rights and all possible defenses. The Defendant has conveyed to me that
    the Defendant understands this document and consents to all its terms. I believe the plea
    and disposition set forth herein are appropriate under the facts of this case. I concur in
    the entry of the plea as indicated above and on the terms and conditions set forth herein.


_____                    _____
        DATE                                      ERSKINE MATHIS
                                                 Counsel for Defendant


13

3.    I have reviewed this document and agree to its provisions.


_____
ALICE H. MARTIN
United States Attorney
Northern District of Alabama



_____
GEORGE A. MARTIN
Assistant United States Attorney
Northern District of Alabama



_____
MIKE RASMUSSEN
Assistant United States Attorney
Northern District of Alabama


JOSHUA R. HOCHBERG
Chief, Fraud Section
Criminal Division
United States Department of Justice


by:    _____
RICHARD C. SMITH
Deputy Chief, Fraud Section
Criminal Division
United States Department of Justice


_____
RICHARD N. WIEDIS
Senior Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice


14

# EXHIBIT 2

```
<DOCUMENT>
<TYPE>EX-99
<SEQUENCE>2
<FILENAME>ex99-1hsc.txt
<DESCRIPTION>EXHIBIT 99.1
<TEXT>
```

Exhibit 99.1
------------

REPORT OF THE
SPECIAL AUDIT REVIEW COMMITTEE
OF THE BOARD OF DIRECTORS
OF HEALTHSOUTH CORPORATION

JON F. HANSON

Counsel
BALCH & BINGHAM LLP

Accounting Advisors
PRICEWATERHOUSECOOPERS LLP
ALIXPARTNERS LLC

May 28, 2004

`<PAGE>`

TABLE OF CONTENTS

Page
----

I.     BACKGROUND AND SUMMARY.................................................1

       A.      Introduction...................................................1

       B.      Formation and Objectives of the Special
               Audit Review Committee.........................................2

       C.      Scope and Limitations of the Forensic Inquiry ................3

       D.      Summary of Conclusions ........................................7

II.    CORPORATE ACCOUNTING FRAUD .........................................10

       A.      Improper Adjustments to Income and Assets..................10

       B.      Recording Improper Entries ................................12

              1.   zon/CMS..........................20
              2.   Rehability.........................21
              3.   Other Acquisition Reserves..........................22

      D.      Bonus Accounting ......................................22

      E.      Investment Accounting ......................................23
              1.   Caremark ........................23
              2.   Summerville ........................24
              3.   Healthtronics ........................25

      F.      Source Medical ......................................26

III.   ADDITIONAL CORPORATE ACCOUNTING ISSUES ......................................27

      A.      Capitalization of Expenses......................................27
              1.   Start Up Costs ......................................28
              2.   Capitalization of Operating Expenses ..................29
              3.   Inventory and Supply Expenses..........................29

      B.      "Borrowed" Depreciation ...................................31

      C.      Assets at Closed Facilities ...............................31

                                           ii

<PAGE>

      D.      Lease Accounting ......................................32

      E.      Audit Adjustments......................................33

      F.      Employee and Other Loans ...............................33

IV.   FACILITY ACCOUNTING REVIEW......................................34

      A.      Overview ......................................34

      B.      Facility Contractual Adjustments..........................35

V.    RECOMMENDATIONS......................................37

                                           iii

<PAGE>

I.    BACKGROUND AND SUMMARY

    A.   Introduction

    On March 18, 2003, a federal law enforcement task force executed a search warrant at the Birmingham, Alabama offices of HealthSouth Corporation, seizing thousands of documents maintained in the Company's executive offices and financial, accounting, information technology, and other departments. The following day, the Securities and Exchange Commission, which six months earlier had begun an investigation triggered by insider stock sales in advance of the Company's August 2002 announcement of an anticipated $175 million earnings

shortfall, filed suit against HealthSouth and its chief executive officer and principal founder, Richard M. Scrushy, claiming that the Company had deliberately overstated its earnings by at least $1.4 billion since 1999.

Within five weeks, nearly a dozen current and former HealthSouth executives, including all five who had served as Chief Financial Officers, had pleaded guilty to criminal violations of the federal securities laws and related statutes. Federal authorities also revised their estimate of HealthSouth's earnings overstatement to more than $2.5 billion.

As details of the Company's accounting practices emerged, it became apparent that HealthSouth had suffered the largest public company accounting fraud in Alabama history and one of the largest in the history of American business. As of the date of this Report, fifteen one time HealthSouth employees have admitted criminal complicity in accounting abuses. Richard Scrushy has been indicted by an Alabama grand jury on eighty-five counts of securities fraud and related charges and faces trial later this year.

<PAGE>

### B. Formation and Objectives of the Special Audit Review Committee

HealthSouth's Board of Directors established a Special Audit Review Committee on March 22, 2003. The Board directed the Committee to conduct an independent forensic investigation of accounting irregularities at HealthSouth and to consider any related matters that it concluded deserved review or comment. Jon F. Hanson, then one of only two Board members who had not served when the principal events under investigation occurred, was selected to conduct the Committee's inquiry. Neither he nor the Committee's counsel or accounting advisors had any relationships with HealthSouth, its Board, its employees, or others with whom it conducted business that would limit an objective inquiry into the Company's financial reporting irregularities.(1)

The Committee's work proceeded while parallel criminal and civil investigations also were underway. To avoid compromising those investigations, the Committee agreed that its principal objectives would be to:

> o    Identify misstatements in HealthSouth's publicly issued financial statements, with emphasis on the period between 1999 and 2001, for which the Company anticipated restating its annual financial statements, and 2002, for which annual financial statements had yet to be released;(2)

---

(1)  The Committee engaged Balch & Bingham LLP as its counsel. Balch & Bingham in turn engaged PricewaterhouseCoopers LLP, and later AlixPartners LLC, as accounting advisors. After the formation of the Committee, PricewaterhouseCoopers was selected as HealthSouth's independent outside auditor, replacing Ernst & Young LLP, which served in that capacity during the period encompassed by the Committee's inquiry. After the Committee's principal investigative work was finished but before this Report was completed, a partner in Balch & Bingham was appointed Executive Vice President, General Counsel and Secretary of HealthSouth. That former partner has played no role in the Committee's investigation or in the preparation of this Report.

<PAGE>

o    Quantify the impact of those misstatements on the Company's reported financial results; and

o    Offer recommendations with respect to internal controls orother practices designed to prevent the recurrence of financial fraud.

Although the Committee interviewed HealthSouth employees who helped perpetrate the fraud in order to understand how it was accomplished, how it was concealed, and its impact on reported financial results, the task of determining who conceived and directed the fraud was beyond the Committee's inquiry. And, while the Committee also sought an understanding of the business environment that encouraged or permitted financial misconduct at HealthSouth on so large a scale and over so long a period of time, an assessment of HealthSouth's corporate culture similarly was not part of the Committee's assignment. (3)

C.  Scope and Limitations of the Forensic Inquiry

The Committee began its work by examining accounting irregularities identified by the Company, as well as those described in criminal and civil filings by government agencies and in private lawsuits filed in the wake of public disclosures relating to HealthSouth's accounting practices. The Committee also explored other areas of HealthSouth's operations in which accounting abuses may have influenced reported results. For the period

---

(2)   At the request of the Company and in response to inquiries from the Department of Justice and the United States Attorney's Office, the Committee also reviewed financial statement disclosures and related accounting issues for the period between 1996 and 1998.

(3)   Nevertheless, the Committee's observations about that culture have informed its recommendations as to internal controls and related accounting practices.

<PAGE>

3

between 1996 and 2002, large or unusual accounting entries, particularly those involving round dollar amounts or adjustments after the close of a financial reporting period, were examined. HealthSouth directors, employees, and consultants, including members of its interim management group, were asked to inform the Committee about irregularities of which they were (or became) aware, and the Committee pursued a number of leads generated by responses to those requests.

The Committee requested and received voluntary production of documents from a variety of sources, including the Company, its counsel, and current and former employees. In addition, the Department of Justice, the Untied States

Committee with documents obtained during the course of the investigations.(4)

The Committee's advisors obtained access to HealthSouth's computer system, its computerized accounting records, and a variety of non-electronic accounting and financial records. They reviewed millions of documents, visited over seventy-five HealthSouth operating facilities and business offices, and interviewed more than 200 present and former HealthSouth employees, some more than once.(5) They examined a large number of transactions, accounting issues, and other details of the Company's business and operations.

Because its work was undertaken as a private internal inquiry, the Committee lacked the authority to compel witnesses to answer questions,

---

(4) These agencies also cooperated with the Committee by facilitating its interviews of many former HealthSouth employees, particularly those against whom criminal proceedings were pending. Government representatives attended a number of those interviews. In addition, the Committee from time to time has briefed representatives of these agencies on the progress of its inquiry.

(5) The Committee's advisors also interviewed a number of current and former outside directors, including nearly all who served during the period covered by the investigation.

4

<PAGE>

produce documents, or otherwise gather or provide information. No testimony was taken under oath or transcribed. While witnesses' recollections and credibility often were tested by cross-examination techniques, the Committee's advisors understood that portions of what they were told - especially by participants in improper accounting practices - might be influenced by a variety of factors, including pending governmental investigations and private litigation. The Committee also faced other practical limitations on its work, including (a) the unavailability of certain corporate records, particularly those relating to the Company's acquisitions; (b) the lack of access to information in the possession of former employees who could not be interviewed,(6) and of the Company's former auditors, Ernst & Young LLP ("E&Y");(7) (c) the Company's e-mail retention practices, which had resulted in the elimination of most electronic communications generated during the period under investigation;(8) and (d) requests by the Department of Justice or the United States Attorney's Office to limit the content of communications with certain witnesses.

---

(6) Chief among these were Richard Scrushy, whose early identification as a target of criminal proceedings and later indictment foreclosed, as a practical matter, questioning by the Committee, and former HealthSouth officers James Bennett and Susan Jones-Smith, both of whom declined, through counsel, to speak to the Committee.

(7) The Committee sought access to E&Y's audit workpapers for the fiscal years 1996 through 2002. E&Y declined to furnish its workpapers unless, among other things, the Committee agreed that neither its review of those documents nor

"the facts developed in connection with the review would be utilized by supplied to the Company. For a variety of reasons - most obviously the obligation to report its findings to the Company - the Committee could not agree to such a condition. The Committee also requested, without success, non-audit workpapers generated by KPMG LLP in connection with its preparation of independent review organization reports for HealthSouth for the period May 2001 to May 2002.

(8)  For those e-mail communications the Company was able to retrieve, the Committee's advisors developed search criteria designed to identify any that might be relevant to the forensic inquiry.

5

<PAGE>

The Committee's work does not represent an audit of HealthSouth's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS"). The Committee therefore expresses no opinion as to whether transactions or accounting entries other than those identified as fraudulent were appropriately recorded in the Company's records or properly reflected in its financial statements. The Committee similarly expresses no opinion as to whether transactions for which the Company's accounting was irregular or questionable resulted in the material misstatement of HealthSouth's financial position or the results of its operations. Nor has the Committee reached conclusions as to the appropriateness of the Company's business transactions.(9) Moreover, although the Committee has addressed internal accounting controls, its work is not a comprehensive review of internal controls in accordance with applicable professional standards or guidance.

There are additional accounting issues involving substantial dollar amounts that the Company currently is evaluating, but that also were not within the scope of the Committee's inquiry. These include, but are not limited to, recognition of impairment of property, plant and equipment, goodwill, and other long-lived assets; the collectibility of, and the determination of appropriate reserves for, accounts receivable; the effect, if any, of restatements

---

(9)  During the period between 1996 and 2002 (and earlier), HealthSouth engaged in transactions or maintained relationships with a number of businesses in which Company officers or directors held equity or management positions. Some of these transactions and relationships appear to have had straightforward business purposes. The business purpose of others - some of which are unusual - is less clear. Examples include facility sale and leaseback agreements with Capstone Capital Corporation and First Cambridge HCI Acquisitions LLC; the sale of facilities and related extensions of credit to Meadowbrook HealthCare, Inc.; loans to, and loan guarantees on behalf of, MedCenterDirect.Com, Inc.; computer equipment purchases from GG Enterprises; and funding for, and the provision of management services to, Andrews HealthSouth Racing, LLC and the Aloha Foundation, which sponsored a boat which was to have competed in the America's Cup Challenge. An assessment of whether these and other business arrangements were of economic benefit or detriment to HealthSouth was beyond the scope of the Committee's investigation.

6

<PAGE>

on minority interest and incentive compensation calculations; the propriety of

appropriate tax provi_____ after restatements; and Medica____ ost reporting and accounting for settleme___ and/or retroactive adjustments. The Company is in the process of evaluating these and other matters.

Within these limitations, the Committee believes that its inquiry was thorough and careful, and that its results will be of substantial assistance to the Company as it undertakes the process of restating its financial statements.

### D. Summary of Conclusions

The accounting fraud at HealthSouth was by any standard both enormous and complex. Its concealment over the course of nearly seven years required considerable effort and, in some cases, luck.(10) For all its size and complexity, however, the fraud shared much in common with other highly publicized earnings overstatement cases, a fact that provided a measure of confidence that significant accounting or reporting misstatements did not escape the Committee's attention.

_____

(10)  The Committee reached no conclusions as to whether the fraud in general, or specific accounting misstatements in particular, should have been discovered before March 2003 (and if so, by whom). The Committee nevertheless has reviewed transactions and documents that may have presented opportunities to detect accounting improprieties. Notable among these are (1) the Company's public disclosures concerning its 1997 acquisition and disposition of assets of Horizon/CMS Health Care Corporation, which refer to an adjustment to goodwill that appears wholly at odds with the economic reality of the transactions; (2) a 1999 complaint to HealthSouth's Vice President of Corporate Compliance, in which the Company's Vice President of Finance expressed concern about the amounts and timing of what she viewed as suspicious quarterly "jumps" in earnings; (3) entries on monthly bank reconciliations, principally those prepared between 1999 and 2001, that failed to correspond with the Company's bank statements; and (4) a 2002 Internet posting in which a former HealthSouth employee alerted E&Y to certain alleged improper accounting practices. (E&Y's inquiries with respect to the posting apparently did not include an interview of the former employee.) Whether or not these or other items were "red flags," at least one former Chief Financial Officer expressed surprise that the fraud did not come to light sooner.

7

<PAGE>

Stated most simply, the fraud was accomplished by making over $2.7 billion in false or unsupported entries in the Company's accounting systems. These improper accounting entries, made for the purpose of inflating HealthSouth's earnings, took two principal forms: (1) exaggeration of reported revenue, primarily through reductions to contractual adjustment accounts, and (2) failure to properly characterize and record operating expenses. The chart below illustrates the categories in which fraudulent entries were identified by the Committee and the impact of those entries on the Company's reported earnings:

Impact To Income Before Minority Interest And Taxes (millions of dollars)

--------------------------------------------------------------------------
|     Reduction of Contractual Allowances                                |

```
|    Acquisition Accounting                      421  |
|    Bonus Accounting                             52  |
|    Investment Accounting                        17  |
|    Facility Contractual Accounting              19  |
|    Third-Party Transaction Accounting           29  |
|                                              -----  |
|                                              2,741  |
```

        As illustrated below, the fraud consistently and significantly
affected the Company's reported income:

<TABLE>
<CAPTION>


        Improper Adjustments To Income Before Taxes And Minority Interests


| | 1996 | 1997 | 1998 | 1999 | |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Reported | 991,480,807 | 1,485,757,791 | 2,067,102,113 | 1,295,544,178 | 1,37 |
| Adjusted | 891,838,188 | 1,086,463,765 | 1,477,895,196 | 892,058,387 | 1,02 |

</TABLE>


                                    8

<PAGE>


        The Committee also identified other accounting issues and transactions
which, while not necessarily the result of intentional fraud, nevertheless were
sufficiently aggressive or questionable to warrant discussion. To the extent
the Committee quantified them, they are summarized below: (11)

        Other Potential Accounting Misstatements (millions of dollars)

```
-------------------------------------------------------------------
|    Capitalization:                                              |
|        Operating Expenses and Start Up Costs         156        |
|        Inventory/Supplies                             49        |
|    "Borrowed" Depreciation                             8        |
|    Assets at Closed Facilities                        62        |
|    Leased Assets                                      82        |
|    Audit Adjustments                                  53        |
|    Facility Contractual Accounting:                             |
|        Reported Under Reserve                         49        |
|        Recalculated Reserve                          155        |
|    Employee and Other Loans                           18        |
|                                                     ----        |
|                                                      632        |
-------------------------------------------------------------------
```

        This Report first describes, in Section II, the principal elements of
HealthSouth's fraudulent accounting. It next describes, in Section III, areas
of aggressive or questionable accounting. Section IV reviews facility
contractual accounting, including both actual and potential accounting
misstatements. The Report concludes, in Section V, with observations about the

(11)   As noted in Section 1(C) of the Report, other questionable practices are
the likely subjects of additional financial statement adjustments.

9

\<PAGE\>

II.      CORPORATE ACCOUNTING FRAUD

     A.  Improper Adjustments to Income and Assets

         HealthSouth sets "standard" charges for each patient service it
provides. The Company's revenue, however, is determined by the amount it
actually receives for those services and, like virtually all health care
providers, HealthSouth rarely collects its standard charge for any particular
service. Instead, both its contractual arrangements with private payors and the
reimbursement rates established by government programs such as Medicare
typically provide for payment at less than standard rates.

         The Company historically has accounted for the provision of health
care services by recording both its standard charge for the service and a
contractual adjustment. The first entry essentially is a constant, unaffected
by the amount actually to be paid by or on behalf of a patient. The second is a
variable, representing the Company's estimate of a discount from the standard
charge which it does not expect to collect. The amount of the variable - the
contractual adjustment - is based on the source of payment, since different
payors may reimburse different amounts for the same service. The difference
between the standard charge and the contractual adjustment, frequently a
significant amount, represents the Company's net operating revenue.

         During the second quarter of 1996, HealthSouth began what was to
become a systematic practice of reducing contractual adjustments - i.e.,
narrowing the gap between standard charges and anticipated reimbursements -
even though the applicable contractual adjustments had not actually changed and
there was otherwise no support for the reductions. This practice continued
without interruption in every reporting period through mid-2002. At the same
time, the Company improperly reclassified a number of operating

10

\<PAGE\>

expenses to make it appear as if the expenses were never incurred.(12)
HealthSouth fabricated hundreds of millions of dollars in pre-tax earnings
during the period these manipulations occurred. The following chart presents
the income statement impact of the improper adjustments on a quarterly, annual,
and cumulative basis:

            Improper Adjustments To Income Before Taxes And Minority Interests
                            (millions of dollars)

| | 1Q | 2Q | 3Q | 4Q | Total |
|---|---|---|---|---|---|
| 1996 | | 7.37 | 10.79 | 70.20 | 88.36 |

| Year | | | | | |
|---|---|---|---|---|---|
| 1997 | 46.76 | 75.73 | 104.95 | 16. | 396.04 |
| 1998 | 100.23 | 127.17 | 167.17 | 208.47 | 603.04 |
| 1999 | 85.43 | 129.79 | 63.80 | 123.94 | 402.96 |
| 2000 | 25.40 | 51.27 | 113.84 | 158.44 | 348.95 |
| 2001 | 60.53 | 228.00 | 120.04 | 167.46 | 576.03 |
| 2002 | 76.33 | 109.59 | 49.31 | (9.80) | 225.43 |
| | | | | | 2,641(13) |

The alteration of HealthSouth's income statements also required balance sheet manipulations. Those manipulations resulted in unsupported entries that affected virtually all of the Company's balance sheet asset accounts. The following chart illustrates how the principal improper adjustments to the Company's balance sheets were distributed:

(12)  Improper revenue recognition attributable to reductions of contractual adjustments was by far the largest component of the income statement manipulation, accounting for nearly 80% of the overstatement of HealthSouth's pre-tax income.

(13)  As noted in Section I(D) of the Report, the Committee has identified $2.7 billion of fraudulent entries in the Company's accounting system. Of that amount, $2.6 billion represents quarter end entries processed in the manner described in this section.

<PAGE>

11

Improper Adjustments To Total Assets As Of December 31, 2002
(millions of dollars)

| | |
|---|---|
| Property, Plant & Equipment | 1,033 |
| Cash | 373 |
| Horizon/CMS - IHS Transactions | 414 |
| Current Assets | 703 |
| Intangible Assets | 118 |
| | ----- |
| | 2,641 |

Although fraudulent entries were processed by HealthSouth's corporate accounting department and reflected in the Company's consolidated financial statements, the entries also affected both the reported operating results and the financial positions of many individual HealthSouth facilities. The process that produced the improper entries, and the relationship of those entries to

the examination of the company income, is discussed in the following section of this Report.

B.   Recording Improper Entries

In the days following the close of each quarter, the Company's operating facilities submitted financial reporting information to the corporate accounting department, which was responsible for preparing HealthSouth's consolidated financial statements. In addition to finalizing facility reporting information, corporate accounting also recorded a variety of other entries, including tax estimates and "minority interests" - the latter of which reflect the economic interest of third-party partners or joint venture participants in the ownership of certain facilities - to produce "first run" consolidated financial statements.(14) For the most part, improper accounting entries were made after "first run"

_____

(14)   "First run" consolidated financial statements refer to those produced by the Company immediately after the posting of minority interests.

<PAGE>                                12

consolidation, rather than in conjunction with proper entries made in the ordinary course of the Company's daily operations.(15)

The improper entries shared other characteristics as well. They typically were in large dollar amounts, routinely carried generic, non-descriptive explanations, and often were not accompanied by contemporaneous documentation or other support.16 Many were extraordinarily long - often exceeding 200 lines - and were entered in the accounting system through external uploads.(17) Improper entries frequently were booked to inter-company and corporate suspense accounts and otherwise affected accounts not normally associated with one another. Many entries self-reversed during successive reporting periods.(18) Finally, many improper entries contained designated letter prefixes,(19) and many of the employees who recorded them were at least generally aware that they were incorrect or unsupported.

Improper adjustments to increase revenue after "first run" consolidation required entries in specific income statement accounts. Once the amount of

_____

(15)   This is not to say that most or all of the entries following "first run" consolidation were improper. The Committee in fact concluded that the majority were legitimate.

(16)   The Committee did not view the absence of documentation in and of itself as conclusive evidence that an accounting entry was improper. Such entries were considered appropriate, however, only in cases in which other reasonable support for them existed.

(17)   An external upload is less time-consuming than manually keying individual entries, particularly if the entries are lengthy or affect a large number of accounts.

[39] A typical general ledger accounting system has the ability to make self-reversing entries, i.e., entries made in one time period and automatically reversed in a subsequent period. The function exists primarily for purposes of recording accruals – the accounting for costs when a benefit has been received and a liability incurred but not yet processed.

(19)  The Committee was told that the use of such prefixes was intended to identify improper entries so that they could be extracted from reported results. This convention was not applied consistently across time periods, however, or even within a particular reporting year. Indeed, during one period a prefix selected to identify fraudulent entries also was used for legitimate ones. The Committee consequently was unable to isolate or identify an improper entry simply by reference to its letter prefix.

<PAGE>                                13

the increase and the accounts to be affected were determined, entries were posted to allocate the improper amounts among facilities. Several employees responsible for these allocations reported that they attempted to distribute fictitious revenue in proportion to a particular facility's percentage of an affected consolidated account.(20) From the available records, however, the Committee could not determine the extent to which such an allocation method actually was used.(21)

        Unexpected or unexplained revenue increases and expense reductions, which improved the earnings of individual facilities, became so institutionalized at HealthSouth that they were referred to by corporate accountants as "management entries" and by operations personnel as "gifts," "pixie dust," "fairy dust," or "candy." Indeed, annual budget planning discussions among some operations personnel reportedly included the subject of whether corporate "gifts" would be available to help meet revenue and earnings projections. The Committee located no documents reflecting such discussions, however, and obtained only anecdotal evidence about whether and to what extent operations employees knew or suspected that earnings were being artificially inflated.(22)

_____

(20)  Thus, for example, if a particular contractual adjustment account was reduced by $10 million and a particular facility's balance in the account comprised 1% of the consolidated account balance, that facility's account balance would be reduced by 1% of $10 million, or $100,000.

(21)  Although the Committee also was told that facilities owned jointly by HealthSouth and third parties were to have been excluded from the allocation of fictitious revenue and assets, instances in which improperly recognized revenue and assets in fact were allocated to partnership or joint venture facilities nevertheless were found.

(22)  When asked for their understanding about corporate "gifts," few current or former employees provided details. Most said that questions about adjustments to earnings were not encouraged. Those who did ask reported that they rarely received responses or, if they did, that the responses were general, attributing additional income to such items as Medicare

HealthSouth's accounting for fraudulent balance sheet entries also departed from customary bookkeeping conventions. Under ordinary circumstances, accounting entries that affect income statement accounts should result in corresponding entries to balance sheet accounts (e.g., contractual adjustment to contractual allowance, operating expense to accounts payable). The Committee found that such corresponding entries largely were absent from the accounting for fraudulent adjustments. Instead, improper income statement entries generally resulted in an increase to a corporate suspense account, which then was reduced by a series of inter-company transfers that increased the assets on various facilities' balance sheets.23 The allocation of false entries to balance sheet accounts was determined principally by considering the facilities and accounts to which additions would be least likely to attract attention.24 Consequently, changes on the income statement of a particular facility did not necessarily (or even usually) equate to changes on the same facility's balance sheet.

---

reimbursements of corporate overhead costs or reversals of amounts that had been over-reserved or over-accrued.

Whether or not plausible explanations for the Company's financial performance would have been forthcoming, most employees did not question reported results. One, for example, recounted anxiety about attending an annual management meeting because of what she believed to be her facility's sub-par financial results. Much to her surprise, she received an award at the meeting in recognition of her facility's performance.

(25) The use of suspense accounts is not improper per se. HealthSouth in fact properly used such accounts to post operator or system errors until they could be corrected and properly recorded. The permissible use of suspense accounts of course has nothing to do with HealthSouth's use of such accounts to capture improper reporting until it could be concealed by transfers to balance sheet accounts.

(26) Larger facilities or facilities with comparatively larger amounts of assets were the most common recipients of fictitious assets.

<PAGE>                                    15

Moreover, many of the improper adjustments to facility balance sheets changed from quarter to quarter. A number of the suspense-to-other balance sheet account transfers were self-reversing, and thus were returned automatically to a suspense account in the succeeding quarter. When that quarter ended, the suspense account balance once again was allocated among facility balance sheet accounts, but neither the accounts selected in the reallocation nor the amounts earmarked for those accounts matched the allocations from previous quarters. In short, improper suspense account balances, which existed only on paper in the first place and served only to conceal income statement fraud, became essentially fungible.

Given the size of the overstatements, accounting for income that