HealthSouth had fraudulent purchasing and receivables control small to the activities of the Company's fixed asset department, which created and recorded more than $1 billion of fictitious assets on the Company's books in order to conceal income statement fraud, illustrate the point. In the normal course of HealthSouth's business, each addition to plant, property and equipment - everything from real estate to medical equipment - should have been reflected by a general ledger entry and supported by appropriate documentation. The Company's physical assets were monitored by its fixed asset department, which generated a detailed asset list and manually reconciled the list to the general ledger each month.(25) To account for assets that did not exist, and thus would not have been recorded in HealthSouth's accounts payable system or processed in its general ledger system in the normal fashion, fictitious assets were added to the fixed asset list during monthly reconciliations.(26)

---

(25)  There is no electronic interface between the Company's fixed asset and general ledger accounting systems.

(26)  Fictitious assets were depreciated for financial statement accounting purposes but not, in most cases, for purposes of seeking cost reimbursement from Medicare.

<PAGE>                              16

Nearly all of the fictitious assets added to the Company's books after "first run" consolidation were processed to the general ledger by external upload. For the most part they were identified only as "AP SUMMARY."(27) Each AP SUMMARY entry into the general ledger accounting system was recorded as one or more assets in the fixed asset system. Given the method by which non-existent fixed assets were allocated to a particular facility's books, some AP SUMMARY entries had dollar values exceeding the cost of any asset the facility would have been likely to acquire. At times, therefore, AP SUMMARY assets reflected in the fixed asset system were separated into a number of assets with lesser dollar values. These and other assets sometimes retained the AP SUMMARY designation and sometimes were identified as furniture, computer equipment, or similar items that a facility would be expected to use.

AP SUMMARY assets first appeared in the fixed asset system during the 1998 fiscal year by virtue of a January 1999 upload and an accompanying retroactive posting to preceding months. At or around the same time, the Company added additional property, plant and equipment general ledger accounts, designated as "New Cap" accounts, which for the most part contained only entries with an AP SUMMARY description. The cumulative amount by quarter of improper adjustments relating to the use of AP SUMMARY assets is as follows:

---

(27)  AP SUMMARY is not to be confused with "AP Summary," a description normally used during the initial processing of legitimate invoices in the Company's accounts payable system and replaced with a specific asset description when a purchase was posted to the general ledger.

Improper Adjustments To The Fixed Asset System
Assets Named Or Once Named AP SUMMARY (millions of dollars)

| | 1Q | 2Q | 3Q | 4Q |
|------|--------|---------|---------|---------|
| 1998 | 64.34 | 123.52 | 202.16 | 305.09 |
| 1999 | 302.77 | 307.07 | 302.05 | 448.87 |
| 2000 | 488.56 | 572.89 | 573.19 | 697.19 |
| 2001 | 754.64 | 716.02 | 796.46 | 854.20 |
| 2002 | 984.13 | 1035.07 | 1034.74 | 1032.95 |

Concealing the overstatement of HealthSouth's reported cash balances by approximately $373 million presented similar challenges. Receipts from the Company's nearly 2,000 bank accounts were swept daily into a corporate consolidation account, known as the 1015 Account, before being transferred to a corporate disbursement account. Funds swept into the 1015 Account were recorded through general ledger entries based on monthly reconciliations prepared by the Company's cash department. Between 1999 and 2002, a former employee responsible for preparing these reconciliations regularly misstated either the 1015 Account general ledger balance or transactional activity in the 1015 Account. For example, if an improper entry of $20 million were recorded, the bank reconciliation would misstate the general ledger account balance, or misstate amounts transferred to or from the 1015 Account, by $20 million. (28) These misstatements had the net effect of increasing the balance in the 1015 Account.

The Committee's accounting advisors identified twenty 1015 Account entries that resulted in overstatement of the Company's cash balances. Some of these entries were self-reversing, but others were not. The following chart illustrates, by quarter and cumulatively, the resulting overstatement of cash:

_____

(28) In the case of misstatements of transactional activity, specific items totaling the amount of the misstatement were selected and removed from the transactional activity detail that accompanied the reconciliation.

18

<PAGE>

Unsupported Entries To 1015 Account (millions of dollars)

| | 1Q99 | 2Q99 | 3Q99 | 4Q99 |
|----------|-------|--------|--------|-------|
| Entry | 20.0 | 20.0 | | 50.7 |
| Reversal | | (20.0) | (20.0) | |

| | | | |
|---|---|---|---|
| | 1Q00 | 2Q00 | 3Q00 | 4Q00 |
| Entry | 72.4 | 98.5 | 137.5 | 172.0 |
| Reversal | (50.7) | (72.4) | (98.5) | (137.5) |
| Net Effect | 72.4 | 98.5 | 137.5 | 172.0 |

| | 1Q01 | 2Q01 | 3Q01 | 4Q01 |
|---|---|---|---|---|
| Entry | | 305.6 | (15.0) | 9.4 |
| Reversal | (172.0) | | 10.8 | 15.0 |
| Net Effect | 0.0 | 305.6 | 301.4 | 325.8 |

| | 1Q02 | 2Q02 | 3Q02 | 4Q02 |
|---|---|---|---|---|
| Entry | | | 23.7 | 23.3 |
| Reversal | | | | |
| Net Effect | 325.8 | 325.8 | 349.5 | 372.8(29) |

## C.  Acquisition Accounting

Between 1996 and 2002 HealthSouth acquired, individually or in groups, more than a thousand health care facilities. Several former employees told the Committee that the Company at times accounted for acquisitions in a manner designed to conceal the overstatements of income described earlier in this Report.(30) In particular, certain acquisitions resulted in unsupported additions

---

(29)  This amount is independent of overstatements to the "cash and cash equivalents" line on the balance sheet, which includes balances in suspense and other general ledger accounts. As discussed earlier, balances in those accounts at the end of a given quarter typically included overstatements of revenue.

(30)  Several former employees expressed a common, albeit general, view that irregularities existed in the Company's accounting for many non-pooling acquisitions during the mid- to late-1990's. The Committee's accounting and legal advisors were unable, however, to locate sufficient historical financial data to reach conclusions as to whether the types of irregularities described in this section, or others, occurred in connection with a number of HealthSouth's significant acquisitions, including National Medical Enterprises (1993), ReLife, Inc. (1994), NovaCare, Inc. (1995), Surgical Health Corporation (1995), Sutter Surgery Centers (1995), Caremark Orthopedic Services, Inc. (1995), National Imaging Affiliates, Inc. (1997), ASC Network Corporation (1997), and Columbia/HCA Healthcare Corporation (1998). In addition, the Committee's accounting advisors were not asked to,

<PAGE>                                  19

to goodwill - a balance sheet asset that reflects the amount by which the purchase price exceeds the net value of assets acquired - through the creation of "cookie jar" or "rainy day" reserves. The excess reserves later were released to offset amounts improperly transferred to suspense accounts or to avoid recognizing expenses.(31) The Committee's principal findings are summarized in this section.

     1.    Horizon/CMS

acquire a group of rehabilitation facilities, nursing homes and related assets from Horizon/CMS HealthCare Corporation ("Horizon/CMS"). Two months later the Company sold the nursing homes and other "non-strategic" assets to Integrated Health Services, Inc. ("IHS") for $1.25 billion, retaining the rehabilitation facilities that it considered part of its core business.(32) The

---

and did not, consider whether the accounting treatment of the transactions discussed in this section was appropriate. The Committee therefore expresses no view on such matters as whether purchase or pooling methodology was applicable to particular transactions.

(31) In at least one case, however, questionable reserves were not used to improve reported financial results or to conceal earlier fraud. Surgical Care Affiliates, Inc. ("SCA"), acquired by HealthSouth early in 1996, established reserves totaling more than $42 million during the fourth quarter of 1995. Although the Committee obtained a list of these reserves, SCA's historical accounting records, which may have contained additional information as to whether they were appropriate, were not available. HealthSouth Board member Joel Gordon, who served as SCA's Chairman and Chief Executive Officer, told the Committee he was unaware of the reserves. In any event, no portion of the reserves was ever released; the original reserved amount remained on HealthSouth's books as of December 31, 2002, seven years after the SCA acquisition.

(32) Charles Newhall III and George Strong, who then were members of HealthSouth's board of directors, also served as directors of IHS. Neither Strong, a member of HealthSouth's Audit Committee, nor Newhall expressed any misgivings concerning the accounting for the Horizon/CMS acquisition, but neither could shed light on the question of why any goodwill should have been associated with the transactions.
    In March 1999 the Company sold 85% of its interest in CompHealth, a medical staffing company acquired in the Horizon/CMS transaction, to three private equity firms. The management of two of these firms included then-HealthSouth directors Newhall (New Enterprise Associates) and G. Sage Givens (Acacia Venture Partners). Although one former

<PAGE>                                 20

Committee was told that the rehabilitation and long-term care components of Horizon/CMS's business each accounted for roughly half of the company's cash flows. When it sold the nursing homes and related assets to IHS, HealthSouth capitalized on an enhanced market demand for long-term care facilities. Rather than properly accounting for the sale to IHS, however, the Company took advantage of a favorable business opportunity to hide fraud. Through a complex series of book entries, the Company accounted for the acquisition and related sale of Horizon/CMS facilities by recharacterizing $414 million, previously recorded in a suspense account, as assets sold to IHS. No support for this entry existed. Instead, the $414 million simply represented a portion of the Company's overstatement of income in earlier periods.

        2.    Rehability

        In June 1999 HealthSouth acquired a group of outpatient rehabilitation centers from the American Rehability Services division of

Mariner Post-Acute Network, Inc. ("Rehability"). The Company's
accountants obtained accounting balances, without detail, maintained in
Rehability's accounting system as of June 30, 1999, reconciled these balances
to those recorded in the Company's accounting system as of July 1, 1999, and
determined that the Company recorded an accounts receivable allowance for
Rehability of $7 million more than the allowance reflected on Rehability's
books. The additional $7 million, for which the Committee could find no
support in the Company's accounting records, was released during 2000 and
2001, thereby improving HealthSouth's reported operating income.

---

Company employee believed that Givens played a role in negotiations on behalf
of the buyers, Givens told the Committee that she played no such role.

### 3.   Other Acquisition Reserves

Many smaller facilities purchased by HealthSouth established or
recorded increases in reserves when (or shortly before) they were acquired.
The Committee believes the Company may have recorded additional reserves in
order to overstate income in future periods. For example, between 1997 and
2002, approximately $24 million of acquired facility reserves were improperly
reclassified - generally in round dollar amounts not exceeding $150,000 - to
an accrued bonus payroll general ledger account, thereby avoiding the
recognition of bonus expense as a reduction to reported income.(33)

### D.  Bonus Accounting

Although HealthSouth never established a formal employee incentive
compensation plan, it paid discretionary bonuses of more than $78 million
between 1997 and 2002. By means of improper accounting entries, the Company
failed to record nearly two-thirds of this bonus expense, again improving its
reported income.

Anticipated future bonus payments ordinarily are accrued and expensed
over time.34 HealthSouth avoided expensing certain bonus payments, however, by
reclassifying other balance sheet account activity to bonus accruals. A portion
of the improper entries recorded incentive payments as bonus accruals, which
later were reduced by increasing other, unrelated balance sheet accounts. These
entries mirror those associated with the reduction of contractual adjustment
accounts, discussed in Section II(B) above. The following chart illustrates the
cumulative income statement effect of the Company's improper bonus accounting
(amounts in millions):

---

(33)  This amount comprises a portion of $52 million the Committee attributes
to improper bonus accounting, discussed in the following section of the
Report.

(37)  The accrual sho    e reduced at the time a bonus    id.

<PAGE>                              22

| | 1997 | 1998 | 1999 | 2000 | 2001 | Total |
|---|---|---|---|---|---|---|
| Bonus Payments | 32.9 | 27.8 | 2.4 | 4.3 | 10.9 | 78.3 |
| Bonus Expense Recorded | 13.1 | 6.8 | 2.3 | 4.3 | 0.0 | 26.5 |
| Difference | 19.8 | 21.0 | 0.1 | 0.0 | 10.9 | 51.8 |

## E.  Investment Accounting

In at least one case, HealthSouth's accounting for investments was deliberately fraudulent. In other cases, the Company's investment-related accounting, even if not intentionally improper, resulted in misstatements.

### 1.  Caremark

Between 1993 and 2000, HealthSouth purchased 1.7 million shares of Caremark Rx ("Caremark") common stock in the public securities markets. The Company sold its Caremark stock in June 2001, realizing a substantial profit and initially recording some $19 million in miscellaneous income attributable to the sale.

Within days of the sale, however, the Company reclassified this income to contractual adjustments, which then were reduced as if the Company had received $19 million in additional operating revenue. At the same time, the Company altered its investment accounts to reflect that it still held 1.7 million shares of Caremark, even though it no longer owned, and never reacquired, those shares. One year later, the Company again recorded a "sale" of Caremark stock, this time booking income of more than $17 million attributable to the sale. The two sales of Caremark stock - one real, one illusory - allowed the Company to report improved operating revenue in the second quarter of 2001, to report phantom income in the second quarter of

<PAGE>                              23

2002, and to treat an otherwise uncollectible $7 million receivable as having been paid.(35)

From the standpoint of the overall financial fraud at HealthSouth, this sleight of hand with Caremark stock is little more than a footnote. What makes it worth mentioning is the extraordinary lengths to which the Company went to pretend that the stock actually was sold in 2002. For example, because employees in the treasury department were at pains to insure that the number of Caremark shares supposedly sold in 2002 did not exceed the actual daily trading volume in Caremark stock, they booked more than half a dozen "sales" totaling 1.7 million shares over the course of seven trading days. And, to make it appear that these non-existent sales

generated proceeds of the supposed sale to its brokerage account and from the broker's account back to a Company operating account.

### 2. Summerville

Between 1997 and 2000 HealthSouth purchased 5.8 million shares of stock in Summerville HealthCare Group, Inc. ("Summerville"), a privately-held operator of assisted living facilities, for approximately $13 million. During 2000 and 2001, Summerville raised additional equity from other investors on terms that afforded those investors preference over existing equity holders.(36) In the meantime, Summerville's business, which had been unprofitable, failed to improve, thus reducing further the value of HealthSouth's investment in the company.

---

(35) When it "replaced" Caremark stock on its books, HealthSouth recorded the value at the then-current market price, nearly $23 million, but left in place a previously booked unrealized gain - the product of market price appreciation during the time it actually held the stock - of $15.3 million. The $7.6 million difference was used to reduce the receivable in question.

(36) HealthSouth elected not to invest in Summerville's 2000 and 2001 offerings.

<PAGE>                              24

Despite clear indications that the value of its Summerville stock was impaired, HealthSouth continued to carry the investment at $13 million until July 2002, when it was written off in its entirety. The Committee believes that an adjustment reducing the value of the Company's Summerville stock should have been made no later than December 31, 2000, and that the investment should have been written off completely by December 31, 2001.

### 3. Healthtronics

Generally Accepted Accounting Principles require (with exceptions not applicable here) periodic "mark-to-market" adjustments to the value of a company's investments in marketable securities. In late 1999, HealthSouth (through a wholly-owned subsidiary) acquired approximately 416,000 shares of Healthtronics, Inc. ("Healthtronics"). The Company failed to record a mark-to-market adjustment in the value of its Healthtronics stock, however, until early 2001.(37) And, while the Company thereafter made timely mark-to-market adjustments of its Healthtronics securities, those adjustments - all of which reflected increases in market over recorded value - were calculated as if the Company held more than twice the number of shares it actually owned. As a result, by August 2002 the Company had overvalued its investment in Healthtronics by more than $12 million. The overvaluation was corrected the following month, when a mark-to-market adjustment was calculated based on the 416,000 shares actually owned by the Company.(38)

---

(37) The Company also failed to record mark-to-market adjustments for its

investments in Abuse. ~~~~~~~~~~~~ Medical Syst. ~~~~~~~, Inc. ~~~~~~
its failure to make t ⬤ adjustments actually had the e. ⬤ of understating
income by $1.5 million 2000 and $361,000 in 2001.

(38) The Committee was informed that the incorrect share count was the result of a typographical error on an investment schedule, rather than a deliberate overstatement, and that the error was corrected shortly after it was discovered. Whether or not intentional, the accounting for Healthtronics stock resulted in misstatements of income in various reporting periods.

<PAGE>                                      25

          F.  Source Medical

          During the late 1990's HealthSouth began developing HCAP, a wireless handheld documentation system by which clinicians could record patient treatment and billing data for immediate electronic processing. The Company planned to use the system at its own facilities and also to market HCAP technology to other health care providers.

          In July 2001 the Company sold HCAP to Source Medical Solutions, Inc. ("Source Medical"), a start-up venture whose principals included three former HealthSouth employees.39 Source Medical acquired HCAP assets, including intellectual property rights to the technology, in exchange for a $25 million promissory note. When it sold the HCAP assets, HealthSouth reclassified over $34 million in costs relating to HCAP development from a capital asset account to an account receivable (and later to a notes receivable) balance due from Source Medical, despite the fact that the true receivable was only $25 million. By virtue of these entries, HealthSouth avoided recognizing a loss of more than $9 million on its sale of HCAP assets.

          Source Medical, which marketed HCAP under the name Therapy Source, was dependent on HealthSouth for a significant portion of its revenue and funding. In the months following the HCAP sale, HealthSouth advanced substantial sums to finance Source Medical's operations, and also booked other (in some cases questionable) costs to its Source Medical receivable. By December 31, 2001, the Company's records reflected a total receivable from Source Medical of more than $81 million. Source Medical's records, however,

---

(39)  HealthSouth purchased nearly four million shares of Source Medical in April 2001, giving it nearly a 36% stake in the company. At least through 2002, HealthSouth representatives also held a majority of the seats on Source Medical's board of directors. The Company currently is considering whether, under applicable accounting rules, HealthSouth and Source Medical should have been consolidated for financial reporting purposes.

                                      26

<PAGE>

reflected that it owed the Company $52 million. By December 31, 2002, the

Source Medical receivable. As of the same date, however, Source Medical's records reflected an indebtedness to HealthSouth of approximately $73 million, some $33 million less than HealthSouth claimed was due.

Based on its examination of entries relating to the Source Medical receivable, the Committee determined that the $33 million variance resulted from an overstatement of the receivable by HealthSouth. In December 2002, the Company sought to avoid a write-off of the overstatement by recording an increase of nearly $29 million in a capital asset account and a corresponding reduction of the Source Medical receivable.(40)

III.    ADDITIONAL CORPORATE ACCOUNTING ISSUES

As noted in Section I(D) of the Report, the Committee observed a number of instances in which HealthSouth's accounting conventions or practices, even if not deliberately fraudulent, nevertheless were highly aggressive. The fact that these practices were followed during a time in which the Company's reported financial results were being altered dramatically by fraud casts additional doubt on their propriety. The Committee summarizes the principal issues below, mindful that the Company is in the process of evaluating many of the same items.

A.    Capitalization of Expenses

Between 1998 and 2002, HealthSouth's reported income was affected by transferring a variety of current expenses to property, plant and equipment accounts, reclassifying those expenses as capital assets, and depreciating them

---

(40)  The remainder of the receivable, some $4.3 million, was written off by elimination journal entries recorded in December 2002.

<PAGE>

over time. As described below, these capitalization policies allowed the Company to defer recognizing over $200 million in expenses.(41)

1. Start Up Costs

HealthSouth historically capitalized not only costs directly associated with the development of facilities, such as certificate of need expenses and architectural fees, but also those of entire corporate functions or departments responsible for facility development. These expenses, reported as a line item on the Company's financial statements, typically were amortized over a 36-month period. In August 1997, in response to SEC comments on HealthSouth's preliminary proxy materials filed with respect to the Horizon/CMS acquisition, the Company agreed to discontinue capitalizing start up costs in connection with acquired facilities as of July 1, 1997 and instead to treat those costs as current operating expenses.(42)

After 1997, HealthSouth no longer increased its reported start up costs, but nevertheless continued to capitalize such costs, treating them

as additions to property, plant and equipment accounts and describing them in terms such as "cap salaries," "legal [    ]" or "arch fees." The Committee's accounting advisors identified more than $156 million of balance sheet assets that appear to be related to start up costs for the period between January 1998 and December 2002:

_____

(41)   To be sure, Generally Accepted Accounting Principles permit certain expenses to be capitalized. The Committee nevertheless believes that some portion of the expenses discussed in this section should have been recognized as operating expenses during the period in which they were incurred.

(42)   The agreement was confirmed in an August 19, 1997 letter to the SEC from HealthSouth's corporate counsel. According to the letter, the SEC agreed that start up costs on HealthSouth's books as of June 30, 1997 would be amortized "in accordance with [the Company's] existing policy."

28

<PAGE>

Assets Related To Start Up Costs
(cumulative, gross of depreciation) (millions of dollars)

|      | 1Q     | 2Q     | 3Q     | 4Q     |
|------|--------|--------|--------|--------|
| 1998 | 48.12  | 55.79  | 66.86  | 77.18  |
| 1999 | 81.93  | 89.13  | 96.09  | 103.55 |
| 2000 | 108.76 | 116.97 | 130.93 | 144.05 |
| 2001 | 152.96 | 151.57 | 155.44 | 145.64 |
| 2002 | 146.66 | 149.35 | 150.64 | 156.31 |

2.   Capitalization of Operating Expenses

HealthSouth also capitalized a variety of miscellaneous operating expenses, describing them in the fixed asset system in ways that did not correspond, or in some cases even bear any discernible relationship, to the nature of the costs incurred. Promotional and marketing expenses, for example, at times were identified as "cap internet costs." Some capitalized assets, moreover, were reclassified in book entries after "first-run" consolidation and, like AP SUMMARY assets, may never have existed at all. From 1998 to 2002, items in this category accounted for approximately $58.5 million of the $156 million of capitalized costs identified by the Committee:

Assets Related To Capitalization Of Expenses
(cumulative, gross of depreciation) (millions of dollars)

_____

| | 1Q | 2Q | 3Q | 4Q |
|---|---|---|---|---|
| 1998 | 4. | 5.42 | 5.64 | 7.02 |
| 1999 | 7.11 | 7.19 | 7.41 | 31.72 |
| 2000 | 32.29 | 32.89 | 37.17 | 65.84 |
| 2001 | 44.01 | 42.04 | 54.23 | 57.67 |
| 2002 | 56.18 | 56.07 | 57.02 | 58.56 |

### 3. Inventory and Supply Expenses

HealthSouth's purchasing policy called for high-level corporate review and approval, by means of a written capital expenditure request, for capital asset purchases of more than $500. Because the policy applied to

<PAGE>                             29

routine purchases of items such as surgical instruments, many of which were requested by physicians on short notice and used only once, facilities at times ignored the capital request process and simply purchased and expensed these items.

Company accountants, aware that facilities made purchases not authorized through a formal expenditure request, periodically reviewed facility inventory and supply accounts and automatically reclassified any purchase exceeding $500 as a capital asset. The reclassified assets typically were described only generically – as, for example, "surgical instruments" or "medical equipment" – and without regard to whether they remained in use at a facility. These wholesale reclassifications almost certainly resulted in capital asset treatment for items that did not qualify for such treatment under Generally Accepted Accounting Principles. Moreover, the Company's approach provided no means of identifying items that, even if properly classified as capital assets, ultimately were disposed of and thus should not have remained in the Company's fixed asset listing.

The Committee's accounting advisors identified nearly $49 million of reclassified inventory and supply costs between 1999 and 2002:

Assets Related To The Reclassification Of Supply Or Inventory Costs
(cumulative, gross of depreciation) (millions of dollars)

| | 1Q | 2Q | 3Q | 4Q |
|---|---|---|---|---|
| 1999 | 1.58 | 3.68 | 6.14 | 7.94 |
| 2000 | 9.50 | 11.62 | 15.47 | 17.25 |
| 2001 | 18.92 | 23.29 | 26.95 | 39.18 |
| 2002 | 41.48 | 44.14 | 48.18 | 48.64 |

<PAGE>

### B.  "Borrowed" Depreciation

In 1999 the Company changed its method of calculating depreciation. Using a depreciation module within the fixed asset system, the calculation was based on the useful life assigned to individual assets, rather than on an estimate that assumed the same useful life for all assets within a particular class or category. The change resulted in accumulated depreciation general ledger balances greater than those reflected in the fixed asset system.

Company employees reported - and the Committee observed - instances in which excess accumulated depreciation was transferred, typically from an operating facility to one scheduled for closing. Company employees referred to these transfers as "borrowing" depreciation. "Borrowed" depreciation went to facilities which, when closed (and prior to the depreciation transfer), still would have had non-fully depreciated assets. These excess depreciation transfers, which occurred between the third quarter of 2001 and the end of 2002 and totaled nearly $8 million, enabled the Company to write off assets at closed facilities without a charge against current period income.

### C.  Assets At Closed Facilities

Although HealthSouth closed a number of facilities between 1998 and 2002, assets at those facilities sometimes remained on the Company's books. A portion of these assets included AP SUMMARY or other non-existent items. The remainder may be bona fide assets, but may not have remained in service at any facility. As of December 31, 2002, the net book value of assets assigned to a "facility" in the HealthSouth accounting system which reported no revenues was nearly $62 million.

<PAGE>

31

### D.  Lease Accounting

HealthSouth entered into two sale-leaseback arrangements in 1999 and a third in 2000 with divisions of General Electric Capital Corporation ("GE"). For accounting purposes, the Company incorrectly treated the 1999 transactions, which covered diagnostic equipment, and the 2000 transaction, which covered an airplane, as both capital and operating leases.

HealthSouth's general ledger reflected that it owned and was depreciating the equipment leased from GE - treatment that is consistent with a capital lease. Unlike a true capital lease, however, the Company recorded no corresponding lease obligations associated with the leased equipment. Instead, the Company expensed lease payments during the period in which they were incurred, as if the payments had been made under operating leases. Complicating matters further, the Company's journal entries reflect that lease payments were made through suspense accounts and thus spread among - and recorded as expenses of - facilities that did not actually use the leased equipment.

The Company intends to evaluate whether these leases should be accounted for as operating or capital leases. If it is determined that they were operating leases, HealthSouth's reported assets were overstated for the period between 1999 and 2002 in amounts ranging from $43 to $89 million.43 If,

on the other hand, also should have been capitalized. The Company underreported its cap... lease obligation liabilities a... erreported its lease rental expense.

(43) As of December 31, 2002, the net book value (asset value less accumulated depreciation) of the leased equipment was approximately $82 million.

<PAGE>                                    32

E.   Audit Adjustments

By law or, in the case of partnership or joint venture arrangements, by contract, the financial statements of certain HealthSouth facilities must be audited annually. These "stand alone" audits, i.e., those conducted separately from annual audits of the Company's consolidated financial statements, at times resulted in proposed adjustments to a facility's financial statements. The proposed entries reflected the auditors' judgment that certain adjustments were necessary or appropriate to the presentation of the facility's financial statements in conformity with Generally Accepted Accounting Principles.

E&Y, the independent outside auditor of HealthSouth's consolidated financial statements, also was engaged to perform most of the required "stand alone" audits. In certain of those audits the "stand alone" financial statements reflected the effect of adjustments proposed by E&Y. The Committee, however, found no evidence that such adjustments actually were recorded in the Company's general ledger or reflected in its consolidated financial statements.(44) The Company's unrecorded audit adjustments totaled nearly $53 million as of December 31, 2002.

F.   Employee and Other Loans

The Committee reviewed outstanding loan balances due to HealthSouth from employees and others during the period between 1998 and 2002. As of December 31, 2002, the Company's books reflected receivables of approximately $18 million in respect of these loans. Many were carried at full value despite the absence of timely (or in some cases any) repayment.(45) At least

(44)   The failure to record "stand alone" audit adjustments was not accidental. Listings of proposed adjustments to the consolidated financial statements included a cumulative total of unrecorded prior year adjustments.

(45)   By virtue of payments or settlements during 2003, the Company's loan receivable balance had been reduced to approximately $12 million.

33

one was treated as having been repaid even though that was not the case.(46)
The Committee found no evidence of collection efforts by the Company and no
accounting entries reflecting an assessment of the collectibility of, or the
propriety of establishing reserves for, these loans.

IV.    FACILITY ACCOUNTING REVIEW

    A.  Overview

      Because individual HealthSouth facilities generally are responsible
for their own daily accounting operations, the Committee's investigation
included a review of the accounting practices in place at the facility level.
This review, conducted over a period of several months, included visits to
health care facilities and business offices in every division of the Company
throughout the United States,(47) as well as an examination of documents
generated or used by facilities to report their financial results.(48)
Administrators, controllers, business office managers, field accountants, and
others were asked about their accounting and financial reporting practices and
were encouraged to inform the Committee of any practices they considered
unusual or irregular.

_____

(46)    In August 2002 William Owens, who at various times served as
HealthSouth's Chief Financial Officer, Chief Operating Officer and Chief
Executive Officer, wrote a check to the Company in the amount of his
outstanding loan balance, nearly $1.3 million. Owens directed that his loans
be removed from the Company's books, but also directed that his check to the
Company not be negotiated. Owens now acknowledges the debt, as well as the
fact that it has not been repaid or forgiven.

(47)    The Committee initially selected facilities for on-site review based on
revenue, geographic location, business and reporting lines, and other factors
designed to allow a meaningful assessment of facility accounting practices.
Additional site visits were conducted based on discussions with Company
employees, a number of whom reported possible irregularities warranting
further inquiry. In all, the Committee's advisors conducted on-site reviews
at more than seventy-five HealthSouth patient care and business office
locations and examined documents maintained by other facilities at which site
reviews were not conducted.

(48)    Facilities compile monthly financial reporting packages from data
generated by various patient accounting systems and transmit the information
to a designated corporate accounting employee.

<PAGE>

      With the exceptions described below, the Committee's review confirmed
the accounts of many current and former Company employees that intentional
misreporting of financial results was carried out at the corporate level
without the active participation of facility personnel. Thus, while facility
managers routinely saw significant improvements in their reported operating
results by virtue of corporate accounting adjustments, they were unable for the
most part to explain such adjustments. Indeed, many facilities were not even

further detail in the balance sheets, asset listings, other basic accounting information.

### B. Facility Contractual Adjustments

Quite apart from the fraudulent reduction of contractual adjustment accounts discussed earlier in this Report, the Committee found that the Company's operational divisions employed no consistent methodology to estimate or establish contractual adjustments and allowances in the first place. Moreover, even if a particular division had adopted a standard policy for determining contractual adjustments, individual facilities at times calculated the adjustments in a manner that departed from that policy, often with the result that earnings were favorably affected. For example, during the period between 1999 and 2002, the Company's Outpatient and Surgery Divisions estimated current contractual adjustments by reference to their prior revenue collection experience, as reflected in so called "zero balance reports." These reports summarized, for an established historical period, the settlement of patient accounts receivables by cash collections, contractual adjustments, and bad debt write-offs. The Committee found little uniformity in the use of zero balance reports, however, and consequently identified numerous inconsistencies in the manner by which individual facilities used information contained in the reports to estimate contractual adjustment allowances.

<PAGE>                                    35

The Committee recalculated the contractual allowances for the Outpatient and Surgery Divisions using a consistent three-month zero balance report, rather than the previously recorded contractual allowance, and quantified a difference of $155 million dollars, reflected as follows:

Under/(Over) Contractual Adjustments
As Computed In The Recalculated Zero Balance Report (millions of dollars)

#### Outpatient Division

|      | 1Q    | 2Q    | 3Q     | 4Q     |
|------|-------|-------|--------|--------|
| 1999 | 26.93 | 63.90 | 116.00 | 131.67 |
| 2000 | 37.60 | 83.24 | 123.97 | 150.57 |
| 2001 | 31.72 | 63.09 | 85.41  | 102.79 |
| 2002 | 23.34 | 53.09 | 85.08  | 119.82 |

#### Surgery Division

|      | 1Q     | 2Q    | 3Q    | 4Q    |
|------|--------|-------|-------|-------|
| 1999 | 101.97 | 23.96 | 34.59 | 45.88 |
| 2000 | 1.58   | 70.29 | 13.76 | 24.08 |
| 2001 | 8.37   | 15.65 | 18.37 | 24.65 |

Additionally, the Committee noted that Surgery Division facilities routinely failed to adjust recorded contractual adjustment allowance balances to the amounts calculated by the facilities using the zero balance report. These amounts were reported to the division's corporate management as under- or over-reserved amounts. The net under-reserve positions reported by facilities to Surgery Division management at year end were:

Under/(Over) Contractual Adjustments
As Computed On The Financial Reporting Package (millions of dollars)

| | |
|------|-------|
| 1999 | 38.76 |
| 2000 | 36.69 |
| 2001 | 44.51 |
| 2002 | 49.04 |

<PAGE>                                     36

The Committee also identified two instances in which regional controllers changed facility contractual allowances and reserves, generally in a manner that improved reported operating results. In both, the regional controllers requested that facilities submit monthly financial reporting packages to them prior to or in lieu of submitting the information to corporate accounting. The controllers' changes usually were in round dollar amounts or flat percentages, without any supporting documentation. When asked, the controllers provided neither reasonable explanations nor any other justification for the adjustments. The Committee quantified the effect of these unsupported adjustments as follows:

Comparison Of Facility And Recorded Reporting Packages
Contractual Adjustments, Surgery Division (millions of dollars)

| | |
|------|-------|
| 2002 | 11.18 |

Comparison Of Facility And Recorded Reporting Packages
Contractual Adjustments, Inpatient Division (millions of dollars)

| Fiscal Year | |
|-------------|------|
| 1999 | 0.10 |
| 2000 | 3.69 |
| 2001 | 2.35 |

```
|-------------------------------------------|
|        Total          7.35                |
|-------------------------------------------|
```

V.      RECOMMENDATIONS

        Much has changed at HealthSouth during the last fourteen months.
Employees who admitted complicity in accounting abuses, and others believed to
have been knowing participants, have resigned or been terminated. A number of
key management positions have been filled, and others soon will be. The
Company has strengthened its corporate compliance and internal audit

<PAGE>                              37

functions. It has engaged new auditors49 and appointed as Audit Committee
members new directors who bring significant financial reporting experience to
their task. Five directors who served during the period in which the fraud
occurred have left the Board. The Company has committed significant resources
to corporate governance initiatives. It continues to make progress in the
arduous processes of evaluating its historical financial reporting and
preparing to restate its financial results. But while much has been
accomplished, much remains to be done. In particular, HealthSouth's internal
controls have serious weaknesses, especially in the areas of contractual
allowances, receivables, and fixed assets.

        The Committee believes that the Company can and should take specific
steps to improve its financial reporting mechanisms and thereby reduce the risk
that accounting abuses will recur.50 These include:

        Systems

                o       Development of integrated financial accounting and
        reporting systems, to which all appropriate personnel have
        access.

                o       Improvement of accounting and related systems to allow the
        pooling of information into a centralized location.

        Contractual Allowances and Reserves

                o       Development of policies and procedures to establish
        contractual allowances and reserves with appropriate

---

(49)    The magnitude of the fraud and the length of time over which it occurred
inevitably raise questions about the role, responsibilities, and
effectiveness of the Company's former outside auditors. An assessment of
whether E&Y fulfilled its responsibilities was beyond the scope of the
Committee's investigation. Such an assessment necessarily would require,
among other things, a review of E&Y's audit workpapers, which were not
available to the Committee.

(50)    Given the nature of the Committee's inquiry, its recommendations relate

principally to the financial reporting and control process, a variety of other corporate operating and governance practices at HealthSouth that also require enhancement.

<PAGE>

                              38

      methodology, consistently applied across all business units
      and at all facilities.

      o      Periodic assessment of the sufficiency of contractual
      allowances and reserves, and adjustment of those allowances
      and reserves when necessary. The reasons for adjustments
      should be documented, and they should be communicated to and
      understood by those responsible for operations and financial
      reporting.

      o      Upgrades to patient accounting systems that eliminate the
      need to estimate or value contractual allowances and
      reserves. Among other things, such upgrades should allow
      contracts to be readily available and to be integrated with
      patient billing systems.

Journal Entries

      o      Establishment of procedures to ensure that the closing
      process is completed in a timely manner.

      o      Implementation of systematic, consistent procedures for the
      creation of journal entries and the maintenance and retention
      of proper supporting documentation and approvals.

      o      Recordation of journal entries by specific operators (i.e.,
      elimination of the EXTERNAL identifier for journal uploads).
      The general ledger accounting system should require that all
      journal entries be unique.

      o      Establishment of reconciliation and review procedures to
      ensure that facility financial reporting packages are
      reflected completely and accurately within the general ledger
      accounting system.

      o      Establishment of policies respecting the use of
      self-reversing entries and procedures monitoring the use of
      such entries.

<PAGE>
                              39

Fixed Assets

      o      Distribution of asset lists to each facility, thus
      permitting periodic reconciliations of such lists to assets
      maintained at the facility.

o   ...lishment of uniform procedures... asset transfers and disposal... a facility level and within the asset management group.

o   Maintenance of asset tags. If an asset cannot be tagged (e.g., computer software), an asset card should be maintained.

o   Establishment of uniform capitalization guidelines.

o   Establishment of procedures for the separate identification of owned and leased assets.

o   Establishment of uniform procedures or guidelines for asset sales at the facility level and within the asset management group.

o   Development of accounting procedures to document assets maintained at closed facilities and assets acquired in transactions with third parties.

Accounts Payable and Receivable

o   All disbursements should be supported by adequate documentation for the expenditure and by appropriate and documented approval.

o   Receivables (including patient receivables and those from loans to employees or third-parties) should be monitored for collection in a timely manner and written off when appropriate.

Budgeting

o   Establishment of budgets and financial targets independent of market expectations or incentive compensation programs. Completion of the budget process from a "bottom up," rather than a "top down," perspective.

<PAGE>                          40

o   Use of budgets and financial targets as benchmarks, rather than as drivers of reported financial results.

Investment and Cash Management

o   Quarterly review to ensure that marketable securities are adjusted to market prices.

o   Implementation of a requirement that marketable securities be held in a central brokerage portfolio.

o   Yearly reconciliation of the balance of each security held

o       Timely performance of bank reconciliations and timely recordation of all resulting adjusting journal entries.

o       Establishment of procedures governing the use, and requiring the monitoring, of suspense accounts, and timely reconciliation of suspense account balances.

Internal Audit

o       The department should be adequately staffed and supervised, and should have a direct reporting line to the Audit Committee.

o       Internal audit programs should address both operations and financial reporting.

o       Internal auditors should receive sufficient training in the general ledger system to permit them to create reports and run queries within the system.

However useful they may be, no accounting procedures or internal control mechanisms can be truly effective in the absence of an appropriate corporate environment. That environment must be one in which there is an explicit commitment by management, the Board, and all others with accounting or financial responsibility to accurate, truthful, and transparent financial reporting. It is an environment in which management and the Audit

41

<PAGE>

Committee must be attentive to any sign of unusual or improper activity, and in which there is no tolerance for efforts to manage earnings or otherwise massage financial results. It is an environment in which the Company must swiftly and unequivocally halt any such effort thereby reinforcing a culture in which fidelity to the truth is the foremost objective and financial misreporting is unthinkable.

42

</TEXT>
</DOCUMENT>

# EXHIBIT 3

# LIMITED PARTNERSHIP AGREEMENT

## OF

# ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO, L.P.

## DATED AS OF JANUARY 18, 1996

# TABLE OF CONTENTS

Page

ARTICLE I   DEFINITIONS

    1.01   Definitions ................................................................................ 1
    1.02   Interpretation............................................................................ 4


ARTICLE II   FORMATION OF PARTNERSHIP

    2.01   Formation ................................................................................. 5
    2.02   Name ....................................................................................... 5
    2.03   Principal Office......................................................................... 5
    2.04   Term ........................................................................................ 5
    2.05   Purposes of the Partnership ...................................................... 5
    2.06   Securities Law Legend .............................................................. 5
    2.07   Disclosure of Partnership Interest ............................................. 5


ARTICLE III   CAPITAL CONTRIBUTIONS

    3.01   Admission of Additional Limited Partners................................. 6
    3.02   Partnership Interests and Capital Contributions......................... 6
    3.03   Additional Capital Contributions .............................................. 6
    3.04   Liability for Negative Capital Accounts .................................... 6
    3.05   No Interest on Contributions..................................................... 6
    3.06   Loans ....................................................................................... 7


ARTICLE IV   ADJUSTMENT OF CAPITAL ACCOUNTS AND
                 PROFITS AND LOSSES

    4.01   Allocations Subsequent to the Admission of
           Additional Limited Partners ...................................................... 7
    4.02   General Partner Allocations ....................................................... 8
    4.03   Tax Items.................................................................................. 8
    4.04   Partial Year Allocations ............................................................ 8
    4.05   Allocations and Distributions Upon Dissolution ........................ 8

AD951590.241

## ARTICLE V  DISTRIBUTIONS

5.01  General Distributions ............................................................... 9
5.02  Distributions Upon Dissolution.................................................. 9
5.03  Withholding ............................................................................ 9
5.04  Liability of General Partner ...................................................... 9

## ARTICLE VI POWERS, DUTIES AND RIGHTS OF GENERAL PARTNER

6.01  Powers of General Partner ....................................................... 9
6.02  Duties of and Decisions by General Partner ............................... 11
6.03  Limitations .............................................................................. 11
6.04  Medical Director ...................................................................... 12
6.05  Medical Advisory Board............................................................ 12
6.06  Related Party Transactions ....................................................... 12
6.07  Reliance on Authority of General Partner................................... 12

## ARTICLE VII LIMITATION ON LIABILITY AND INDEMNIFICATION
   OF GENERAL PARTNER

7.01  Limitation of Liability of the General Partner............................. 12

## ARTICLE VIII POWERS AND RIGHTS OF LIMITED PARTNERS

8.01  Powers and Rights.................................................................. 13
8.02  Liability .................................................................................. 13

## ARTICLE IX COMPENSATION AND REIMBURSEMENTS

9.01  Out-of-Pocket Reimbursements ................................................ 14
9.02  Reimbursement for Organization and Start-up Expenses ............. 14
9.03  Management Agreement ........................................................... 14
9.04  Medical Director ...................................................................... 14

AD951590.241

Page

ARTICLE X ACCOUNTING, BOOKS AND RECORDS

    10.01 Accounting Method .................................................................. 14
    10.02 Books and Records .................................................................. 14
    10.03 Financial Statements ............................................................... 14
    10.04 Tax Returns ............................................................................ 15
    10.05 Tax Matters Partner ............................................................... 15

ARTICLE XI TRANSFERS, ASSIGNMENTS AND REDEMPTIONS
           BY PARTNERS

    11.01 General Prohibition ................................................................. 15
    11.02 Conditions of Transfer ............................................................ 15
    11.03 Death of Limited Partner ........................................................ 16
    11.04 Fraud and Abuse .................................................................... 17
    11.05 Transfer of Interest in Limited Partner .................................... 18
    11.06 Right of First Refusal Granted to Limited Partners ................... 18
    11.07 Right of First Refusal Granted to General Partner .................... 18

ARTICLE XII DISQUALIFICATION

    12.01 Limited Partners ..................................................................... 18
    12.02 General Partner ...................................................................... 18
    12.03 Disqualification ...................................................................... 19

ARTICLE XIII DISSOLUTION OF PARTNERSHIP

    13.01 Events of Dissolution .............................................................. 19

ARTICLE XIV DISTRIBUTIONS UPON DISSOLUTION

    14.01 Liquidation ............................................................................. 20
    14.02 Distributions in Kind ............................................................... 20
    14.03 No Action for Dissolution ........................................................ 21
    14.04 No Further Claim .................................................................... 21

AD951590.241

Page

ARTICLE XV POWER OF ATTORNEY

    15.01 Appointment ................................................................................ 21


ARTICLE XVI MISCELLANEOUS

    16.01 Restrictions on Relationships of Limited Partners
           with Competitors .......................................................................... 22
    16.02 Amendments by the General Partner ............................................ 22
    16.03 Additional Documents ................................................................. 23
    16.04 Notices ....................................................................................... 23
    16.05 Applicable Law ........................................................................... 23
    16.06 Entire Agreement ........................................................................ 23
    16.07 Severability ................................................................................. 23
    16.08 Successors .................................................................................. 23
    16.09 Counterparts ............................................................................... 23
    16.10 Headings ..................................................................................... 23
    16.11 Acceptance of Prior Acts by New Partner ................................... 24
    16.12 Partnership Property .................................................................... 24
    16.13 Meetings ..................................................................................... 24
    16.14 Gender and Number .................................................................... 24

- iv -

AD951590.241

# LIMITED PARTNERSHIP AGREEMENT

## OF

## ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO, L.P.

THIS LIMITED PARTNERSHIP AGREEMENT is entered into as of the 18th day of January, 1996 by and between, SHC SAN DIEGO, INC., a Georgia corporation (hereinafter referred to as the "General Partner"), and SURGICAL HEALTH CORPORATION, a Delaware corporation (hereinafter referred to as the "Initial Limited Partner").

## W I T N E S S E T H:

WHEREAS, the parties hereto desire to form a limited partnership in accordance with the Georgia Revised Uniform Limited Partnership Act; and

WHEREAS, the parties desire to set forth in full the terms and conditions of their understandings and agreements;

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises, obligations and agreements set forth herein, and of other good and valuable consideration, the receipt ad sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.01  Definitions.  For purposes of this Agreement, the following capitalized terms shall have the following respective meanings:

"Act" means the Georgia Revised Uniform Limited Partnership Act, O.C.G.A. §14-9-100 et seq.

"Additional Limited Partner" means any Person who purchases all or part of a Unit and is admitted to the Partnership pursuant to Sections 3.01 and 3.02 hereof.

"Affiliate" means a Person or Persons directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with the Person(s) in question. The term "control," as used in the immediately preceding sentence, means, with respect to a Person that is a corporation, the right to the exercise, directly or indirectly, of more than 50% of the voting rights attributable to the shares of such controlled corporation and, with respect to a Person that is not a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such controlled Person.

AD951590.241

"Available Cash" means, with respect to any point in time, all cash of the Partnership on hand as of such point in time, after the payment of all then due debts and liabilities of the Partnership and after any prepayments of any debts and liabilities of the Partnership that the General Partner deems appropriate to cause the Partnership to make, less any reserves reasonably deemed necessary by the General Partner, consistent with the provisions of this Agreement, for (a) the repayment of any debts or liabilities of the Partnership, (b) the working capital or other requirements of the Partnership, and (c) any contingent or unforeseen liabilities of the Partnership.

"Business" means the development and operation of the Center.

"Capital Account" of a Partner means a capital account established, maintained, and adjusted in accordance with Treasury Regulations section 1.704-1(b)(2)(iv). Consistent therewith, each Partner's Capital Account will be adjusted from time to time pursuant to Section 4.01 hereof, the purpose of which is to set forth certain operating rules for the allocation of book items of income, gain, loss and deduction for Capital Account purposes. The provisions of Section 4.01 shall be construed in a manner consistent with Treasury Regulations section 1.704-1(b)(2)(iv). The Capital Accounts shall not be adjusted for items as they are computed and allocated to the Partners solely for federal income tax purposes. Upon the transfer hereunder of all or part of a Partner's Units, other than a transfer that terminates the Partnership within the meaning of Code Section 708(b)(1)(B) and other than a sale of Limited Partner Units held by the General Partner, the Capital Account of the transferor Partner that is attributable to the transferred Units will carry over to the transferee Partner. In the event of a transfer of all or part of a Partner's Units that causes a termination of the Partnership within the meaning of Code Section 708(b)(1)(B), the Partners' Capital Accounts will be adjusted in accordance with Treasury Regulations section 1.704-1(b)(2)(iv)(1).

"Capital Ratio" means, at any particular time (i) with respect to a Limited Partner, forty percent (40%) multiplied by a fraction, the numerator of which is the total number of Units owned by such Limited Partner at the time in question, and the denominator of which is the total number of Limited Partner Units outstanding, and (ii) with respect to the General Partner, sixty percent (60%). Notwithstanding the foregoing, in the event of the disqualification of the General Partner pursuant to Article XII hereof, the term "Capital Ratio" shall mean from and after the date of such disqualification of the General Partner for all purposes under this Agreement (a) with respect to a Limited Partner (excluding the converted Disqualified General Partner), (1) forty percent (40%) minus the Partnership Interest transferred to the new General Partner, if any, multiplied by (2) a fraction, the numerator of which is the total number of Units owned by such Limited Partner at the time in question, and the denominator of which is the total number of Limited Partner Units (excluding the converted Disqualified General Partner Units) outstanding at such time, (b) with respect to the Disqualified General Partner, sixty percent (60%), and (c) with respect to the new General Partner, such Partnership Interest as may be transferred to the new General Partner pursuant to the terms of this Agreement.

"Center" means the outpatient surgery center to be operated by the Partnership in San Diego, California.

- 2 -

"Certificate" means the certificate of limited partnership required to be filed pursuant to the Act.

"Code" means the Internal Revenue Code of 1986, as amended, including effective date and transition rules (whether or not codified), and any successor thereto. Any reference to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of succeeding law.

"Commencement Date" means the date upon which the Partnership begins operating the Center.

"Fiscal Year" of the Partnership means the calendar year.

"General Partner" means SHC San Diego, Inc., a Georgia corporation, so long as it remains the General Partner, and thereafter shall mean any Person who is admitted to the Partnership as a general partner in accordance with the provisions of Articles XI or XII hereof.

"Initial Closing Date" shall have the meaning ascribed to it in the Memorandum.

"Limited Partners" means the Initial Limited Partner, the Additional Limited Partners, the General Partner in its capacity as a Limited Partner pursuant to Section 3.01 hereof and following the conversion of its General Partner Unit to Limited Partner Units pursuant to Section 12.02 hereof; and shall also mean each Person to whom all or any portion of the Units of any of such Persons is transferred or assigned and who is admitted to the Partnership as a substituted Limited Partner in accordance with the provisions of Section 11.02 hereof.

"Management Company" means SHC Management Company, a Georgia corporation, as more particularly described in Section 9.03 hereof.

"Maximum Number of Units" means the maximum number of Units to be purchased as set forth in the Memorandum, exclusive of Units to be purchased by the General Partner.

"Medical Advisory Board" means a group comprised of up to seven (7) individuals which shall provide the Partnership and the General Partner with counsel and advice concerning the medical standards and practices of the Center, as more particularly described in Section 6.05 hereof.

"Medical Director" means an individual appointed from time to time by the General Partner, who will be responsible for medical quality control matters, as more particularly described in Section 6.04 hereof.

"Memorandum" means that certain Confidential Private Placement Memorandum dated January 18, 1996 to be used in connection with the offering of Units in the Partnership, as modified or superseded following the initial offering of Units.

- 3 -

"Net Profits" and "Net Losses" mean the Partnership's taxable income or loss determined in accordance with Code Section 703(a) for each of its Fiscal Years (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss) with the following adjustments: (i) such Net Profits and Net Losses will be computed as if items of tax-exempt income and nondeductible, noncapital expenditures (under Code Section 705(a)(1)(B) and 705(a)(2)(B)) were included in the computation of taxable income or loss; (ii) that any items specially allocated pursuant to Section 4.01(b) hereof shall not be taken into account in computing Net Profits or Net Losses; (iii) if any Partner contributes property to the Partnership with an initial book value to the Partnership different from its adjusted basis for federal income tax purposes to the Partnership, or if Partnership property is revalued in accordance with Treasury Regulations section 1.704-1(b)(2)(iv)(f) or as otherwise required by the Regulations, Net Profits and Net Losses will be computed as if the initial adjusted basis for federal income tax purposes to the Partnership of such contributed or revalued property equalled its initial book value to the Partnership as of the date of contribution or revaluation; and (iv) credits or debits to Capital Accounts due to a revaluation of Partnership assets in accordance with Treasury Regulations section 1.704-1(b)(2)(iv)(f), or due to a distribution of noncash assets as provided in Section 14.02 hereof, will be taken into account as gain or loss from the disposition of such assets for purposes of computing Net Profits and Net Losses.

"Net Revenues" means the gross revenues of the Partnership minus contractual adjustments and bad debts.

"Offering" means the offering of the Maximum Number of Units on the terms set forth in the Memorandum.

"Partners" means, collectively, the General Partner and Limited Partners; reference to a Partner means any one of the General Partner or Limited Partners.

"Partnership Interest" means with respect to each Partner, the Partner's entire ownership interest in the Partnership acquired by such Partner pursuant to the terms hereof, including the right of such Partner to any and all benefits to which it may be entitled as provided hereunder or in the Act, together with the obligation of such Partner to comply with all the terms hereof.

"Person" means an individual, partnership, joint venture, association, corporation, trust, limited liability company or any other legal entity.

"Subscription Agreement" shall have the meaning ascribed to it in the Memorandum.

"Tax Decision" shall mean the determination: (a) based on advice of counsel, to amend the provisions of this Agreement to the minimum extent necessary to ensure that the allocations set forth in Article IV hereof for federal income tax and Capital Account purposes are respected by the Internal Revenue Service and otherwise remain in compliance with applicable law; (b) to make any election under the Code including without limitation, an election under Code Section 754; (c) to change the accounting method or Fiscal Year of the Partnership for tax purposes; (d) to cause a

- 4 -



revaluation of the Partnership's assets, consistent with Treasury Regulations section 1.704-1(b)(2)(iv)(f); and (e) of any other matter relating to Partnership tax accounting or other tax issues.

"Unit" means one of the units of investment in the Partnership acquired by a Partner and includes both General Partner Units and Limited Partner Units. There shall be a total of 40 Units available for issuance to the Additional Limited Partners.

1.02 Interpretation. The terms defined in this Article I shall include the plural as well as the singular. Other capitalized terms used in this Agreement and not defined in this Article I shall have the meanings ascribed to such terms elsewhere in this Agreement. Some lower case terms that appear throughout this Agreement also appear above in this Article I and elsewhere in this Agreement as capitalized terms. Only when such terms appear as capitalized terms shall such terms have the meanings ascribed to such capitalized terms in this Agreement.

## ARTICLE II
## FORMATION OF PARTNERSHIP

2.01 Formation. The Partners hereby form a limited partnership pursuant to the Act. The General Partner will forthwith execute a Certificate and cause the same to be filed as required by the Act.

2.02 Name. The name of the Partnership is, and the Business of the Partnership shall be conducted under, the firm name and style: Arthroscopic & Laser Surgery Center of San Diego, L.P.

2.03 Principal Office. The principal office of the Partnership will be located at Two Perimeter Park South, Suite 224W, Birmingham, Alabama 35243, or at such other place as the General Partner from time to time designates by written notice to the Limited Partners. The Partnership may have additional offices at such other places as the General Partner deems advisable.

2.04 Term. The Partnership will commence on the date when the Certificate has been duly filed pursuant to the Act and will continue until December 31, 2035, unless sooner terminated as hereinafter provided.

2.05 Purposes of the Partnership. The purposes of the Partnership are to engage in the Business and to engage in any and all activities related thereto.

2.06 Securities Law Legend. THE UNITS HAVE BEEN ISSUED OR SOLD IN RELIANCE ON EXEMPTIONS FROM REGISTRATION CONTAINED IN THE "CALIFORNIA CORPORATE SECURITIES LAW OF 1968, AS AMENDED" AND/OR THE RULES AND REGULATIONS PROMULGATED THEREUNDER, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT. In

AD951590.241

addition, the Units have been issued or sold in reliance on exemptions from registration contained in the Securities Act of 1993, as amended, and/or the rules and regulations promulgated thereunder, as amended (collectively, the "1933 Act"). Accordingly, the Units under the 1933 Act are deemed to be "restricted securities" and may not be sold or transferred except in a transaction which is exempt from the registration requirements of the 1933 Act, or pursuant to an effective registration statement under the 1933 Act or in a transaction which is otherwise in compliance with the 1933 Act. The Partnership will be under no obligation to register any of the Units under any federal or state securities laws, or to take any action necessary in order to establish an exemption from the registration requirements of any such laws.

2.07  Disclosure of Partnership Interest.  Each Limited Partner shall disclose his participation in the Partnership to any individuals referred to or treated at the Center by such Limited Partner. Such disclosures shall be in a form which complies with all applicable federal and state laws governing the disclosure of a Limited Partner's ownership interest in a health care facility.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

3.01  Admission of Additional Limited Partners.  Subject to the prior written consent of the majority in interest of the holders of Limited Partner Units, the General Partner will have the right to admit such Persons as Additional Limited Partners as it deems advisable.

3.02  Partnership Interests and Capital Contributions.  The interests in the Partnership shall be as follows:

(a)  Sixty (60) General Partner Units for which the General Partner will contribute cash to the Partnership on or before the Initial Closing Date in the sum of $150,000; provided, however, that on or before such date the General Partner has received and accepted Subscription Agreements from a sufficient number of qualified investors to warrant a continuation of the Offering.

(b)  An Initial Limited Partner interest for which the Initial Limited Partner has contributed to capital of the Partnership the sum of $100.00  The Initial Limited Partner's interest shall be redeemed for $100.00 upon the admission of the first Additional Limited Partner.

(c)  Not more than the Maximum Number of Units nor less than one Unit; provided, however, that the number of Units under this Section 3.02(c) shall be equal to the number of Units actually subscribed for and purchased by Additional Limited Partners. Each Additional Limited Partner shall make a capital contribution to the Partnership in cash in an amount not less than $25,000 for each Unit subscribed for and purchased by such Additional Limited Partner, in accordance with the terms and conditions of the Memorandum. No more than the Maximum Number of Units shall be sold pursuant to the offering of Units.

- 6 -

AD951590.241

3.03  Additional Capital Contributions.  Except as provided in this Section 3.03, no Partner shall be required to make any additional capital contributions to the Partnership.

3.04  Liability for Negative Capital Accounts.  Upon dissolution and final liquidation of the Partnership pursuant to Articles XIII and XIV hereof, the General Partner shall be liable for the payment to the Partnership of any negative balance which may exist in its Capital Account after such Capital Account has been adjusted for all allocations of deductions, losses and distributions as provided herein.  To the extent possible such payment shall be made within the time period prescribed by Treasury Regulations section 1.704-1(b)(2)(ii)(b)(3).  No Limited Partner shall have any liability for restoration of any negative Capital Account balance.

3.05  No Interest on Contributions.  No Partner will be entitled to receive interest on its capital contributions.

3.06  Loans.  In the event the General Partner determines in good faith that funds in excess of those provided to the Partnership pursuant to the preceding Sections of this Article III are necessary for maintaining and protecting the Partnership's assets or conducting its Business, the Partnership shall be authorized to borrow funds from Partners and their Affiliates, provided that the interest rate and other terms of such loans are no less favorable to the Partnership than the Partnership could have secured from third parties.  If any Partner, or Affiliate of a Partner, lends money to the Partnership pursuant to this Section 3.06, such Partner or Affiliate shall be deemed an unrelated creditor with respect to such loan to the extent allowed by law.

## ARTICLE IV
## ADJUSTMENT OF CAPITAL ACCOUNTS AND
## PROFITS AND LOSSES

4.01    Allocations Subsequent to the Admission of Additional Limited Partners.

(a)  General Tax Allocations.  As of the end of each Fiscal Year, and after giving effect to the special tax allocations set forth in Section 4.01(b), Net Profits and Net Losses shall be allocated among the Partners for federal income tax purposes in accordance with their Capital Ratios.

(b)  Special Allocations.  At the end of each Fiscal Year of the Partnership and notwithstanding any other provision of this Section 4.01, the following special allocations shall be made for both Capital Account and for federal income tax purposes unless otherwise provided:

(i)  In accordance with the ordering rules of Treasury Regulation section 1.704-2(j), items of gross income and realized gain first shall be allocated in an amount and in a manner that complies with the "chargeback" requirement of Treasury Regulation section 1.704-2(i)(4), the "qualified income offset" requirement of Treasury Regulation section 1.704-1(b)(2)(ii)(d), and the "minimum gain

- 7 -



chargeback" requirement of Treasury Regulation section 1.704-2(f). Further, any "partner nonrecourse deductions" within the meaning of Treasury Regulation section 1.704-2(i)(2) attributable to "partner nonrecourse debt" shall be allocated to the Partner who bears the "economic risk of loss" for such debt in accordance with Treasury Regulation section 1.704-2(i)  If a Partner receives an allocation under this paragraph (i), to the extent possible the Partnership shall adjust allocations of other items to the Partners in the current, and to the extent necessary, future accounting periods, so as to place the Partners in as nearly as possible the same position as though these provisions were not a part of this Agreement.

(ii)  If a taxing authority ignores the characterization of any amounts paid to a Partner (or an Affiliate thereof) as salaries, management fees, commissions or other compensation for services ("Compensation"), and refuses to treat such payments as either guaranteed payments within the meaning of Code Section 707(c) or payments made to such Partner other than in such Partner's capacity as a Partner within the meaning of Code Section 707(a), and such taxing authority ultimately treats such amounts paid to a Partner (or an Affiliate thereof) as a distribution to such Partner for federal income tax purposes which reduces such Partner's Capital Account, then the Compensation shall be treated as an allocation of an item of income or gain of the Partnership to the recipient Partner so that, consistent with the intent of the Partners, the Compensation shall not be treated as a distribution which reduces the recipient Partner's Capital Account.  Accordingly, such Partner shall be allocated the first available items of Partnership income and gain (including in a succeeding year) in a amount equal to the Compensation.

(iii)  If the Partnership owns (a) any property contributed by a Partner that had a fair market value different from its adjusted basis for federal income tax purposes on the date of the contribution, or (b) any property that has been revalued pursuant to Treasury Regulation section 1.704-1(b)(2)(iv)(f), then for federal income tax purposes only and not for Capital Account purposes, any income, gain, loss or deduction with respect to such property shall be allocated among the Partners in accordance with Code Section 704(c) and the Treasury Regulations thereunder.

4.02  General Partner Allocations. To the extent the allocations language in this Article IV does not otherwise provide for allocations to General Partner Units, such allocations shall be on a Limited Partner Unit equivalent basis.

4.03  Tax Items.  Except as otherwise provided herein, any allocation to a Partner of a portion of the Net Profits or Net Losses for a Fiscal Year (or other relevant period) will be deemed to be an allocation to that Partner of the same proportionate part of each item of income, gain, loss, deduction or credit that is earned, realized or available by or to the Partnership for federal income tax purposes.

4.04  Partial Year Allocations.  In the event that a Limited Partner is admitted to the Partnership during the Partnership's Fiscal Year, or all or a portion of a Limited Partner's Units are

- 8 -

AD951590.241

transferred during the Partnership's Fiscal Year, Net Profits and Net Losses shall be allocated to the admitted or transferee Limited Partner in any manner permitted by Code Section 706 or the Treasury Regulations thereunder, as the General Partner shall determine in its reasonable discretion. Allocations made in this Article IV shall be made to each holder of a Unit whether or not the holder is a substituted Limited Partner.

4.05    Allocations and Distributions Upon Dissolution.    When the Partnership is dissolved and wound-up pursuant to Article XIV hereof, all items of income, gain, loss and deduction not previously allocated shall be allocated to the Partners pursuant to this Article IV. It is the intent of the parties hereto that after the allocations described in the previous sentence are made and the final cash distribution referred to in Section 14.01(d) is made, that such actions will result in the Capital Account balances of the Partners equalling zero following the dissolution of the Partnership. The allocation and distribution provisions of Articles IV and V hereof, respectively, of this Agreement, as well as the provisions of Article XIV hereof, shall be construed in such a way by the General Partner in order to achieve this result.

## ARTICLE V
## DISTRIBUTIONS

5.01    General Distributions.    The Partnership may distribute Available Cash in the discretion of the General Partner. The General Partner expects to make such distributions at least quarterly. Such distributions shall be made pro rata among the Partners in accordance with their respective Capital Ratios; provided, however, that the General Partner, in its reasonable discretion, shall have the right to take into account the length of time a Partner has held its Units in any period relating to a distribution in determining the proportionate amount of such Partner's respective distributions.

5.02    Distributions Upon Dissolution.    Notwithstanding anything herein to the contrary, upon the occurrence of an event of dissolution as provided in Section 13.01 hereof, cash distributions occurring in connection with such event of dissolution and thereafter shall be made in accordance with Article XIV hereof.

5.03    Withholding.    The General Partner shall be authorized to withhold from amounts to be distributed to any Partner hereunder any withholding required by the Code or any provision of any statute or local tax law, and to pay such amounts to the Internal Revenue Service or other appropriate taxing authority. Any such amounts withheld shall be treated as having been distributed to such Partner pursuant to this Article V for all purposes of this Agreement.

5.04    Liability of General Partner.    Upon the determination in good faith to pay and distribute cash in the manner herein provided, the General Partner shall incur no liability on account of such distribution, even though such distribution may result in the Partnership retaining insufficient funds for the operation of its Business, which insufficiency results in loss to the Partnership or the borrowing of funds by the Partnership.

- 9 -

AD951590.241

## ARTICLE VI
## POWERS, DUTIES AND RIGHTS OF GENERAL PARTNER

6.01 <u>Powers of General Partner</u>. Except as specifically provided herein, all references to any action to be taken by the Partnership shall mean action taken in the name of the Partnership and on its behalf by the General Partner. Except as specifically provided herein, the General Partner will have the rights, powers and authority of a general partner as set forth in the Act and will have full, exclusive and complete discretion in the management and control of the Partnership and will make all decisions affecting the Partnership's Business and affairs. By way of illustration and not in limitation of the foregoing, the General Partner has the power and authority, on behalf of the Partnership:

(a)  To execute all agreements and other documents necessary to implement the purposes of the Partnership, and to take such actions as may be necessary to consummate the transactions contemplated thereby;

(b)  To engage personnel and professional advisers, and do such other acts and incur such other expenses on behalf of the Partnership as may be necessary or advisable in connection with the conduct of its Business and affairs;

(c)  To open, maintain and close accounts, including margin accounts, with brokers and dealers, and to pay the customary fees and charges applicable to transactions in all such accounts;

(d)  To open, maintain and close bank accounts and to draw checks and other orders for the payment of money;

(e)  To make and execute all contracts, certificates and other legal documents relating to the Partnership's Business or organization, either personally or through agents selected by the General Partner, whether or not compensated by the Partnership (including management agreements to execute and carry out the powers of the General Partner);

(f)  To borrow money and pledge assets of the Partnership to secure borrowings;

(g)  To lend money and make investments;

(h)  To compromise any claim or liability due to the Partnership;

(i)  To execute, acknowledge, verify and file any notifications, applications, statements and other filings that the General Partner considers necessary or desirable to be filed with any state or federal securities administrator or commission;

(j)  To make all Tax Decisions;

AD951590.241

(k)  To satisfy the requirements of the Code: (i) with respect to the Partnership's allocations, (ii) with respect to the Partnership's status as a partnership for federal income tax purposes, and (iii) to ensure that the Partnership is not treated as a "publicly traded partnership" described in Code Section 7704;

(l)  To take any action described in Section 11.04 hereof in the event of an investigation of the Partnership under any applicable federal fraud and abuse statute, rule, regulation or law by either the Department of Health and Human Services or the United States Attorney;

(m)  To acquire real or personal property as may be necessary in connection with the development and operation of the Center;

(n)  To admit Additional Limited Partners subject to the consent of the Limited Partners as set forth in Section 6.03 hereof;

(o)  To redeem the Units of any Limited Partner in accordance with the terms of this Agreement; and

(p)  To exercise any and all other powers which may be necessary to implement the foregoing purposes, policies and powers of the Partnership including those granted to limited partnerships under the Act, upon such terms and conditions as the General Partner, in its sole discretion, determines to be necessary, desirable or appropriate.

6.02.  <u>Duties of and Decisions by General Partner</u>.  The General Partner shall be charged with the full responsibility of managing and promoting the Partnership's purposes and Business. The General Partner shall cause its officers, directors and employees to devote the amount of their business time to the affairs and Business of the Partnership as in the General Partner's judgment is reasonably required to perform its duties concerning the Business and affairs of the Partnership, taking into account business time required by other business activities of such Persons.  The General Partner may, in its sole discretion, appoint such executive officers as it deems desirable to carry on the Business of the Partnership, and any such executive officer shall have the responsibilities expressly designated to him or her by the General Partner, subject to the restrictions on the General Partner's authority contained in this Agreement.  The General Partner and any Affiliate thereof may engage in or possess an interest in, directly or indirectly, any other present or future business ventures or investments of any nature or description for its own account, independently or with others, including, but not limited to, any investment in any aspect of medical care delivery business or any other business engaged in by the Partnership and, inter alia, may become a general partner in other partnerships, and neither the Partnership nor any Partner shall have any rights in or to such investment or independent venture or the income or profits derived therefrom.

6.03  <u>Limitations</u>.  Without obtaining the consent of Limited Partners holding more than fifty percent (50%) of the Units (exclusive of Units held by the General Partner), the General Partner shall not:

- 11 -

AD951590.241

(a) Act in contravention of this Agreement;

(b) Except as provided in Articles XIII and XIV herein, do any act which would make it impossible to carry on the ordinary Business of the Partnership;

(c) Confess a judgment against the Partnership;

(d) Possess Partnership property, or assign any rights in specific Partnership property, including any assignment for the benefit of Partnership creditors, for other than a Partnership purpose;

(e) Admit a Person to the Partnership as a General Partner; or

(f) Admit a Person to the Partnership as a Limited Partner.

6.04    Medical Director.  The General Partner shall appoint an individual to serve as the Partnership's Medical Director from time to time.  The Medical Director will be responsible for the Partnership's medical quality control matters.  The Medical Director must be a physician licensed to practice medicine in the state in which the Center is located.  The Medical Director will receive a salary from the Partnership, as determined from time to time by the General Partner, in its sole discretion.

6.05    Medical Advisory Board.  The General Partner shall appoint up to five individuals to serve from time to time on the Partnership's Medical Advisory Board.  Upon request by the General Partner, the Medical Advisory Board shall provide counsel and advice to the Partnership and the General Partner concerning the medical standards and practices of the Center.  The General Partner shall have no obligation to consult the Medical Advisory Board with respect to any particular issues or matters.  The Medical Advisory Board shall have no power to bind the Partnership.  Its members shall receive no salary from the Partnership in such capacity.

6.06    Related Party Transactions.  The General Partner may employ and deal with any Partner (including itself) or any Affiliate of any Partner for the performance of other services or the purchase of other goods or property or the leasing of the same, provided that such other services, goods or property are reasonably necessary and customary in the Business of the Partnership and that any such other services, goods or property are obtained on terms no less favorable to the Partnership than those reasonably available from third Persons and provided that the Limited Partners are given notice of the terms of the transaction prior to its consummation.  Neither the Partnership nor any Partner shall have any rights in or to any income or profits derived by any Partner or Affiliate from such other ventures or businesses as a result of entering into this Agreement.

6.07    Reliance on Authority of General Partner.  No Person dealing with the General Partner will be required to determine the General Partner's authority to make any undertaking on behalf of the Partnership or to determine any fact or circumstance bearing upon the existence of such authority.

AD951590.241

## ARTICLE VII
## LIMITATION ON LIABILITY AND
## INDEMNIFICATION OF GENERAL PARTNER

7.01 <u>Limitation of Liability of the General Partner</u>. The General Partner and its affiliates (as defined below for purposes of this Section 7.01) shall have no liability to the Partnership or to any Limited Partner for any loss suffered by the Partnership which arises out of any action or inaction of the General Partner or its affiliates, if the General Partner or its affiliates, in good faith, determined that such course of conduct was in the best interest of the Partnership and such course of conduct did not (i) constitute gross negligence or intentional misconduct on the part of the General Partner or its affiliates, or (ii) involve a transaction for which the General Partner or its affiliates received an improper personal benefit in violation or breach of any provision of this Agreement. The General Partner and its affiliates shall be indemnified by the Partnership to the extent of the Partnership's assets against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by it in connection with the Partnership, provided that the same were not the result of gross negligence or intentional misconduct on the part of the General Partner or its affiliates, and did not involve a transaction for which the General Partner or its affiliates received an improper personal benefit in violation or breach of any provision of this Agreement. Notwithstanding the above, the General Partner and its affiliates shall not be indemnified for liabilities arising under federal and state securities laws unless (a) there has been a successful adjudication on the merits of each count involving securities laws violations; or (b) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction. The Partnership shall not incur the cost of the portion of any insurance which insures any party against any liability as to which such party is herein prohibited from being indemnified. For purposes of this Section 7.01, "affiliates" means any Person or entity performing services on behalf of the Partnership who: (y) directly or indirectly controls, is controlled by, or is under common control with, the General Partner, or (z) is an officer, director or shareholder of the General Partner.

## ARTICLE VIII
## POWERS AND RIGHTS OF LIMITED PARTNERS

8.01 <u>Powers and Rights</u>. Except as specifically provided herein, the Limited Partners shall not take part in the conduct or control of the Partnership's Business and affairs, and will have no right or authority to act or sign for or to obligate the Partnership; provided, however, that this Section 8.01 shall in no way limit the powers, duties, rights and obligations of a Limited Partner acting in its capacity as a General Partner. At no time will the Limited Partners be entitled to withdraw all or any part of their contributions to the capital of the Partnership except as provided in Articles V and XIV hereof. The Limited Partners will have no right to demand and receive any property other than cash in return for their contributions and, prior to the dissolution and liquidation of the Partnership pursuant to Articles XIII and XIV hereof, their right to cash shall be limited to the rights set forth in Article V hereof.

- 13 -

AD951590.241

8.02  Liability.  Except for payment of the subscription price for the Units, the Limited Partners shall not be bound by or personally liable to the Partnership, to the General Partner or to the creditors of the Partnership, for expenses, liabilities or obligations of the Partnership.

## ARTICLE IX
## COMPENSATION AND REIMBURSEMENTS

9.01  Out-of-Pocket Reimbursements.  Direct out-of-pocket costs and expenses incurred by the General Partner or its Affiliates on behalf of the Partnership in conducting the Business will be reimbursed by the Partnership.

9.02  Reimbursement for Organization and Start-up Expenses.  The Partnership will pay all costs incurred in the organization and formation of the Partnership, the development of the Center, the offering of Units in the Partnership and the exemption of such offering from registration under the Securities Act of 1933 and the Blue Sky laws of the various states in which such offering may be made, and all costs incurred in the investigation and creation of the Partnership's trade or business prior to its formation.  All of such costs will be reimbursed to the General Partner or its Affiliates to the extent that the General Partner or its Affiliates have already paid such costs.

9.03  Management Agreement.  The General Partner is specifically authorized to enter into a management agreement with the Management Company under which the Management Company will be responsible for assisting the General Partner with the day-to-day management of the Partnership.  The Partnership will pay an annual management fee to the Management Company equal to six percent (6%) of Net Revenues.  Such management fee shall be paid monthly based on the Net Revenues of the immediately preceding month.

9.04  Medical Director.  The Medical Director will receive the compensation described in Section 6.04 hereof.

## ARTICLE X
## ACCOUNTING, BOOKS AND RECORDS

10.01  Accounting Method.  The Partnership will maintain its books and records on such basis of accounting as the General Partner shall determine.

10.02  Books and Records.  The General Partner shall keep, or cause to be kept, at the Partnership's expense, full, complete and accurate books of account and other records showing the assets, liabilities, costs, expenditures, receipts and such other matters as are required by Section 14-9-105 of the Act.  Such books of account will be the property of the Partnership, will be kept in accordance with sound accounting principles and procedures consistently applied and will be open to the reasonable inspection and examination by the Limited Partners and their duly authorized

- 14 -

representatives.    Such books of account will be maintained at the principal office of the Partnership, or at such other place as the General Partner determines.

10.03 <u>Financial Statements</u>.  Within one hundred twenty (120) days following the end of each Fiscal Year of the Partnership, the General Partner shall cause to be prepared and delivered to each Partner unaudited financial statements of the Partnership for such Fiscal Year.

10.04 <u>Tax Returns</u>. The General Partner shall cause the Partnership's tax returns and other governmental returns and reports to be prepared and timely filed.  The General Partner shall deliver copies of Schedule K-1 of Form 1065 (or a comparable schedule) and other necessary tax information for each Fiscal Year to each Partner no later than ninety (90) days after the end of each Fiscal Year.

10.05 <u>Tax Matters Partner</u>.  The General Partner, or such other Partner as the General Partner may designate, is hereby designated the Tax Matters Partner of the Partnership, as provided in Treasury Regulations pursuant to Code Section 6231.  The Tax Matters Partner shall represent the Partnership (at the expense of the Partnership) in connection with all examinations of the affairs of the Partnership by any federal, state, or local tax authorities, including any resulting administrative and judicial proceedings, and to expend funds of the Partnership for professional services and costs associated therewith.  The provisions on limitations of liability of the General Partner and the indemnification set forth in Section 7.01 hereof will be fully applicable to the Tax Matters Partner in its capacity as such.

# ARTICLE XI
## TRANSFERS, ASSIGNMENTS AND REDEMPTIONS BY PARTNERS

11.01 <u>General Prohibition</u>.  Except as provided in this Article XI, no Partner may assign, convey, sell, transfer, liquidate, encumber, or in any way alienate (collectively, a "Transfer"), all or any part of his or its Units or, in the event such Partner is a corporation, partnership or any other form of legal entity, such Partner may not Transfer or accept an offer to acquire all of its capital stock, partnership interests or its other form of equity investment interests (a Partner's Units or a majority of its capital stock, partnership interests or other form of equity investment interests shall be collectively referred to herein as the "Ownership Interest") unless such Transfer is (i) registered or exempt from registration under all applicable federal and state securities laws, and (ii) authorized by the General Partner following waiver of its right of first refusal set forth in Section 11.07 hereof, which authorization may be given or withheld by the General Partner in its sole and absolute discretion, regardless of whether it exercises such right of first refusal.  If a Limited Partner's Units are Transferred pursuant to the terms of this Agreement, the transferee shall, upon compliance with the provisions of Section 11.02, succeed to the transferred Units of the transferor Limited Partner and all rights, duties and obligations under this Agreement with respect to such transferred Units. Any attempted Transfer of all or any portion of a Limited Partner's Units without the necessary consent, or as otherwise permitted hereunder, shall be null and void and shall have no effect whatsoever.

- 15 -

11.02 <u>Conditions of Transfer</u>.  No transferee of the Units of a Limited Partner will become a substituted Limited Partner until the following conditions have been satisfied:

(a)   the transferor Limited Partner must have executed a written instrument of transfer of such Units in form and substance satisfactory to the General Partner;

(b)   the transferee must have executed a written agreement, in form and substance satisfactory to the General Partner, to assume all of the duties and obligations of the transferor Limited Partner under this Agreement and to be bound by and subject to all of the terms and conditions of this Agreement;

(c)   the transferor Limited Partner and the transferee must have executed a written agreement, in form and substance satisfactory to the General Partner, to indemnify and hold the Partnership and the General Partner harmless from and against any loss or liability arising out of the transfer;

(d)   the transferee must have executed a power of attorney substantially identical to that contained in Article XV hereof, and such other documents and instruments as the General Partner may deem necessary to effect the admission of the transferee as a Limited Partner;

(e)   upon request by the General Partner, the transferor must have delivered to the Partnership a written opinion of counsel for the Partnership or of other counsel reasonably satisfactory to the General Partner (which opinion shall be obtained at the expense of the transferor) that such transfer will not result in (i) a violation of applicable law or this Agreement, (ii) the Partnership being classified as an association taxable as a corporation, or (iii) unless waived by the General Partner, the Partnership being deemed terminated pursuant to Code Section 708 or any comparable future section of the Code; and

(f)   unless otherwise waived by the General Partner, the transferee or transferor must have paid the expenses incurred by the Partnership in connection with the admission of the transferee to the Partnership.

A transferee who does not become a substituted Limited Partner will be entitled to receive only that portion of the distributions or allocations to which his transferor would otherwise be entitled, and such transferee will not be entitled to vote on any question regarding the Partnership, and his Units will not be considered to be outstanding for voting purposes but will be treated as outstanding for Article IV purposes.

11.03 <u>Death of Limited Partner</u>.  Except as set forth in Section 11.06 hereof, upon the death of a Limited Partner, or all of the members or shareholders of a professional association or professional corporation which is a Limited Partner, the General Partner will have an option to purchase the Units of such Limited Partner.  Such option will be exercisable, if at all, by the delivery of a written notice by the General Partner to such Limited Partner within the one year period following such death.  The purchase price per Unit shall be equal to: (i) four (4) times, (ii) the Partnership's Net Revenues for the preceding Fiscal Year reduced by the Partnership's operating expenses for such preceding Fiscal Year, multiplied by (iii) such Limited Partner's

- 16 -

Capital Ratio as of the date of such Limited Partner's death. The purchase price shall be payable twenty percent (20%) in cash at closing, and the balance by the General Partner's promissory note payable in eight (8) equal quarterly installments of principal, the first of which is due three (3) months after closing. The unpaid balance of such promissory note shall bear interest at the rate announced from time to time as the "prime rate" by NationsBank of Georgia, N.A., Atlanta, Georgia (or successor thereof). Accrued interest on the entire balance will be payable quarterly with each installment payment of principal.

11.04 Fraud and Abuse. In the event of an investigation of the Partnership or any Partner under any then applicable federal or state fraud and abuse statute, rule, regulation or law by the Department of Health and Human Services, the United States Attorney or any federal or state agency having jurisdiction over the Partnership, the General Partner, in its sole discretion, is authorized to (i) terminate, liquidate and dissolve the Partnership, (ii) cause the Partnership to redeem all or any portion of the Units of any Limited Partners whose investment in the Partnership is determined by the General Partner to cause a fraud and abuse violation by the Partnership or such Limited Partner, (iii) cause a Limited Partner, in the event such Limited Partner is a corporation, partnership or other form of legal entity, to redeem any stockholder, partner or other investor in such Limited Partner whose investment is determined by the General Partner to cause a fraud and abuse violation by the Partnership or such Limited Partner, or (iv) amend this Limited Partnership Agreement pursuant to Section 16.02(a). In the event the General Partner causes a Limited Partner to redeem any stockholder, partner or other investor therein pursuant to (iii) above, the General Partner shall cause the Partnership to redeem from the Limited Partner that number of Units equal to the product of (A) such redeemed stockholder's, partner's or other investor's pro rata share of its equity investment interest in the Limited Partner, times (B) the aggregate number of Units owned by the Limited Partner, rounded to the nearest whole number. The redemption price of the Units payable to any such Limited Partner within three years of the Commencement Date shall be equal to the cash portion of such Limited Partner's capital contribution, together with simple interest thereon from the date on which the Limited Partner's subscription was accepted by the Partnership, calculated based on the interest rate payable on the most current one-year U.S. Treasury Bill. The redemption price of the Units payable to any Limited Partner after such three year period shall be equal to the fair market value thereof, as determined by an independent appraisal obtained at Partnership expense. At the option of the General Partner, such redemption price shall be paid in cash at closing or pursuant to the payment terms described in Section 11.03 herein. For federal income tax purposes, all of the Partners expressly intend that the redemption of Units held by Limited Partners by the Partnership shall be treated as a complete liquidation of such Partner's Partnership Interest pursuant to Section 736 of the Code. The Partners further acknowledge that they have negotiated concerning the treatment of the fair market value of the Units being the redemption price (which may or may not approximate the Capital Account balance attributable to the Units redeemed) and that the redemption price shall be treated as being composed of both so-called "Section 736(a) payments" and also so-called "Section 736(b) payments." Having so negotiated, the Partners hereby agree that the fair market value redemption price shall first be treated as a Section 736(b) payment to the extent of the full fair market value of the redeemed Limited Partner's "interest in partnership property" within the meaning of Code Section 736(b) and the Treasury Regulations thereunder, and the remaining portion of the fair market value redemption price is intended to constitute a Section 707(c) "guaranteed payment" which shall be treated as a Section 736(a) payment. The Partners further expressly agree among

- 17 -

AD951590.241

themselves that no portion of the redemption price is intended to be treated as a payment for goodwill under Section 736(b) of the Code. Finally, the interest accrued and paid on any unpaid portion of the redemption price shall be treated as a Section 707(c) guaranteed payment.

11.05  <u>Transfer of Interest in Limited Partner</u>.  No Limited Partner that is a corporation, partnership or any other form of legal entity may transfer or accept an offer to acquire any of its capital stock, partnership interests or other form of equity investment interests in such Limited Partner without the prior written consent of the General Partner, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing, any such Limited Partner may, upon providing written notice to the General Partner, effect any such transfer to (i) a physician, (ii) a professional corporation, partnership or association comprised solely of physicians, or (iii) upon the death of one owning an interest in such Limited Partner.

11.06  <u>Right of First Refusal Granted to Limited Partners</u>.  Notwithstanding the right of first refusal granted to the General Partner pursuant to Sections 11.03 and 11.07 hereof, in the event any Limited Partner that is a member of a physician group practice desires to Transfer all or any portion of his Units either prior to or after terminating his relationship with such physician group practice, or in the event of such Limited Partner's death, the other members of such Limited Partner's physician group practice that are also Limited Partners immediately prior to the date of such Transfer shall have a right of first refusal to purchase their respective pro rata share of the Units on the same terms and at the same purchase price offered to the selling Limited Partner in connection with such Transfer or, in the event of death, on the same terms payable by the General Partner pursuant to Section 11.03 hereof.  Such offer to the other Limited Partners of the physician group practice shall be in writing, shall include a copy of the offer to purchase received by the selling Limited Partner or such other applicable terms of Transfer delivered in connection therewith and shall be irrevocable by the selling Limited Partner for a period of thirty (30) days after the receipt thereof by the non-selling Limited Partners.  In the event the non-selling Limited Partners reject the offer or fail to exercise this right of first refusal within such thirty-day period, then the terms of either Section 11.03 or Section 11.07, as the case may be, shall apply.

11.07  <u>Right of First Refusal Granted to General Partner</u>.  Except as set forth in Section 11.06 above, no Partner may Transfer or accept an offer to acquire its Ownership Interest without first extending the offer to sell such Ownership Interest to the General Partner upon the same terms and at the same purchase price offered to the selling Partner.  Such offer to the General Partner shall be in writing, shall include a copy of the offer to purchase received by the Partner or such other applicable terms of Transfer delivered in connection therewith and shall be irrevocable by the selling Partner for a period of thirty (30) days after the receipt thereof by the General Partner.  In the event the General Partner rejects the offer or fails to exercise this right of first refusal within such thirty (30) day period, the selling Partner must consummate the sale upon the same terms presented to the General Partner within 180 days of such notice to the General Partner or such Transfer shall again be subject to the restrictions contained in this Section 11.07.

AD951590.241

## ARTICLE XII
## DISQUALIFICATION

12.01 <u>Limited Partners</u>. The disqualification (as defined in Section 12.03) of a Limited Partner will not dissolve the Partnership. Upon the disqualification of a Limited Partner, any successor-in-interest of such Limited Partner will become an assignee of such Limited Partner's Units and will be credited or charged with and/or paid, as the case may be, all future allocations and distributions on account of the Units of such Limited Partner; provided, however, that no such successor-in-interest will become a substituted Limited Partner without first complying with the provisions of Section 11.02 hereof.

12.02 <u>General Partner</u>. The General Partner may not retire or withdraw from the Partnership without the prior written consent of all Partners. If the General Partner retires or withdraws without the prior written consent of all Partners or becomes disqualified (the "Disqualified General Partner"), such Disqualified General Partner's Units will automatically be converted into Limited Partner Units for all purposes thereafter, and the Partnership shall dissolve and thereafter conduct only activities necessary to wind up its affairs in accordance with the provisions of Article XIV hereof, unless, within thirty (30) days after the retirement, withdrawal or disqualification of the General Partner, the Limited Partners owning 75% of the Units owned by all Limited Partners (excluding the converted Disqualified General Partner) elect to continue the Partnership pursuant to the terms and provisions of this Agreement. Notwithstanding the preceding sentence, in the event of the conversion of a Disqualified General Partner to a Limited Partner, such conversion shall not relieve the Disqualified General Partner of any liabilities and obligations incurred by the Partnership prior to such conversion or any obligation to contribute cash to the capital of the Partnership pursuant to Section 3.04 hereof with respect to liabilities and obligations of the Partnership incurred by the Partnership prior to such conversion. In such event, the provisions of Section 4.01(b)(i) hereof shall continue to apply to such Disqualified General Partner as if such Disqualified General Partner were still a General Partner, to the extent of any negative Capital Account balance it may have as of the date of such conversion or may incur subsequent to such date with respect to liabilities and obligations incurred by the Partnership prior to such conversion. If a decision to continue the Partnership is made, then a new General Partner will be elected by vote of Limited Partners owning 75% of the Units owned by all Limited Partners (excluding the converted Disqualified General Partner). If the new General Partner was not previously a Limited Partner, it will receive such Partnership Interest as the Limited Partners electing it determine, as well as the fair market value thereof, and this Agreement shall be amended to reflect the Partnership Interest of such new General Partner.

12.03 <u>Disqualification</u>. For purposes of this Agreement, a Partner will be deemed to be "disqualified" upon the occurrence of any of the following events:

(a) If the Partner is a natural person, upon his death, his filing of a voluntary petition in bankruptcy, his adjudication as incompetent, bankrupt or insolvent, or his making an assignment for the benefit of creditors.

- 19 -

AD951590.241

(b)  If the Partner is not a natural person, upon its voluntary dissolution or liquidation, its filing of a voluntary petition in bankruptcy, its adjudication as bankrupt or insolvent, its making an assignment for the benefit of creditors, or its becoming subject to involuntary reorganization or liquidation proceedings.

(c)  In the case of the General Partner, the retirement or withdrawal from the Partnership without the prior written consent of all Partners.

## ARTICLE XIII
## DISSOLUTION OF PARTNERSHIP

13.01 Events of Dissolution.  The Partnership will be dissolved upon the first to occur of the following events:

(a)  the expiration of the term of the Partnership set forth in Section 2.04 hereof;

(b)  the failure of the Limited Partners to continue the Partnership after the disqualification of the General Partner in accordance with the provisions of Section 12.02 hereof;

(c)  the exercise of the General Partner's power to dissolve the Partnership pursuant to Sections 6.01(l) and 11.04 hereof; or

(d)  the election to terminate the Partnership by the General Partner and Limited Partners, who, in the aggregate, own at least two-thirds (2/3) of the total Units (inclusive of Units held by the General Partner).

## ARTICLE XIV
## DISTRIBUTIONS UPON DISSOLUTION

14.01 Liquidation.  Upon dissolution of the Partnership for any reason, the Partnership shall promptly commence to wind up its affairs.  A reasonable period of time will be allowed for the orderly termination of the Partnership's Business, the discharge of its liabilities and the distribution or liquidation of its remaining assets so as to enable the Partnership to minimize the normal losses attendant to the liquidation process.  A full accounting of the assets and liabilities of the Partnership as of the date of dissolution will be taken and a written statement thereof will be furnished to each Partner within sixty (60) days after such date.  Such accounting and statement will be prepared under the direction of the General Partner or, if there is no General Partner, by a liquidating trustee selected by Limited Partners owning a majority of the Units.  The Partnership's property and assets and/or the proceeds from the liquidation thereof will be applied in the following order of priority;

- 20 -

(a)  payment of the debts and liabilities of the Partnership, in the order of priority provided by law (excluding any loans by Partners or their Affiliates), and payment of the expenses of liquidation;

(b)  payment of any and all loans made by Partners or their Affiliates to the Partnership, plus any accrued but unpaid interest thereon, which amount shall be applied first to interest and then to principal; provided, that in the event the Partnership's funds are insufficient to satisfy fully all such loans, then all loans made by all Partners or their Affiliates shall be repaid on a pro rata basis;

(c)  setting up of such reserves as the General Partner or liquidating trustee deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership or any obligation or liability not then due and payable; provided, any balance of such reserve, at the expiration of such period as the General Partner or liquidating trustee shall deem advisable, shall be distributed in the manner herein provided;

(d)  distribution to the Partners, on a pro rata basis, of the positive balances of their Capital Accounts, adjusted to the date of distribution until such accounts are zero; and

(e)  distribution to the Partners, on a pro rata basis, based upon their Capital Ratio.

14.02  <u>Distributions in Kind</u>.  Any noncash asset to be distributed in kind (as a liquidating distribution or otherwise) to one or more Partners will first be valued at its fair market value to determine the gain or loss that would have resulted if such asset were sold for such value, and such gain or loss will then be allocated pursuant to Article IV hereof, and the Partners' Capital Accounts shall be adjusted to reflect such gain or loss.  The amount distributed and charged to the Capital Account of each Partner receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Partner is considered to assume or take subject to under Code Section 752).  The General Partner or liquidating trustee, as the case may be, shall determine the fair market value of such asset.

14.03  <u>No Action for Dissolution</u>.  The Partners acknowledge that irreparable damage would be done to the goodwill and reputation of the Partnership if any Partner should bring an action in court to dissolve the Partnership.  This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payments in liquidation of the interests of all Partners. Accordingly, each Partner hereby waives and renounces his right to initiate legal action to seek dissolution, or to seek the appointment of a receiver or trustee to liquidate the Partnership.

14.04  <u>No Further Claim</u>.  Upon dissolution, each Limited Partner will look solely to the assets of the Partnership for the return of his or its investment; and if the Partnership property remaining after payment or discharge of the debts and liabilities of the Partnership, including debts and liabilities owed to one or more of the Partners, in insufficient to return the aggregate capital contributions of each Limited Partner, such Limited Partners will have no recourse against the General Partner or any other Limited Partner.

- 21 -

## ARTICLE XV
## POWER OF ATTORNEY

15.01 Appointment. Each Limited Partner hereby irrevocably constitutes and appoints the General Partner as his or its true and lawful agent and attorney-in-fact, with full power of substitution, in his or its name, place and stead, to make, execute and acknowledge, swear to, record, publish and file:

(a) Any instruments with respect to the Partnership that are required to be filed under the laws of any state or of the United States, or which the General Partner deems advisable to file;

(b) Any and all amendments to this Agreement authorized hereunder; and

(c) All documents that are required to effectuate the redemption or transfer of Units or the dissolution and termination of the Partnership.

The foregoing power of attorney is coupled with an interest, is irrevocable and will survive the death, incompetency, dissolution, merger, consolidation, bankruptcy or insolvency of each of the Limited Partners. The Limited Partners shall execute and deliver to the General Partner, within five (5) days after receipt of the General Partner's written request therefor, such further designations, powers of attorney and other instruments as the General Partner deems necessary to carry out the purposes of this Agreement.

## ARTICLE XVI
## MISCELLANEOUS

16.01 Restrictions on Relationships of Limited Partners with Competitors. No Limited Partner (or any member, shareholder or partner of a professional association, professional corporation, partnership or other entity which is a Limited Partner) shall have any direct or indirect ownership interest in any business or entity competing with the Partnership in the development, management or operation of an outpatient surgical care facility within a ten-mile radius of the Center for a period of three (3) years following the later of (i) the Commencement Date or (ii) the date such person ceases to be a Limited Partner; provided, however, that no Limited Partner (or any member, shareholder or partner of a professional association, professional corporation, partnership or other entity which is a Limited Partner) shall be prevented from serving as a member of the medical staff, or holding any position on the medical staff, of any hospital. This provision shall not (i) restrict any Person from being able to perform outpatient surgery in his office or in any other location he may desire at any time, (ii) require the referral of patients to the Center, or (iii) apply to any relationship of a Limited Partner which existed as of the date of such Limited Partner's subscription if reported in writing to the General Partner prior to or upon delivery of the investor's subscription agreement. Notwithstanding the foregoing, these restrictions shall not apply to the General Partner in its capacity as a Limited Partner.

AD951590.241

16.02 <u>Amendments by the General Partner</u>.

(a)  <u>Clarifying Amendments</u>.  The General Partner may amend this Agreement without the consent of the Limited Partners if such amendment is: (i) for the purpose of clarification and does not materially change the substance hereof and the Partnership has obtained the opinion of its legal counsel to that effect; provided, however, that such amendment does not adversely and materially affect the interests of the Limited Partners; (ii) necessary or appropriate pursuant to Section 6.01 hereof, to satisfy the requirements of the Code with respect to the Partnership's allocations or the Partnership's status as a partnership, or pursuant to any Tax Decision, or any federal or state securities laws or regulations; (iii) necessary to cause the Partnership to comply with any then applicable fraud and abuse or similar statute, rule, regulation or law pursuant to Section 11.04; or (iv) for the purpose of ensuring that the General Partner will be allocated tax basis associated with Partnership liabilities under Section 752 of the Code and the Treasury Regulations thereunder (the "Section 752 Rules") when the General Partner, or a "related person" to the General Partner within the meaning of the Section 752 Rules, has the economic risk of loss with respect to such Partnership liabilities.

(b)  <u>Substantive Amendments</u>.  The General Partner may propose any other amendment or amendments to this Agreement by mailing to the Limited Partners a notice describing the proposed amendment(s), which notice must include the text of the proposed amendment(s). If within thirty (30) days after such notice has been mailed, the General Partner has not received written objections to such amendment(s) from Limited Partners owning, in the aggregate, more than one-third (1/3) of the Units owned by all of the Limited Partners (exclusive of the Units held by the General Partner), then, subject to the other provisions of this Agreement, the proposed amendment(s) will become effective as of the date specified.  The General Partner is expressly authorized to file such amendment(s) to the Partnership's Certificate as the General Partner deems necessary to implement such amendment(s).

16.03 <u>Additional Documents</u>.  At any time and from time to time after the date of this Agreement, upon the request of the General Partner, the Limited Partners shall do and perform, or cause to be done and performed, all such additional acts and deeds, and shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such additional instruments and documents, as are required to best effectuate the purposes and intent of this Agreement.

16.04 <u>Notices</u>.  Any notices or other communications required or permitted by this Agreement must be in writing and shall be deemed to have been duly given and delivered when delivered in person or when mailed postage prepaid to the recipient Partner(s) at the most recent address of the recipient Partner as shown on the records of the Partnership (or to such other address of which the Partnership subsequently has been notified in writing by such Partner).  Any Partner may change his or its address by giving notice to the General Partner.

16.05 <u>Applicable Law</u>.  This Agreement is to be governed by, construed under, and enforced and interpreted in accordance with the laws of the State of Georgia.

16.06 <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties and supersedes any prior understanding or agreement among them respecting the subject

- 23 -

matter hereof. There are no representations, arrangements, understandings or agreements, oral or written, among the parties hereto relating to the subject matter of this Agreement, except those fully expressed herein. No waiver of any provision hereof will be valid or binding on the parties hereto, unless such waiver is in writing and signed by or on behalf of the parties hereto, and no waiver on one occasion shall be deemed to be a waiver of the same or any other provision hereof in the future.

16.07 <u>Severability</u>. If any term or provision of this Agreement is held illegal, invalid or unenforceable, such illegality, invalidity or unenforceability will not affect the legality, validity or enforceability of the remainder of this Agreement.

16.08 <u>Successors</u>. Subject to the provisions hereof imposing limitations and conditions upon the transfer, sale or other disposition of the Partners' Units, all the provisions hereof will inure to the benefit of and be binding upon the successors, legal representatives and assigns of the parties hereto.

16.09 <u>Counterparts</u>. This Agreement can be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts will together constitute one and the same agreement.

16.10 <u>Headings</u>. Section and other headings contained in this Agreement are for reference purposes only and are in no way intended to define, interpret, describe or limit the scope, extent or intent of this Agreement or any provision hereof.

16.11 <u>Acceptance of Prior Acts by New Partner</u>. Each Person who becomes a Partner, by becoming a Partner, ratifies, affirms and confirms, and agrees to be bound by, all actions duly taken by the Partnership, pursuant to the terms of this Agreement, prior to the date such Person becomes a Partner.

16.12 <u>Partnership Property</u>. The title to all real or personal property (or interests therein) now or hereafter acquired by the Partnership will be held by and vested in the Partnership, and not by or in any Partner, individually.

16.13 <u>Meetings</u>. The General Partner may call meetings of the Partners from time to time. The General Partner shall provide the Limited Partners with thirty (30) days prior notice of the time and place of any meeting of the Partners. Upon the written request of Limited Partners (other than the General Partner) owning at least twenty-five percent (25%) of the total Units (other than Units held by the General Partner), the General Partner shall call a meeting of the Partners. Partners may vote in person or by proxy at any meeting of the Partners. The provisions of the Georgia Business Corporation Code governing the use and validity of corporate proxies shall govern the validity and use of proxies under this Agreement. Unless otherwise consented to by the majority in interest of the Limited Partners, all meetings called pursuant to this Section 16.13 shall be held in the county in which the Center is located.

- 24 -

AD951590.241

16.14 <u>Gender and Number</u>.   Where the context requires, the use of a pronoun of one gender is to be deemed to include a pronoun of the appropriate gender or the neuter, and singular words are to be deemed to include the plural and vice versa.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first above written.

GENERAL PARTNER:

SHC SAN DIEGO, INC.

By: _____
Title: _____

INITIAL LIMITED PARTNER:

SURGICAL HEALTH CORPORATION

By: _____
Title: _____

- 25 -

AD951590.241

AMENDMENT TO

LIMITED PARTNERSHIP AGREEMENT
OF
ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO, L.P.

This amendment (the "Amendment") to the Limited Partnership Agreement of Arthroscopic & Laser Surgery Center of San Diego, L.P., dated January 18, 1996 and amended in January, 1999 (the "Partnership Agreement"), is made and entered into as of July 3, 2002, by SHC San Diego, Inc. (the "General Partner"), whose principal business address is One HealthSouth Parkway, Birmingham, Alabama 35243, and the Limited Partners listed on Exhibit A hereto.

W I T N E S S E T H:

WHEREAS, the General Partner desires to extend the term of the Limited Partner non-compete covenant; and

WHEREAS, the General Partner desires to amend provisions relating to the required transfer of a Limited Partner's Units under certain circumstances, including those which arise out of the implementation of some of the standards of the safe harbor to the Anti-Kickback Statute (42 USC §1320a-7b(b)) for physician investment in entities owning and operating ambulatory surgery centers (the "ASC Safe Harbor"); and

WHEREAS, this Amendment has been duly approved in accordance with the provisions of the Partnership Agreement.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Amendments.

(a)    Section 1.01 shall be amended by adding the following definitions of "Entity Limited Partner," "Entity Limited Partner's Proportionate Units" and "Physician Interest Holder":

"Entity Limited Partner" means a professional association, professional corporation, partnership, limited liability company, corporation or other such entity that is a Limited Partner.

"Entity Limited Partner's Proportionate Units" means the number of Units held by an Entity Limited Partner that is attributable to a Physician Interest Holder based on such Physician Interest Holder's ownership percentage interest in the Entity Limited Partner.

"Physician Interest Holder" means (1) a physician who is a Limited Partner; (2) a physician who is a member, shareholder, partner or other owner of an Entity Limited Partner; or (3) a physician who created, who is the beneficiary of, or who is the trustee of a Trust Limited Partner.

"Trust Limited Partner" means a trust that is a Limited Partner

(b)    Section 2.07 shall be amended with deletions indicated by strikethrough text and additions indicated by underlined text as follows:

2.07    Disclosure of Partnership Interest. Each Physician Interest Holder ~~Limited Partner~~ shall disclose his participation in the Partnership to any individuals referred to or treated at the Center by such Physician Interest Holder ~~Limited Partner~~. Such disclosures shall be in a form which complies with all applicable federal and state laws governing the disclosure of a Limited Partner's ownership interest in a health care facility.

(c)    The following shall be added as Section 2.08:

2.08    Annual Certification. In order to assist the General Partner in determining whether the Partnership meets some of the standards set forth in the safe harbor to the Anti-Kickback Statute (42 USC §1320a-7b(b)) applicable to ambulatory surgery center investments, each Physician Interest Holder shall certify annually to the Partnership in writing, with respect to the prior fiscal year, on or before April 15 (the first such certification being due April 15, 2003): (i) whether such Physician Interest Holder derived at least one-third (1/3) of his or her medical practice income from performing outpatient surgical procedures; (ii) whether such Physician Interest Holder performed at least one-third (1/3) of his or her outpatient surgical procedures at the Center; and (iii) whether such Physician Interest Holder has been excluded from participation in a Federal health care program. A copy of the form of Annual Certification is attached hereto as Exhibit B. For purposes of this Section 2.08, "outpatient surgical procedures" means (x) any procedures on the list of Medicare-covered procedures for ambulatory surgery centers and (y) any other surgical procedures actually performed by such Physician Interest Holder on an outpatient basis in a licensed facility.

(d)    The following shall be added as Section 2.09:

2.09    Non-Discrimination. Each Physician Interest Holder and each Entity Limited Partner must treat Center patients receiving medical benefits or assistance under any Federal health care program in a nondiscriminatory manner.

(e)    The following shall be added as Section 2.10:

2.10    Federal Health Care Program Participation. Each Physician Interest Holder and Entity Limited Partner must not have been excluded from participation in Medicare, Medicaid or any other Federal health care program.

(f)    The following shall be added as Section 2.11:

2.11    Medical Malpractice Insurance. Each Physician Interest Holder shall maintain medical malpractice insurance in accordance with the Center's medical staff bylaws.

(g)    Section 11.03 will be deleted in its entirety and replaced with the following:

11.03    Involuntary Transfer of Limited Partner's Interest. Except as set forth in Section 11.06, upon the occurrence of any of the following events, the General Partner will have the option to purchase the physician Limited Partner's Units, the Trust Limited Partner's Units or the Entity Limited Partner's Proportionate Units, as the case may be. The purchase price shall be payable twenty percent (20%) in cash at closing, and the balance

by the General Partner's promissory note payable in eight (8) equal quarterly installments of principal, the first of which is due three (3) months after closing. The unpaid balance of such promissory note shall bear interest at the rate announced from time to time as the "prime rate" by NationsBank of Georgia, N.A., Atlanta, Georgia (or successor thereof). Accrued interest on the entire balance will be payable quarterly with each installment payment of principal.

11.03.01 Upon (i) a Limited Partner's or, in the case of a Trust Limited Partner, a Physician Interest Holder's exclusion from participation in Medicare, Medicaid or any other Federal health care program in violation of Section 2.10 hereof, or (ii) if an Entity Limited Partner fails to acquire an excluded Physician Interest Holder's entire interest in the Entity Limited Partner within sixty (60) days after the Physician Interest Holder's exclusion, the General Partner will have the right to require the Limited Partner to sell his or its entire interest in the Partnership to the General Partner or the Partnership for $1.00; provided however, if an Entity Limited Partner, which has not itself been excluded, does acquire the entire interest of an excluded Physician Interest Holder within sixty (60) days after the Physician Interest Holder's exclusion, the General Partner will have the right to require the Entity Limited Partner to sell the Entity Limited Partner's Proportionate Units for the excluded Physician Interest Holder to the General Partner or the Partnership for $1.00.

11.03.02 Upon the death of a Limited Partner, or of a Physician Interest Holder of an Entity Limited Partner or Trust Limited Partner, the General Partner will have an option to purchase the Units of such Limited Partner or the Entity Limited Partner's Proportionate Units of such Physician Interest Holder. Such option will be exercisable, if at all, by the delivery of a written notice by the General Partner to such Limited Partner or Physician Interest Holder within the one-year period following such death. The purchase price per Unit shall be equal to (i) four (4) times the Partnership's Net Revenues for the preceding Fiscal Year reduced by the Partnership's operating expenses for such preceding Fiscal Year, multiplied by (ii) one percent (1%).

11.03.03 Upon (a) a violation of the noncompete provision contained in Section 16.01 hereof by a Limited Partner or any Physician Interest Holder of an Entity Limited Partner or Trust Limited Partner; (b) an attempted transfer of a Unit or of an interest in a Unit in violation of this Agreement by a Limited Partner or any Physician Interest Holder of an Entity Limited Partner or Trust Limited Partner; (c) a Physician Interest Holder's failure to maintain medical malpractice insurance in accordance with Section 2.11 hereof; (d) the disability or mental incompetency of a Physician Interest Holder; (e) a Limited Partner's or, in the case of an Entity Limited Partner or Trust Limited Partner, any Physician Interest Holder's adjudication of bankruptcy, or general assignment for the benefit of creditors, or taking the benefit of any insolvency act, or if a permanent receiver or trustee in bankruptcy is appointed for any Limited Partner's or Physician Interest Holder's property, or if a temporary receiver be appointed for any Limited Partner or Physician Interest Holder and such appointment is not vacated or set aside within 60 days from the date of such appointment; or (f) if a final divorce decree or settlement or any other judicial order requires a Limited Partner or any Physician Interest Holder of an Entity Limited Partner or

Trust Limited Partner to transfer or dispose of his Units, the General Partner may require the transfer of the involved Limited Partner's Units to the General Partner or the Partnership. The purchase price per Unit shall be equal to distributions of Available Cash per Unit for the twelve-month period preceding the date the General Partner delivers notice to the Limited Partner or Physician Interest Holder, multiplied by three (3).

11.03.04 At any time upon the General Partner's good faith determination, taking into account the annual certification provided by such Physician Interest Holder pursuant to Section 2.08 (when determining annual compliance with the extension of practice standards set forth in Section 2.08) and such other facts and circumstances as the General Partner shall deem relevant, that the Physician Interest Holder no longer uses the Center as an extension of his or her practice, for any reason, including, but not limited to, a Physician Interest Holder's retirement (evidenced by such Physician Interest Holder's ceasing actively to practice his or her profession in the Center's market area for an average of thirty hours per week for at least forty weeks per year), or the relocation of his or her practice outside of the Center's market area, then the General Partner may require the transfer of the involved Limited Partner's Units or the Entity Limited Partner's Proportionate Units, as the case may be, to the General Partner or the Partnership. The purchase price per Unit shall be equal to distributions of Available Cash per Unit for the twelve-month period preceding the date the General Partner delivers notice to the Limited Partner or Physician Interest Holder, multiplied by three (3).

The General Partner shall give the affected Limited Partner notice of any determination pursuant to this Section 11.03, which notice shall specify (i) a summary of the basis for such determination, (ii) the transfer price, and (iv) the closing date for the transfer, which shall be not later than 30 days from the date of delivery of such notice.

(h)    Section 11.04 shall be amended with deletions indicated by strikethrough text and additions indicated by underlined text as follows:

11.04    Fraud and Abuse. In the event of an investigation of the Partnership, or any Partner or any Physician Interest Holder under any then applicable federal or state fraud and abuse statute, rule, regulation or law by the Department of Health and Human Services, the United States Attorney or any federal or state agency having jurisdiction over the Partnership, the General Partner, in its sole discretion, is authorized to (i) terminate, liquidate and dissolve the Partnership, (ii) cause the Partnership to redeem all or any portion of the Units of any Limited Partners whose investment in the Partnership is determined by the General Partner to cause a fraud and abuse violation by the Partnership or such Limited Partner, (iii) cause an ~~a~~ Entity Limited Partner, ~~in the event such Limited Partner is a corporation, partnership or other form of legal entity,~~ to redeem any Physician Interest Holder ~~stockholder, partner or other investor~~ in such Entity Limited Partner whose investment is determined by the General Partner to cause a fraud and abuse violation by the Partnership or such Entity Limited Partner, or (iv) amend this Limited Partnership Agreement pursuant to Section 16.02(a). In the event the General Partner causes an ~~a~~ Entity Limited Partner to redeem any Physician Interest Holder ~~stockholder, partner or other investor therein~~ pursuant to (iii) above, the General Partner shall cause the Partnership to redeem from the Entity Limited

Partner <u>the Entity Limited Partner's Proportionate Units attributable to that Physician Interest Holder.</u> ~~that number of Units equal to the product of (A) such redeemed stockholder's, partner's or other investor's pro rata share of its equity investment interest in the Limited Partner, times (B) the aggregate number of Units owned by the Limited Partner, rounded to the nearest whole number.   The redemption price of the Units payable to any such Limited Partner within three years of the Commencement Date shall be equal to the cash portion of such Limited Partner's capital contribution, together with simple interest thereon from the date on which the Limited Partner's subscription was accepted by the Partnership, calculated based on the interest rate payable on the most current one year U.S. Treasury Bill.~~ The redemption price of the Units payable to any Limited Partner ~~after such three year period~~ shall be equal to <u>distributions of Available Cash per Unit for the twelve-month period preceding the date the General Partner delivers notice to the Limited Partner or Physician Interest Holder, multiplied by three (3).</u> ~~the fair market value thereof, as determined by an independent appraisal obtained at Partnership expense.~~ At the option of the General Partner, such redemption price shall be paid in cash at closing or pursuant to the payment terms described in Section 11.03 herein.  For federal income tax purposes, all of the Partners expressly intend that the redemption of Units held by Limited Partners by the Partnership shall be treated as a complete liquidation of such Partner's Partnership Interest pursuant to Section 736 of the Code.  The Partners further acknowledge that they have negotiated concerning the treatment of the fair market value of the Units being the redemption price (which may or may not approximate the Capital Account balance attributable to the Units redeemed) and that the redemption price shall be treated as being composed of both so-called "Section 736(a) payments" and also so-called "Section 736(b) payments."  Having so negotiated, the Partners hereby agree that the fair market value redemption price shall first be treated as a Section 736(b) payment to the extent of the full fair market value of the redeemed Limited Partner's "interest in partnership property" within the meaning of Code Section 736(b) and the Treasury Regulations thereunder, and the remaining portion of the fair market value redemption price is intended to constitute a Section 707(c) "guaranteed payment" which shall be treated as a Section 736(a) payment.   The Partners further expressly agree among themselves that no portion of the redemption price is intended to be treated as a payment for goodwill under Section 736(b) of the Code.  Finally, the interest accrued and paid on any unpaid portion of the redemption price shall be treated as a Section 707(c) guaranteed payment.

     (i)    Section 11.05 shall be amended with deletions indicated by strikethrough text and additions indicated by underlined text as follows:

     11.05   <u>Transfer of Interest in Limited Partner</u>.  No <u>Entity</u> Limited Partner ~~that is a corporation, partnership or any other form of legal entity~~ may transfer or accept an offer to acquire any of its capital stock, partnership interests or other form of equity investment interests in such <u>Entity</u> Limited Partner without the prior written consent of the General Partner, which consent shall not be unreasonably withheld.  ~~Notwithstanding the foregoing, any such Limited Partner may, upon providing written notice to the General Partner, effect any such transfer to (i) a physician, (ii) a professional corporation, partnership or association comprised solely of physicians, or (iii) upon the death of one owning an interest in such Limited Partner.~~

     (j)    Section 11.08 shall be amended with deletions indicated by strikethrough text and additions indicated by underlined text as follows:

11.08    Prohibition on Ownership of Units.    In the event of the enactment of any federal, state or local law which would prohibit the ownership of any or all of the Units or Entity Limited Partner's Proportionate Units by any Limited Partner or any Physician Interest Holder of an Entity Limited Partner or Trust Limited Partner, the Partnership shall redeem, or cause a third party to purchase, the Units or Entity Limited Partner's Proportionate Units, as the case may be, that such Limited Partner or Physician Interest Holder is prohibited from owning.    The purchase price per Unit shall be equal to: distributions of Available Cash per Unit for the twelve-month period preceding the date the General Partner delivers notice to the Limited Partner or Physician Interest Holder, multiplied by three (3). (i) 3 times, (ii) the Partnership's net income for the trailing 12 months, multiplied by one percent (1%).  The determination as to whether any law would prohibit the ownership of any or all of the Units or Entity Limited Partner's Proportionate Units by any Limited Partner or Physician Interest Holder shall be made based upon the opinion from counsel selected by the General Partner.  The closing of the purchase of any Units or Entity Limited Partner's Proportionate Units of a Limited Partner or Physician Interest Holder pursuant to this Section 11.08 shall occur within the thirty (30) day period immediately preceding the date on which such Limited Partner or Physician Interest Holder will be (i) prohibited from owning such Units or Entity Limited Partner's Proportionate Units, or (ii) subject to penalties or sanctions as a result of the ownership of such Units or Entity Limited Partner's Proportionate Units, as specified in the legal opinion required by this Section 11.08.  At the option of the General Partner, such redemption price shall be paid in cash at closing or pursuant to the payment terms described in Section 11.03 herein.

(k)    Section 16.01 shall be amended with deletions indicated by strikethrough text and additions indicated by underlined text as follows:

16.01    Restrictions on Relationships of Limited Partners with Competitors.  No Limited Partner or Physician Interest Holder of an Entity Limited Partner or Trust Limited Partner (or any member, shareholder or partner of a professional association, professional corporation, partnership or other entity which is a Limited Partner) shall have any direct or indirect ownership interest in any business or entity competing with the Partnership in the development, management or operation of an outpatient surgical care facility within a ten-mile radius of the Center from the date of the Limited Partner's or Physician Interest Holder's admission to the Partnership until the later of (i) five years after his or its admission as a Limited Partner or Physician Interest Holder or (ii) two years after he or it is no longer a Limited Partner or Physician Interest Holder for a period of three (3) years following the later of (i) the Commencement Date or (ii) the date such person ceases to be a Limited Partner; provided, however, that no Limited Partner or Physician Interest Holder (or any member, shareholder or partner of a professional association, professional corporation, partnership or other entity which is a Limited Partner) shall be prevented from serving as a member of the medical staff, or holding any position on the medical staff, of any hospital.  This provision shall not (i) restrict any Person from being able to perform outpatient surgery in his office or in any other location he may desire at any time, (ii) require the referral of patients to the Center, or (iii) apply to any relationship of a Limited Partner which existed as of the date of such Limited Partner's subscription if reported in writing to the General Partner prior to or upon delivery of the investor's subscription agreement.  Notwithstanding the foregoing, these restrictions shall not apply to the General Partner in its capacity as a Limited Partner.

2.     <u>Amendment and Ratification</u>.  The Partnership Agreement is hereby amended in accordance with the foregoing provisions of this Amendment.  The Partnership Agreement, as amended as provided herein, is hereby ratified and shall remain in full force and effect.

3.     <u>Defined Terms</u>. Capitalized terms used in this Amendment shall have the same meanings as in the Partnership Agreement unless otherwise defined herein.

IN WITNESS WHEREOF, this Amendment to the Partnership Agreement is effective on the date first above written.

GENERAL PARTNER:

SHC SAN DIEGO, INC.

By: _____

Title: _____


LIMITED PARTNERS as listed on the attached Exhibit A:

By:    SHC San Diego, Inc., as attorney-in-fact for all of the Limited Partners

By: _____

Title: _____

EXHIBIT B

## ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO, L.P.

### Limited Partner Certification

The undersigned, a Physician Interest Holder (as defined in the Limited Partnership Agreement) of Arthroscopic & Laser Surgery Center of San Diego, L.P. (the "Partnership"), hereby certifies to the Partnership that during the prior fiscal year:

1.    I    *(please check one)*

      ❑    have derived

      ❑    have <u>not</u> derived

at least one-third (1/3) of my medical practice income from performing outpatient surgical procedures*; and

2.    I    *(please check one)*

      ❑    have performed

      ❑    have <u>not</u> performed

at least one-third (1/3) of my outpatient surgical procedures* at the OASIS/HEALTHSOUTH Surgery Center.

3.    I    *(please check one)*

      ❑    have been excluded

      ❑    have <u>not</u> been excluded

from participation in Medicare, Medicaid or any other Federal health care program.

Executed this ____ day of _____, 20___.

_____
Name (printed or typed)

_____
Signature

\*    "outpatient surgical procedures" means (x) any procedures on the list of Medicare-covered procedures for ambulatory surgery centers and (y) any other surgical procedures actually performed by such Physician Interest Holder on an outpatient basis in a licensed facility.

746633.5

FIRST AMENDMENT TO
LIMITED PARTNERSHIP AGREEMENT
of
ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO, L.P.

THIS FIRST AMENDMENT (the "Amendment") to the Limited Partnership Agreement, dated January 18, 1996 (the "Agreement"), of Arthroscopic & Laser Surgery Center of San Diego, L.P. (the "Partnership"), is made and entered into effective as of the _____ day of January, 1999.

WITNESSETH

WHEREAS, in accordance with the Agreement, the Partnership desires to amend the Agreement as set forth herein:

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises, obligations and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Agreement is hereby amended as follows:

1.      The definition of "Capital Ratio" in Section 1.01 is hereby deleted from the Agreement in its entirety, and, in lieu thereof, the following new definition of "Capital Ratio" is hereby inserted:

"Capital Ratio" means at any particular time with respect to a Limited Partner, the ratio of such Limited Partner's Units to the total number of General and Limited Partner Units outstanding or available for issuance to Additional Limited Partners. "Capital Ratio" means, at any particular time with respect to the General Partner, a fraction, the numerator of which is the total number of General and Limited Partner Units outstanding or available for issuance to Additional Limited Partners less the number of Units held by Limited Partners, and the denominator of which is the total number of General and Limited Partner Units outstanding or available for issuance to Additional Limited Partners.

2.      The definition of "Maximum Number of Units" in Section 1.01 is hereby deleted from the Agreement in its entirety, and, in lieu thereof, the following new definition of "Maximum Number of Units" is hereby inserted:

"Maximum Number of Units" means 100 Units.

3.      The definition of "Memorandum" in Section 1.01 is hereby deleted from the Agreement in its entirety, and, in lieu thereof, the following new definition of "Memorandum" is hereby inserted:

"Memorandum" means a Confidential Private Placement Memorandum to be used in the offering of Units in the Partnership.

ATL01/10427607v2

4.   The definition of "Offering" in Section 1.01 is hereby deleted from the Agreement in its entirety, and, in lieu thereof, the following new definition of "Offering" is hereby inserted:

"Offering" means the offering of Units on the terms set forth in a Memorandum approved by the General Partner for such purpose.

5.   The definition of "Unit" in Section 1.01 is hereby deleted from the Agreement in its entirety, and, in lieu thereof, the following new definition of "Unit" is hereby inserted:

"Unit" means one of the units of investment in the Partnership acquired by a Partner and includes both General Partner Units and Limited Partner Units.

6.   Section 3.01 is hereby deleted in its entirety and, in lieu thereof, the following Section 3.01 is hereby inserted:

Subject to the prior written consent of the majority in interest of the holders of Limited Partner Units, which consent shall not be unreasonably withheld, the General Partner will have the right to admit such Persons as Additional Limited Partners as it deems advisable. The General Partner or any officer, director or shareholder in the General Partner may acquire Units pursuant to this Section 3.01, and in his or its capacity as such, will have the same rights and be subject to the same obligations as other such Additional Limited Partners; provided, however, that nothing contained in this Section 3.01 shall be deemed to reduce any of the liability of the General Partner as such under this Agreement. The General Partner, in its discretion, shall have the right to dilute its partnership interest in the Partnership in order to admit Persons as Additional Limited Partners, subject to Section 11.09.

7   Section 3.02(c) is hereby deleted in its entirety and, in lieu thereof, the following Section 3.02( c) is hereby inserted:

Not more than the Maximum Number of Units nor less than one Unit; provided, however, that the number of Units under this Section 3.02(c) shall be equal to the number of Units actually subscribed for and purchased by Additional Limited Partners. Each Additional Limited Partner shall make a capital contribution to the Partnership in cash or other form of consideration acceptable to the General Partner for each Unit subscribed for and purchased by such Additional Limited Partner, in accordance with the terms and conditions of the Memorandum. No more than the Maximum Number of Units shall be sold pursuant to the offering of Units as described in the Memorandum. The name of each Limited Partner and the number of Units held by such Partner shall be set forth on Schedule A hereto. The General Partner is authorized to amend this Agreement without the approval of the Limited Partners solely to reflect any changes in Schedule A.

8.   Section 6.01 is hereby amended by adding the following Subsection (q):

And, to take any action described in Section 11.08 hereof in the event of the enactment of any federal, state, or local law which would prohibit the ownership of any or all of the Units by a Limited Partner.

- 2 -

9.    Section 6.03(f) is hereby amended by adding to the end of Subsection (f) the words "which consent to such admission shall not be unreasonably withheld."

10.    Section 11.03 is hereby amended by deleting from the third sentence the words "such Limited Partner's Capital Ratio as of the date of such Limited Partner's death" and inserting in lieu thereof "one percent (1%)."

11.    Section 11.08 is hereby added to the Agreement as follows:

11.08 Prohibition on Ownership of Units. In the event of the enactment of any federal, state or local law which would prohibit the ownership of any or all of the Units by any Limited Partner, the Partnership shall redeem, or cause a third party to purchase, the Units that such Limited Partner is prohibited from owning. The purchase price per Unit shall be equal to: (i) 3 times, (ii) the Partnership's net income for the trailing 12 months, multiplied by one percent (1%). The determination as to whether any law would prohibit the ownership of any or all of the Units by any Limited Partner shall be made based upon the opinion from counsel selected by the General Partner. The closing of the purchase of any Units of a Limited Partner pursuant to this Section 11.08 shall occur within the thirty (30) day period immediately preceding the date on which such Limited Partner will be (i) prohibited from owning such Units, or (ii) subject to penalties or sanctions as a result of the ownership of such Units, as specified in the legal opinion required by this Section 11.08. At the option of the General Partner, such redemption price shall be paid in cash at closing or pursuant to the payment terms described in Section 11.03 herein.

12.    Section 11.09 is hereby added to the Agreement as follows:

11.09 Redemption of Limited Partnership Units from General Partner. The General Partner, in its sole discretion, shall have the authority to cause the Partnership to redeem any portion of its general partnership interest in connection with the offering of Additional Limited Partner Units pursuant to Section 3.01; provided, however, that the General Partner does not reduce its interest in the Partnership to less than fifty-one percent (51%).

13.    Capitalized terms used in this Amendment shall have the meaning ascribed to them in the Agreement, unless otherwise defined.

14.    The Limited Partners acknowledge that they have read and understood this Amendment and the Memorandum explaining this Amendment from SHC San Diego, Inc. to the Limited Partners dated January 25, 1999. The Limited Partners further acknowledge they have had an opportunity to ask questions of and to receive answers from the officers of the General Partner regarding this Amendment.

15.    This Amendment can be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts will together constitute one and the same agreement.

- 3 -

16.    Except as set forth herein, the Agreement shall remain and continue in full force and effect and shall for all purposes be and constitute the Limited Partnership Agreement of Arthroscopic & Laser Surgery Center of San Diego, L.P.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as the day and year first above written.

GENERAL PARTNER:
SHC SAN DIEGO, INC.

By:
Name:
Title:

LIMITED PARTNERS:

Gary Losse, M.D.

Paul Murphy, M.D.

Byron King, M.D.

David Chao, M.D.

- 4 -

ATL01/10427607v1

# EXHIBIT 4

HealthSouth Surgery Center Management Service

## Financial:

- HealthSouth maintains staff to negotiate, analyze, prepare and review payer contracts with all third party entities at the national and regional level. A managed care professional is assigned to every center.
- Our vast network of surgery centers and access to competitive data allows analysis of market information to ensure patient charges for services provided are at market rates.
- With a staff of over fifty accounting professionals we maintain all accounting records to include all journals, ledgers, check registers and payroll records.
- Over seventy centralized employees work to process accounts payable. This ensures payments are timely as well as adds a check and balance to the process.
- All payroll functions are centralized and automated. We offer and encourage direct deposit to local banks providing employees with a seamless process. We also ensure timely payment of all payroll tax items.
- We maintain a specialized tax department where professionals supervise the preparation and filing of annual income tax documents and property tax items.
- Bank reconciliations on all accounts are prepared monthly by a dedicated staff of experts.
- The accounting department prepares and distributes monthly profit and loss statements; balance sheets and statements of cash flows in accordance with generally accepted accounting principles.
- HealthSouth has established policies and procedures related to patient insurance billing and collection procedures.
- Each facility administrator works closely with area management to prepare an annual operating plan that includes operating and capital budgets. This allows the partnership to set tangible goals for the center each year.
- HealthSouth has developed a national coding initiative, relieving the center from the burden of coding and placing this responsibility with a large staff of experts to ensure efficiency, consistancy and accuracy.
- HealthSouth has many financing options for a surgery center partnership to expand physical plant or to purchase additional equipment.

## Licensure:

- The corporation's size allows leverage for the purchase of hazard, liability, professional and other necessary insurance coverage for the center.
- We maintain a dedicated department to provide risk management support and guidance with regards to local, state and federal regulations.
- The Quality Standards Department focuses solely on the accreditation of the center with the proper agencies; AAAHC, JCAHO, State Government, Federal Government and insurance carriers.
- HealthSouth has an exclusive "regional survey" with JCAHO. This allows our surgery centers to participate in an accreditation process historically reserved for large hospitals. Our regional survey process promotes affordable and achievable JCAHO accreditation for surgery centers.

## Legal:

- Our in-house legal staff is comprised of professionals versed in the healthcare industry. Attorneys provide coverage for all legal aspects from Stark regulations to real estate issues.
- Through in house personnel and lobbying we maintain involvement in state and federal legislation to ensure representation of facility interests.

## Personnel:

- Corporate and local management provide human resource services including: employment arrangements including; employing, supervising, directing, leasing and discharging all personnel performing services.
- Our experience has allowed us to create staffing schedules; wage structures and personnel policies for all personnel.
- HealthSouth provides preparation and filing of all necessary forms for disability insurance, hospitalization, group life insurance, unemployment insurance, withholding, social security taxes and

**Personnel (Cont'd):**

- We offer the only corporate, certified AORN training program in the country. This program provides an opportunity for interested nursing staff to receive education and certification in OR nursing. This allows growth from within and decreases turnover and nursing vacancies.
- HealthSouth sponsors the HealthSouth National Nursing Advisory Board. This board allows our nursing staff, over 10,000 strong, to have a voice in all aspects of our business.
- Our national footprint allows for recruitment and relocation of staff.
- Nursing shortages are managed nationally to reduce the impact on specific markets.
- By employing over 54,000 employees nationwide allows HealthSouth to maintain quality health related insurance at a discounted rate.

## Education:

- By utilizing our Back to Health television network and wholly owned conference center HealthSouth provide continuing education opportunities for clinical and non-clinical employees.
- HealthSouth also maintains a clinical education department that publishes a monthly newsletter for clinicians, maintains a clinical education website, and provides continuing education opportunities for clinical staff.
- HealthSouth provides HealthSouth University for marketers, coders, business office managers, nurse managers and administrators to keep key positions up to date on best practices.
- New administrator orientation and the administrator in training programs keep our managers current with the HealthSouth goals, expectations, policies and procedures.

## Operational:

- HealthSouth provides published operating policies and procedures to all necessary departments.
- Provide standard format and best practices for charts, invoices and other forms used in the operation of the center.
- HealthSouth provides aggressive contract negotiation for the purchase or lease, by the center, of all supplies and equipment used in the operation by leveraging our national buying power.
- We provide access to MedCenterDirect.com an internet based buying co-op to ensure contract utilization and guarantee the lowest price available for supplies and equipment.
- HealthSouth provides a corporate compliance program for centers (i.e. education, training, hotline) to insure compliance with standards of business conduct as well as local, state and federal laws and regulations.
- Using template term sheets our management will negotiate or retain contractual relationships for anesthesiology, radiology, pathology, pharmacy, etc.
- HealthSouth provides all locations with our Pristine Audit program. This program brings Ernst & Young, LLP accounting firm to visit all centers for random audits. A checklist of 100 items is provided to the centers in advance. This list includes items such as cleanliness of the center, cash handling and attitudes of employees to name a few. HealthSouth is the only healthcare company to scrutinize itself to ensure our patients have a "Pristine" experience.
- HealthSouth contracts with a national organization to compile and review patient satisfaction surveys. The results are shared with our physician partners to allow all of us an opportunity to improve our customers' experience.
- HealthSouth facilitates physician advisory boards for major specialties. National meetings are held at our corporate office to allow our physician partners to meet our senior management team. The main focus of these meetings is to ensure physician partners needs are met.
- By utilizing our Back to Health television network and wholly owned conference center HealthSouth provide continuing education opportunities for clinical and non-clinical employees.
- Provide support related to architectural design and project management services.
- We employ over 100 information technology professionals to provide technological support for all computer hardware and software.
- Our internal audit staff conducts impromptu and scheduled audits to ensure compliance with all federal, state, local and corporate regulations.
- Owning the largest network of freestanding surgery centers in the nation allows benchmarking to ensure centers are performing appropriately and identify opportunity for improvement.
- HealthSouth has created relationships with some of the largest managed care providers in the nation.

These relationships al— to address issues at the highest levels in thes— —izations.

- HealthSouth has many — s to showcase our services and our physicians. — r internal broadcasting network allows us to introduce new technology, physician accomplishments, facility locations and any other health related subject to over 2,000 waiting rooms nationwide.

- Healthsouth's relationships with major vendors have allowed us access to new technology before it is released for mass production and utilization. Because of our national footprint and volume of patients, many vendors approach us to beta test new technology or procedures.

- Healthsouth.com offers a free directory listing for our physicians and facilities. In addition, it provides all types of healthcare information for our physician, patients and clinicians.

- The HealthSouth marketing team works continuously to promote facilities and recruit new physicians to the surgery centers.

1256

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
HEALTHSOUTH CORPORATION, a Delaware corporation; SHC SAN DIEGO, INC., a Georgia corporation; SHC MANAGEMENT COMPANY, a Georgia corporation; SURGICAL HEALTH CORPORATION, a Delaware corporation; HEALTHSOUTH SURGERY CENTERS-WEST, INC., a Delaware corporation;

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

DAVID J. CHAO

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*

CASE NUMBER:
*(Número del Caso):*

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
CENTRAL DIVISION - HALL OF JUSTICE
330 West Broadway, San Diego, CA 92101

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Mark S. Bagula, Esq. (C.S.B. # 171141); Davina A. B. Bloom, Esq. (C.S.B. #236850)    PHONE: (858) 535-1511
THE WATKINS FIRM, APC, 4520 Executive Drive, Suite 105, San Diego, CA 92121

DATE: 9/21/07
*(Fecha)*

Clerk, by    I. REYES    , Deputy
*(Secretario)*    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Page 1 of 1

Code of Civil Procedure §§ 412.20, 465

SUM-200(A)

| SHORT TITLE: . | CASE NUMBER: |
|---|---|
| CHAO vs. HEALTHSOUTH CORPORATION, et al. | 37-2007-00075329-CU-BC-CTL |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff    ☑ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

SURGICAL CARE AFFILIATES, LLC, a Delaware Limited Liability, corporation; ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO, L.P., and DOES 1 through 100, inclusively

Page _____ of _____

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

www.accesslaw.com

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | |
|---|---|
| STREET ADDRESS: 330 West Broadway | |
| MAILING ADDRESS: 330 West Broadway | |
| CITY AND ZIP CODE: San Diego, CA 92101 | |
| BRANCH NAME: Central | |
| TELEPHONE NUMBER: (619) 685-6151 | |

| PLAINTIFF(S) / PETITIONER(S): David J. Chao | |
|---|---|
| DEFENDANT(S) / RESPONDENT(S): Healthsouth Corporation et.al. | |
| CHAO VS. HEALTHSOUTH CORPORATION | |

| NOTICE OF CASE ASSIGNMENT | CASE NUMBER: 37-2007-00075329-CU-BC-CTL |
|---|---|

Judge: Kevin A. Enright                                      Department: C-72

**COMPLAINT/PETITION FILED:** 09/19/2007

### CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

CASE NUMBER: 37-2007-00075329-CU-BC-CTL        CASE TITLE: Chao vs. Healthsouth Corporation

## NOTICE TO LITIGANTS/ADR INFORMATION PACKAGE

You are required to serve a copy of this Notice to Litigants/ADR Information Package and a copy of the blank Stipulation to Alternative Dispute Resolution Process (received from the Civil Business Office at the time of filing) with a copy of the Summons and Complaint on all defendants in accordance with San Diego Superior Court Rule 2.1.5, Division II and CRC Rule 201.9.

## ADR POLICY

It is the policy of the San Diego Superior Court to strongly support the use of Alternative Dispute Resolution ("ADR") in all general civil cases. The court has long recognized the value of early case management intervention and the use of alternative dispute resolution options for amenable and eligible cases. The use of ADR will be discussed at all Case Management Conferences. It is the court's expectation that litigants will utilize some form of ADR – i.e. the court's mediation or arbitration programs or other available private ADR options as a mechanism for case settlement before trial

## ADR OPTIONS

1) **CIVIL MEDIATION PROGRAM:** The San Diego Superior Court Civil Mediation Program is designed to assist parties with the early resolution of their dispute. All general civil independent calendar cases, including construction defect, complex and eminent domain cases are eligible to participant in the program. Limited civil collection cases are not eligible at this time. San Diego Superior Court Local Rule 2.31, Division II addresses this program specifically. Mediation is a non- binding process in which a trained mediator 1) facilitates communication between disputants, and 2) assists parties in reaching a mutually acceptable resolution of all or part of their dispute. In this process, the mediator carefully explores not only the relevant evidence and law, but also the parties' underlying interests, needs and priorities. The mediator is not the decision-maker and will not resolve the dispute – the parties do. Mediation is a flexible, informal and confidential process that is less stressful than a formalized trial. It can also save time and money, allow for greater client participation and allow for more flexibility in creating a resolution.

**Assignment to Mediation, Cost and Timelines:** Parties may stipulate to mediation at any time up to the CMC or may stipulate to mediation at the CMC. Mediator fees and expenses are split equally by the parties, unless otherwise agreed. Mediators on the court's approved panel have agreed to the court's payment schedule for county-referred mediation: $150.00 per hour for each of the first two hours and their individual rate per hour thereafter. Parties may select any mediator, however, the court maintains a panel of court-approved mediators who have satisfied panel requirements and who must adhere to ethical standards. All court-approved mediator fees and other policies are listed in the Mediator Directory at each court location to assist parties with selection. **Discovery:** Parties do not need to conduct full discovery in the case before mediation is considered, utilized or referred. **Attendance at Mediation:** Trial counsel, parties and all persons with full authority to settle the case must personally attend the mediation, unless excused by the court for good cause.

2) **JUDICIAL ARBITRATION:** Judicial Arbitration is a binding or non-binding process where an arbitrator applies the law to the facts of the case and issues an award. The goal of judicial arbitration is to provide parties with an adjudication that is earlier, faster, less formal and less expensive than trial. The arbitrator's award may either become the judgment in the case if all parties accept or if no trial de novo is requested within the required time. Either party may reject the award and request a trial de novo before the assigned judge if the arbitration was non-binding. If a trial de novo is requested, the trial will usually be scheduled within a year of the filing date.

**Assignment to Arbitration, Cost and Timelines:** Parties may stipulate to binding or non-binding judicial arbitration or the judge may order the matter to arbitration at the case management conference, held approximately 150 days after filing, if a case is valued at under $50,000 and is "at issue". The court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. In addition, if parties select an arbitrator from the court's panel, the court will pay the arbitrator's fees. Superior Court

**3) SETTLEMENT CONFERENCES:** The goal of a settlement conference is to assist the parties in their efforts to negotiate a settlement of all or part of the dispute. Parties may, at any time, request a settlement conference before the judge assigned to their case; request another assigned judge or a pro tem to act as settlement officer; or may privately utilize the services of a retired judge. The court may also order a case to a mandatory settlement conference prior to trial before the court's assigned Settlement Conference judge.

**4) OTHER VOLUNTARY ADR:** Parties may voluntarily stipulate to private ADR options outside the court system including private binding arbitration, private early neutral evaluation or private judging at any time by completing the "Stipulation to Alternative Dispute Resolution Process" which is included in this ADR package. Parties may also utilize mediation services offered by programs that are partially funded by the county's Dispute Resolution Programs Act. These services are available at no cost or on a sliding scale based on need. For a list of approved DRPA providers, please contact the County's DRPA program office at (619) 238-2400.

**ADDITIONAL ADR INFORMATION:** For more information about the Civil Mediation Program, please contact the Civil Mediation Department at (619) 515-8908. For more information about the Judicial Arbitration Program, please contact the Arbitration Office at (619) 531-3818. For more information about Settlement Conferences, please contact the Independent Calendar department to which your case is assigned. Please note that staff can only discuss ADR options and cannot give legal advice.

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Mark S. Bagula (SBN 171141), Davina A. B. Bloom (SBN 236850)
THE WATKINS FIRM, APC
4520 Executive Drive, Suite 105, San Diego, CA 92121

TELEPHONE NO.: (858) 535-1511    FAX NO.: (858) 535-1581
ATTORNEY FOR *(Name):* Plaintiff, DAVID J. CHAO

FOR COURT USE ONLY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
STREET ADDRESS: 330 West Broadway, San Diego, CA 92101
MAILING ADDRESS: P.O. Box 120128, San Diego, CA 92112
CITY AND ZIP CODE:
BRANCH NAME: CENTRAL DIVISION - HALL OF JUSTICE

CASE NAME: Chao v HealthSouth Corporation, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | 37-2007-00075329-CU-BC-CTL<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☑ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☐ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action *(specify):* Seventeen (17)
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 19, 2007

Davina A. B. Bloom, Esq.
(TYPE OR PRINT NAME)                    ▶ _(signature)_
                                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov
www.accesslaw.com

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, bar number, and address)*:

Mark S. Bagula, Esq. (CSB # 171141); Davina A.B. Bloom, Esq. (CSB # 236850)
THE WATKINS FIRM, APC
4520 Executive Drive, Suite 105, San Diego, CA 92121

TELEPHONE NO.: (858) 535-1511    FAX NO.: (858) 535-1581
ATTORNEY FOR *(Name)*:

**FOR COURT USE ONLY**

FILED
CIVIL BUSINESS OFFICE 10
CENTRAL DIVISION

2007 NOV 16 P 4:03

CLERK SUPERIOR COURT
SAN DIEGO COUNTY, CA

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
☑ HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827
☐ MADGE BRADLEY BLDG., 1409 4TH AVE., SAN DIEGO, CA 92101-3105
☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92081-6643
☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941
☐ RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200
☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649

PLAINTIFF(S)/PETITIONER(S)

David J. Chao

DEFENDANT(S)/RESPONDENT(S)

HealthSouth Corporation, et al.

☑ I/C JUDGE  Michael M. Anello

☐ MASTER CALENDAR

DEPT  72

**CERTIFICATE OF:**
**PROGRESS; INABILITY TO RESPOND; INABILITY TO DEFAULT**
**(San Diego Superior Court Rules: Division II, rules 2.5, 2.6, 2.7, 2.34;**
**Division IV rules 4.169 & 4.170)**

CASE NUMBER

37-2007-00075329-CU-BC-CTL

**MUST BE FILED ON COURT APPROVED FORM WITH A STAMPED, SELF-ADDRESSED ENVELOPE OR MESSENGER SERVICE SLIP.**

The ☑ plaintiff(s)  ☐ defendant(s) in the above-entitled case, by and through their attorney(s) Mark S. Bagula, Esq. and
Davina A.B. Bloom of The Watkins Firm _____ certify that: *(CHECK ONE BOX)*

3C1 ☑  Plaintiff has been unable to serve the complaint on defendant(s) HealthSouth Corporation, SHC San Diego, Inc.,
HealthSouth Surgery Centers-West, Inc.,
Surgical Care Affiliates, LLC, Arthroscopic & Laser
3C1 ☐  Plaintiff requests stay under claim for uninsured/underinsured as to: ___ Surgery Center of San Diego, L.P. _____
(ALL or list individual(s))

3C5 ☐  Defendant was served on _____, and is unable to answer or otherwise respond.

3C8 ☐  Plaintiff served defendant on _____, but was unable to request entry of default.

Therefore, it is requested that the time be extended until  December 10, 2007  for filing of a(n):  NOV 16 '07 PM ___

☑ CERTIFICATE OF SERVICE (SDSC CIV-345)
☐ ANSWER OR OTHER DEFENDANT APPEARANCE
☐ REQUEST FOR ENTRY OF DEFAULT (SDSC CIV-204)

Reason(s): Efforts at settlement communications failed. We dismissed SHC Management and Surgical Health.
The Summons was filed but not issued due to a clerical error by this Court. In state Defendants are being
personally served & out of state Defendants are being served via 1st class mail return receipt requested today.

I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct:

Dated: November 16, 2007

_____
SIGNATURE OF ATTORNEY(S)

**FOR COURT USE ONLY**

☑ EXTENSION GRANTED - DOCUMENT CHECKED ABOVE SHALL BE FILED NOT LATER THAN: 12-21-07

☐ EXTENSION DENIED - THIS MATTER IS SET FOR HEARING ON: _____ AT: _____ M. DEPT _____
    ☐ INSUFFICIENT REASON FOR DELAY OF CASE.
    ☐ OBTAIN ORDER FOR PUBLICATION IMMEDIATELY.

DATED:  NOV 3 0 2007

_____
JUDGE OF THE SUPERIOR COURT

☐ NOTICE TO COUNSEL REQUESTING EXTENSION: After Court's decision, you must serve a copy of this certificate on all counsel concerned.

MICHAEL M. ANELLO

**CERTIFICATE OF:**
SDSC CIV-144(Rev. 4-04)    **PROGRESS; INABILITY TO RESPOND; INABILITY TO DEFAULT**

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):* | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):*
Mark S. Bagula, Esq. (C.S.B. # 171141)
Davina A. B. Bloom, Esq. (C.S.B. #236850)
THE WATKINS FIRM, APC
4520 Executive Drive, Suite 105
San Diego, CA 92121

TELEPHONE NO.:
(858) 535-1511

FOR COURT USE ONLY
FILED
CIVIL BUSINESS OFFICE 10
CENTRAL DIVISION

2007 NOV 16  P 4: 02

SUPERIOR COURT
SAN DIEGO COUNTY, CA

ATTORNEY FOR *(Name):* Plaintiff, DAVID J. CHAO

Insert name of court and name of judicial district and branch court, if any: Central
Superior Court of California, County of San Diego
330 West Broadway, San Diego, CA 92101

PLAINTIFF/PETITIONER: David J. Chao

DEFENDANT/ RESPONDENT: HealthSouth Corporation, et al.

**REQUEST FOR DISMISSAL**
- [ ] Personal Injury, Property Damage, or Wrongful Death
  - [ ] Motor Vehicle     [ ] Other
- [ ] Family Law
- [ ] Eminent Domain
- [✓] Other *(specify):* Breach of Contract

CASE NUMBER:
37-2007-00075329-CU-BC-CTL

- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -

1. TO THE CLERK: Please **dismiss** this action as follows:
   a. (1) [ ] With prejudice  (2) [✓] Without prejudice
   b. (1) [ ] Complaint  (2) [ ] Petition
   (3) [ ] Cross-complaint filed by *(name):*                     on *(date):*
   (4) [ ] Cross-complaint filed by *(name):*                     on *(date):*
   (5) [ ] Entire action of all parties and all causes of action
   (6) [✓] Other *(specify):** ONLY  as to SURGICAL HEALTH CORPORATION, a Delaware corporation

Date: November 16, 2007

MARK S. BAGULA, ESQ.
.............................................................
(TYPE OR PRINT NAME OF  [✓] ATTORNEY  [ ] PARTY WITHOUT ATTORNEY)

*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

▶                               _(SIGNATURE)_

Attorney or party without attorney for:
[✓] Plaintiff/Petitioner      [ ] Defendant/Respondent
[ ] Cross - complainant

2. TO THE CLERK: Consent to the above dismissal is hereby given.**
   Date:

NOV 16 '07 PM 3:58

(TYPE OR PRINT NAME OF  [ ] ATTORNEY  [ ] PARTY WITHOUT ATTORNEY)

** If a cross-complaint-or Response (Family Law) seeking affirmative relief -is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

▶                               _(SIGNATURE)_

Attorney or party without attorney for:
[ ] Plaintiff/Petitioner      [ ] Defendant/Respondent
[ ] Cross - complainant

*(To be completed by clerk)*
3. [ ] Dismissal entered as requested on *(date):*
4. [✓] Dismissal entered on *(date):* NOV 16 2007  as to only *(name):* See above
5. [ ] Dismissal **not entered** as requested for the following reasons *(specify):*

6. [✓] a. Attorney or party without attorney notified on *(date):* DEC 3 2007
   b. Attorney or party without attorney not notified. Filing party failed to provide
   [ ] a copy to conformed  [ ] means to return conformed copy

Date: DEC 3 2007          Clerk, by _____ , Deputy

D. Feureisen

Page 1 of 1

Form Adopted for Mandatory use
Judicial Council of California
CIV-110 [Rev. January 1, 2007]

**REQUEST FOR DISMISSAL**

Code of Civil Procedure, § 581 et seq.;
Cal. Rules of Court, rule 3.1390
www.courtinfo.ca.gov

www.accesslaw.com

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):*<br>Mark S. Bagula, Esq. (C.S.B. # 171141)<br>Davina A. B. Bloom, Esq. (C.S.B. #236850)<br>THE WATKINS FIRM, APC<br>4520 Executive Drive, Suite 105<br>San Diego, CA 92121 | TELEPHONE NO.:<br>(858) 535-1511 | FOR COURT USE ONLY<br>CIVIL BUSINESS OFFICE 10<br>CENTRAL DIVISION<br><br>2007 NOV 16  P 4: 02<br><br>CLERK SUPERIOR COURT<br>SAN DIEGO COUNTY, CA |
|---|---|---|

ATTORNEY FOR *(Name):* Plaintiff, DAVID J. CHAO

Insert name of court and name of judicial district and branch court, it any:  Central
Superior Court of California, County of San Diego
330 West Broadway, San Diego, CA 92101

PLAINTIFF/PETITIONER: David J. Chao

DEFENDANT/ RESPONDENT: HealthSouth Corporation, et al.

| **REQUEST FOR DISMISSAL**<br>☐ Personal Injury, Property Damage, or Wrongful Death<br>  ☐ Motor Vehicle    ☐  Other<br>☐ Family Law<br>☐ Eminent Domain<br>☑ Other *(specify)* : Breach of Contract | CASE NUMBER:<br><br>37-2007-00075329-CU-BC-CTL |
|---|---|

**- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -**

1. TO THE CLERK: Please **dismiss** this action as follows:
   a. (1) ☐  With prejudice   (2) ☑  Without prejudice
   b. (1) ☐  Complaint   (2) ☐  Petition
      (3) ☐  Cross-complaint filed by *(name):*                          on *(date):*
      (4) ☐  Cross-complaint filed by *(name):*                          on *(date):*
      (5) ☐  Entire action of all parties and all causes of action
      (6) ☑  Other *(specify):** ONLY as to SHC MANAGEMENT COMPANY

Date: November 16, 2007

MARK S. BAGULA, ESQ.
................................................
(TYPE OR PRINT NAME OF  ☑ ATTORNEY  ☐ PARTY WITHOUT ATTORNEY)

*If dismissal requested is of specified parties only of specified causes of
action only, or of specified cross-complaints only, so state and identify
the parties, causes of action, or cross-complaints to be dismissed.

▶                   *(SIGNATURE)*

Attorney or party without attorney for:
☑ Plaintiff/Petitioner        ☐ Defendant/Respondent
☐ Cross - complainant

2. TO THE CLERK: Consent to the above dismissal is hereby given.**
   Date:

................................................
(TYPE OR PRINT NAME OF  ☐ ATTORNEY  ☐ PARTY WITHOUT ATTORNEY)

** If a cross-complaint-or Response (Family Law) seeking affirmative
relief -is on file, the attorney for cross-complainant (respondent) must
sign this consent if required by Code of Civil Procedure section 581 (i)
or (j).

▶                   *(SIGNATURE)*

Attorney or party without attorney for:
☐ Plaintiff/Petitioner        ☐ Defendant/Respondent
☐ Cross - complainant

*(To be completed by clerk)*
3. ☐  Dismissal entered as requested on *(date):*
4. ☑  Dismissal entered on *(date):*                as only *(name):* see above
5. ☐  Dismissal **not entered** as requested for the following reasons *(specify):*
                                                DEC 3 2007
6. ☑  a. Attorney or party without attorney notified on *(date):*
      b. Attorney or party without attorney not notified. Filing party failed to provide
         ☐ a copy to conformed  ☐ means to return conformed copy

Date:                              Clerk, by_____, Deputy
                                                                    Page 1 of 1

| Form Adopted for Mandatory use<br>Judicial Council of California<br>CIV-110 [Rev. January 1, 2007] | **REQUEST FOR DISMISSAL** | Code of Civil Procedure, § 581 et seq.,<br>Cal. Rules of Court, rule 3.1390<br>www.courtinfo.ca.gov |
|---|---|---|

| ATTORNEY OR PARTY WITHOUT ATTORNEY(Name, state bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Mark S. Bagula, Esq. (CSB#171141); Davina A. B. Bloom, Esq. (CSB 236850) THE WATKINS FIRM, APC 4520 Executive Drive, Suite 105, San Diego, CA 92121 TELEPHONE NO.: (858) 535-1511    FAX NO.: (858) 535-1581 ATTORNEY FOR (Name):   Plaintiff DAVID J. CHAO | CIVIL SUPERIOR JUSTICE 10 2007 DEC -6 P 3:13 |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO |
|---|
| ☑ HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827 |
| ☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92081-6643 |
| ☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941 |
| ☐ RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200 |
| ☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649 |

| PLAINTIFF(S) DAVID J. CHAO | JUDGE: Hon. Michael M. Anello |
|---|---|
| DEFENDANT(S) HEALTHSOUTH CORPORATION, et al. | DEPT: 72 |
| AMENDMENT TO COMPLAINT (CCP 473, 474) | CASE NUMBER 37-2007-00075329-CU-BC-CTL |

Under Section 474, Code of Civil Procedure:
FICTITIOUS NAME (Court order required once case is at issue. San Diego Superior Court Rules, Division II, rule 2.10)

Plaintiff(s), being ignorant of the true name of a defendant when the complaint in the above-named case was filed, and having designated said defendant in the complaint by the fictitious name of

DOES 1, 2 and 3

and having discovered the true name of the said defendant to be

SHC MANAGEMENT CORPORATION, a Georgia corporation; SHC MANAGEMENT CORPORATION, a Delaware corporation, and SHC MANAGEMENT CORP., a Delaware corporation

amends the complaint by inserting such true name in place and stead of such fictitious name wherever it appears in said complaint.

Date: December 4, 2007

Mark S. Bagula, Esq.                    Attorney(s) for Plaintiff(s)

Under Section 473, Code of Civil Procedure:
NAME - Add or Correct (Court order required)

Plaintiff(s), having designated a ☐ defendant ☐ plaintiff in the complaint by the name of

_____

and having discovered ☐ said name to be incorrect and the correct name is ☐ defendant also uses the name of

_____

amends the complaint by ☐ substituting ☐ adding such name(s) wherever the name of

_____

appears in said complaint.

Date: _____        _____
                                      Attorney(s) for Plaintiff(s)

**ORDER**

The above amendment to the complaint is allowed.

Date: _____        _____
                                      Judge of the Superior Court

SDSC CIV-12(Rev. 10-02)          **AMENDMENT TO COMPLAINT**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):*
THE WATKINS FIRM
DAVINA A. B. BLOOM - SBN # 236850
4520 EXECUTIVE DRIVE, SUITE 105
SAN DIEGO, CA 92121
TELEPHONE NO.*(Optional)* (858) 535-1511 FAX NO.*(Optional)* (858) 535-1581
EMAIL ADDRESS:*(Optional)*
ATTORNEY FOR*(Name):* PLAINTIFF

FOR COURT USE ONLY
FILED
CIVIL BUSINESS OFFICE
CENTRAL DIVISION

07 DEC -3 PM 2:59

CLERK OF THE COURT
SAN DIEGO COUNTY, CA

SUPERIOR COURT OF CALIFORNIA, COUNTY OF: SAN DIEGO
STREET ADDRESS: 330 W. BROADWAY
MAILING ADDRESS:
CITY AND ZIP CODE: SAN DIEGO, CA 92101
BRANCH NAME:

| PLAINTIFF/PETITIONER: | CHAO | CASE NUMBER: |
|---|---|---|
| | | 37200775329CU-BC-CTL |
| DEFENDANT/RESPONDENT: | HEALTHSOUTH | |

| **PROOF OF SERVICE OF SUMMONS** | Ref No. or File No. |
|---|---|
| | 0P141112-01/OASIS/CHAO RE |

*(Separate proof of service is required for each party served)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of the summons and
   e. other *(specifiy documents):*
   SUMMONS AND COMPLAINT; NOTICE OF CASE ASSIGNMENT; CIVIL CASE COVER SHEET;
   STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION PROCESS; NOTICE TO
   LITIGANTS/ADR INFORMATION PACKAGE;

3. a. Party Served: *(specify name of party as shown on the documents served):*
   HEALTHSOUTH CORPORATION, A DELAWARE CORPORATION

   b. Person Served: other *(specify name and relationship to party named in item 3a):* other *(specify name and relationsh*
   MARGARET WILSON, PERSON AUTHORIZED TO ACCEPT

4. Address where the party was served:          818 W. 7TH STREET
                                               LOS ANGELES, CA 90017

5. I served the party *(check proper box)*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to
   receive service of process for the party (1) on (date):November 16, 2007 (2) at (time): 03:25 pm

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. January 1, 2007]      **PROOF OF SERVICE OF SUMMONS**      Code of Civil Procedure,1 417.10

149.90

| PETITIONER: CHAO | CASE NUMBER: |
|---|---|
| RESPONDENT: HEALTHSOUTH | 37200775329CU-BC-CTL |

6. The "Notice to the Person Served" (on the summons) was completed as follows:
    under the following Code of Civil Procedure section:
       [XX] 416.10 (corporation)

7. Person who served papers
  a. Name: ROBERT HALL
  b. Address: 3500 5th. AVE. SUITE 202, SAN DIEGO, CA 92103
  c. Telephone: (619) 299-2012
  d. *The fee* for service was: $   149.90
  e. I am: (3) a registered California process server
       (i) INDEPENDENT CONTRACTOR
       (ii) Registration No.: 5181
       (iii) County : LOS ANGELES

8. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:    November 20, 2007

      ROBERT HALL

| _____ | _____ |
|---|---|
| (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHALL) | (SIGNATURE) |

Page 2 of 2

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

41A/0P141112-01

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I. (a) PLAINTIFFS**
DAVID J. CHAO

FILED
2007 DEC 26  AM 9: 30
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ RM _____ DEPUTY

**DEFENDANTS**
HEALTHSOUTH CORPORATION; SHC SAN DIEGO, INC.; SHC MANAGEMENT COMPANY; SURGICAL HEALTH CORPORATION; HEALTHSOUTH SURGERY CENTERS-WEST, INC.; SURGICAL CARE AFFILIATES, LLC; ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO, L.P.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Delaware
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Daniel W. Watkins
The Watkins Firm
4520 Executive Drive
San Diego, CA 92121
(858) 535-1511

ATTORNEYS (IF KNOWN)
Cathleen G. Fitch
Coughlan, Semmer & Lipman, LLP
501 W. Broadway, Ste. 400
San Diego, CA  92101
(619) 232-0800

**II. BASIS OF JURISDICTION** (PLACE AN 'X' IN ONE BOX ONLY)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [x] 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated or Principal Place of Business in This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)   Removed by Defendant SURGICAL CARE AFFILIATES, LLC pursuant to 28 U.S.C. Sections 1332 and 1441(b)

'07 CV 2408 DMS WMC

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 458 | [ ] 400 State Reappointment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury - Medical Malpractice | [ ] 620 Other Food & Drug | | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 365 Personal Injury - Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 423 Withdrawal 28 USC 157 | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 368 Asbestos Personal Injury Product Liability | | **PROPERTY RIGHTS** | [ ] 450 Commerce/ICC Rates/etc. |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 630 Liquor Laws | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 640 R.R. & Truck | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud | [ ] 650 Airline Regs. | [ ] 840 Trademark | [ ] 810 Selective Service |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 660 Occupational Safety/Health | **SOCIAL SECURITY** | [ ] 850 Securities/Commodities/Exchange |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | [ ] 690 Other | [ ] 861 HIA (1395ff) | [ ] 875 Customer Challenge 12 USC 3410 |
| [x] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | **LABOR** | [ ] 862 Black Lung (923) | [ ] 891 Agricultural Acts |
| [ ] 195 Contract Product Liability | | | [ ] 710 Fair Labor Standards Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 720 Labor/Mgmt. Relations | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motion to Vacate Sentence | [ ] 730 Labor/Mgmt. Reporting & Disclosure Act | [ ] 865 RSI (405(g)) | [ ] 894 Energy Allocation Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | **HABEAS CORPUS:** | [ ] 740 Railway Labor Act | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/Accommodations | [ ] 530 General | [ ] 790 Other Labor Litigation | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | [ ] 791 Empl. Ret. Inc. Security Act | [ ] 871 IRS - Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 245 Tort Product Liability | [ ] 440 Other Civil Rights | [ ] 540 Mandamus & Other | | | [ ] 890 Other Statutory Actions |
| [ ] 290 All Other Real Property | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Conditions | | | |

**VI. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- [ ] 1 Original Proceeding
- [x] 2 Removal from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**
[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ Damages, Specific Perform. & Injunction
CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] YES  [x] NO

**VIII. RELATED CASE(S) IF ANY** (See instructions)
JUDGE _____   Docket Number _____

DATE
December 21, 2007

SIGNATURE OF ATTORNEY OF RECORD
_(signature)_

PAID $350  12/26/07  BH  RCPT #145854

..\ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

# ORIGINAL

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# 145854    — BH
* * C O P Y * *
December 26, 2007
09:28:53

### Civ Fil Non—Pris
USAO #.: 07CV2408 CIVIL FILING
Judge..: DANA M SABRAW
Amount.:                    $350.00 CK
Check#.: BC# 9602

Total—>  $350.00

FROM: CIVIL FILING
      CHAO V. HEALTHSOUTH ET AL