1   **MARK S. BAGULA [CSB No. 171141]**
    **DAVINA A. B. BLOOM [CSB No. 236850]**
2   **DANIEL W. WATKINS [CSB No. 128849]**
    **THE WATKINS FIRM**
3   **A Professional Corporation**
    4520 Executive Drive
4   San Diego, CA 92121
    (858) 535-1511
5   (858) 535-1581 [Facsimile]

6   Attorneys for Plaintiff, DAVID J. CHAO

7

8                    **UNITED STATES DISTRICT COURT**

9                  **SOUTHERN DISTRICT OF CALIFORNIA**

10  DAVID J. CHAO, an individual,                )
                                                 )
11                                               )   CASE NO:    3:07-cv-2408-DMS-WMC
                    Plaintiff,                   )
12  vs.                                          )
                                                 )   **PLAINTIFF DAVID J. CHAO'S**
13  HEALTHSOUTH CORPORATION, a Delaware)   **MOTION TO REMAND ACTION AND**
    corporation; SHC SAN DIEGO, INC., a Georgia) **SUPPORTING POINTS AND**
14  corporation; SHC MANAGEMENT COMPANY,)  **AUTHORITIES.**
    a Georgia corporation; SURGICAL HEALTH)
15  CORPORATION,    a   Delaware   corporation;)
    HEALTHSOUTH SURGERY CENTERS-WEST,)
16  INC., a Delaware corporation; SURGICAL CARE)  Judge:  Hon. Dana M. Sabraw
    AFFILIATES, LLC, a Delaware Limited Liability)  Dept.:  Courtroom 10
17  corporation;    ARTHROSCOPIC    &   LASER)   Date:   February 29, 2008
    SURGERY CENTER OF SAN DIEGO, L.P., and)    Time:   1:30 p.m.
18  DOES 1 through 100, inclusively,             )
                                                 )
19                  Defendants.                  )
                                                 )
20  _____)

21

22

23

24

25

26

27

28

1  In response to the Notice of Removal filed in this action, Plaintiff DAVID J. CHAO, an

2  individual (hereinafter "Plaintiff" or "Dr. Chao") moves to remand this case to the Superior Court of

3  the State of California, in and for the County of San Diego, the court in which it was pending before

4  it was improperly removed.  Plaintiff also seeks an award of the attorneys fees incurred as a result of

5  the improper removal.

6  **I.    Grounds for Relief.**

7  1.    The Notice of Removal is untimely and therefore procedurally defective.  Defendant

8  HealthSouth was served in this matter on November 16, 2007.  It failed to file a notice

9  of removal within 30 days of receiving the Complaint pursuant to the federal removal

10  statutes.  Thereafter, on December 26, 2007, Defendant Surgical Care Affiliates, LLC

11  (hereinafter "SCA"), who was served on November 26, 2007,  filed a notice of

12  removal and Defendant HealthSouth joined on the same day.  Defendants

13  HealthSouth and SCA share the same attorneys of record and are charged with

14  awareness of the thirty day rule.  Since HealthSouth failed to remove within thirty

15  days of service, the removal is defective and this case must be remanded.

16  2.    Defendant ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO,

17  L.P., (hereinafter "Partnership") has its principal place of business in San Diego.  The

18  Partnership is essential to this action.  The Partnership is not a nominal defendant and

19  therefore should not be aligned with Plaintiff as stated in SCA's Notice of Removal.

20  As such, complete diversity if defeated.

21  3.    Not all of the served Defendants in this case have joined in or consented to removal of

22  the case to federal court.  The Defendants which have not joined in or consented to

23  removal include the Partnership, SHC San Diego, Inc. and HealthSouth Surgery

24  Center-West.  The latter parties are represented by counsel for HealthSouth and SCA,

25  which has agreed to accept service for them.  Since such joinder or consent is required

26  by the federal removal statutes, the removal in this case is improper and the case must

27  be remanded.

28  / / /

4.   The principal place of business of the General Partner, SCH, San Diego, Inc., is San Diego, and therefore diversity jurisdiction does not exist in this case and this action must be remanded.

5.   Plaintiff intends to name Arthur Casey, an individual, as a defendant in this action. Arthur Casey was an employee of HealthSouth and the primary actor for SHC SD the General Partner of the Partnership. Arthur Casey is a citizen of the State of California and therefore diversity jurisdiction does not exist in this case and this action must be remanded.

6.   Defendant SCA's statement that damages are "expected" to be in excess of $75,000 is conjecture and not sufficient to justify removal. Therefore the case must be remanded.

**II.    Motion Papers**

7.   The motion papers on which this motion is based include this Points and Authorities, the Notice of Motion, Notice of Lodgement, the Certificate of Service, the supporting declaration of Mark S. Bagula, Esq., and the pleadings and other papers on file in this action.

*Respectfully Submitted,*

THE WATKINS FIRM, APC

Dated: January 23, 2008

**MARK S. BAGULA, ESQ.**
Attorney for Plaintiff

1

## <u>TABLE OF CONTENTS</u>

2

3   I.      SUMMARY OF FACTS................................................ ..............................4

4   II.     THE NOTICE OF REMOVAL WAS UNTIMELY FILED BY DEFENDANTS AND
            THEREFORE THIS ACTION SHOULD BE REMANDED .................................5

5

6   III.    THE DISTRICT COURT IS REQUIRED TO REMAND THE CASE AS THERE IS NOT
            DIVERSITY OF CITIZENSHIP.............................................................7

7           A.     Defendant ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO,
                   L.P. is a Limited Partnership and a Citizen of the State of
8                  California............................................................................7
            B.     Defendant Partnership is not a Nominal Defendant.............................8

9

10  IV      ALTERNATIVELY, THE GENERAL PARTNER, DEFENDANT SHC SD INC. HAS ITS
            PRINCIPAL PLACE OF BUSINESS IN CALIFORNIA, DESTROYING DIVERSITY.....12

11

12  V.      PLAINTIFF INTENDS TO NAME ARTHUR CASEY, AN INDIVIDUAL, AS A
            DEFENDANT IN THIS ACTION, WHICH WILL DESTROY DIVERSITY
            JURISDICTION...........................................................................13

13

14  VI.     ALL OF THE DEFENDANTS HAVE NOT JOINED OR CONSENTED TO REMOVAL
            AND THEREFORE THIS CASE MUST REMANDED.......................................14

15  VII.    DEFENDANT HAS NOT PROVED THE CLAIMED DAMAGES WILL BE IN EXCESS
            OF
16          $75,000...................................................................................15

17  VIII.   PLAINTIFF IS ENTITLED TO ATTORNEYS FEES INCURRED....................................15

18  IX.     CONCLUSION............................................................................16

19

20

21

22

23

24

25

26

27

28

I.                    SUMMARY OF FACTS

This case arises out of the widely publicized accounting and securities fraud committed by Defendant HealthSouth Corporation (hereinafter "HealthSouth") which came to light in 2003 after an extensive Securities and Exchange Commission investigation. HealthSouth was in the business of providing business management services to surgery centers and other health care providers. Thereafter, HealthSouth reached an agreement with the Internal Revenue Service to restate all of the financials of the surgery centers they managed for the years 2000 to 2005. When actually provided to a center, such restatements were provided in 2006 and 2007, and revealed gross accounting errors and fraud.

Plaintiff is a medical doctor and Limited Partner in a Partnership established with Defendants, called Arthroscopic & Laser Surgery Center of San Diego, L.P (hereinafter "Partnership"). Plaintiff, as a Limited Partner, owns 18% of the shares of the Partnership. The General Partner is Defendant Surgical Health Corporation San Diego (hereinafter "SHC SD") which owns 56% and the controlling interest in the Partnership. SHC SD was a wholly owned subsidiary of Defendant SHC Management Company, which in turn was a wholly owned subsidiary of HealthSouth. Surgical Care Affiliates, LLC (hereinafter "SCA") bought out HealthSouth and all of its surgery center affiliates in July of 2007. Only in January 2008 were the limited partners of the Partnership informed of the finalization of SCA's purchase.

Plaintiff became aware that the aforementioned fraudulent and deceitful activities affected the Partnership center (and thus his personal reputation as the primary doctor associated with the center). Specifically, Plaintiff realized that the Partnership had become one of several conduits through which Defendants committed their fraud. The Partnership's own accounting was manipulated so that Defendants could in turn manipulate their reported earnings.

Due to these harmful activities on the part of Defendants, Plaintiff was ultimately forced to approach HealthSouth with the ultimatum to either sell him enough shares to increase his ownership to a controlling interest or continue the Partnership without Plaintiff as a Limited Partner doctor working at the center. Defendants agreed to sell Plaintiff a controlling interest in the Partnership, but reneged, and later sold all its interest to a third party (SCA) without the consent or consultation of Plaintiff or any of the other limited partners, in contravention of the partnership agreement. In fact, it was not until several months after the sale, on January 16th, 2008, that it was announced to the limited partners that

1    the sale of the controlling interest of the Partnership had been finalized.  Plaintiff filed this suit in

2    September 2007, and seeks damages for breach of contract, negligence, breach of covenant of good faith

3    and fair dealing, breach of fiduciary duty, fraud, violations of California Business and Professions Code

4    §17200 and interference with contract and prospective economic advantage.  Plaintiff also seeks

5    equitable relief including an injunction against <u>all</u> of the defendants to the stop the harmful behavior

6    from further damaging Plaintiff.

7    **II.        THE NOTICE OF REMOVAL WAS UNTIMELY FILED BY DEFENDANTS
              AND THEREFORE THIS ACTION SHOULD BE REMANDED.**

8         A motion for remand to state court is the proper procedure for challenging removal, and such a

9    motion will succeed upon a showing that the federal court lacks subject matter jurisdiction. *Continental*

10   *Insurance Company v. Foss Maritime Company, et al.*, 2002 U.S. Dist. LEXIS 20523 (N.D. Cal. 2002).

11   Moreover, a removal statute is strictly construed against removal jurisdiction and in favor of state court

12   jurisdiction. *Boggs v. Lewis*, 863 F.2d 662, 663 (9th Cir. 1988); *see also, Shamrock Oil and Gas Corp.*

13   *v. Sheets*, 313 U.S. 100, 108-9 85 L.Ed. 1214, 61 S.Ct. 868 (1941).  For this reason, removal is rejected

14   if there is any doubt as to the right of removal in the first instance. *Gaus v. Miles, Inc.*, 980 F2d. 564,

15   566 (9th Cir. 1992).  This strong presumption against removal jurisdiction means that the defendant

16   always has the burden of establishing that removal is proper. *Id.*

17        Pursuant to 28 U.S.C. §1446(b), a notice of removal of a civil action ***shall*** be filed within thirty

18   days after a defendant's receipt of the summons and complaint.  Literally dozens of federal courts have

19   held that the time provisions of section 1446(b) are mandatory and must be strictly construed. *See e.g.*

20   *United States ex rel. Walker v. Gunn*, 511 F2d. 1024, 1026 (9th Cir.), *cert. denied*, 96 S. Ct. 91 (1975);

21   *Fristoe v. Reynolds Metals Co.*, 615 F.2d 1209, 1212 (9th Cir. 1980); *Douglass v. Weyerhaeuser Co.*, 662

22   F.Supp. 147, 149 (C.D.Cal. 1987); *Owens v. General Dynamics Corp*, 686 F.Supp. 827 (S.D.Cal. 1988).)

23   Further, in *Clyde v. National Data Corp.*, 609 F.Supp. 216, 218 (D.C. Ga. 1985), the court explained

24   that the thirty day rule was undoubtedly designed "to provide a uniform and definite time for a defendant

25   to remove an action." *Id.* at 218.  It deprives defendants the "undeserved tactical advantage" of waiting

26   to see how a state court is faring before removing, and preventing delay and waste of resources in

27   beginning a federal case. *Wilson v. Intercollegiate (Big Ten) Conference Athletic Assoc.*, 668 F.2d 692

28   (7th Cir. 1982).

1    The removal statute also requires that all proper defendants to the action must join in the removal

2  or consent to it. *Prize Frize, Inc. v. Matrix, Inc.*, 167 F3d 1261, 1266 (9th Cir. 1999). In accordance with

3  28 U.S.C. § 1446(b), that consent must be manifested within the thirty day period beginning from the

4  date upon which the non-petitioning defendant is served with the complaint. *Hernandez v. Six Flags*

5  *Magic Mountain, Inc.*, 688 F.Supp 560, 562 (C.D. Cal. 1988). An untimely removal is procedurally

6  defective, and the case must be remanded to state court. *Dietrich v. Cooperstein*, et al., 1995 U.S. Dist.

7  LEXIS 1588 (N.D. Cal. 1995).[1]

8    In the instant case, all of the defendants are represented by the same counsel, the law firm of

9  Coughlan, Semmer, & Lipman located in San Diego, California. In fact, the recent filing by Defendants'

10  counsel seeking a continuance of the early neutral evaluation conference, states that "Defendants wish

11  to use one law firm to defend them." See Exhibit 2 to Notice of Lodgment ("NOL"), Defendants'

12  Request to Continue Early Neutral Evaluation Conference at p. 2, ¶3:19-20. Presumably, as it happens

13  in most cases, Coughlan, Semmer & Lipman was hired by defendants at the same time when the decision

14  was made by defendant that it would be in their best interest to be represented by the same attorneys.

15    Defendant HealthSouth was served with the Summons and Complaint in this matter on

16  November 16th, 2007. No Notice of Removal was filed by HealthSouth within 30 days of service. On

17  December 26, 2007, exactly thirty days from when it was served, Defendant SCA filed a Notice of

18  Removal to this United States District Court pursuant to 28 U.S.C. § 1441(b). On that very same day,

19  however, December 26, 2007, Defendant HealthSouth, through Coughlan, Semmer & Lipman, filed a

20  joinder to SCA's Notice of Removal. At this point in time, Defendant HealthSouth was ten days past

21  its thirty-day window to file a Notice of Removal. Circumstantially, it is obvious that HealthSouth and

22

23

24    [1] The *Detreich* Court stated, "Removal must be accomplished within "thirty days after the receipt

25  by the defendant, through service or otherwise, a copy of the initial pleading setting for the claim forth

26  relief up on which such action or proceeding is based. 28 U.S.C. §1446(b). The only exception to this

27  rule applies where the basis for removal was not evident on the initial pleadings. In such cases, the

28  defendant must remove within thirty days of receipt of the first pleading on which federal jurisdiction

is evident. 28 U.S.C. § 1446(b)." *Id.* at 4.

1  SCA were represented by the same counsel at the same time. It is Defendants' obligation to put forth

2  evidence contradicting the circumstantial evidence that all of the Defendants were represented by the

3  same counsel at the same time, or that they were not hired at the same time.[2]

4      The *Detreich* Court states, "The removal statute could not be clearer: a defendant who wishes

5  to remove a state court action to federal court must do so within thirty days of receipt of the first

6  pleading on which federal jurisdiction is evident. 28 U.S.C. § 1446(b). Defendants do not, and could

7  not, argue that the basis for federal diversity jurisdiction first became apparent in [a subsequent

8  pleading]." *Id.* at 10-11. Similarly, in this case, HealthSouth and its attorney cannot argue that diversity

9  jurisdiction first became apparent when SCA was served as opposed to when HealthSouth was served

10 10 days earlier. Representation by identical counsel vests HealthSouth with the same knowledge as SCA,

11 on the basis of principal and agency law (the principal is vested with the knowledge of its agent under

12 the law). HealthSouth's removal is clearly untimely and therefore procedurally defective; thus the case

13 must be remanded to state court.

14 **III.    THE DISTRICT COURT IS REQUIRED TO REMAND THE CASE AS THERE IS NOT DIVERSITY OF CITIZENSHIP.**

15

16     Complete diversity jurisdiction does not exist in this case because Defendant Partnership is a

17 citizen of California. Further, for the reasons set forth below, the Partnership is not a nominal defendant

    and should remain aligned with Defendants.

18

19 / / /

20 / / /

21 / / /

22

23     [2]The date of retention of counsel by a party is not protected by either the attorney-client privilege

24 or attorney work product privilege under California Law. The privilege does not protect "independent

25 facts related to a communication; that a communication took place, and the time, date and participants

26 in a communication." *State Farm Fire & Casualty Co. v. Superior Court*, 54 Cal.App.4th 625, 640

27 (1997).

28

**A.**        **Defendant ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO,**
**L.P. is a Limited Partnership and a Citizen of the State of California.**

Diversity jurisdiction exists over any civil action in which the amount in controversy exceeds the sum or value of $75,000, exclusive of costs and interests, and the action is between citizens of different states.  28 U.S.C. §1332(a).  Moreover, diversity jurisdiction exists only when there is complete diversity, i.e., none of the defendants (***served or not***) is a citizen of the same state as any of the plaintiffs.  *Id. See also, Morris v. Princess Cruises, Inc.* 236 F.3d 1061, 1067 (9th Cir. 2001).  A corporation is a "citizen" both of the state in which it was incorporated and of the state where it has its principal place of business.  28 U.S.C. §1332(c)(1).  Therefore actions brought in the courts of either state cannot be removed to federal court.  With a partnership, the citizenship of ***each member*** of the partnership must be considered for determining diversity.  *Carden v. Arkoma Associates*, 494 U.S. 185, 110 S.Ct. 1015, 1021, 108 L.E.d2d 157 (1990).

In the present case, Defendant Partnership includes several partners who are citizens of California.  Surgical Care Affiliates, LLC (hereinafter "SCA"), in its Notice of Removal admits that Defendant Partnership "is a Georgia limited partnership with its principal place of business in San Diego, California."  See Exhibit 1 to NOL, Notice of Removal at p. 4, ¶ 12: 6-7.  Therefore, by SCA's own admission and by the facts of record, both Plaintiff and Defendant Partnership are citizens of the same state and diversity jurisdiction is destroyed.  Consequently, removal is improper and the case must be remanded to state court.

**B.**        **Defendant Partnership is not a Nominal Defendant.**

In its Notice of Removal, SCA discusses the Partnership and states that, "...[S]aid partnership Defendant is a nominal defendant and is aligned with Chao.  Accordingly, its citizenship is not properly considered for diversity purposes."  See Exhibit 1 to NOL, Notice of Removal at p. 4, ¶ 12: 11-12. Defendant SCA is wrong on this point.  Defendant Partnership is much more than a nominal defendant.

Nominal or formal parties, being neither necessary nor indispensable, are not required to join in the petition for removal.  *Shattuck v. North British and Mercantile Ins. Co.*, 58 F. Supp. 609 (8th Cir. 1893).  In *Stonybrook Tenants Assoc., Inc. v. Alpert*, 194 F. Supp. 552 (D.Conn., 1961), the court said, "the ultimate test of whether the ...defendants are...indispensable parties...is whether in the absence of

1    the [defendant], the Court can enter a final judgment consistent with equity and good conscience which

2    would not be in any way unfair or inequitable to plaintiff." *Id.* at 559.

3        A nominal defendant is a legal person who "holds the subject matter of the litigation in a

4    subordinate or possessory capacity as to which there is no dispute." *Securities and Exchange*

5    *Commission v. Coello,* 139 F.3d 674, 676 (9th Cir. 1998) *citing Cherif,.* 933 F.2d at 414.  The *Coello*

6    court explains:

7            The paradigmatic nominal defendant is a trustee, agent, or depository...[who is] joined

8            purely as a means of facilitating collection.  As the nominal defendant has no legitimate

9            claim to the disputed property, he is not a real party in interest.  Accordingly, 'there is no

10           claim against him and it is unnecessary to obtain subject matter jurisdiction over him

11           once jurisdiction of the defendant is established.'   (internal quotations and citations

12           omitted).

13   *Id.*  Usually, the standard nominal defendant is a bank or trustee which only has custodial claim to the

14   property. *Id.* at 677.  Other circuits have also explained what constitutes a "nominal defendant."

15   In *SEC v. Charif*, 933 F.2d 403 (7th Cir. 1991), the court explained, "A 'nominal defendant' is a person

16   who can be joined to aid the recovery of relief without an assertion of subject matter jurisdiction only

17   because he has no ownership interest in the property which is the subject of the litigation." *Id.* at 414.

18   And yet another federal court stated "Nominal parties have no interest in the subject matter litigated....A

19   nominal party's presence in a suit is merely incidental, and 'it is of no moment whether the one or the

20   other side in [the] controversy succeeds." *Lehr v. McCord*, 2003 U.S. Dist. Lexis 8481, at 3 (S.D. Ind.

21   2003).

22       Based on the above law, Defendant Partnership is not a nominal party.  First and foremost, the

23   Partnership has more than a custodial claim to the property which is the subject of this litigation.  It is

24   not a bank or a trustee; rather it is a legal entity made up of several partners including some of the other

25   defendants.  Plaintiff owns only 18% of the shares of the Partnership.  The party alleged to have

26   committed wrongdoing is the General Partner which owns 56%.  It is of much consequence to the

27   Partnership which side of the controversy succeeds in this litigation.

28   ///

---

1    Moreover, the Partnership is an indispensable party to this litigation. Plaintiff is seeking an order

2  forcing the general partner to sell its shares of the Partnership as previously promised. Cmplt. at 18-20,

3  ¶¶60-70. A change in ownership of shares is obviously impossible without the involvement of the

4  Partnership itself.

5    Furthermore, in its prayer, Plaintiff asks that all defendants be ordered to turn over their

6  ownership interest. Specifically, it asks "For an order instructing Defendants to transfer and sell, at the

7  market rates established in the Partnership Agreement, enough shares of the partnership to increase

8  Plaintiff's ownership to 80%." Cmplt. at 57, ¶6.

9    The Partnership Agreement itself states that in the event of fraud or abuse, the Partnership must

10  "redeem all or any portion of the Units of any Limited Partners whose investment in the Partnership is

11  determined....to cause a fraud and abuse violation...." See Exhibit 3 to NOL, Partnership Agreement at

12  17, §11.04.[3] Clearly, if the Partnership is required to take possession of the shares of the wrongdoing

13  Defendants, the Partnership is a necessary party to this action.

14    Dissolution of the limited partnership itself is sought in the sixth cause of action of the complaint.

15  Cmplt. at 25, ¶¶97-99. Obviously, jurisdiction over Defendant Partnership is necessary for Plaintiff to

16  gain the relief requested.

17    And finally, equitable relief is impossible for Plaintiff without involving the Partnership because

18  the General Partner, SHC SD, is the majority interest holder in the Partnership with 56% of the shares.

19  The General Partner controls the Partnership. See Exhibit 3 to NOL, Partnership Agreement at p. 9-12,

20  Article XI. Unless the Partnership as a whole is enjoined from distributing monies to the General

21  Partner during the course of the litigation, Plaintiff will be harmed. In several places in the complaint

22  Plaintiff alleges that the General Partner has improperly taken monies from the Partnership, and Plaintiff

23  / / /

24

25    [3] Plaintiff contends that the Partnership Agreement provides that when either a Limited Partner

26  **OR** the General Partner is found to have committed fraud or abuse, the Partnership must redeem that

27  Partners shares. The Partnership Agreement is incorporated by reference into the Complaint by its

28  attachment.

1   seeks to enjoin the Partnership from paying distributions, or other monies to the General Partner. Cmplt.

2   at 20, ¶70; at 21, ¶77; at 23, ¶ 84; at 25, ¶ 95. It is clear that the court must exercise jurisdiction over

3   the Partnership, making it more than a nominal defendant.

4          The seminal case setting forth the doctrine of realignment is *City of Indianapolis v. Chase Nat.*

5   *Bank of City of New York*, 314 U.S. 63 (1941). In *City of Indianapolis*, the dissenting opinion (as to the

6   holding only) explained the doctrine as follows: "The doctrine of realignment permits and requires a

7   nominal defendant to be treated as a plaintiff for the purpose of defining the real controversy where no

8   real cause of action is asserted against him by the plaintiff, but it does not admit of such treatment of a

9   defendant against whom the plaintiff asserts a cause of action within the jurisdiction of the court. [A

10  party] cannot be rightly deprived of the benefit of that jurisdiction... ...because the court may think that

11  such a cause of action is relatively less important than that asserted against another defendant or because

12  one action 'dominates' the other or because one is more 'actual' or 'substantial' than the other." *Id.* at

13  80.

14         First and foremost, Plaintiff asserts the Thirteenth Cause of Action for unfair business practices

15  against all of the defendants including Defendant Partnership. Cmplt. at 49, ¶¶ 162-169. In addition,

16  from the Court's statement above in the *Indianapolis* case, it logically follows that diversity jurisdiction

17  also may not *be created* because the court may think that such a cause of action is relatively less

18  important than that asserted against another defendant. This is what SCA is attempting to do and it must

19  not be permitted.

20         As a threshold matter, a court must determine whether, in a particular case, it has the authority

21  to realign the parties. *Plumtree Software, Inc., v. Datamize, LLC*, 2003 U.S. Dist. Lexis 26948 at 4

22  (2003). In so doing, the Ninth Circuit, as well as other circuits, uses the "principal purpose" test.

23  *Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1523 n.2 (9th Cir. 1987). The

24  "principal purpose" test provides that courts must "align for jurisdictional purposes those parties whose

25  interests coincide respecting the primary matter in dispute." *Prudential Real Estate Affil, Inc., v. PPR*

26  *Realty, Inc.*, 204 F.3d 967, 873 (9th Cir. 2000) (quoting *Continental Airlines, Inc. V. Goodyear Tire &*

27  *Rubber Co.*, 819 F.2d 1519, 1523 (9th Cir 1987)); see also *Dolch v. United California Bank*, 702 F.2d

28  ///

*Motion for Remand*
**Chao v. HealthSouth Corporation, et al.**

1    178, 181 (9th Cir. 1983)(noting that the courts, not the parties are responsible for aligning the parties in

2    accordance with their interests in the case).

3          In the case at hand, and as stated in Plaintiff's Complaint, SHC SD is the majority interest holder

4    in the partnership.  As the general partner,  Defendant SHC SD owns 56% of Defendant Partnership.

5    Plaintiff Chao, on the other hand, owns 18% of Defendant Partnership and has little or no control over

6    the center's activities.   The entire purpose of this litigation initiated by Plaintiff is that Defendant

7    Partnership, as it exists under the control and discretion of its general partner,  has been used as a

8    mechanism to further the fraud, dishonesty, and criminal business practices against the limited partners

9    including Plaintiff.   Therefore, any allegations made by Plaintiff against the General Partner are also

10   made against the Partnership.  ***Plaintiff should not be limited in its recovery of damages to only the***

11   ***assets of the General Partner, which may turn out to be a mere shell.  Plaintiff should be able to gain***

12   ***a judgment executable against the entire Partnership.***

13         SCA, the moving party, states that "Chao alleges no wrongdoing by said partnership Defendant

14   and seeks no affirmative relief against it."  See Notice of Removal at p. 4, ¶12:11-12.  SCA goes on to

15   state that, "Consequently, said partnership Defendant is a nominal defendant and is aligned with Chao."

16   Again, SCA's statements are contradicted by the Complaint.   A closer look at Plaintiff's Complaint

17   shows that Plaintiff seeks various forms of affirmative relief against Defendant Partnership including

18   an injunction and clearly alleges that Defendant Partnership has engaged in wrongdoing.  (I.e., note the

19   Business and Profession Code §17200 claim.)   A long list of  wrongful activities alleged in the

20   Complaint implicate the Defendant Partnership to the detriment of the limited partners.[4]

21         As long as Defendant Partnership remains controlled by an outside management company and

22   commits fraudulent and deceitful behavior, the Partnership's interests are opposed to that of Plaintiff's.

23

24         [4] For examples of alleged wrongful activities which implicate the Partnership see Cmplt. at 4,

25   ¶12:16-17; Cmplt. at 6, ¶19:17; Cmplt. at 7, ¶23:5-7; Cmplt. at 7, ¶23:7-9; Cmplt. at 7, ¶24; Cmplt. at

26   10, ¶29:8-11; Cmplt. at 10, ¶29:12-16; Cmplt. at 11, ¶32:21-22; Cmplt. at 12, ¶33:12-13; Cmplt. at 12,

27   ¶34:17-20; Cmplt. at 17, ¶57:6-8; Cmplt. at 17, ¶59:18-20; Cmplt. at 17, ¶59:20-22; Cmplt. at 25, ¶94:6-

28   8.

1    As alleged in the Complaint, Plaintiff Chao became so concerned that he approached Defendants, to

2    increase his ownership to a controlling interest.  Until Defendant Partnership faces judgment and/or

3    dissolution, it is aligned with its controlling parties, namely, Defendants.

4    **IV.    ALTERNATIVELY, THE GENERAL PARTNER, DEFENDANT SHC SD INC. HAS ITS PRINCIPAL PLACE OF BUSINESS IN CALIFORNIA, DESTROYING DIVERSITY.**

5

6    Defendant, the General Partner SHC SD LLC was a wholly owned subsidiary of Defendant SHC

7    Management Company, which in turn was a wholly owned subsidiary of HealthSouth.  See MSB Decl.

8    at 2, ¶8.  SHC SD INC. was formed for the exclusive purpose of managing the business affairs of the

9    Partnership as the General Partner.  The Partnership's surgery center conducts business in San Diego

10   exclusively.  See Declaration of Mark S. Bagula (hereinafter "MSB Decl.") at 2, ¶5.  It does not do any

11   business outside of the state of California.  See MSB Decl. at 2, ¶5.  In fact, its only stated business

12   purpose is to conduct business in California to manage the Partnership's surgery center. See MSB Decl.

13   at 2, ¶5.  Its name, SHC *San Diego*, is telling.  There are employees working at the surgery center,

14   performing the General Partner's management functions.  See MSB Decl. at 2, ¶5.  There are also local

15   managerial personnel located in California.  See MSB Decl. at 2, ¶5.

16   The General Partner is conducting a medical business in the state of California under California's

17   laws and, for public policy reasons, should not be allowed to claim that its principal place of business

18   is outside of California, when in reality, it *only* does business in California.  See MSB Decl. at 2, ¶5.

19   Moreover, the General Partner has clearly submitted itself to the laws of California through its business

20   activities.  The State of California has a strong policy interest in adjudicating medical matters which

21   arise out of a medical business conducted here.  For all practical purposes, the General Partner's

22   principal place of business is in California.  If this is in any way factually inaccurate, the removing

23   defendants need to show such in opposition.  As such, diversity jurisdiction is destroyed and the case

24   should remanded.

25   **V.    PLAINTIFF INTENDS TO NAME ARTHUR CASEY, AN INDIVIDUAL, AS A DEFENDANT IN THIS ACTION, WHICH WILL DESTROY DIVERSITY JURISDICTION.**

26

27   As stated above, diversity jurisdiction exists only when there is complete diversity, i.e., none

28   of the defendants (served or not) is a citizen of the same state as any of the plaintiffs.  *Morris v.*

1   *Princess Cruises, Inc.* 236 F.3d 1061, 1067 (9th Cir. 2001). Plaintiff intends to name Arthur Casey

2   (hereinafter "Casey") as an individual defendant in this action, for his part in the wrongful activities

3   which have harmed Plaintiff. See MSB Decl. at 2, ¶4. Casey is an employee of Defendant

4   HealthSouth during the relevant time frame. Casey lives and works in San Diego, in the State of

5   California, ostensibly for the purpose of being the Partnership's point of contact at SHC SD. Casey

6   conducted the business affairs of the Partnership in San Diego, where the Partnership is located. His

7   responsibilities included identifying an expense or potential expense on a facilities books and

8   ascertaining whether or not the expenses have been appropriately classified. See MSB Decl. at 2, ¶4.

9   Since Casey lived, worked, and conducted the business affairs of the Partnership in California, he is

10  clearly a citizen of the State of California. When Casey is named as a defendant in this action,

11  because he has the same citizenship as Plaintiff, complete diversity will be destroyed. Therefore, this

12  action must be heard in the state courts of California.

13  **VI.      ALL OF THE DEFENDANTS HAVE NOT JOINED OR CONSENTED TO**
14  **REMOVAL AND THEREFORE THIS CASE MUST REMANDED.**

15          The statute requires that all proper defendants to the action must join in or consent to the

16  removal of the case to federal court. 28 U.S.C. §1446. *Prize Frize, Inc. v. Matrix, Inc.*, 167 F3d

17  1261, 1266 (9th Cir. 1999). The removing party, Defendant SCA, has failed to obtain the consent or

18  joinder of all parties to this case and therefore the case must be remanded to state court. First and

19  foremost, Defendant Partnership, who was properly served on November 19, 2007, has not joined or

20  consented to SCA's Notice of Removal. See Exhibit 'C' to the MSB Decl.

21          Further, the General Partner, SHC SD, and defendant, HealthSouth Surgery Centers-West,

22  Inc. have also not joined in the removal, despite the fact that the law firm representing the other

23  defendants in this case, Coughlan, Semmer, & Lipman, has a agreed to accept service for all

24  defendants except the Partnership. In Defendants' Request to Continue the Early Neutral Evaluation

25  Conference, Defendants' counsel states, "It was anticipated that Coughlan, Semmer & Lipman

26  would appear as attorney of record once the other Defendants were served, and has agreed to accept

27  service for said Defendants." See Exhibit 2 to NOL, Defendants Request for Continuance at p. 2,

28  ¶1:7-9. Other than the Partnership, Defendants SHC Management Corp., SHC SD, and HealthSouth

1  Surgery Centers-West, Inc. were previously 100% owned subsidiaries or affiliates of HealthSouth,

2  and are not 100% owned subsidiaries or affiliates of SCA. See MSB Decl. at 2, ¶8. Clearly, there is

3  an element of subterfuge present when Defendants' counsel has agreed to accept service for and

4  represent all of the subsidiary/affiliate defendants, but now states that SHC SD, and HealthSouth

5  Surgery Centers-West, Inc. did not join in (or in the very least consent to) the notice of removal

6  because they have not been served. In order to confront this issue, Defendants or Defendants'

7  counsel needs to define a distinction amongst the various defendants to explain why service has not

8  been affected and why they are clinging to formalities in their Notice of Removal. Absent such

9  evidence, there is no reason why these Defendants could not join in or consent to the Notice of

10 Removal. Therefore, SCA's attempt to remove this case is not in compliance with the federal rules

11 and the case must be remanded.

12 **VII.    DEFENDANT HAS NOT PROVED THE CLAIMED DAMAGES WILL BE IN EXCESS OF $75,000.**

13

14        In its Notice of Removal, SCA states that, "The amount of damages sought are unspecified

15 but exceed $75,000. The entity...is a local surgery center which is expected to generate profits well

16 in excess of $75,000 per year and thus, is valued in excess of $75,000." See Notice of Removal at

17 2, ¶ 3:16-18. SCA's aforementioned statements are purely conjecture and speculation. Whether or

18 not Defendant SCA "expects" the surgery center to generate profits "well in excess of $75,000," the

19 surgery center could just as easily experience losses every year and ultimately be appraised at less

20 than $75,000. SCA has no basis for stating the amount of damages in this litigation. As previously

21 stated, diversity jurisdiction exists over any civil action in which the amount in controversy exceeds

22 the sum or value of $75,000, exclusive of costs and interests pursuant to 28 U.S.C. §1332(a).

23 Removal must be rejected if there is ***any doubt*** as to the right of removal in the first instance. *Gaus*

24 *v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). Since Defendant has not met its burden the amount

25 in controversy, removal is improper.

26 **VIII.    PLAINTIFF IS ENTITLED TO ATTORNEYS FEES INCURRED.**

27        The Court should award cost attorneys fees pursuant to 28 U.S.C. §1447(c) for the improper

28 removal of this action from State court. 28 U.S.C. §1447(c) provides in relevant part: "...An order

1  remanding the case may require payment of just costs and any actual expenses, including attorneys

2  fees, incurred as a result of the removal...."  California courts have enforced this provision.  In

3  *Dietrich v. Cooperstein*, *supra*, proper notice was given to the removing party that removal was

4  improper and the plaintiff was going to file a motion for remand.  The removing party did not

5  stipulate to remand despite the warnings from Plaintiff.  Plaintiff filed its motion for remand and the

6  court awarded costs and attorneys fees.  It is the same situation in this case.

7          Defendant SCA improperly removed this matter from State court.  Plaintiff's counsel warned

8  SCA's counsel by way of an email on January 17, 2008 that removal was improper and Plaintiff

9  would file a motion for remand if SCA did not stipulate to remand.  See MSB Decl. at 2, ¶3.  A true

10  and correct copy of said email is attached to the MSB Decl. as Exhibit 'A.'  SCA's counsel did not

11  respond.  Plaintiff's counsel sent a second letter dated January 22, 2008 and facsimile again notifying

12  SCA's counsel that Plaintiff intended to have the case remanded and would seek attorneys fees and

13  costs in connection with its efforts.  A true and correct copy of this letter is attached to the MSB

14  Decl. as Exhibit 'B.'  Again, SCA did not respond.  Plaintiff has been forced to prepare appropriate

15  papers to remand the matter to State court, which has resulted in attorneys fees.  Plaintiff respectfully

16  requests that Defendants, not Plaintiff, bear these considerable costs.  See MSB Decl. at 2-3, ¶¶10-

17  16, enumerating these fees at $9,456.00.

18  **IX.          CONCLUSION**.

19          For the above reasons, this matter should be remanded to San Diego Superior Court.

20

21  *Respectfully Submitted,*

22  Dated: January 23, 2008

          THE WATKINS FIRM, APC

23  **MARK S. BAGULA, ESQ.**
      Attorney for Plaintiff

24

25

26

27

28

*Motion for Remand*
**Chao v. HealthSouth Corporation, et al.**

1  **MARK S. BAGULA [CSB No. 171141]**
   **DAVINA A. B. BLOOM [CSB No. 236850]**
2  **DANIEL W. WATKINS [CSB No. 128849]**
   **THE WATKINS FIRM**
3  **A Professional Corporation**
   4520 Executive Drive
4  San Diego, CA 92121
   (858) 535-1511
5  (858) 535-1581 [Facsimile]

6  Attorneys for Plaintiff, DAVID J. CHAO

7

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  DAVID J. CHAO, an individual,              ) CASE NO.: 3:07-cv-02408 DMS WMC
                                               )
12              Plaintiff,                     )
                                               ) **NOTICE OF LODGEMENT IN SUPPORT**
13  vs.                                        ) **OF PLAINTIFF DAVID J. CHAO'S**
                                               ) **MOTION TO REMAND  ACTION TO**
14  HEALTHSOUTH CORPORATION, a Delaware )      **STATE COURT**
    corporation; SHC SAN DIEGO, INC., a Georgia )
15  corporation; SHC MANAGEMENT COMPANY, )
    a Georgia corporation; SURGICAL HEALTH )
16  CORPORATION,   a   Delaware   corporation;)  Judge: Hon. Dana M. Sabraw
    HEALTHSOUTH SURGERY CENTERS-WEST,)       Dept.: Courtroom 10
17  INC., a Delaware corporation; SURGICAL CARE) Date:
    AFFILIATES, LLC, a Delaware Limited Liability)  Time:
18  corporation;   ARTHROSCOPIC   &   LASER)
    SURGERY CENTER OF SAN DIEGO, L.P., and)
19  DOES 1 through 100, inclusively,           )
                                               )
20              Defendants.                    )
    _____ )

21

22

23  **TO DEFENDANTS AND TO THEIR ATTORNEY OF RECORD:**

24          PLEASE TAKE NOTICE that Plaintiff David J. Chao  hereby lodges the following documents

25  in support of his Motion to Remand Action to State Court:

26  1.      Exhibit 1 - A true and correct copy of Defendant Surgical Care Affiliates, LLC's Notice of

27          Removal of Civil Action to United States District Court, filed with this Court on December 26,

28          2007 (only pages 1-4, not accompanied documents); and

1   2.      Exhibit 2 - A true and correct copy of Defendants' HealthSouth Corporation, SHC Management

2           Corporation and Surgical Care Affiliates Request To Continue The Early Neutral Evaluation

3           Conference, dated January 18, 2008.

4   3.      Exhibit 3 - A true and correct copy of Limited Partnership Agreement of Arthroscopic & Laser

5           Surgery Center of San Diego, L.P., dated as of January 18, 1996.

6

7   *Respectfully Submitted,*

8                             **THE WATKINS FIRM, APC**

9

10  Dated:  January 23, 2008

11                             **MARK S. BAGULA, ESQ.**
                                      Attorney for Plaintiff, DAVID J. CHAO

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

1  Robert F. Semmer (State Bar No. 102576)
   Cathleen G. Fitch (State Bar No. 95302)
2  **COUGHLAN, SEMMER & LIPMAN, LLP**
   501 West Broadway, Suite 400
3  San Diego, CA 92101
   (619) 232-0800
4  (619) 232-0107 (Fax)

5

   **Attorneys for** Defendant SURGICAL CARE
6  AFFILIATES, LLC

7

8

9              **UNITED STATES DISTRICT COURT**

10            **SOUTHERN DISTRICT OF CALIFORNIA**

11  DAVID J. CHAO, an individual,          CASE NO. '07 CV 2408 DMS WMc

12                   Plaintiff,            **NOTICE OF REMOVAL OF CIVIL
                                           ACTION TO UNITED STATES**
13          vs.                            **DISTRICT COURT PURSUANT TO 28
                                           U.S.C. § 1441(b)**
14  HEALTHSOUTH CORPORATION, a
    Delaware corporation;
15  SHC SAN DIEGO, INC., a Georgia
    corporation;
16  SHC MANAGEMENT COMPANY, a
    Georgia corporation;
17  SURGICAL HEALTH CORPORATION, a
    Delaware corporation;
18  HEALTHSOUTH SURGERY CENTERS-
    WEST, INC., a Delaware corporation;
19  SURGICAL CARE AFFILIATES, LLC a
    Delaware Limited Liability corporation;
20  ARTHROSCOPIC & LASER SURGERY
    CENTER OF SAN DIEGO, L.P., and
21  DOES 1 through 100, inclusively,

22                   Defendants.

23       TO THE CLERK AND JUDGES OF THE UNITED STATES DISTRICT COURT FOR

24  THE SOUTHERN DISTRICT OF CALIFORNIA:

25       PLEASE TAKE NOTICE that Defendant Surgical Care Affiliates, LLC (hereinafter

26  "SCA"), by and through its attorneys Coughlan, Semmer & Lipman, LLP, hereby remove this

27  pending action from the Superior Court of the State of California for the County of San Diego,

28  Central Division, to the United States District Court for the Southern District of California on the

                                    - 1 -

FILED
DEC 2 6 2007
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY            DEPUTY

COPY

1    following grounds:

2        1.    On or about September 19, 2007, there was filed in the Superior Court of the State

3    of California for the County of San Diego, Central Division, a Summons and Complaint bearing

4    Case No. 37-2007-00075329-CU-BC-CTL, a true and correct copy of which is attached hereto as

5    Exhibit "A."

6        2.    A copy of said Summons and Complaint was served on SCA on November 26,

7    2007, by mail on an out-of-state person pursuant to Code of Civil Procedure §415.40.

8        3.    This action by Plaintiff David Chao ("Chao") alleges that SCA engaged in

9    unlawful and unfair business practices, refused to perform a contract to sell an ownership interest

10    in a partnership and interfered with Dr. Chao's economic advantage in connection with the sale

11    of the ownership interest.  Chao also alleges that other defendants mismanaged and defrauded a

12    partnership in which Chao claims to hold an 18% interest.  The Complaint seeks damages for

13    breach of contract, negligence, breach of the covenant of good faith and fair dealing, breach of

14    fiduciary duty, fraud and interference with contract and prospective economic advantage.  Chao

15    further seeks compensation for alleged damage to his reputation and attorneys' fees and costs

16    incurred. The amount of damages sought are unspecified but exceed $75,000.  The entity which

17    Chao claims he was prevented from acquiring is a local surgery center which is expected to

18    generate profits well in excess of $75,000 per year and thus, is valued in excess of $75,000.

19        4.    This is a civil action over which this Court has original diversity jurisdiction

20    pursuant to 28 U.S.C. § 1332 and is subject to removal pursuant to 28 U.S.C. § 1441(b).

21        5.    Upon information and belief, Plaintiff Chao was at all times relevant hereto and

22    still is an individual residing in San Diego, California.

23        6.    Defendant SCA is and at all times relevant hereto has been a corporation or

24    limited liability company duly organized and existing under the laws of the state of Delaware

25    having its principal place of business in Alabama.

26        7.    Defendant HEALTHSOUTH CORPORATION, is and at all times relevant hereto

27    has been a corporation duly organized and existing under the laws of the state of Delaware,

28    having its principal place of business in Alabama.  Said Defendant has purportedly been served

- 2 -

Case No. _____
Notice of Removal

1   on or about November 16, 2007 and joins in this Notice of Removal.

2       8.      Prior to June 27, 2007, Defendant SHC SAN DIEGO, INC., was at all times

3   relevant hereto a corporation duly organized and existing under the laws of the state of Georgia,

4   having its principal place of business in Alabama.  On June 27, 2007, SHC SAN DIEGO, INC.

5   was converted to a limited liability company organized and existing under the laws of the state of

6   Delaware, with its principal place of business in Alabama.  It is now named SHC San Diego,

7   LLC.  On information and belief, said Defendant has not been served but upon proper service of

8   the Summons and Complaint, will join in this Notice of Removal.

9       9.      At all time relevant hereto until about December 26, 2002, Defendant SHC

10  MANAGEMENT COMPANY, was a corporation duly organized and existing under the laws of

11  the state of Georgia, having its principal place of business in Alabama.  On or about December

12  26, 2002, SHC MANAGEMENT COMPANY transferred all of its assets, debts, obligations and

13  liabilities to its parent company, Surgical Health Corporation, and SHC MANAGEMENT

14  COMPANY was subsequently voluntarily dissolved.  On information and belief, said Defendant

15  has not been served but upon proper service of the Summons and Complaint, will join in this

16  Notice of Removal.

17      10.     Prior to June 25, 2007, Defendant SURGICAL HEALTH CORPORATION was

18  at all times relevant hereto, a corporation duly organized and existing under the laws of the state

19  of Delaware, having its principal place of business in Alabama.  On June 25, 2007, SURGICAL

20  HEALTH CORPORATION was converted to a limited liability company organized and existing

21  under the laws of the state of Delaware, with its principal place of business in Alabama.  It is

22  now named Surgical Health, LLC.  On information and belief, said Defendant has not been

23  served but upon proper service of the Summons and Complaint, will join in this Notice of

24  Removal.

25      11.     Prior to June 25, 2007, Defendant HEALTHSOUTH SURGERY CENTERS-

26  WEST, INC., was at all times relevant hereto, a corporation duly organized and existing under

27  the laws of the state of Delaware, having its principal place of business in Alabama.  On June 25,

28  2007, HEALTHSOUTH SURGERY CENTERS-WEST, INC.  was converted to a limited

- 3 -

1   liability company organized and existing under the laws of the state of Delaware, with its

2   principal place of business in Alabama. It is now named Surgery Centers-West Holdings, LLC.

3   On information and belief, said Defendant has not been served but upon proper service of the

4   Summons and Complaint, will join in this Notice of Removal.

5        12.    Defendant ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO,

6   L.P., is a Georgia limited partnership which is alleged to have its principal place of business in

7   San Diego, California. Said Defendant was served on November 26, 2007 by mail to an out-of-

8   state person pursuant to Code of Civil Procedure §415.40. Chao is a limited partner of said

9   partnership. Chao alleges in the Complaint that he sues derivatively on behalf of said partnership

10  Defendant. Chao alleges no wrongdoing by said partnership Defendant and seeks no affirmative

11  relief against it. Consequently, said partnership Defendant is a nominal defendant and is aligned

12  with Chao. Accordingly, its citizenship is not properly considered for diversity purposes. See,

13  Exhibit A at ¶¶ 1, 9, 10, 14.

14       13.    Defendants identified as "DOES 1 through 100" in the Complaint are merely

15  fictitious parties against whom no cause of action can be validly alleged. Upon information and

16  belief, no fictitiously designated defendant has been served with process.

17       14.    WHEREFORE, Defendant prays that the above-entitled action now pending in the

18  Superior Court of the State of California for the County of San Diego, Central Division, be

19  removed to this Court pursuant to 28 U.S.C. § 1441(b).

20

21  DATED: December 21, 2007         Respectfully submitted,

22                       **COUGHLAN, SEMMER & LIPMAN, LLP**

23

24

                     By

25                          Robert F. Semmer, Esq.

26                          Cathleen G. Fitch, Esq.
                        Attorneys for Defendant SURGICAL CARE

27                          AFFILIATES, LLC

28  @PFDesktop\::ODMA/PCDOCS/CSL/65239/1

Case No. _____
Notice of Removal

# EXHIBIT 2

1  Robert F. Semmer, Esq. (SBN 102576)
   Cathleen G. Fitch, Esq. (SBN 95302)
2  **COUGHLAN, SEMMER & LIPMAN, LLP**
3  501 W. Broadway, Suite 400
   San Diego, CA 92101
4  (619) 232-0800 Telephone
   (619) 232-0107 Facsimile
5
6  Attorneys for Defendants HEALTHSOUTH CORPORATION, SURGICAL CARE
   AFFILIATES, LLC, AND SHC MANAGEMENT CORPORATION
7
8                        **UNITED STATES DISTRICT COURT**
9                      **SOUTHERN DISTRICT OF CALIFORNIA**
10
11  DAVID J. CHAO, an individual,            **CASE NO. 3:07-cv-2408 DMS WMc**
12            Plaintiff,
13       vs.                                 **DEFENDANTS' HEALTHSOUTH**
                                             **CORPORATION, SHC MANAGEMENT**
14  HEALTHSOUTH CORPORATION, a               **CORPORATION AND SURGICAL CARE**
    Delaware corporation; SHC SAN DIEGO,     **AFFILIATES REQUEST TO CONTINUE**
15  INC., a Georgia corporation; SHC         **THE EARLY NEUTRAL EVALUATION**
    MANAGEMENT COMPANY, a Georgia            **CONFERENCE**
16  corporation; SURGICAL HEALTH
    CORPORATION, a Delaware corporation;     Date:       February 4, 2008
17  HEALTHSOUTH SURGERY CENTERS-             Time:       9:30 a.m.
    WEST, INC., a Delaware corporation;      Department: Chambers of
18  SURGICAL CARE AFFILIATES, LLC a                      JudgeWilliam McCurine, Jr.
    Delaware Limited Liability corporation;
19  ARTHROSCOPIC & LASER SURGERY
    CENTER OF SAN DIEGO, L.P., and
20  DOES 1 through 100, inclusively,
21
22            Defendants.
23  ────────────────────────────────
24
25       Defendants HealthSouth Corporation, SHC Management Corporation and Surgical Care
26  Affiliates, LLC, respectfully request that the Early Neutral Evaluation Conference currently set for
27  February 4, 2008, before the Hon. William McCurine, Jr., be continued for approximately 45 days
28  to allow said Defendants to retain new counsel as follows:

1.    Defendants, HealthSouth Corporation, SHC Management Corporation and Surgical Care Affiliates, LLC, have been served in this action and have retained the firm of Coughlan Semmer & Lipman to jointly defend them in this action.  The remaining Defendants, with the exception of Arthroscopic & Laser Surgery Center of San Diego, LP, for which Plaintiff sues derivatively and is aligned with Plaintiff, have not been served and Defendant Surgical Health Corporation was dismissed by Plaintiff.  It was anticipated that Coughlan Semmer & Lipman would appear as attorney of record once the other Defendants were served, and has agreed to accept service for said Defendants.

2.    This case was removed to this Court by Defendant Surgical Care Affiliates, LLC on December 26, 2007.  HealthSouth Corporation joined in Surgical Care Affiliates' Petition for Removal on that date and answered the Complaint on December 31, 2008.  Defendant SHC Management Corporation also joined in the Petition for Removal and answered the Complaint on January 2, 2008.

3.    It has come to the attention of HealthSouth Corporation just this week that Coughlan Semmer & Lipman represents an individual in a matter unrelated to this litigation, but who may, in the future, become adverse to HealthSouth Corporation, and HealthSouth has determined it is best served by retaining new counsel at this time.  The Defendants wish to use one law firm to defend them.  Accordingly, Coughlan Semmer & Lipman will be substituting out of this case as attorney of record for Defendants shortly.

4.    It is anticipated that Defendants will be able to promptly retain substitute counsel but that new counsel will need at least 30 days to come up to speed on the issues in this case and to be prepared to effectively participate in an Early Neutral Evaluation Conference.

5.    Defendants' current counsel, the undersigned, also just this week, was notified that Plaintiff is contemplating a motion to remand the case to state court which would be filed but likely not heard, before the currently scheduled Early Neutral Evaluation Conference on February 4,

1   2008.  Accordingly, it may be most efficient to hold the Early Neutral Evaluation Conference after

2   the resolution of such a motion.

3        It is therefore, respectfully requested that a new date for the Early Neutral Evaluation

4   Conference be set 45 days from February 4, 2008.

6   DATED:  January 18, 2008            **COUGHLAN, SEMMER & LIPMAN, LLP**

8                                     By___s/ Cathleen G. Fitch_____
                                         Cathleen G. Fitch
9                                        Attorneys for Defendants HealthSouth
                                         Corporation, SHC Management Corporation
10                                       and Surgical Care Affiliates, LLC

11  ::ODMA\PCDOCS\CSL\65576\1

# CERTIFICATE OF SERVICE

I, the undersigned, hereby certify:

1.    On this date I caused the within document to be filed and served electronically via the Court's CM/ECF System except as otherwise stated in paragraph #2 below.

2.    I caused the documents listed above to be served on the following party/parties by other means addressed to the last known address and delivered as follows:

[  ]   Each envelope was placed for deposit in the U.S. Mail according to the normal business practices observed at this office, with first class postage prepaid to:

**N/A**

3.    I am a member of the Bar of this Court, and it was at my direction the above described service was made.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 18, 2008, at San Diego, California.

s/ Cathleen G. Fitch
**Cathleen G. Fitch**

# EXHIBIT 3

# LIMITED PARTNERSHIP AGREEMENT

## OF

# ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO, L.P.

## DATED AS OF JANUARY 18, 1996

# TABLE OF CONTENTS

Page

ARTICLE I  DEFINITIONS

    1.01   Definitions ............................................................................. 1
    1.02   Interpretation......................................................................... 4


ARTICLE II  FORMATION OF PARTNERSHIP

    2.01   Formation ............................................................................. 5
    2.02   Name .................................................................................... 5
    2.03   Principal Office.................................................................... 5
    2.04   Term  ................................................................................... 5
    2.05   Purposes of the Partnership ................................................. 5
    2.06   Securities Law Legend ........................................................ 5
    2.07   Disclosure of Partnership Interest ....................................... 5


ARTICLE III  CAPITAL CONTRIBUTIONS

    3.01   Admission of Additional Limited Partners........................... 6
    3.02   Partnership Interests and Capital Contributions.................. 6
    3.03   Additional Capital Contributions ........................................ 6
    3.04   Liability for Negative Capital Accounts ............................... 6
    3.05   No Interest on Contributions................................................ 6
    3.06   Loans  .................................................................................. 7


ARTICLE IV  ADJUSTMENT OF CAPITAL ACCOUNTS AND
               PROFITS AND LOSSES

    4.01   Allocations Subsequent to the Admission of
           Additional Limited Partners................................................. 7
    4.02   General Partner Allocations ................................................ 8
    4.03   Tax Items............................................................................. 8
    4.04   Partial Year Allocations ...................................................... 8
    4.05   Allocations and Distributions Upon Dissolution ................. 8

AD951590.241

Page

ARTICLE V  DISTRIBUTIONS

    5.01   General Distributions .................................................................... 9
    5.02   Distributions Upon Dissolution.................................................... 9
    5.03   Withholding ................................................................................. 9
    5.04   Liability of General Partner ......................................................... 9

ARTICLE VI POWERS, DUTIES AND RIGHTS OF GENERAL PARTNER

    6.01   Powers of General Partner .......................................................... 9
    6.02   Duties of and Decisions by General Partner .............................. 11
    6.03   Limitations ................................................................................. 11
    6.04   Medical Director ........................................................................ 12
    6.05   Medical Advisory Board ............................................................ 12
    6.06   Related Party Transactions ........................................................ 12
    6.07   Reliance on Authority of General Partner .................................. 12

ARTICLE VII LIMITATION ON LIABILITY AND INDEMNIFICATION
          OF GENERAL PARTNER

    7.01   Limitation of Liability of the General Partner ............................. 12

ARTICLE VIII POWERS AND RIGHTS OF LIMITED PARTNERS

    8.01   Powers and Rights ..................................................................... 13
    8.02   Liability ...................................................................................... 13

ARTICLE IX COMPENSATION AND REIMBURSEMENTS

    9.01   Out-of-Pocket Reimbursements ................................................ 14
    9.02   Reimbursement for Organization and Start-up Expenses ........... 14
    9.03   Management Agreement ............................................................. 14
    9.04   Medical Director ........................................................................ 14

AD951590.241

Page

ARTICLE X ACCOUNTING, BOOKS AND RECORDS

    10.01 Accounting Method ........................................................ 14
    10.02 Books and Records ...................................................... 14
    10.03 Financial Statements .................................................... 14
    10.04 Tax Returns ............................................................. 15
    10.05 Tax Matters Partner .................................................... 15

ARTICLE XI TRANSFERS, ASSIGNMENTS AND REDEMPTIONS
           BY PARTNERS

    11.01 General Prohibition ..................................................... 15
    11.02 Conditions of Transfer .................................................. 15
    11.03 Death of Limited Partner ............................................... 16
    11.04 Fraud and Abuse ....................................................... 17
    11.05 Transfer of Interest in Limited Partner ................................. 18
    11.06 Right of First Refusal Granted to Limited Partners ...................... 18
    11.07 Right of First Refusal Granted to General Partner ....................... 18

ARTICLE XII DISQUALIFICATION

    12.01 Limited Partners ....................................................... 18
    12.02 General Partner ........................................................ 18
    12.03 Disqualification ........................................................ 19

ARTICLE XIII DISSOLUTION OF PARTNERSHIP

    13.01 Events of Dissolution ................................................... 19

ARTICLE XIV DISTRIBUTIONS UPON DISSOLUTION

    14.01 Liquidation ............................................................ 20
    14.02 Distributions in Kind ................................................... 20
    14.03 No Action for Dissolution .............................................. 21
    14.04 No Further Claim ...................................................... 21

AD951590.241

Page

ARTICLE XV POWER OF ATTORNEY

    15.01  Appointment ............................................................................... 21


ARTICLE XVI MISCELLANEOUS

    16.01  Restrictions on Relationships of Limited Partners
           with Competitors ................................................................. 22
    16.02  Amendments by the General Partner ........................................... 22
    16.03  Additional Documents ................................................................ 23
    16.04  Notices ...................................................................................... 23
    16.05  Applicable Law .......................................................................... 23
    16.06  Entire Agreement ....................................................................... 23
    16.07  Severability ............................................................................... 23
    16.08  Successors ................................................................................. 23
    16.09  Counterparts .............................................................................. 23
    16.10  Headings .................................................................................... 23
    16.11  Acceptance of Prior Acts by New Partner .................................. 24
    16.12  Partnership Property ................................................................... 24
    16.13  Meetings .................................................................................... 24
    16.14  Gender and Number ................................................................... 24

AD951590.241

LIMITED PARTNERSHIP AGREEMENT

OF

ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO, L.P.

THIS LIMITED PARTNERSHIP AGREEMENT is entered into as of the 18th day of January, 1996 by and between, SHC SAN DIEGO, INC., a Georgia corporation (hereinafter referred to as the "General Partner"), and SURGICAL HEALTH CORPORATION, a Delaware corporation (hereinafter referred to as the "Initial Limited Partner").

W I T N E S S E T H:

WHEREAS, the parties hereto desire to form a limited partnership in accordance with the Georgia Revised Uniform Limited Partnership Act; and

WHEREAS, the parties desire to set forth in full the terms and conditions of their understandings and agreements;

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises, obligations and agreements set forth herein, and of other good and valuable consideration, the receipt ad sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

ARTICLE I
DEFINITIONS

1.01  Definitions.  For purposes of this Agreement, the following capitalized terms shall have the following respective meanings:

"Act" means the Georgia Revised Uniform Limited Partnership Act, O.C.G.A. §14-9-100 et seq.

"Additional Limited Partner" means any Person who purchases all or part of a Unit and is admitted to the Partnership pursuant to Sections 3.01 and 3.02 hereof.

"Affiliate" means a Person or Persons directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with the Person(s) in question. The term "control," as used in the immediately preceding sentence, means, with respect to a Person that is a corporation, the right to the exercise, directly or indirectly, of more than 50% of the voting rights attributable to the shares of such controlled corporation and, with respect to a Person that is not a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such controlled Person.

AD951590.241

"Available Cash" means, with respect to any point in time, all cash of the Partnership on hand as of such point in time, after the payment of all then due debts and liabilities of the Partnership and after any prepayments of any debts and liabilities of the Partnership that the General Partner deems appropriate to cause the Partnership to make, less any reserves reasonably deemed necessary by the General Partner, consistent with the provisions of this Agreement, for (a) the repayment of any debts or liabilities of the Partnership, (b) the working capital or other requirements of the Partnership, and (c) any contingent or unforeseen liabilities of the Partnership.

"Business" means the development and operation of the Center.

"Capital Account" of a Partner means a capital account established, maintained, and adjusted in accordance with Treasury Regulations section 1.704-1(b)(2)(iv). Consistent therewith, each Partner's Capital Account will be adjusted from time to time pursuant to Section 4.01 hereof, the purpose of which is to set forth certain operating rules for the allocation of book items of income, gain, loss and deduction for Capital Account purposes. The provisions of Section 4.01 shall be construed in a manner consistent with Treasury Regulations section 1.704-1(b)(2)(iv). The Capital Accounts shall not be adjusted for items as they are computed and allocated to the Partners solely for federal income tax purposes. Upon the transfer hereunder of all or part of a Partner's Units, other than a transfer that terminates the Partnership within the meaning of Code Section 708(b)(1)(B) and other than a sale of Limited Partner Units held by the General Partner, the Capital Account of the transferor Partner that is attributable to the transferred Units will carry over to the transferee Partner. In the event of a transfer of all or part of a Partner's Units that causes a termination of the Partnership within the meaning of Code Section 708(b)(1)(B), the Partners' Capital Accounts will be adjusted in accordance with Treasury Regulations section 1.704-1(b)(2)(iv)(1).

"Capital Ratio" means, at any particular time (i) with respect to a Limited Partner, forty percent (40%) multiplied by a fraction, the numerator of which is the total number of Units owned by such Limited Partner at the time in question, and the denominator of which is the total number of Limited Partner Units outstanding, and (ii) with respect to the General Partner, sixty percent (60%). Notwithstanding the foregoing, in the event of the disqualification of the General Partner pursuant to Article XII hereof, the term "Capital Ratio" shall mean from and after the date of such disqualification of the General Partner for all purposes under this Agreement (a) with respect to a Limited Partner (excluding the converted Disqualified General Partner), (1) forty percent (40%) minus the Partnership Interest transferred to the new General Partner, if any, multiplied by (2) a fraction, the numerator of which is the total number of Units owned by such Limited Partner at the time in question, and the denominator of which is the total number of Limited Partner Units (excluding the converted Disqualified General Partner Units) outstanding at such time, (b) with respect to the Disqualified General Partner, sixty percent (60%), and (c) with respect to the new General Partner, such Partnership Interest as may be transferred to the new General Partner pursuant to the terms of this Agreement.

"Center" means the outpatient surgery center to be operated by the Partnership in San Diego, California.

AD951590.241

"Certificate" means the certificate of limited partnership required to be filed pursuant to the Act.

"Code" means the Internal Revenue Code of 1986, as amended, including effective date and transition rules (whether or not codified), and any successor thereto. Any reference to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of succeeding law.

"Commencement Date" means the date upon which the Partnership begins operating the Center.

"Fiscal Year" of the Partnership means the calendar year.

"General Partner" means SHC San Diego, Inc., a Georgia corporation, so long as it remains the General Partner, and thereafter shall mean any Person who is admitted to the Partnership as a general partner in accordance with the provisions of Articles XI or XII hereof.

"Initial Closing Date" shall have the meaning ascribed to it in the Memorandum.

"Limited Partners" means the Initial Limited Partner, the Additional Limited Partners, the General Partner in its capacity as a Limited Partner pursuant to Section 3.01 hereof and following the conversion of its General Partner Unit to Limited Partner Units pursuant to Section 12.02 hereof; and shall also mean each Person to whom all or any portion of the Units of any of such Persons is transferred or assigned and who is admitted to the Partnership as a substituted Limited Partner in accordance with the provisions of Section 11.02 hereof.

"Management Company" means SHC Management Company, a Georgia corporation, as more particularly described in Section 9.03 hereof.

"Maximum Number of Units" means the maximum number of Units to be purchased as set forth in the Memorandum, exclusive of Units to be purchased by the General Partner.

"Medical Advisory Board" means a group comprised of up to seven (7) individuals which shall provide the Partnership and the General Partner with counsel and advice concerning the medical standards and practices of the Center, as more particularly described in Section 6.05 hereof.

"Medical Director" means an individual appointed from time to time by the General Partner, who will be responsible for medical quality control matters, as more particularly described in Section 6.04 hereof.

"Memorandum" means that certain Confidential Private Placement Memorandum dated January 18, 1996 to be used in connection with the offering of Units in the Partnership, as modified or superseded following the initial offering of Units.

AD951590.241

"Net Profits" and "Net Losses" mean the Partnership's taxable income or loss determined in accordance with Code Section 703(a) for each of its Fiscal Years (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss) with the following adjustments: (i) such Net Profits and Net Losses will be computed as if items of tax-exempt income and nondeductible, noncapital expenditures (under Code Section 705(a)(1)(B) and 705(a)(2)(B)) were included in the computation of taxable income or loss; (ii) that any items specially allocated pursuant to Section 4.01(b) hereof shall not be taken into account in computing Net Profits or Net Losses; (iii) if any Partner contributes property to the Partnership with an initial book value to the Partnership different from its adjusted basis for federal income tax purposes to the Partnership, or if Partnership property is revalued in accordance with Treasury Regulations section 1.704-1(b)(2)(iv)(f) or as otherwise required by the Regulations, Net Profits and Net Losses will be computed as if the initial adjusted basis for federal income tax purposes to the Partnership of such contributed or revalued property equalled its initial book value to the Partnership as of the date of contribution or revaluation; and (iv) credits or debits to Capital Accounts due to a revaluation of Partnership assets in accordance with Treasury Regulations section 1.704-1(b)(2)(iv)(f), or due to a distribution of noncash assets as provided in Section 14.02 hereof, will be taken into account as gain or loss from the disposition of such assets for purposes of computing Net Profits and Net Losses.

"Net Revenues" means the gross revenues of the Partnership minus contractual adjustments and bad debts.

"Offering" means the offering of the Maximum Number of Units on the terms set forth in the Memorandum.

"Partners" means, collectively, the General Partner and Limited Partners; reference to a Partner means any one of the General Partner or Limited Partners.

"Partnership Interest" means with respect to each Partner, the Partner's entire ownership interest in the Partnership acquired by such Partner pursuant to the terms hereof, including the right of such Partner to any and all benefits to which it may be entitled as provided hereunder or in the Act, together with the obligation of such Partner to comply with all the terms hereof.

"Person" means an individual, partnership, joint venture, association, corporation, trust, limited liability company or any other legal entity.

"Subscription Agreement" shall have the meaning ascribed to it in the Memorandum.

"Tax Decision" shall mean the determination: (a) based on advice of counsel, to amend the provisions of this Agreement to the minimum extent necessary to ensure that the allocations set forth in Article IV hereof for federal income tax and Capital Account purposes are respected by the Internal Revenue Service and otherwise remain in compliance with applicable law; (b) to make any election under the Code including without limitation, an election under Code Section 754; (c) to change the accounting method or Fiscal Year of the Partnership for tax purposes; (d) to cause a

- 4 -

AD951590.241

revaluation of the Partnership's assets, consistent with Treasury Regulations section 1.704-1(b)(2)(iv)(f); and (e) of any other matter relating to Partnership tax accounting or other tax issues.

"Unit" means one of the units of investment in the Partnership acquired by a Partner and includes both General Partner Units and Limited Partner Units. There shall be a total of 40 Units available for issuance to the Additional Limited Partners.

1.02  Interpretation.  The terms defined in this Article I shall include the plural as well as the singular. Other capitalized terms used in this Agreement and not defined in this Article I shall have the meanings ascribed to such terms elsewhere in this Agreement. Some lower case terms that appear throughout this Agreement also appear above in this Article I and elsewhere in this Agreement as capitalized terms. Only when such terms appear as capitalized terms shall such terms have the meanings ascribed to such capitalized terms in this Agreement.

## ARTICLE II
## FORMATION OF PARTNERSHIP

2.01  Formation.  The Partners hereby form a limited partnership pursuant to the Act. The General Partner will forthwith execute a Certificate and cause the same to be filed as required by the Act.

2.02  Name.  The name of the Partnership is, and the Business of the Partnership shall be conducted under, the firm name and style: Arthroscopic & Laser Surgery Center of San Diego, L.P.

2.03  Principal Office.  The principal office of the Partnership will be located at Two Perimeter Park South, Suite 224W, Birmingham, Alabama 35243, or at such other place as the General Partner from time to time designates by written notice to the Limited Partners. The Partnership may have additional offices at such other places as the General Partner deems advisable.

2.04  Term.  The Partnership will commence on the date when the Certificate has been duly filed pursuant to the Act and will continue until December 31, 2035, unless sooner terminated as hereinafter provided.

2.05  Purposes of the Partnership.  The purposes of the Partnership are to engage in the Business and to engage in any and all activities related thereto.

2.06  Securities Law Legend.  THE UNITS HAVE BEEN ISSUED OR SOLD IN RELIANCE ON EXEMPTIONS FROM REGISTRATION CONTAINED IN THE "CALIFORNIA CORPORATE SECURITIES LAW OF 1968, AS AMENDED" AND/OR THE RULES AND REGULATIONS PROMULGATED THEREUNDER, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT. In

AD951590.241

addition, the Units have been issued or sold in reliance on exemptions from registration contained in the Securities Act of 1993, as amended, and/or the rules and regulations promulgated thereunder, as amended (collectively, the "1933 Act"). Accordingly, the Units under the 1933 Act are deemed to be "restricted securities" and may not be sold or transferred except in a transaction which is exempt from the registration requirements of the 1933 Act, or pursuant to an effective registration statement under the 1933 Act or in a transaction which is otherwise in compliance with the 1933 Act. The Partnership will be under no obligation to register any of the Units under any federal or state securities laws, or to take any action necessary in order to establish an exemption from the registration requirements of any such laws.

2.07  <u>Disclosure of Partnership Interest</u>.  Each Limited Partner shall disclose his participation in the Partnership to any individuals referred to or treated at the Center by such Limited Partner. Such disclosures shall be in a form which complies with all applicable federal and state laws governing the disclosure of a Limited Partner's ownership interest in a health care facility.

# ARTICLE III
## CAPITAL CONTRIBUTIONS

3.01  <u>Admission of Additional Limited Partners</u>.  Subject to the prior written consent of the majority in interest of the holders of Limited Partner Units, the General Partner will have the right to admit such Persons as Additional Limited Partners as it deems advisable.

3.02  <u>Partnership Interests and Capital Contributions</u>. The interests in the Partnership shall be as follows:

(a)  Sixty (60) General Partner Units for which the General Partner will contribute cash to the Partnership on or before the Initial Closing Date in the sum of $150,000; provided, however, that on or before such date the General Partner has received and accepted Subscription Agreements from a sufficient number of qualified investors to warrant a continuation of the Offering.

(b)  An Initial Limited Partner interest for which the Initial Limited Partner has contributed to capital of the Partnership the sum of $100.00 The Initial Limited Partner's interest shall be redeemed for $100.00 upon the admission of the first Additional Limited Partner.

(c)  Not more than the Maximum Number of Units nor less than one Unit; provided, however, that the number of Units under this Section 3.02(c) shall be equal to the number of Units actually subscribed for and purchased by Additional Limited Partners. Each Additional Limited Partner shall make a capital contribution to the Partnership in cash in an amount not less than $25,000 for each Unit subscribed for and purchased by such Additional Limited Partner, in accordance with the terms and conditions of the Memorandum. No more than the Maximum Number of Units shall be sold pursuant to the offering of Units.

- 6 -

AD951590.241

3.03  Additional Capital Contributions. Except as provided in this Section 3.03, no Partner shall be required to make any additional capital contributions to the Partnership.

3.04  Liability for Negative Capital Accounts. Upon dissolution and final liquidation of the Partnership pursuant to Articles XIII and XIV hereof, the General Partner shall be liable for the payment to the Partnership of any negative balance which may exist in its Capital Account after such Capital Account has been adjusted for all allocations of deductions, losses and distributions as provided herein. To the extent possible such payment shall be made within the time period prescribed by Treasury Regulations section 1.704-1(b)(2)(ii)(b)(3). No Limited Partner shall have any liability for restoration of any negative Capital Account balance.

3.05  No Interest on Contributions. No Partner will be entitled to receive interest on its capital contributions.

3.06  Loans. In the event the General Partner determines in good faith that funds in excess of those provided to the Partnership pursuant to the preceding Sections of this Article III are necessary for maintaining and protecting the Partnership's assets or conducting its Business, the Partnership shall be authorized to borrow funds from Partners and their Affiliates, provided that the interest rate and other terms of such loans are no less favorable to the Partnership than the Partnership could have secured from third parties. If any Partner, or Affiliate of a Partner, lends money to the Partnership pursuant to this Section 3.06, such Partner or Affiliate shall be deemed an unrelated creditor with respect to such loan to the extent allowed by law.

ARTICLE IV
ADJUSTMENT OF CAPITAL ACCOUNTS AND
PROFITS AND LOSSES

4.01  Allocations Subsequent to the Admission of Additional Limited Partners.

(a)  General Tax Allocations. As of the end of each Fiscal Year, and after giving effect to the special tax allocations set forth in Section 4.01(b), Net Profits and Net Losses shall be allocated among the Partners for federal income tax purposes in accordance with their Capital Ratios.

(b)  Special Allocations. At the end of each Fiscal Year of the Partnership and notwithstanding any other provision of this Section 4.01, the following special allocations shall be made for both Capital Account and for federal income tax purposes unless otherwise provided:

(i)  In accordance with the ordering rules of Treasury Regulation section 1.704-2(j), items of gross income and realized gain first shall be allocated in an amount and in a manner that complies with the "chargeback" requirement of Treasury Regulation section 1.704-2(i)(4), the "qualified income offset" requirement of Treasury Regulation section 1.704-1(b)(2)(ii)(d), and the "minimum gain

- 7 -

AD951590.241

chargeback" requirement of Treasury Regulation section 1.704-2(f). Further, any "partner nonrecourse deductions" within the meaning of Treasury Regulation section 1.704-2(i)(2) attributable to "partner nonrecourse debt" shall be allocated to the Partner who bears the "economic risk of loss" for such debt in accordance with Treasury Regulation section 1.704-2(i). If a Partner receives an allocation under this paragraph (i), to the extent possible the Partnership shall adjust allocations of other items to the Partners in the current, and to the extent necessary, future accounting periods, so as to place the Partners in as nearly as possible the same position as though these provisions were not a part of this Agreement.

(ii) If a taxing authority ignores the characterization of any amounts paid to a Partner (or an Affiliate thereof) as salaries, management fees, commissions or other compensation for services ("Compensation"), and refuses to treat such payments as either guaranteed payments within the meaning of Code Section 707(c) or payments made to such Partner other than in such Partner's capacity as a Partner within the meaning of Code Section 707(a), and such taxing authority ultimately treats such amounts paid to a Partner (or an Affiliate thereof) as a distribution to such Partner for federal income tax purposes which reduces such Partner's Capital Account, then the Compensation shall be treated as an allocation of an item of income or gain of the Partnership to the recipient Partner so that, consistent with the intent of the Partners, the Compensation shall not be treated as a distribution which reduces the recipient Partner's Capital Account. Accordingly, such Partner shall be allocated the first available items of Partnership income and gain (including in a succeeding year) in a amount equal to the Compensation.

(iii) If the Partnership owns (a) any property contributed by a Partner that had a fair market value different from its adjusted basis for federal income tax purposes on the date of the contribution, or (b) any property that has been revalued pursuant to Treasury Regulation section 1.704-1(b)(2)(iv)(f), then for federal income tax purposes only and not for Capital Account purposes, any income, gain, loss or deduction with respect to such property shall be allocated among the Partners in accordance with Code Section 704(c) and the Treasury Regulations thereunder.

4.02  Underline: General Partner Allocations. To the extent the allocations language in this Article IV does not otherwise provide for allocations to General Partner Units, such allocations shall be on a Limited Partner Unit equivalent basis.

4.03  Underline: Tax Items. Except as otherwise provided herein, any allocation to a Partner of a portion of the Net Profits or Net Losses for a Fiscal Year (or other relevant period) will be deemed to be an allocation to that Partner of the same proportionate part of each item of income, gain, loss, deduction or credit that is earned, realized or available by or to the Partnership for federal income tax purposes.

4.04  Underline: Partial Year Allocations. In the event that a Limited Partner is admitted to the Partnership during the Partnership's Fiscal Year, or all or a portion of a Limited Partner's Units are

- 8 -

transferred during the Partnership's Fiscal Year, Net Profits and Net Losses shall be allocated to the admitted or transferee Limited Partner in any manner permitted by Code Section 706 or the Treasury Regulations thereunder, as the General Partner shall determine in its reasonable discretion. Allocations made in this Article IV shall be made to each holder of a Unit whether or not the holder is a substituted Limited Partner.

4.05  Allocations and Distributions Upon Dissolution.  When the Partnership is dissolved and wound-up pursuant to Article XIV hereof, all items of income, gain, loss and deduction not previously allocated shall be allocated to the Partners pursuant to this Article IV. It is the intent of the parties hereto that after the allocations described in the previous sentence are made and the final cash distribution referred to in Section 14.01(d) is made, that such actions will result in the Capital Account balances of the Partners equalling zero following the dissolution of the Partnership. The allocation and distribution provisions of Articles IV and V hereof, respectively, of this Agreement, as well as the provisions of Article XIV hereof, shall be construed in such a way by the General Partner in order to achieve this result.

## ARTICLE V
## DISTRIBUTIONS

5.01  General Distributions.  The Partnership may distribute Available Cash in the discretion of the General Partner. The General Partner expects to make such distributions at least quarterly. Such distributions shall be made pro rata among the Partners in accordance with their respective Capital Ratios; provided, however, that the General Partner, in its reasonable discretion, shall have the right to take into account the length of time a Partner has held its Units in any period relating to a distribution in determining the proportionate amount of such Partner's respective distributions.

5.02  Distributions Upon Dissolution.  Notwithstanding anything herein to the contrary, upon the occurrence of an event of dissolution as provided in Section 13.01 hereof, cash distributions occurring in connection with such event of dissolution and thereafter shall be made in accordance with Article XIV hereof.

5.03  Withholding.  The General Partner shall be authorized to withhold from amounts to be distributed to any Partner hereunder any withholding required by the Code or any provision of any statute or local tax law, and to pay such amounts to the Internal Revenue Service or other appropriate taxing authority. Any such amounts withheld shall be treated as having been distributed to such Partner pursuant to this Article V for all purposes of this Agreement.

5.04  Liability of General Partner.  Upon the determination in good faith to pay and distribute cash in the manner herein provided, the General Partner shall incur no liability on account of such distribution, even though such distribution may result in the Partnership retaining insufficient funds for the operation of its Business, which insufficiency results in loss to the Partnership or the borrowing of funds by the Partnership.

- 9 -

AD951590.241

ARTICLE VI
POWERS, DUTIES AND RIGHTS OF GENERAL PARTNER

6.01  Powers of General Partner.  Except as specifically provided herein, all references to any action to be taken by the Partnership shall mean action taken in the name of the Partnership and on its behalf by the General Partner.  Except as specifically provided herein, the General Partner will have the rights, powers and authority of a general partner as set forth in the Act and will have full, exclusive and complete discretion in the management and control of the Partnership and will make all decisions affecting the Partnership's Business and affairs.  By way of illustration and not in limitation of the foregoing, the General Partner has the power and authority, on behalf of the Partnership:

(a)  To execute all agreements and other documents necessary to implement the purposes of the Partnership, and to take such actions as may be necessary to consummate the transactions contemplated thereby;

(b)  To engage personnel and professional advisers, and do such other acts and incur such other expenses on behalf of the Partnership as may be necessary or advisable in connection with the conduct of its Business and affairs;

(c)  To open, maintain and close accounts, including margin accounts, with brokers and dealers, and to pay the customary fees and charges applicable to transactions in all such accounts;

(d)  To open, maintain and close bank accounts and to draw checks and other orders for the payment of money;

(e)  To make and execute all contracts, certificates and other legal documents relating to the Partnership's Business or organization, either personally or through agents selected by the General Partner, whether or not compensated by the Partnership (including management agreements to execute and carry out the powers of the General Partner);

(f)  To borrow money and pledge assets of the Partnership to secure borrowings;

(g)  To lend money and make investments;

(h)  To compromise any claim or liability due to the Partnership;

(i)  To execute, acknowledge, verify and file any notifications, applications, statements and other filings that the General Partner considers necessary or desirable to be filed with any state or federal securities administrator or commission;

(j)  To make all Tax Decisions;

- 10 -

(k)  To satisfy the requirements of the Code: (i) with respect to the Partnership's allocations, (ii) with respect to the Partnership's status as a partnership for federal income tax purposes, and (iii) to ensure that the Partnership is not treated as a "publicly traded partnership" described in Code Section 7704;

(l)  To take any action described in Section 11.04 hereof in the event of an investigation of the Partnership under any applicable federal fraud and abuse statute, rule, regulation or law by either the Department of Health and Human Services or the United States Attorney;

(m)  To acquire real or personal property as may be necessary in connection with the development and operation of the Center;

(n)  To admit Additional Limited Partners subject to the consent of the Limited Partners as set forth in Section 6.03 hereof;

(o)  To redeem the Units of any Limited Partner in accordance with the terms of this Agreement; and

(p)  To exercise any and all other powers which may be necessary to implement the foregoing purposes, policies and powers of the Partnership including those granted to limited partnerships under the Act, upon such terms and conditions as the General Partner, in its sole discretion, determines to be necessary, desirable or appropriate.

6.02.  Duties of and Decisions by General Partner.  The General Partner shall be charged with the full responsibility of managing and promoting the Partnership's purposes and Business. The General Partner shall cause its officers, directors and employees to devote the amount of their business time to the affairs and Business of the Partnership as in the General Partner's judgment is reasonably required to perform its duties concerning the Business and affairs of such Persons.  The General Partner may, in its sole discretion, appoint such executive officers as it deems desirable to carry on the Business of the Partnership, and any such executive officer shall have the responsibilities expressly designated to him or her by the General Partner, subject to the restrictions on the General Partner's authority contained in this Agreement.  The General Partner and any Affiliate thereof may engage in or possess an interest in, directly or indirectly, any other present or future business ventures or investments of any nature or description for its own account, independently or with others, including, but not limited to, any investment in any aspect of medical care delivery business or any other business engaged in by the Partnership and, inter alia, may become a general partner in other partnerships, and neither the Partnership nor any Partner shall have any rights in or to such investment or independent venture or the income or profits derived therefrom.

6.03  Limitations.  Without obtaining the consent of Limited Partners holding more than fifty percent (50%) of the Units (exclusive of Units held by the General Partner), the General Partner shall not:

- 11 -

AD951590.241

(a) Act in contravention of this Agreement;

(b) Except as provided in Articles XIII and XIV herein, do any act which would make it impossible to carry on the ordinary Business of the Partnership;

(c) Confess a judgment against the Partnership;

(d) Possess Partnership property, or assign any rights in specific Partnership property, including any assignment for the benefit of Partnership creditors, for other than a Partnership purpose;

(e) Admit a Person to the Partnership as a General Partner; or

(f) Admit a Person to the Partnership as a Limited Partner.

6.04  Medical Director.  The General Partner shall appoint an individual to serve as the Partnership's Medical Director from time to time.  The Medical Director will be responsible for the Partnership's medical quality control matters.  The Medical Director must be a physician licensed to practice medicine in the state in which the Center is located.  The Medical Director will receive a salary from the Partnership, as determined from time to time by the General Partner, in its sole discretion.

6.05  Medical Advisory Board.  The General Partner shall appoint up to five individuals to serve from time to time on the Partnership's Medical Advisory Board.  Upon request by the General Partner, the Medical Advisory Board shall provide counsel and advice to the Partnership and the General Partner concerning the medical standards and practices of the Center.  The General Partner shall have no obligation to consult the Medical Advisory Board with respect to any particular issues or matters.  The Medical Advisory Board shall have no power to bind the Partnership.  Its members shall receive no salary from the Partnership in such capacity.

6.06  Related Party Transactions.  The General Partner may employ and deal with any Partner (including itself) or any Affiliate of any Partner for the performance of other services or the purchase of other goods or property or the leasing of the same, provided that such other services, goods or property are reasonably necessary and customary in the Business of the Partnership and that any such other services, goods or property are obtained on terms no less favorable to the Partnership than those reasonably available from third Persons and provided that the Limited Partners are given notice of the terms of the transaction prior to its consummation.  Neither the Partnership nor any Partner shall have any rights in or to any income or profits derived by any Partner or Affiliate from such other ventures or businesses as a result of entering into this Agreement.

6.07  Reliance on Authority of General Partner.  No Person dealing with the General Partner will be required to determine the General Partner's authority to make any undertaking on behalf of the Partnership or to determine any fact or circumstance bearing upon the existence of such authority.

AD951590.241

ARTICLE VII
LIMITATION ON LIABILITY AND
INDEMNIFICATION OF GENERAL PARTNER

7.01 <u>Limitation of Liability of the General Partner</u>.  The General Partner and its affiliates (as defined below for purposes of this Section 7.01) shall have no liability to the Partnership or to any Limited Partner for any loss suffered by the Partnership which arises out of any action or inaction of the General Partner or its affiliates, if the General Partner or its affiliates, in good faith, determined that such course of conduct was in the best interest of the Partnership and such course of conduct did not (i) constitute gross negligence or intentional misconduct on the part of the General Partner or its affiliates, or (ii) involve a transaction for which the General Partner or its affiliates received an improper personal benefit in violation or breach of any provision of this Agreement.  The General Partner and its affiliates shall be indemnified by the Partnership to the extent of the Partnership's assets against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by it in connection with the Partnership, provided that the same were not the result of gross negligence or intentional misconduct on the part of the General Partner or its affiliates, and did not involve a transaction for which the General Partner or its affiliates received an improper personal benefit in violation or breach of any provision of this Agreement.  Notwithstanding the above, the General Partner and its affiliates shall not be indemnified for liabilities arising under federal and state securities laws unless (a) there has been a successful adjudication on the merits of each count involving securities laws violations; or (b) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction.  The Partnership shall not incur the cost of the portion of any insurance which insures any party against any liability as to which such party is herein prohibited from being indemnified.  For purposes of this Section 7.01, "affiliates" means any Person or entity performing services on behalf of the Partnership who: (y) directly or indirectly controls, is controlled by, or is under common control with, the General Partner, or (z) is an officer, director or shareholder of the General Partner.

ARTICLE VIII
POWERS AND RIGHTS OF LIMITED PARTNERS

8.01 <u>Powers and Rights</u>.  Except as specifically provided herein, the Limited Partners shall not take part in the conduct or control of the Partnership's Business and affairs, and will have no right or authority to act or sign for or to obligate the Partnership; provided, however, that this Section 8.01 shall in no way limit the powers, duties, rights and obligations of a Limited Partner acting in its capacity as a General Partner.  At no time will the Limited Partners be entitled to withdraw all or any part of their contributions to the capital of the Partnership except as provided in Articles V and XIV hereof.  The Limited Partners will have no right to demand and receive any property other than cash in return for their contributions and, prior to the dissolution and liquidation of the Partnership pursuant to Articles XIII and XIV hereof, their right to cash shall be limited to the rights set forth in Article V hereof.

- 13 -

8.02 <u>Liability</u>. Except for payment of the subscription price for the Units, the Limited Partners shall not be bound by or personally liable to the Partnership, to the General Partner or to the creditors of the Partnership, for expenses, liabilities or obligations of the Partnership.

## ARTICLE IX
## COMPENSATION AND REIMBURSEMENTS

9.01 <u>Out-of-Pocket Reimbursements</u>. Direct out-of-pocket costs and expenses incurred by the General Partner or its Affiliates on behalf of the Partnership in conducting the Business will be reimbursed by the Partnership.

9.02 <u>Reimbursement for Organization and Start-up Expenses</u>. The Partnership will pay all costs incurred in the organization and formation of the Partnership, the development of the Center, the offering of Units in the Partnership and the exemption of such offering from registration under the Securities Act of 1933 and the Blue Sky laws of the various states in which such offering may be made, and all costs incurred in the investigation and creation of the Partnership's trade or business prior to its formation. All of such costs will be reimbursed to the General Partner or its Affiliates to the extent that the General Partner or its Affiliates have already paid such costs.

9.03 <u>Management Agreement</u>. The General Partner is specifically authorized to enter into a management agreement with the Management Company under which the Management Company will be responsible for assisting the General Partner with the day-to-day management of the Partnership. The Partnership will pay an annual management fee to the Management Company equal to six percent (6%) of Net Revenues. Such management fee shall be paid monthly based on the Net Revenues of the immediately preceding month.

9.04 <u>Medical Director</u>. The Medical Director will receive the compensation described in Section 6.04 hereof.

## ARTICLE X
## ACCOUNTING, BOOKS AND RECORDS

10.01 <u>Accounting Method</u>. The Partnership will maintain its books and records on such basis of accounting as the General Partner shall determine.

10.02 <u>Books and Records</u>. The General Partner shall keep, or cause to be kept, at the Partnership's expense, full, complete and accurate books of account and other records showing the assets, liabilities, costs, expenditures, receipts and such other matters as are required by Section 14-9-105 of the Act. Such books of account will be the property of the Partnership, will be kept in accordance with sound accounting principles and procedures consistently applied and will be open to the reasonable inspection and examination by the Limited Partners and their duly authorized

AD951590.241

representatives. Such books of account will be maintained at the principal office of the Partnership, or at such other place as the General Partner determines.

10.03 Financial Statements. Within one hundred twenty (120) days following the end of each Fiscal Year of the Partnership, the General Partner shall cause to be prepared and delivered to each Partner unaudited financial statements of the Partnership for such Fiscal Year.

10.04 Tax Returns. The General Partner shall cause the Partnership's tax returns and other governmental returns and reports to be prepared and timely filed. The General Partner shall deliver copies of Schedule K-1 of Form 1065 (or a comparable schedule) and other necessary tax information for each Fiscal Year to each Partner no later than ninety (90) days after the end of each Fiscal Year.

10.05 Tax Matters Partner. The General Partner, or such other Partner as the General Partner may designate, is hereby designated the Tax Matters Partner of the Partnership, as provided in Treasury Regulations pursuant to Code Section 6231. The Tax Matters Partner shall represent the Partnership (at the expense of the Partnership) in connection with all examinations of the affairs of the Partnership by any federal, state, or local tax authorities, including any resulting administrative and judicial proceedings, and to expend funds of the Partnership for professional services and costs associated therewith. The provisions on limitations of liability of the General Partner and the indemnification set forth in Section 7.01 hereof will be fully applicable to the Tax Matters Partner in its capacity as such.

## ARTICLE XI
## TRANSFERS, ASSIGNMENTS AND REDEMPTIONS BY PARTNERS

11.01 General Prohibition. Except as provided in this Article XI, no Partner may assign, convey, sell, transfer, liquidate, encumber, or in any way alienate (collectively, a "Transfer"), all or any part of his or its Units or, in the event such Partner is a corporation, partnership or any other form of legal entity, such Partner may not Transfer or accept an offer to acquire all of its capital stock, partnership interests or its other form of equity investment interests (a Partner's Units or a majority of its capital stock, partnership interests or other form of equity investment interests shall be collectively referred to herein as the "Ownership Interest") unless such Transfer is (i) registered or exempt from registration under all applicable federal and state securities laws, and (ii) authorized by the General Partner following waiver of its right of first refusal set forth in Section 11.07 hereof, which authorization may be given or withheld by the General Partner in its sole and absolute discretion, regardless of whether it exercises such right of first refusal. If a Limited Partner's Units are Transferred pursuant to the terms of this Agreement, the transferee shall, upon compliance with the provisions of Section 11.02, succeed to the transferred Units of the transferor Limited Partner and all rights, duties and obligations under this Agreement with respect to such transferred Units. Any attempted Transfer of all or any portion of a Limited Partner's Units without the necessary consent, or as otherwise permitted hereunder, shall be null and void and shall have no effect whatsoever.

- 15 -

AD951590.241

11.02 <u>Conditions of Transfer</u>. No transferee of the Units of a Limited Partner will become a substituted Limited Partner until the following conditions have been satisfied:

(a)   the transferor Limited Partner must have executed a written instrument of transfer of such Units in form and substance satisfactory to the General Partner;

(b)   the transferee must have executed a written agreement, in form and substance satisfactory to the General Partner, to assume all of the duties and obligations of the transferor Limited Partner under this Agreement and to be bound by and subject to all of the terms and conditions of this Agreement;

(c)   the transferor Limited Partner and the transferee must have executed a written agreement, in form and substance satisfactory to the General Partner, to indemnify and hold the Partnership and the General Partner harmless from and against any loss or liability arising out of the transfer;

(d)   the transferee must have executed a power of attorney substantially identical to that contained in Article XV hereof, and such other documents and instruments as the General Partner may deem necessary to effect the admission of the transferee as a Limited Partner;

(e)   upon request by the General Partner, the transferor must have delivered to the Partnership a written opinion of counsel for the Partnership or of other counsel reasonably satisfactory to the General Partner (which opinion shall be obtained at the expense of the transferor) that such transfer will not result in (i) a violation of applicable law or this Agreement, (ii) the Partnership being classified as an association taxable as a corporation, or (iii) unless waived by the General Partner, the Partnership being deemed terminated pursuant to Code Section 708 or any comparable future section of the Code; and

(f)   unless otherwise waived by the General Partner, the transferee or transferor must have paid the expenses incurred by the Partnership in connection with the admission of the transferee to the Partnership.

A transferee who does not become a substituted Limited Partner will be entitled to receive only that portion of the distributions or allocations to which his transferor would otherwise be entitled, and such transferee will not be entitled to vote on any question regarding the Partnership, and his Units will not be considered to be outstanding for voting purposes but will be treated as outstanding for Article IV purposes.

11.03 <u>Death of Limited Partner</u>.  Except as set forth in Section 11.06 hereof, upon the death of a Limited Partner, or all of the members or shareholders of a professional association or professional corporation which is a Limited Partner, the General Partner will have an option to purchase the Units of such Limited Partner.  Such option will be exercisable, if at all, by the delivery of a written notice by the General Partner to such Limited Partner within the one year period following such death.  The purchase price per Unit shall be equal to: (i) four (4) times, (ii) the Partnership's Net Revenues for the preceding Fiscal Year reduced by the Partnership's operating expenses for such preceding Fiscal Year, multiplied by (iii) such Limited Partner's

- 16 -

Capital Ratio as of the date of such Limited Partner's death. The purchase price shall be payable twenty percent (20%) in cash at closing, and the balance by the General Partner's promissory note payable in eight (8) equal quarterly installments of principal, the first of which is due three (3) months after closing. The unpaid balance of such promissory note shall bear interest at the rate announced from time to time as the "prime rate" by NationsBank of Georgia, N.A., Atlanta, Georgia (or successor thereof). Accrued interest on the entire balance will be payable quarterly with each installment payment of principal.

11.04 Fraud and Abuse. In the event of an investigation of the Partnership or any Partner under any then applicable federal or state fraud and abuse statute, rule, regulation or law by the Department of Health and Human Services, the United States Attorney or any federal or state agency having jurisdiction over the Partnership, the General Partner, in its sole discretion, is authorized to (i) terminate, liquidate and dissolve the Partnership, (ii) cause the Partnership to redeem all or any portion of the Units of any Limited Partners whose investment in the Partnership is determined by the General Partner to cause a fraud and abuse violation by the Partnership or such Limited Partner, (iii) cause a Limited Partner, in the event such Limited Partner is a corporation, partnership or other form of legal entity, to redeem any stockholder, partner or other investor in such Limited Partner whose investment is determined by the General Partner to cause a fraud and abuse violation by the Partnership or such Limited Partner, or (iv) amend this Limited Partnership Agreement pursuant to Section 16.02(a). In the event the General Partner causes a Limited Partner to redeem any stockholder, partner or other investor therein pursuant to (iii) above, the General Partner shall cause the Partnership to redeem from the Limited Partner that number of Units equal to the product of (A) such redeemed stockholder's, partner's or other investor's pro rata share of its equity investment interest in the Limited Partner, times (B) the aggregate number of Units owned by the Limited Partner, rounded to the nearest whole number. The redemption price of the Units payable to any such Limited Partner within three years of the Commencement Date shall be equal to the cash portion of such Limited Partner's capital contribution, together with simple interest thereon from the date on which the Limited Partner's subscription was accepted by the Partnership, calculated based on the interest rate payable on the most current one-year U.S. Treasury Bill. The redemption price of the Units payable to any Limited Partner after such three year period shall be equal to the fair market value thereof, as determined by an independent appraisal obtained at Partnership expense. At the option of the General Partner, such redemption price shall be paid in cash at closing or pursuant to the payment terms described in Section 11.03 herein. For federal income tax purposes, all of the Partners expressly intend that the redemption of Units held by Limited Partners by the Partnership shall be treated as a complete liquidation of such Partner's Partnership Interest pursuant to Section 736 of the Code. The Partners further acknowledge that they have negotiated concerning the treatment of the fair market value of the Units being the redemption price (which may or may not approximate the Capital Account balance attributable to the Units redeemed) and that the redemption price shall be treated as being composed of both so-called "Section 736(a) payments" and also so-called "Section 736(b) payments." Having so negotiated, the Partners hereby agree that the fair market value redemption price shall first be treated as a Section 736(b) payment to the extent of the full fair market value of the redeemed Limited Partner's "interest in partnership property" within the meaning of Code Section 736(b) and the Treasury Regulations thereunder, and the remaining portion of the fair market value redemption price is intended to constitute a Section 707(c) "guaranteed payment" which shall be treated as a Section 736(a) payment. The Partners further expressly agree among

- 17 -

AD951590.241

themselves that no portion of the redemption price is intended to be treated as a payment for goodwill under Section 736(b) of the Code. Finally, the interest accrued and paid on any unpaid portion of the redemption price shall be treated as a Section 707(c) guaranteed payment.

11.05  Transfer of Interest in Limited Partner.  No Limited Partner that is a corporation, partnership or any other form of legal entity may transfer or accept an offer to acquire any of its capital stock, partnership interests or other form of equity investment interests in such Limited Partner without the prior written consent of the General Partner, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing, any such Limited Partner may, upon providing written notice to the General Partner, effect any such transfer to (i) a physician, (ii) a professional corporation, partnership or association comprised solely of physicians, or (iii) upon the death of one owning an interest in such Limited Partner.

11.06  Right of First Refusal Granted to Limited Partners.  Notwithstanding the right of first refusal granted to the General Partner pursuant to Sections 11.03 and 11.07 hereof, in the event any Limited Partner that is a member of a physician group practice desires to Transfer all or any portion of his Units either prior to or after terminating his relationship with such physician group practice, or in the event of such Limited Partner's death, the other members of such Limited Partner's physician group practice that are also Limited Partners immediately prior to the date of such Transfer shall have a right of first refusal to purchase their respective pro rata share of the Units on the same terms and at the same purchase price offered to the selling Limited Partner in connection with such Transfer or, in the event of death, on the same terms payable by the General Partner pursuant to Section 11.03 hereof.  Such offer to the other Limited Partners of the physician group practice shall be in writing, shall include a copy of the offer to purchase received by the selling Limited Partner or such other applicable terms of Transfer delivered in connection therewith and shall be irrevocable by the selling Limited Partner for a period of thirty (30) days after the receipt thereof by the non-selling Limited Partners.  In the event the non-selling Limited Partners reject the offer or fail to exercise this right of first refusal within such thirty-day period, then the terms of either Section 11.03 or Section 11.07, as the case may be, shall apply.

11.07  Right of First Refusal Granted to General Partner.  Except as set forth in Section 11.06 above, no Partner may Transfer or accept an offer to acquire its Ownership Interest without first extending the offer to sell such Ownership Interest to the General Partner upon the same terms and at the same purchase price offered to the selling Partner.  Such offer to the General Partner shall be in writing, shall include a copy of the offer to purchase received by the Partner or such other applicable terms of Transfer delivered in connection therewith and shall be irrevocable by the selling Partner for a period of thirty (30) days after the receipt thereof by the General Partner.  In the event the General Partner rejects the offer or fails to exercise this right of first refusal within such thirty (30) day period, the selling Partner must consummate the sale upon the same terms presented to the General Partner within 180 days of such notice to the General Partner or such Transfer shall again be subject to the restrictions contained in this Section 11.07.

- 18 -

ARTICLE XII
DISQUALIFICATION

12.01 <u>Limited Partners</u>.  The disqualification (as defined in Section 12.03) of a Limited Partner will not dissolve the Partnership. Upon the disqualification of a Limited Partner, any successor-in-interest of such Limited Partner will become an assignee of such Limited Partner's Units and will be credited or charged with and/or paid, as the case may be, all future allocations and distributions on account of the Units of such Limited Partner; provided, however, that no such successor-in-interest will become a substituted Limited Partner without first complying with the provisions of Section 11.02 hereof.

12.02 <u>General Partner</u>.  The General Partner may not retire or withdraw from the Partnership without the prior written consent of all Partners.  If the General Partner retires or withdraws without the prior written consent of all Partners or becomes disqualified (the "Disqualified General Partner"), such Disqualified General Partner's Units will automatically be converted into Limited Partner Units for all purposes thereafter, and the Partnership shall dissolve and thereafter conduct only activities necessary to wind up its affairs in accordance with the provisions of Article XIV hereof, unless, within thirty (30) days after the retirement, withdrawal or disqualification of the General Partner, the Limited Partners owning 75% of the Units owned by all Limited Partners (excluding the converted Disqualified General Partner) elect to continue the Partnership pursuant to the terms and provisions of this Agreement.   Notwithstanding the preceding sentence, in the event of the conversion of a Disqualified General Partner to a Limited Partner, such conversion shall not relieve the Disqualified General Partner of any liabilities and obligations incurred by the Partnership prior to such conversion or any obligation to contribute cash to the capital of the Partnership pursuant to Section 3.04 hereof with respect to liabilities and obligations of the Partnership incurred by the Partnership prior to such conversion.  In such event, the provisions of Section 4.01(b)(i) hereof shall continue to apply to such Disqualified General Partner as if such Disqualified General Partner were still a General Partner, to the extent of any negative Capital Account balance it may have as of the date of such conversion or may incur subsequent to such date with respect to liabilities and obligations incurred by the Partnership prior to such conversion.  If a decision to continue the Partnership is made, then a new General Partner will be elected by vote of Limited Partners owning 75% of the Units owned by all Limited Partners (excluding the converted Disqualified General Partner).  If the new General Partner was not previously a Limited Partner, it will receive such Partnership Interest as the Limited Partners electing it determine, as well as the fair market value thereof, and this Agreement shall be amended to reflect the Partnership Interest of such new General Partner.

12.03 <u>Disqualification</u>.  For purposes of this Agreement, a Partner will be deemed to be "disqualified" upon the occurrence of any of the following events:

(a)  If the Partner is a natural person, upon his death, his filing of a voluntary petition in bankruptcy, his adjudication as incompetent, bankrupt or insolvent, or his making an assignment for the benefit of creditors.

- 19 -

(b)  If the Partner is not a natural person, upon its voluntary dissolution or liquidation, its filing of a voluntary petition in bankruptcy, its adjudication as bankrupt or insolvent, its making an assignment for the benefit of creditors, or its becoming subject to involuntary reorganization or liquidation proceedings.

(c)  In the case of the General Partner, the retirement or withdrawal from the Partnership without the prior written consent of all Partners.

## ARTICLE XIII
## DISSOLUTION OF PARTNERSHIP

13.01 Events of Dissolution.  The Partnership will be dissolved upon the first to occur of the following events:

(a)  the expiration of the term of the Partnership set forth in Section 2.04 hereof;

(b)  the failure of the Limited Partners to continue the Partnership after the disqualification of the General Partner in accordance with the provisions of Section 12.02 hereof;

(c)  the exercise of the General Partner's power to dissolve the Partnership pursuant to Sections 6.01(l) and 11.04 hereof; or

(d)  the election to terminate the Partnership by the General Partner and Limited Partners, who, in the aggregate, own at least two-thirds (2/3) of the total Units (inclusive of Units held by the General Partner).

## ARTICLE XIV
## DISTRIBUTIONS UPON DISSOLUTION

14.01 Liquidation.  Upon dissolution of the Partnership for any reason, the Partnership shall promptly commence to wind up its affairs.  A reasonable period of time will be allowed for the orderly termination of the Partnership's Business, the discharge of its liabilities and the distribution or liquidation of its remaining assets so as to enable the Partnership to minimize the normal losses attendant to the liquidation process.  A full accounting of the assets and liabilities of the Partnership as of the date of dissolution will be taken and a written statement thereof will be furnished to each Partner within sixty (60) days after such date.  Such accounting and statement will be prepared under the direction of the General Partner or, if there is no General Partner, by a liquidating trustee selected by Limited Partners owning a majority of the Units.  The Partnership's property and assets and/or the proceeds from the liquidation thereof will be applied in the following order of priority;

- 20 -

(a)  payment of the debts and liabilities of the Partnership, in the order of priority provided by law (excluding any loans by Partners or their Affiliates), and payment of the expenses of liquidation;

(b)  payment of any and all loans made by Partners or their Affiliates to the Partnership, plus any accrued but unpaid interest thereon, which amount shall be applied first to interest and then to principal; provided, that in the event the Partnership's funds are insufficient to satisfy fully all such loans, then all loans made by all Partners or their Affiliates shall be repaid on a pro rata basis;

(c)  setting up of such reserves as the General Partner or liquidating trustee deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership or any obligation or liability not then due and payable; provided, any balance of such reserve, at the expiration of such period as the General Partner or liquidating trustee shall deem advisable, shall be distributed in the manner herein provided;

(d)  distribution to the Partners, on a pro rata basis, of the positive balances of their Capital Accounts, adjusted to the date of distribution until such accounts are zero; and

(e)  distribution to the Partners, on a pro rata basis, based upon their Capital Ratio.

14.02  Distributions in Kind.  Any noncash asset to be distributed in kind (as a liquidating distribution or otherwise) to one or more Partners will first be valued at its fair market value to determine the gain or loss that would have resulted if such asset were sold for such value, and such gain or loss will then be allocated pursuant to Article IV hereof, and the Partners' Capital Accounts shall be adjusted to reflect such gain or loss.  The amount distributed and charged to the Capital Account of each Partner receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Partner is considered to assume or take subject to under Code Section 752).  The General Partner or liquidating trustee, as the case may be, shall determine the fair market value of such asset.

14.03  No Action for Dissolution.  The Partners acknowledge that irreparable damage would be done to the goodwill and reputation of the Partnership if any Partner should bring an action in court to dissolve the Partnership.  This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payments in liquidation of the interests of all Partners. Accordingly, each Partner hereby waives and renounces his right to initiate legal action to seek dissolution, or to seek the appointment of a receiver or trustee to liquidate the Partnership.

14.04  No Further Claim.  Upon dissolution, each Limited Partner will look solely to the assets of the Partnership for the return of his or its investment, and if the Partnership property remaining after payment or discharge of the debts and liabilities of the Partnership, including debts and liabilities owed to one or more of the Partners, in insufficient to return the aggregate capital contributions of each Limited Partner, such Limited Partners will have no recourse against the General Partner or any other Limited Partner.

- 21 -

ARTICLE XV
POWER OF ATTORNEY

15.01 <u>Appointment</u>. Each Limited Partner hereby irrevocably constitutes and appoints the General Partner as his or its true and lawful agent and attorney-in-fact, with full power of substitution, in his or its name, place and stead, to make, execute and acknowledge, swear to, record, publish and file:

(a) Any instruments with respect to the Partnership that are required to be filed under the laws of any state or of the United States, or which the General Partner deems advisable to file;

(b) Any and all amendments to this Agreement authorized hereunder; and

(c) All documents that are required to effectuate the redemption or transfer of Units or the dissolution and termination of the Partnership.

The foregoing power of attorney is coupled with an interest, is irrevocable and will survive the death, incompetency, dissolution, merger, consolidation, bankruptcy or insolvency of each of the Limited Partners. The Limited Partners shall execute and deliver to the General Partner, within five (5) days after receipt of the General Partner's written request therefor, such further designations, powers of attorney and other instruments as the General Partner deems necessary to carry out the purposes of this Agreement.

ARTICLE XVI
MISCELLANEOUS

16.01 <u>Restrictions on Relationships of Limited Partners with Competitors</u>. No Limited Partner (or any member, shareholder or partner of a professional association, professional corporation, partnership or other entity which is a Limited Partner) shall have any direct or indirect ownership interest in any business or entity competing with the Partnership in the development, management or operation of an outpatient surgical care facility within a ten-mile radius of the Center for a period of three (3) years following the later of (i) the Commencement Date or (ii) the date such person ceases to be a Limited Partner; <u>provided, however</u>, that no Limited Partner (or any member, shareholder or partner of a professional association, professional corporation, partnership or other entity which is a Limited Partner) shall be prevented from serving as a member of the medical staff, or holding any position on the medical staff, of any hospital. This provision shall not (i) restrict any Person from being able to perform outpatient surgery in his office or in any other location he may desire at any time, (ii) require the referral of patients to the Center, or (iii) apply to any relationship of a Limited Partner which existed as of the date of such Limited Partner's subscription if reported in writing to the General Partner prior to or upon delivery of the investor's subscription agreement. Notwithstanding the foregoing, these restrictions shall not apply to the General Partner in its capacity as a Limited Partner.

AD951590.241

16.02 <u>Amendments by the General Partner</u>.

    (a)  <u>Clarifying Amendments</u>.  The General Partner may amend this Agreement without the consent of the Limited Partners if such amendment is: (i) for the purpose of clarification and does not materially change the substance hereof and the Partnership has obtained the opinion of its legal counsel to that effect; provided, however, that such amendment does not adversely and materially affect the interests of the Limited Partners; (ii) necessary or appropriate pursuant to Section 6.01 hereof, to satisfy the requirements of the Code with respect to the Partnership's allocations or the Partnership's status as a partnership, or pursuant to any Tax Decision, or any federal or state securities laws or regulations; (iii) necessary to cause the Partnership to comply with any then applicable fraud and abuse or similar statute, rule, regulation or law pursuant to Section 11.04; or (iv) for the purpose of ensuring that the General Partner will be allocated tax basis associated with Partnership liabilities under Section 752 of the Code and the Treasury Regulations thereunder (the "Section 752 Rules") when the General Partner, or a "related person" to the General Partner within the meaning of the Section 752 Rules, has the economic risk of loss with respect to such Partnership liabilities.

    (b)  <u>Substantive Amendments</u>.  The General Partner may propose any other amendment or amendments to this Agreement by mailing to the Limited Partners a notice describing the proposed amendment(s), which notice must include the text of the proposed amendment(s).  If within thirty (30) days after such notice has been mailed, the General Partner has not received written objections to such amendment(s) from Limited Partners owning, in the aggregate, more than one-third (1/3) of the Units owned by all of the Limited Partners (exclusive of the Units held by the General Partner), then, subject to the other provisions of this Agreement, the proposed amendment(s) will become effective as of the date specified.  The General Partner is expressly authorized to file such amendment(s) to the Partnership's Certificate as the General Partner deems necessary to implement such amendment(s).

    16.03 <u>Additional Documents</u>.  At any time and from time to time after the date of this Agreement, upon the request of the General Partner, the Limited Partners shall do and perform, or cause to be done and performed, all such additional acts and deeds, and shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such additional instruments and documents, as are required to best effectuate the purposes and intent of this Agreement.

    16.04 <u>Notices</u>.  Any notices or other communications required or permitted by this Agreement must be in writing and shall be deemed to have been duly given and delivered when delivered in person or when mailed postage prepaid to the recipient Partner(s) at the most recent address of the recipient Partner as shown on the records of the Partnership (or to such other address of which the Partnership subsequently has been notified in writing by such Partner).  Any Partner may change his or its address by giving notice to the General Partner.

    16.05 <u>Applicable Law</u>.  This Agreement is to be governed by, construed under, and enforced and interpreted in accordance with the laws of the State of Georgia.

    16.06 <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties and supersedes any prior understanding or agreement among them respecting the subject

- 23 -

matter hereof. There are no representations, arrangements, understandings or agreements, oral or written, among the parties hereto relating to the subject matter of this Agreement, except those fully expressed herein. No waiver of any provision hereof will be valid or binding on the parties hereto, unless such waiver is in writing and signed by or on behalf of the parties hereto, and no waiver on one occasion shall be deemed to be a waiver of the same or any other provision hereof in the future.

16.07 <u>Severability</u>. If any term or provision of this Agreement is held illegal, invalid or unenforceable, such illegality, invalidity or unenforceability will not affect the legality, validity or enforceability of the remainder of this Agreement.

16.08 <u>Successors</u>. Subject to the provisions hereof imposing limitations and conditions upon the transfer, sale or other disposition of the Partners' Units, all the provisions hereof will inure to the benefit of and be binding upon the successors, legal representatives and assigns of the parties hereto.

16.09 <u>Counterparts</u>. This Agreement can be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts will together constitute one and the same agreement.

16.10 <u>Headings</u>. Section and other headings contained in this Agreement are for reference purposes only and are in no way intended to define, interpret, describe or limit the scope, extent or intent of this Agreement or any provision hereof.

16.11 <u>Acceptance of Prior Acts by New Partner</u>. Each Person who becomes a Partner, by becoming a Partner, ratifies, affirms and confirms, and agrees to be bound by, all actions duly taken by the Partnership, pursuant to the terms of this Agreement, prior to the date such Person becomes a Partner.

16.12 <u>Partnership Property</u>. The title to all real or personal property (or interests therein) now or hereafter acquired by the Partnership will be held by and vested in the Partnership, and not by or in any Partner, individually.

16.13 <u>Meetings</u>. The General Partner may call meetings of the Partners from time to time. The General Partner shall provide the Limited Partners with thirty (30) days prior notice of the time and place of any meeting of the Partners. Upon the written request of Limited Partners (other than the General Partner) owning at least twenty-five percent (25%) of the total Units (other than Units held by the General Partner), the General Partner shall call a meeting of the Partners. Partners may vote in person or by proxy at any meeting of the Partners. The provisions of the Georgia Business Corporation Code governing the use and validity of corporate proxies shall govern the validity and use of proxies under this Agreement. Unless otherwise consented to by the majority in interest of the Limited Partners, all meetings called pursuant to this Section 16.13 shall be held in the county in which the Center is located.

AD951590.241

16.14 <u>Gender and Number</u>.  Where the context requires, the use of a pronoun of one gender is to be deemed to include a pronoun of the appropriate gender or the neuter, and singular words are to be deemed to include the plural and vice versa.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first above written.

GENERAL PARTNER:

SHC SAN DIEGO, INC.

By: _____
Title: _____

INITIAL LIMITED PARTNER:

SURGICAL HEALTH CORPORATION

By: _____
Title: _____

- 25 -

AD951590.241

AMENDMENT TO

LIMITED PARTNERSHIP AGREEMENT
OF
ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO, L.P.

This amendment (the "Amendment") to the Limited Partnership Agreement of Arthroscopic & Laser Surgery Center of San Diego, L.P., dated January 18, 1996 and amended in January, 1999 (the "Partnership Agreement"), is made and entered into as of July 3, 2002, by SHC San Diego, Inc. (the "General Partner"), whose principal business address is One HealthSouth Parkway, Birmingham, Alabama 35243, and the Limited Partners listed on Exhibit A hereto.

W I T N E S S E T H:

WHEREAS, the General Partner desires to extend the term of the Limited Partner non-compete covenant; and

WHEREAS, the General Partner desires to amend provisions relating to the required transfer of a Limited Partner's Units under certain circumstances, including those which arise out of the implementation of some of the standards of the safe harbor to the Anti-Kickback Statute (42 USC §1320a-7b(b)) for physician investment in entities owning and operating ambulatory surgery centers (the "ASC Safe Harbor"); and

WHEREAS, this Amendment has been duly approved in accordance with the provisions of the Partnership Agreement.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Amendments.

(a)    Section 1.01 shall be amended by adding the following definitions of "Entity Limited Partner," "Entity Limited Partner's Proportionate Units" and "Physician Interest Holder":

"Entity Limited Partner" means a professional association, professional corporation, partnership, limited liability company, corporation or other such entity that is a Limited Partner.

"Entity Limited Partner's Proportionate Units" means the number of Units held by an Entity Limited Partner that is attributable to a Physician Interest Holder based on such Physician Interest Holder's ownership percentage interest in the Entity Limited Partner.

"Physician Interest Holder" means (1) a physician who is a Limited Partner; (2) a physician who is a member, shareholder, partner or other owner of an Entity Limited Partner; or (3) a physician who created, who is the beneficiary of, or who is the trustee of a Trust Limited Partner.

"Trust Limited Partner" means a trust that is a Limited Partner

(b)    Section 2.07 shall be amended with deletions indicated by strikethrough text and additions indicated by underlined text as follows:

2.07    Disclosure of Partnership Interest. Each Physician Interest Holder ~~Limited Partner~~ shall disclose his participation in the Partnership to any individuals referred to or treated at the Center by such Physician Interest Holder ~~Limited Partner~~. Such disclosures shall be in a form which complies with all applicable federal and state laws governing the disclosure of a Limited Partner's ownership interest in a health care facility.

(c)    The following shall be added as Section 2.08:

2.08    Annual Certification. In order to assist the General Partner in determining whether the Partnership meets some of the standards set forth in the safe harbor to the Anti-Kickback Statute (42 USC §1320a-7b(b)) applicable to ambulatory surgery center investments, each Physician Interest Holder shall certify annually to the Partnership in writing, with respect to the prior fiscal year, on or before April 15 (the first such certification being due April 15, 2003): (i) whether such Physician Interest Holder derived at least one-third (1/3) of his or her medical practice income from performing outpatient surgical procedures; (ii) whether such Physician Interest Holder performed at least one-third (1/3) of his or her outpatient surgical procedures at the Center; and (iii) whether such Physician Interest Holder has been excluded from participation in a Federal health care program. A copy of the form of Annual Certification is attached hereto as Exhibit E. For purposes of this Section 2.08, "outpatient surgical procedures" means (x) any procedures on the list of Medicare-covered procedures for ambulatory surgery centers and (y) any other surgical procedures actually performed by such Physician Interest Holder on an outpatient basis in a licensed facility.

(d)    The following shall be added as Section 2.09:

2.09    Non-Discrimination. Each Physician Interest Holder and each Entity Limited Partner must treat Center patients receiving medical benefits or assistance under any Federal health care program in a nondiscriminatory manner.

(e)    The following shall be added as Section 2.10:

2.10    Federal Health Care Program Participation. Each Physician Interest Holder and Entity Limited Partner must not have been excluded from participation in Medicare, Medicaid or any other Federal health care program.

(f)    The following shall be added as Section 2.11:

2.11    Medical Malpractice Insurance. Each Physician Interest Holder shall maintain medical malpractice insurance in accordance with the Center's medical staff bylaws.

(g)    Section 11.03 will be deleted in its entirety and replaced with the following:

11.03    Involuntary Transfer of Limited Partner's Interest. Except as set forth in Section 11.06, upon the occurrence of any of the following events, the General Partner will have the option to purchase the physician Limited Partner's Units, the Trust Limited Partner's Units or the Entity Limited Partner's Proportionate Units, as the case may be. The purchase price shall be payable twenty percent (20%) in cash at closing, and the balance

by the General Partner's promissory note payable in eight (8) equal quarterly installments of principal, the first of which is due three (3) months after closing. The unpaid balance of such promissory note shall bear interest at the rate announced from time to time as the "prime rate" by NationsBank of Georgia, N.A., Atlanta, Georgia (or successor thereof). Accrued interest on the entire balance will be payable quarterly with each installment payment of principal.

11.03.01 Upon (i) a Limited Partner's or, in the case of a Trust Limited Partner, a Physician Interest Holder's exclusion from participation in Medicare, Medicaid or any other Federal health care program in violation of Section 2.10 hereof, or (ii) if an Entity Limited Partner fails to acquire an excluded Physician Interest Holder's entire interest in the Entity Limited Partner within sixty (60) days after the Physician Interest Holder's exclusion, the General Partner will have the right to require the Limited Partner to sell his or its entire interest in the Partnership to the General Partner or the Partnership for $1.00; provided however, if an Entity Limited Partner, which has not itself been excluded, does acquire the entire interest of an excluded Physician Interest Holder within sixty (60) days after the Physician Interest Holder's exclusion, the General Partner will have the right to require the Entity Limited Partner to sell the Entity Limited Partner's Proportionate Units for the excluded Physician Interest Holder to the General Partner or the Partnership for $1.00.

11.03.02 Upon the death of a Limited Partner, or of a Physician Interest Holder of an Entity Limited Partner or Trust Limited Partner, the General Partner will have an option to purchase the Units of such Limited Partner or the Entity Limited Partner's Proportionate Units of such Physician Interest Holder. Such option will be exercisable, if at all, by the delivery of a written notice by the General Partner to such Limited Partner or Physician Interest Holder within the one-year period following such death. The purchase price per Unit shall be equal to (i) four (4) times the Partnership's Net Revenues for the preceding Fiscal Year reduced by the Partnership's operating expenses for such preceding Fiscal Year, multiplied by (ii) one percent (1%).

11.03.03 Upon (a) a violation of the noncompete provision contained in Section 16.01 hereof by a Limited Partner or any Physician Interest Holder of an Entity Limited Partner or Trust Limited Partner; (b) an attempted transfer of a Unit or of an interest in a Unit in violation of this Agreement by a Limited Partner or any Physician Interest Holder of an Entity Limited Partner or Trust Limited Partner; (c) a Physician Interest Holder's failure to maintain medical malpractice insurance in accordance with Section 2.11 hereof; (d) the disability or mental incompetency of a Physician Interest Holder; (e) a Limited Partner's or, in the case of an Entity Limited Partner or Trust Limited Partner, any Physician Interest Holder's adjudication of bankruptcy, or general assignment for the benefit of creditors, or taking the benefit of any insolvency act, or if a permanent receiver or trustee in bankruptcy is appointed for any Limited Partner's or Physician Interest Holder's property, or if a temporary receiver be appointed for any Limited Partner or Physician Interest Holder and such appointment is not vacated or set aside within 60 days from the date of such appointment; or (f) if a final divorce decree or settlement or any other judicial order requires a Limited Partner or any Physician Interest Holder of an Entity Limited Partner or

Trust Limited Partner to transfer or dispose of his Units, the General Partner may require the transfer of the involved Limited Partner's Units to the General Partner or the Partnership. The purchase price per Unit shall be equal to distributions of Available Cash per Unit for the twelve-month period preceding the date the General Partner delivers notice to the Limited Partner or Physician Interest Holder, multiplied by three (3).

11.03.04 At any time upon the General Partner's good faith determination, taking into account the annual certification provided by such Physician Interest Holder pursuant to Section 2.08 (when determining annual compliance with the extension of practice standards set forth in Section 2.08) and such other facts and circumstances as the General Partner shall deem relevant, that the Physician Interest Holder no longer uses the Center as an extension of his or her practice, for any reason, including, but not limited to, a Physician Interest Holder's retirement (evidenced by such Physician Interest Holder's ceasing actively to practice his or her profession in the Center's market area on an average of thirty hours per week for at least forty weeks per year), or the relocation of his or her practice outside of the Center's market area, then the General Partner may require the transfer of the involved Limited Partner's Units or the Entity Limited Partner's Proportionate Units, as the case may be, to the General Partner or the Partnership. The purchase price per Unit shall be equal to distributions of Available Cash per Unit for the twelve-month period preceding the date the General Partner delivers notice to the Limited Partner or Physician Interest Holder, multiplied by three (3).

The General Partner shall give the affected Limited Partner notice of any determination pursuant to this Section 11.03, which notice shall specify (i) a summary of the basis for such determination, (ii) the transfer price, and (iv) the closing date for the transfer, which shall be not later than 30 days from the date of delivery of such notice.

(h)    Section 11.04 shall be amended with deletions indicated by strikethrough text and additions indicated by underlined text as follows:

11.04    _Fraud and Abuse._ In the event of an investigation of the Partnership, ~~or~~ any Partner _or any Physician Interest Holder_ under any then applicable federal or state fraud and abuse statute, rule, regulation or law by the Department of Health and Human Services, the United States Attorney or any federal or state agency having jurisdiction over the Partnership, the General Partner, in its sole discretion, is authorized to (i) terminate, liquidate and dissolve the Partnership, (ii) cause the Partnership to redeem all or any portion of the Units of any Limited Partners whose investment in the Partnership is determined by the General Partner to cause a fraud and abuse violation by the Partnership or such Limited Partner, (iii) cause _an_ ~~a~~ _Entity_ Limited Partner, ~~in the event such Limited Partner is a corporation, partnership or other form of legal entity,~~ to redeem any _Physician Interest Holder_ ~~stockholder, partner or other investor~~ in such _Entity_ Limited Partner whose investment is determined by the General Partner to cause a fraud and abuse violation by the Partnership or such _Entity_ Limited Partner, or (iv) amend this Limited Partnership Agreement pursuant to Section 16.02(a). In the event the General Partner causes _an_ ~~a~~ _Entity_ Limited Partner to redeem any _Physician Interest Holder_ ~~stockholder, partner or other investor therein~~ pursuant to (iii) above, the General Partner shall cause the Partnership to redeem from the _Entity_ Limited

Partner <u>the Entity Limited Partner's Proportionate Units attributable to that Physician Interest Holder.</u> ~~that number of Units equal to the product of (A) such redeemed stockholder's, partner's or other investor's pro rata share of its equity investment interest in the Limited Partner, times (B) the aggregate number of Units owned by the Limited Partner, rounded to the nearest whole number. The redemption price of the Units payable to any such Limited Partner within three years of the Commencement Date shall be equal to the cash portion of such Limited Partner's capital contribution, together with simple interest thereon from the date on which the Limited Partner's subscription was accepted by the Partnership, calculated based on the interest rate payable on the most current one year U.S. Treasury Bill.~~ The redemption price of the Units payable to any Limited Partner ~~after such three year period~~ shall be equal to <u>distributions of Available Cash per Unit for the twelve-month period preceding the date the General Partner delivers notice to the Limited Partner or Physician Interest Holder, multiplied by three (3).</u> ~~the fair market value thereof, as determined by an independent appraisal obtained at Partnership expense.~~ At the option of the General Partner, such redemption price shall be paid in cash at closing or pursuant to the payment terms described in Section 11.03 herein. For federal income tax purposes, all of the Partners expressly intend that the redemption of Units held by Limited Partners by the Partnership shall be treated as a complete liquidation of such Partner's Partnership Interest pursuant to Section 736 of the Code. The Partners further acknowledge that they have negotiated concerning the treatment of the fair market value of the Units being the redemption price (which may or may not approximate the Capital Account balance attributable to the Units redeemed) and that the redemption price shall be treated as being composed of both so-called "Section 736(a) payments" and also so-called "Section 736(b) payments." Having so negotiated, the Partners hereby agree that the fair market value redemption price shall first be treated as a Section 736(b) payment to the extent of the full fair market value of the redeemed Limited Partner's "interest in partnership property" within the meaning of Code Section 736(b) and the Treasury Regulations thereunder, and the remaining portion of the fair market value redemption price is intended to constitute a Section 707(c) "guaranteed payment" which shall be treated as a Section 736(a) payment. The Partners further expressly agree among themselves that no portion of the redemption price is intended to be treated as a payment for goodwill under Section 736(b) of the Code. Finally, the interest accrued and paid on any unpaid portion of the redemption price shall be treated as a Section 707(c) guaranteed payment.

(i)        Section 11.05 shall be amended with deletions indicated by strikethrough text and additions indicated by underlined text as follows:

11.05    <u>Transfer of Interest in Limited Partner</u>. No <u>Entity</u> Limited Partner ~~that is a corporation, partnership or any other form of legal entity~~ may transfer or accept an offer to acquire any of its capital stock, partnership interests or other form of equity investment interests in such <u>Entity</u> Limited Partner without the prior written consent of the General Partner, which consent shall not be unreasonably withheld. ~~Notwithstanding the foregoing, any such Limited Partner may, upon providing written notice to the General Partner, effect any such transfer to (i) a physician, (ii) a professional corporation, partnership or association comprised solely of physicians, or (iii) upon the death of one owning an interest in such Limited Partner.~~

(j)        Section 11.08 shall be amended with deletions indicated by strikethrough text and additions indicated by underlined text as follows:

11.08   <u>Prohibition on Ownership of Units</u>.     In the event of the enactment of any federal, state or local law which would prohibit the ownership of any or all of the Units <u>or Entity Limited Partner's Proportionate Units</u> by any Limited Partner <u>or any Physician Interest Holder of an Entity Limited Partner or Trust Limited Partner</u>, the Partnership shall redeem, or cause a third party to purchase, the Units <u>or Entity Limited Partner's Proportionate Units, as the case may be,</u> that such Limited Partner <u>or Physician Interest Holder</u> is prohibited from owning.     The purchase price per Unit shall be equal to: <u>distributions of Available Cash per Unit for the twelve-month period preceding the date the General Partner delivers notice to the Limited Partner or Physician Interest Holder, multiplied by three (3).</u> ~~(i) 3 times,~~ ~~(ii) the Partnership's net income for the trailing 12 months, multiplied by one percent (1%).~~ The determination as to whether any law would prohibit the ownership of any or all of the Units <u>or Entity Limited Partner's Proportionate Units</u> by any Limited Partner <u>or Physician Interest Holder</u> shall be made based upon the opinion from counsel selected by the General Partner. The closing of the purchase of any Units <u>or Entity Limited Partner's Proportionate Units</u> of a Limited Partner <u>or Physician Interest Holder</u> pursuant to this Section 11.08 shall occur within the thirty (30) day period immediately preceding the date on which such Limited Partner <u>or Physician Interest Holder</u> will be (i) prohibited from owning such Units <u>or Entity Limited Partner's Proportionate Units</u>, or (ii) subject to penalties or sanctions as a result of the ownership of such Units <u>or Entity Limited Partner's Proportionate Units</u>, as specified in the legal opinion required by this Section 11.08.  At the option of the General Partner, such redemption price shall be paid in cash at closing or pursuant to the payment terms described in Section 11.03 herein.

(k)     Section 16.01 shall be amended with deletions indicated by ~~strikethrough~~ text and additions indicated by underlined text as follows:

16.01   <u>Restrictions on Relationships of Limited Partners with Competitors</u>. No Limited Partner <u>or Physician Interest Holder of an Entity Limited Partner or Trust Limited Partner</u> ~~(or any member, shareholder or partner of a professional association, professional corporation, partnership or other entity which is a Limited Partner)~~ shall have any direct or indirect ownership interest in any business or entity competing with the Partnership in the development, management or operation of an outpatient surgical care facility within a ten-mile radius of the Center <u>from the date of the Limited Partner's or Physician Interest Holder's admission to the Partnership until the later of (i) five years after his or its admission as a Limited Partner or Physician Interest Holder or (ii) two years after he or it is no longer a Limited Partner or Physician Interest Holder</u> ~~for a period of three (3) years following the later of (i) the Commencement Date or (ii) the date such person ceases to be a Limited Partner~~; provided, <u>h</u>owever, that no Limited Partner <u>or Physician Interest Holder</u> ~~(or any member, shareholder or partner of a professional association, professional corporation, partnership or other entity which is a Limited Partner)~~ shall be prevented from serving as a member of the medical staff, or holding any position on the medical staff, of any hospital.  This provision shall not (i) restrict any Person from being able to perform outpatient surgery in his office or in any other location he may desire at any time, (ii) require the referral of patients to the Center, or (iii) apply to any relationship of a Limited Partner which existed as of the date of such Limited Partner's subscription if reported in writing to the General Partner prior to or upon delivery of the investor's subscription agreement.  Notwithstanding the foregoing, these restrictions shall not apply to the General Partner in its capacity as a Limited Partner.

2.    <u>Amendment and Ratification</u>.  The Partnership Agreement is hereby amended in accordance with the foregoing provisions of this Amendment.  The Partnership Agreement, as amended as provided herein, is hereby ratified and shall remain in full force and effect.

3.    <u>Defined Terms</u>. Capitalized terms used in this Amendment shall have the same meanings as in the Partnership Agreement unless otherwise defined herein.

IN WITNESS WHEREOF, this Amendment to the Partnership Agreement is effective on the date first above written.

GENERAL PARTNER:

SHC SAN DIEGO, INC.

By: _____

Title: _____


LIMITED PARTNERS as listed on the attached Exhibit A:

By:     SHC San Diego, Inc., as attorney-in-fact for all
        of the Limited Partners,

        By: _____

        Title: _____

746633.5                              8

<u>EXHIBIT B</u>

ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO, L.P.

Limited Partner Certification

The undersigned, a Physician Interest Holder (as defined in the Limited Partnership Agreement) of Arthroscopic & Laser Surgery Center of San Diego, L.P. (the "Partnership"), hereby certifies to the Partnership that during the prior fiscal year:

1.    I    *(please check one)*

    ❑    have derived

    ❑    have <u>not</u> derived

at least one-third (1/3) of my medical practice income from performing outpatient surgical procedures*; and

2.    I    *(please check one)*

    ❑    have performed

    ❑    have <u>not</u> performed

at least one-third (1/3) of my outpatient surgical procedures* at the OASIS/HEALTHSOUTH Surgery Center.

3.    I    *(please check one)*

    ❑    have been excluded

    ❑    have <u>not</u> been excluded

from participation in Medicare, Medicaid or any other Federal health care program.

Executed this ____ day of _____, 20___.

_____

Name (printed or typed)

_____

Signature

\*    "outpatient surgical procedures" means (x) any procedures on the list of Medicare-covered procedures for ambulatory surgery centers and (y) any other surgical procedures actually performed by such Physician Interest Holder on an outpatient basis in a licensed facility.

746633.5

FIRST AMENDMENT TO
LIMITED PARTNERSHIP AGREEMENT
of
ARTHROSCOPIC & LASER SURGERY CENTER OF SAN DIEGO, L.P.

THIS FIRST AMENDMENT (the "Amendment") to the Limited Partnership Agreement, dated January 18, 1996 (the "Agreement"), of Arthroscopic & Laser Surgery Center of San Diego, L.P. (the "Partnership"), is made and entered into effective as of the _____ day of January, 1999.

WITNESSETH

WHEREAS, in accordance with the Agreement, the Partnership desires to amend the Agreement as set forth herein:

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises, obligations and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Agreement is hereby amended as follows:

1.      The definition of "Capital Ratio" in Section 1.01 is hereby deleted from the Agreement in its entirety, and, in lieu thereof, the following new definition of "Capital Ratio" is hereby inserted:

"Capital Ratio" means at any particular time with respect to a Limited Partner, the ratio of such Limited Partner's Units to the total number of General and Limited Partner Units outstanding or available for issuance to Additional Limited Partners. "Capital Ratio" means, at any particular time with respect to the General Partner, a fraction, the numerator of which is the total number of General and Limited Partner Units outstanding or available for issuance to Additional Limited Partners less the number of Units held by Limited Partners, and the denominator of which is the total number of General and Limited Partner Units outstanding or available for issuance to Additional Limited Partners.

2.      The definition of "Maximum Number of Units" in Section 1.01 is hereby deleted from the Agreement in its entirety, and, in lieu thereof, the following new definition of "Maximum Number of Units" is hereby inserted:

"Maximum Number of Units" means 100 Units.

3.      The definition of "Memorandum" in Section 1.01 is hereby deleted from the Agreement in its entirety, and, in lieu thereof, the following new definition of "Memorandum" is hereby inserted:

"Memorandum" means a Confidential Private Placement Memorandum to be used in the offering of Units in the Partnership.

ATL01/10427607v2

4.    The definition of "Offering" in Section 1.01 is hereby deleted from the Agreement in its entirety, and, in lieu thereof, the following new definition of "Offering" is hereby inserted:

"Offering" means the offering of Units on the terms set forth in a Memorandum approved by the General Partner for such purpose.

5.    The definition of "Unit" in Section 1.01 is hereby deleted from the Agreement in its entirety, and, in lieu thereof, the following new definition of "Unit" is hereby inserted:

"Unit" means one of the units of investment in the Partnership acquired by a Partner and includes both General Partner Units and Limited Partner Units.

6.    Section 3.01 is hereby deleted in its entirety and, in lieu thereof, the following Section 3.01 is hereby inserted:

Subject to the prior written consent of the majority in interest of the holders of Limited Partner Units, which consent shall not be unreasonably withheld, the General Partner will have the right to admit such Persons as Additional Limited Partners as it deems advisable. The General Partner or any officer, director or shareholder in the General Partner may acquire Units pursuant to this Section 3.01, and in his or its capacity as such, will have the same rights and be subject to the same obligations as other such Additional Limited Partners; provided, however, that nothing contained in this Section 3.01 shall be deemed to reduce any of the liability of the General Partner as such under this Agreement. The General Partner, in its discretion, shall have the right to dilute its partnership interest in the Partnership in order to admit Persons as Additional Limited Partners, subject to Section 11.09.

7.    Section 3.02(c) is hereby deleted in its entirety and, in lieu thereof, the following Section 3.02(c) is hereby inserted:

Not more than the Maximum Number of Units nor less than one Unit; provided, however, that the number of Units under this Section 3.02(c) shall be equal to the number of Units actually subscribed for and purchased by Additional Limited Partners. Each Additional Limited Partner shall make a capital contribution to the Partnership in cash or other form of consideration acceptable to the General Partner for each Unit subscribed for and purchased by such Additional Limited Partner, in accordance with the terms and conditions of the Memorandum. No more than the Maximum Number of Units shall be sold pursuant to the offering of Units as described in the Memorandum. The name of each Limited Partner and the number of Units held by such Partner shall be set forth on Schedule A hereto. The General Partner is authorized to amend this Agreement without the approval of the Limited Partners solely to reflect any changes in Schedule A.

8.    Section 6.01 is hereby amended by adding the following Subsection (q):

And, to take any action described in Section 11.08 hereof in the event of the enactment of any federal, state, or local law which would prohibit the ownership of any or all of the Units by a Limited Partner.

- 2 -

9.    Section 6.03(f) is hereby amended by adding to the end of Subsection (f) the words "which consent to such admission shall not be unreasonably withheld."

10.    Section 11.03 is hereby amended by deleting from the third sentence the words "such Limited Partner's Capital Ratio as of the date of such Limited Partner's death" and inserting in lieu thereof "one percent (1%)."

11.    Section 11.08 is hereby added to the Agreement as follows:

11.08 Prohibition on Ownership of Units. In the event of the enactment of any federal, state or local law which would prohibit the ownership of any or all of the Units by any Limited Partner, the Partnership shall redeem, or cause a third party to purchase, the Units that such Limited Partner is prohibited from owning. The purchase price per Unit shall be equal to: (i) 3 times, (ii) the Partnership's net income for the trailing 12 months, multiplied by one percent (1%). The determination as to whether any law would prohibit the ownership of any or all of the Units by any Limited Partner shall be made based upon the opinion from counsel selected by the General Partner. The closing of the purchase of any Units of a Limited Partner pursuant to this Section 11.08 shall occur within the thirty (30) day period immediately preceding the date on which such Limited Partner will be (i) prohibited from owning such Units, or (ii) subject to penalties or sanctions as a result of the ownership of such Units, as specified in the legal opinion required by this Section 11.08. At the option of the General Partner, such redemption price shall be paid in cash at closing or pursuant to the payment terms described in Section 11.03 herein.

12.    Section 11.09 is hereby added to the Agreement as follows:

11.09 Redemption of Limited Partnership Units from General Partner. The General Partner, in its sole discretion, shall have the authority to cause the Partnership to redeem any portion of its general partnership interest in connection with the offering of Additional Limited Partner Units pursuant to Section 3.01; provided, however, that the General Partner does not reduce its interest in the Partnership to less than fifty-one percent (51%).

13.    Capitalized terms used in this Amendment shall have the meaning ascribed to them in the Agreement, unless otherwise defined.

14.    The Limited Partners acknowledge that they have read and understood this Amendment and the Memorandum explaining this Amendment from SHC San Diego, Inc. to the Limited Partners dated January 25, 1999. The Limited Partners further acknowledge they have had an opportunity to ask questions of and to receive answers from the officers of the General Partner regarding this Amendment.

15.    This Amendment can be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts will together constitute one and the same agreement.

ATL01/10427607v1

16.　　Except as set forth herein, the Agreement shall remain and continue in full force and effect and shall for all purposes be and constitute the Limited Partnership Agreement of Arthroscopic & Laser Surgery Center of San Diego, L.P.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as the day and year first above written.

GENERAL PARTNER:
SHC SAN DIEGO, INC.

By: _____
Name: _____
Title: _____

LIMITED PARTNERS:

_____
Gary Losse, M.D.

_____
Paul Murphy, M.D.

_____
Byron King, M.D.

_____
David Chao, M.D.

- 4 -

ATL01/10427607v2